OFFICE COPY

Nels T. Lippert
WILMER CUTLER PICKERING
    HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
(212) 230-8800

Thomas P. Olson
Katherine A. Oyama*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

Mark D. Selwyn*
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1117 California Avenue
Palo Alto, California 94304
(650) 858-6000

Attorneys for Plaintiff CoStar Group, Inc.



FEB 05 2008
U.S.D.C. S.D. N.Y.
CASHIERS

JUDGE DANIELS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| COSTAR GROUP, INC., ) | **08 CV 1156** |
| Plaintiff, ) | Civil Action No. 08-_____ |
| v. ) | |
| LOOPNET, INC., ) | **JURY TRIAL DEMANDED** |
| Defendant. ) | |

**COMPLAINT**

Plaintiff CoStar Group, Inc. ("CoStar"), by its attorneys Wilmer Cutler Pickering Hale

and Dorr LLP, for its complaint against defendant LoopNet, Inc. ("LoopNet"), alleges as

follows:

---

\*        Not admitted to the Bar of this Court.

### Introduction

1.    This is an action for false advertising under Section 43(a) of the Lanham Act.

2.    LoopNet operates an online real estate information business.  Knowing that it can attract more customers if it is perceived to be widely used, LoopNet has engaged in a systematic – and successful – campaign to communicate the false impression that it has a vast, and constantly growing, number of users.

3.    These claims are false.  In fact, as LoopNet itself has unintentionally (and indirectly) disclosed, the number of people who actually use its site is only a fraction of the number that LoopNet claims.  And as to LoopNet's supposed growth, on information and belief, the number of people who actually use LoopNet has declined over the past year and is continuing to decline even today.

4.    At the heart of LoopNet's misleading campaign are its claims about its "members," a term that LoopNet misleadingly equates with *active users*.  On its website, for example, LoopNet boasts that it has "*more than 2.5 million registered members*" and claims that these members constitute LoopNet's "*user base*" and an "*online community.*"  Similarly, in a November 28, 2007 press release announcing that it had "surpassed 2.5 million registered members," LoopNet assured potential customers that its members "*use the company's suite of information services*" for a wide variety of purposes.  Similarly, LoopNet's CEO, Richard Boyle, has publicly referred to LoopNet's registered members as its "**registered *user* base**" and publicly described them as "the *massive users* on LoopNet."  (Emphasis added here and throughout.)

5.    LoopNet correctly views its (false) claims about its "members" as important to its customers and potential customers seeking to market commercial real estate.  For example, in a

brochure called "Premium Membership for Professionals," LoopNet seeks to attract customers to pay for listings on LoopNet by promising them that paid listings are *"immediately exposed to more than 2.4 million LoopNet members."* Similarly, in the "Success Stories" portion of its website, LoopNet describes a broker whose listing (in 2006) supposedly achieved *"instant national exposure to 1.4 million members"* through LoopNet.

6.    Similarly, on a portion of its website headlined "Advertise with LoopNet," defendant explicitly claims that ads on LoopNet are *"seen by"* 2.5 million people:

## Advertise with LoopNet

### Property Advertising with LoopNet

Advertising on LoopNet.com can triple the number of times your property is viewed. Choose from additional exposure on our web page or go beyond our website and advertise in LoopNews, our weekly E-Newsletter sent to more than 800,000 subscribers.

LoopNet, Inc. is the leading commercial real estate web site and the largest listing service online. In addition to listing your property on our site, you can also customize your own marketing campaign for your properties.

When you advertise on LoopNet, your property is seen by:

| | |
|---|---|
| Registered Members: | 2.5 million |
| Unique Visitors: | 915,000 per month |
| Market Coverage: | All US & Canada |
| User Sessions: | 12 million per month |

7.    In a brochure entitled "LoopNet Product Summary" (apparently issued at a time when LoopNet claimed 2.2 million registered members), LoopNet describes its membership as "the largest *audience of 2.2 million active commercial real estate professionals.*"

8.    LoopNet is well aware of the importance the marketplace attaches to LoopNet's grossly exaggerated claims about the size – and the supposed ceaseless growth – of its "membership." LoopNet's strategy is to convince the marketplace that it has a vast user population – what LoopNet's CEO Richard Boyle refers to as "critical mass" – because people

- 3 -

who believe that LoopNet is widely used are more likely to use LoopNet themselves. Reflecting this strategy, LoopNet's CEO, Richard Boyle used the expression "*critical mass*" three times in explaining the company's strategy during a November 2006 conference call: "the *critical mass* we have built"; "we have been able to build a *critical mass* of searching activity very quickly and substantially larger than any other player"; "[t]hat *critical mass* then becomes itself a source of significant competitive differentiation." In the same vein, LoopNet's Chief Marketing Officer, Thomas Byrne, was quoted in a February 3, 2008 article in the *New York Times* as referring to LoopNet as "the eBay of commercial real estate."

9.      LoopNet also works hard – and successfully – to convey the impression that the number of people who use its site is constantly *growing*. Having repeatedly told the marketplace that "registered members" means "users," each of LoopNet's many statements about growth in registered members is a claim that LoopNet has a growing number of *users*. At a conference in November 2006, LoopNet CEO Richard Boyle made this claim explicit in presenting a slide showing growth in registered *users* (then at almost 1.6 million). Mr. Boyle said the slide showed "how many people are the registered *users* who have come on and *become transaction participants* on the LoopNet marketplace." A year later, in November 2007, in a presentation posted on LoopNet's website, Mr. Boyle asserted that LoopNet had "about 2.4 million *users*" at the end of the third quarter of 2007, "which is 50% year to year growth."

10.      LoopNet's claims are false and misleading, and are harmful to CoStar in its competition with LoopNet. A "member" of LoopNet is not a unique person, much less a unique person who actively uses the LoopNet site. Rather, a LoopNet "member" is just an email address. That is because LoopNet records an additional "member" whenever its

computers reflect the submission of a valid email address and a password. LoopNet uses the term "member" in this way so it can claim a large, and always-growing number of "members," even though LoopNet knows that the number of such "members" it has collected over the years is meaningless and does not support LoopNet's assurances to the marketplace about how many *users* it has.

11.   LoopNet has been accumulating such "registered members" (*i.e.*, email addresses) for more than a decade – since 1995. Thus, on information and belief, LoopNet's claimed 2.5 million "members" include large numbers of:

- email addresses of people who signed up for LoopNet (at any time from 1995 to the present) but did not view a single property at the time

- email addresses of people who clicked on a link to LoopNet from another site (at any time from 1995 to the present), created a user name and password out of curiosity, but decided after a single visit that the LoopNet site was of no interest to them

- email addresses of potential LoopNet investors or business analysts who simply wanted to learn about LoopNet's products, and had no interest in buying, selling, leasing, or marketing commercial real estate properties

- email addresses of people who registered under invented names, since LoopNet has no way of knowing whether the "names" submitted by basic members are real

- email addresses of "bots" or other nonhuman "visitors"

- duplicative "memberships" for a single individual using different email addresses (such as janedoe12345@yahoo.com, janedoenyc@hotmail.com, janewdoe@aol.com, janedoerealestate@gmail.com, and jane.doe@company.com), and

- email addresses of individuals who once signed up for LoopNet but are now retired, are no longer in the commercial real estate business, have long since sold the only property they hoped to market, or are deceased

12.   Not only are LoopNet's claims about the absolute *number* of users of the LoopNet service false, its claims about *growth* in the number of users are, on information and belief, also false. In April 2007, for example, LoopNet assured the market that it had 2 million members; by November 2007, LoopNet boasted that it had increased its total membership to 2.5 million.

But while LoopNet successfully communicated the impression that its user numbers were rapidly *growing*, on information and belief, the number of unique individuals actually signing into LoopNet as members was actually *declining*.

13.    LoopNet's misinformation campaign is intended to deceive the relevant public, and it has succeeded.  For example, one target of LoopNet's promotional claims, a regional real estate alliance, repeated LoopNet's statement (at a time when LoopNet claimed 1.5 million members) that paid listings are *"immediately expos[ed] to more than 1.5 million LoopNet members."*  Similarly, the real estate website RetailTraffic stated in an October 1, 2007, report that "LoopNet reports having *more than 2.2 million registered users."*  As quoted by LoopNet on its own website, the California Real Estate Journal reported on April 9, 2007, that "LoopNet has *1.77 million* **registered users.**"  In the *Guide to Real Estate and Construction for Small Business*, the author recommends "[signing] up for the free basic service at LoopNet, the commercial real estate listing service . . . *that 2.2 million members use* to find the perfect real estate and construction listings for small businesses."  The Virtual Earth website, in a posting entitled "Solution Highlight:  LoopNet," stated on April 27, 2006 that "LoopNet's solution powers over 1000 websites *used by over 1.2 million members.*"  And the website of a real estate broker assures customers that because the broker uses LoopNet, his customers' properties are "*Marketed locally and nationally to over 2.5 Million registered members.*"

14.    LoopNet has openly admitted that it has overstated its size in the past:  based on 2007 interviews with LoopNet CEO Richard Boyle and with a LoopNet investor, the online journal Startup Review reported that in its early years, LoopNet relied on *"the art of exaggeration" to "convince[] prospects it was larger than it actually was."*  As the facts above show, LoopNet continues to follow the same strategy today.

15.    LoopNet's false claims have misled not only the real estate industry but also securities analysts. For example, SunTrust Robinson Humphrey analysts Andrew W. Jeffrey and Jack D. Ancich reasonably accepted at face value the repeated, specific assurances made by LoopNet, a publicly traded company regulated by the SEC. As a result, Mr. Jeffrey and Mr. Ancich were deceived by LoopNet's false claims about its total membership, as reflected in a June 2007 report in which the analysts wrote:

> "*[W]e encourage investors to note that LoopNet currently has two million registered members.* Of these, all but 84,500 are currently non-paying members. The company estimates that roughly 40% of its non-paying members are agents. *By this measure, the company already has relationships with about 768,000 agents.* This exceeds our estimate of the entire commercial real estate agent market! From this, we infer that LoopNet's appeal extends beyond traditionally defined commercial real estate agents."

16.    Similarly, Jake Fuller and Timothy Forrester, two securities analysts at Thomas Weisel Partners, commenting on LoopNet's November 28, 2007 press release, understood LoopNet's claim about "2.5 million members" to mean that LoopNet has 2.5 million "users": "LOOP also announced today (November 28) that it hit *2.5 [million] registered users* (includes free *users* and paid subs)."

17.    The influential online investing site, The Motley Fool, has been repeatedly misled by LoopNet's false claims.

18.    On December 31, 2007, for example, The Motley Fool, in an article written by Katrina Chan, stated (in recommending LoopNet as an investment) that a crucial feature of LoopNet is that it has "**a website *frequented by* more than 2.5 million members.**" The

Motley Fool's description of LoopNet as being "frequented" by 2.5 million people reflects the success of LoopNet's misinformation campaign.

19.    Similarly, in an October 2007 piece, Rick Aristotle Munarriz, a Motley Fool analyst, accepted LoopNet's (false) claims and described LoopNet as having "2.4 million registered *users*." A few months earlier, Mr. Munarriz (writing on July 26, 2007) was again deceived by LoopNet's claim that its registered members actually *use* the site: "Most of LoopNet's *2.2 million registered users* hold free accounts."

20.    Similarly, in an October 2006 article, Mr. Munarriz of The Motley Fool was again taken in by LoopNet's claim that its registered members represent *people* who are *actually exposed* to the LoopNet site, writing: "The LoopNet concept is clicking within the commercial real estate sector. *Over the past year, the company has seen its registered member base grow 58% higher, to 1.6 million.* Only slightly more than 76,000 of those members pay for premium access and exposure, but even so, *there's no such thing as a bad set of eyeballs in cyberspace.*" Much the same happened in June 2006, when The Motley Fool's Tom Taulli wrote that "[t]he LoopNet marketplace has *1.2 million registered users.*"

21.    *Forbes* magazine also has been deceived by LoopNet's false claims: in a June 2, 2006 article written by Scott Reeves, *Forbes* reported that LoopNet had "*1.2 million registered users.*" The website TheStreet.com was likewise misled by LoopNet's false claims: in a July 17, 2007 video, commentator Lindsay Campbell told viewers that LoopNet has "*2 million registered users.*" And the July 2007 issue of the Urban Land Institute newsletter reported that LoopNet "has gradually built a base of *2 million registered users*, up 59% from a year ago." Bloggers have likewise been misled: the PaperClipCMS site stated in June 2007 that LoopNet has "*2 million registered site users.*" And a participant on the blog run by TheStreet.com

stated in April 2007, that "[LoopNet] stock recently spiked after news that it hit *2 million members online*."

22.    Similarly, Andrew Jeffrey and Richard Cheever, securities analysts at SunTrust Robinson Humphrey, wrote in November 2007 that "the value of the [LoopNet] network reflects total registered users more than paying subscribers.  In other words*, the value of LoopNet to a paying member is his access to 2.5+ million total potential customers*."

23.    To CoStar's knowledge, LoopNet has made no effort to correct the false impressions that it has carefully cultivated through its many public statements and presentations.

24.    That LoopNet knows its claims about its supposed 2.5 million users are false is shown by the fine print in the prospectus it filed with the Securities & Exchange Commission when it went public.  In its June 2006 Prospectus, LoopNet disclosed how it defines the term "registered member":  "Registration requires that a user create a user record, which includes basic contact information such as *name and a working email address*, and also requires that a user accepts our Terms of Service."  In other words, "membership" has nothing to do with whether a human being actually visits (or uses) the LoopNet website, views listings, is exposed to ads, or is even still alive.  Rather, LoopNet records (and continues to claim thereafter) an additional "member" whenever its computers reflect the submission of a valid email address and a password.

25.    As a further indication of LoopNet's knowledge that its claims concerning its "user base" are false and misleading, on information and belief, LoopNet uses website tracking technology to maintain accurate information  – which LoopNet does not (except inadvertently) disclose to the marketplace – about how many people actually *use* the LoopNet service on a

—

regular basis. For example, on information and belief, LoopNet has internal data showing how many unique individuals sign in to the password-protected areas of its website each month. In effect, on information and belief, LoopNet maintains two sets of books about its user metrics.

26.    Although LoopNet has worked hard to communicate its claim about a vast user community to the marketplace, it has several times indirectly admitted – perhaps unwittingly – that the claim is wildly exaggerated.

27.    *First*, in its "Basic Membership Reference Guide," LoopNet states that listings by non-paying (or "Basic") members "are accessible to *almost 10% of LoopNet's audience*." The "10% of LoopNet's audience" to which LoopNet refers are LoopNet's paying ("Premium") members, who are the only ones allowed to see listings by non-paying ("Basic") subscribers. As of November 2007, LoopNet claimed to have approximately 90,000 Premium members. LoopNet's statement in its Basic Membership Reference Guide, therefore, means that its total "audience" is ten times the size of its Premium member group (*i.e.*, 10 times 90,000), or 900,000, rather than the 2.5 million it has repeatedly told the marketplace. By its own inadvertent admission, LoopNet's "2.5 million member" claim is thus overstated *by at least 170%.*

28.    LoopNet has separately – and again inadvertently – revealed how few people actually use its website. On the "Self-Service Support" feature that LoopNet makes available to the public, for example, LoopNet states that "Premium Listings get up to four times more exposure than LoopNet basic listings." The implications of this statement are as follows: the exposure of "LoopNet basic listings" is about 90,000 (the number of LoopNet Premium members, who are the only ones allowed to see Basic Listings). The total exposure of LoopNet's paid ("Premium") Listings is therefore no more than 360,000 ("up to four times"

90,000). By LoopNet's own (unintentional) admission, *premium ads on LoopNet are "exposed" not to 2.5 million people but to only 360,000, an overstatement of more than 590%.*

29.    In another context, LoopNet has – again apparently by accident – disclosed facts that, once analyzed, are revealing about the actual size of LoopNet's audience. In a November 14, 2007 press release, LoopNet stated that a new type of listings, called LoopNet Showcase Property Listings, "deliver up to triple the exposure of Premium Listings and 10 times the exposure of Basic Listings." The implications of these statistics are as follows: the "exposure of Basic Listings" is about 90,000 (the number of LoopNet Premium members, who are the only ones allowed to see Basic Listings). According to LoopNet, therefore, its "Showcase Property Listings" are "exposed" to 900,000 individuals ("ten times the exposure of Basic Listings"). This 900,000 figure, according to the LoopNet press release, is "triple the exposure of LoopNet's Premium Listings," which are available to all LoopNet members. The total "exposure of LoopNet's Premium Listings," therefore, is 1/3 of 900,000, or 300,000. Accordingly, by LoopNet's own inadvertent admission, premium ads on LoopNet *are "exposed" not to 2.5 million people but to only 300,000, an overstatement of 830%.*

30.    All of these calculations are based on the assumption that 100% of LoopNet's paying members in fact use LoopNet. In fact, on information and belief, a substantial number of paying members do not – such as individuals whose companies purchase a subscription for them that they do not use. If this reality is taken into account, the fair calculations of LoopNet's actual users above would reveal even greater overstatement by LoopNet.

31.    LoopNet conducted an initial public offering of its stock in June 2006. Since then, in an effort to attract more customers and to boost the trading prices for the company's

- 11 -

stock, LoopNet has issued repeated press releases calling the market's attention to supposed increases in LoopNet "members." LoopNet has issued such press releases on at least the following dates: August 22, 2006 (1.5 million members), April 26, 2007 (2 million members) and November 28, 2007 (2.5 million members).

32.    LoopNet's executives are fully aware that, through those press releases and similar statements, the company has communicated to the marketplace a false picture of the number and nature of the users of the company's website. LoopNet's communication of false and misleading information to the marketplace has thus been deliberate and intentional.

33.    During the time that LoopNet has engaged in this deliberate campaign to deceive the marketplace, its top executives have sold large amounts of their company stock. Since the IPO in 2006, for example, LoopNet CEO Richard Boyle has disposed of more than $6.4 million of his LoopNet stock, or over 27% of his total shares. Mr. Boyle has done so through over 1,100 different transactions.

34.    During the same period, LoopNet's CFO, Brent Stumme, disposed of more than $5 million of LoopNet stock, or more than 41% of his LoopNet shares. Mr. Stumme has done so through over 800 different transactions.

35.    Similarly, LoopNet's Chief Marketing Officer, Thomas Byrne, who is quoted in press releases boasting (falsely) about LoopNet's vast "membership," disposed of over $7.2 million of LoopNet stock since the IPO, or almost 60% of his total shares. Mr. Byrne has done so through more than 900 different transactions.

36.    LoopNet Chief Technology Officer, Wayne Warthen, disposed of more than $2.7 million of LoopNet stock since the IPO, or more than 15% of his total shares. Mr. Warthen has made these sales in over 500 different transactions.

37.    LoopNet Chief Product Officer, Jason Greenman, has disposed of almost $2 million of LoopNet stock since the IPO, or over 17% of his total shares.  Mr. Greenman has done so through nearly 500 different transactions.

38.    On information and belief, the intentional nature of LoopNet's violations of the Lanham Act is shown by the fact that LoopNet executives have sought to dispose of their holdings of company stock before the marketplace becomes aware of the truth about the size of LoopNet's user base.

39.    In its competition with LoopNet for customers, CoStar has been injured by LoopNet's successful efforts to mislead the marketplace.

40.    By this lawsuit, CoStar seeks to have the Court (i) enjoin LoopNet from continuing to make false and misleading claims about the size of its membership, (ii) order LoopNet to disseminate corrective advertising, and (iii) order LoopNet to pay CoStar damages and/or profits (including treble damages) relating to LoopNet's false and misleading advertising.

## The Parties, Jurisdiction and Venue

41.    CoStar is a Delaware corporation with its principal place of business and corporate offices at 2 Bethesda Metro Center, Bethesda, MD 20814-5388.  CoStar is licensed by the New York Department of State to conduct business in this State and operates an office in this District.

42.    LoopNet is a Delaware corporation with its principal place of business at 185 Berry Street, San Francisco, California.  On information and belief, LoopNet is licensed with the New York Department of State to conduct business in this State.  On information and belief,

LoopNet also operates a wholly-owned subsidiary, CityFeet.com, from a headquarters located in this District.

43.    This action is based on Section 43 of the Lanham Act, 15 U.S.C. § 1125. This Court has jurisdiction over the subject matter of the action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331.

44.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## Background

45.    CoStar is a provider of information services to commercial real estate professionals in the United States.

46.    LoopNet competes with CoStar in offering information and marketing services relating to commercial real estate.

47.    LoopNet offers its users two levels of membership to its service. A "Basic" membership costs nothing, but allows only limited functionality, including access to listings by paying ("Premium") members. Paying members, by contrast, have access to all ads placed on LoopNet, including ads placed by non-paying ("Basic") members.

## LoopNet's False and Misleading Advertising and Promotion

48.    To induce potential customers to (i) sign up for LoopNet, (ii) list properties for sale or lease on LoopNet, (iii) pay LoopNet money for a Premium Membership, and (iv) engage in other activities beneficial to it, LoopNet actively advertises and promotes that it has large and growing numbers of members who use the LoopNet service and constitute an online community. These false claims are made in commercial advertising and promotion and are harmful to CoStar as a competitor of LoopNet.

**LoopNet's Claims**

49.    LoopNet has made many different false claims about its characteristics and services, including those set forth above.  By way of illustration, those claims include the following:

50.    On its website, LoopNet states:  *"[w]ith more than 2.5 million registered members, LoopNet's user base represents the largest online community of commercial real estate professionals,* including brokers, corporate executives, service providers and more than 1.1 million principals."

51.    In a brochure called "Premium Membership for Professionals," LoopNet states that paid listings on LoopNet are *"immediately exposed to more than 2.4 million LoopNet members*."

52.    On November 28, 2007, LoopNet issued a press release that states:  "*Members of LoopNet use the company's suite of information services* to search for property sale and lease opportunities, expose their available properties widely, research property values and transaction history, identify buyers and tenants, and analyze property data trends."

53.     LoopNet also claims on its website that, "[w]ith *more than 2.4 million members, LoopNet attracts the largest community of commercial real estate professionals*."

54.    In its November 28, 2007 press release, LoopNet claimed that its online marketplace had "surpassed *2.5 million registered members*" and that, "[a]s of November 25, 2007, LoopNet had 2,511,813 registered members, more than any other commercial real estate service."

55.    On its website, LoopNet claims that "[w]hen you advertise on LoopNet, *your property is seen by*" 2.5 million registered members.

56.    Also on its website, LoopNet invites customers to use its LoopLink product as follows: *"Promote your company to over 2.5 million registered members* with your logo and web site link on every listing profile."

57.    LoopNet considers its registered member statistic, and the (supposed) growth in that statistic, to be a critical indicator of its health as a business, and has made representations concerning the importance of that statistic in many public filings.  In its annual and quarterly reports, for example, LoopNet has repeatedly told the Securities and Exchange Commission that its number of registered members is one of the five "key metrics" that are "material to an analysis of our business."

58.    Similarly, in an August 22, 2006 press release, Thomas Byrne, LoopNet's Chief Marketing Officer, asserted that "[n]o other commercial real estate service delivers the reach and exposure of the LoopNet marketplace," referring to LoopNet's supposedly large audience of users.

59.    In the same press release, LoopNet stated that its "entire organization is *focused on delivering exceptional service and results to our 1.5 million registered commercial real estate members.*"

60.    Also in the August 22, 2006 press release, Mr. Byrne claimed "that more than 1.5 million commercial real estate professionals *are* 'In the Loop' with LoopNet" and that LoopNet was "very excited about the potential to deliver value to such a diverse *user* base."

61.    The marketplace relies on, and places great importance on, LoopNet's claim to have a large and growing number of members.  In an announcement dated January 16, 2008, for example, Zacks.com urged investors to purchase LoopNet stock, stating:  "Despite a terrible real estate market, *LoopNet continues to do well.  The company recently said it surpassed 2.5*

*million registered members.*" Similarly, in an article discussing online real estate databases in the *New York Times* on February 3, 2008, the first statistic quoted about LoopNet is its claim to have "*more than 2.5 million registered members.*"

62.    LoopNet uses the same "key metric" to make grossly misleading comparisons to CoStar in an attempt to persuade customers to do business with LoopNet instead of CoStar. In a Michigan Business Review article dated June 14, 2007, for example, LoopNet Chief Marketing Officer Thomas Byrne is quoted as follows: "LoopNet counts two million members, he said, whereas the next-closest national commercial platform [*i.e.*, CoStar] tallies only 50,000 to 60,000."

63.    On its website, LoopNet asserts that "Premium Member Listings appear in the first section of Search Results and can be viewed by **ALL 2.5 million LoopNet members**, whereas Basic Listings are available to fewer than 10% of LoopNet members."

64.    In a 2006 issue of the RCA Report, a commercial real estate journal published by the National Association of Realtors, LoopNet sponsored a prominent advertisement, claiming that it had "*over 1.2 million members viewing* 100 million property listings each month."

65.    In marketing literature co-branded with Microsoft, LoopNet claimed that it "has *more than 1.2 million registered members. . . . For LoopNet members, the company's products and services provide value* by allowing them to list, search, market, and finance commercial real estate properties over the Internet, reducing their marketing costs, expanding their reach, and accelerating the pace of transactions."

66.    On August 2, 2007, LoopNet CEO Richard Boyle, in responding to a question from a Morgan Stanley securities analyst (Jennifer Pinnick) about LoopNet's growth trajectory

after acquiring a company called CityFeet, said that LoopNet would "marry[] [CityFeet's] distribution network . . . with the *massive users* on LoopNet."

67.    During an October 24, 2007 conference call, Mr. Boyle described LoopNet's registered members as LoopNet's "**registered *user* base**."

68.    On November 9, 2006, LoopNet's CEO, Mr. Boyle was interviewed by John Duncan, Pacific Growth Equities' Internet Infrastructure & Services Analyst.  Mr. Boyle repeatedly referred to LoopNet's registered members as "users" of its service and "transaction participants" on the LoopNet marketplace.  He stated that the first of "three key metrics that we look at in terms of measuring against our primary goal of bringing the marketplace online . . . is *registered users*," which Mr. Boyle defined as "*how many people are the registered users who have come on and become transaction participants on the LoopNet marketplace*, as I said, ending Q3 just under *1.6 million*."  One of LoopNet's "[p]rimary areas of investment," according to Mr. Boyle, was "to drive further growth in the registered *user* base, so bringing more participants online . . . . "

69.    In a December 2007 email urging customers to pay $1,139 for an annual premium subscription to LoopNet, defendant's first bullet point described LoopNet's 2.5 million "members" as its "*audience of potential prospects* for your listings."  And in November 2007, Mr. Boyle claimed that LoopNet had "about 2.4 million registered *users*" as of September 2007, which he described as reflecting "50% year to year *growth*."

**LoopNet's Own Statements Demonstrate The Falsity of Its Claims**

70.    As discussed above, despite its claims to have 2.5 million members that use the
LoopNet service and constitute an online community, LoopNet has unwittingly revealed the
falsity of these claims.  These inadvertent disclosures, however, require the reader to carefully
parse LoopNet's statements to extract the truth.

71.    As discussed in detail above, for example, the disclosures in LoopNet's Basic
Membership Reference Guide reveal that the audience for paid listings by LoopNet members is
1.6 million smaller than LoopNet's public claim of 2.5 million members.

72.    Similarly, the "Self-Service Support" feature that LoopNet makes available to the
public reveals, apparently inadvertently, that premium ads on LoopNet are "exposed" not to 2.5
million people but to only 360,000.

73.    Finally, and also as discussed above, the data reported by LoopNet in its
November 14, 2007 press release show that paid listings on LoopNet are exposed to no more
than 300,000 people, not 2.5 million

74.    LoopNet's claims to have vast numbers of users (currently 2.5 million) are also
shown to be false by other key metrics that LoopNet uses (and reports publicly) to track its
customers' usage of its service.

75.    If LoopNet's claims about its vast number of *users* were true, they would be
reflected in corresponding increases in *unique visitors* to its website.  But in fact, LoopNet's
own reports about unique visitors show the falsity of its claims about growth in users.

76.    LoopNet has told the public that its users grew by 720% (from 305,000 to 2.5
million) between April 2002 and December 2007; however, by its own account, LoopNet's
unique visitors grew by far less (from 341,000 to 915,000, or 168%) over that same period.  In

other words, *LoopNet's claimed growth in users is over four times larger than its growth in unique monthly visitors*.  The following chart tells the story:



77.    LoopNet's own figures thus demonstrate that the company is massively misrepresenting and overstating its number of actual users.

### LoopNet's Statements Are Central to Its Marketing Campaign

78.    LoopNet's claims about how many "members" it has are central to its marketing campaign and have been widely disseminated to the relevant consumers.

79.    LoopNet's claims appear prominently on its website and in its press releases, email newsletters, and marketing materials.  Indeed, LoopNet's claim regarding its number of members (currently 2.5 million) is so central that LoopNet features it *on the top of every page containing an individual property listing* on its website.

80.    LoopNet's claims have regularly appeared in commercial real estate trade journals and periodicals, such as the RCA Report and the National Real Estate Investor, and on the websites of organizations in the commercial real estate industry, such as the National Association of Industrial & Office Properties.

### The Harm to CoStar and to the Public

81.    The marketplace understands LoopNet's representations about its members to mean that LoopNet has 2.5 million active users. This figure is critically important to the marketplace. LoopNet has worked hard, and with success, to convince consumers in the commercial real estate industry that providing property listings to LoopNet results in those listings being "seen" or otherwise "exposed' to over 2 million unique persons. The result of this false impression is that consumers are likely to be more willing to provide such property listings to LoopNet, to sign up as a registered member of LoopNet, and to subscribe to LoopNet's premium or other pay services, rather than to do business with CoStar.

82.    LoopNet's false and misleading statements are perceived as so credible that they have even misled securities analysts into misgauging the value and growth of LoopNet as a business. For example, in a July 18, 2006 report on the company, Heath Terry and Andrew Thomas of Credit Suisse stated that the expansion of LoopNet's "base of registered members" was one of the *"five major opportunities"* for growth.

83.    As discussed above, LoopNet's false claims have deceived both the real estate industry and the securities industry and have harmed CoStar in its competition with LoopNet.

## COUNT I (VIOLATION OF LANHAM ACT)

84.    CoStar repeats and realleges the allegations contained in paragraphs 1 through 83 above.

85.    In connection with its services, which are offered in interstate commerce, LoopNet has made false or misleading descriptions or representations of fact.  These false or misleading statements misrepresent the nature, characteristics, or qualities of LoopNet's services or commercial activities.  LoopNet's statements are expressly false, impliedly false, or both.

86.    LoopNet's false or misleading statements have deceived, or have the tendency to deceive, a substantial portion of the intended audience, about matters that are material to purchasing decisions.

87.    LoopNet's misrepresentations about the number of its members are made in commercial advertising and promotion in interstate commerce and violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

88.    CoStar is likely to suffer, has suffered, and will continue to suffer damage as a result of LoopNet's wrongful acts.

Wherefore, CoStar respectfully requests that the Court:

(i)    issue a permanent injunction ordering that LoopNet, its agents, servants, employees, representatives, subsidiaries and affiliates refrain from directly or indirectly using in commerce or causing to be published or otherwise disseminated any advertising or promotional materials or activities containing any of the false and misleading claims described in the Complaint;

(ii)    issue a permanent injunction ordering that LoopNet, its agents, servants, employees, representatives, subsidiaries and affiliates refrain from directly or indirectly using in commerce any claim, statement, or representation that states or implies that the number of members of LoopNet is greater than the number of members that actively use the LoopNet service;

(iii)    issue a permanent injunction ordering LoopNet to issue appropriate corrective advertisements and promotional materials, reasonably designed to reach all people to whom its false and misleading advertising and promotional materials were disseminated, retracting the false and misleading claims contained in the advertising and promotional materials;

(iv)    award the maximum dollar amount permitted by the Lanham Act, including damages and/or profits (trebled as provided by law);

(v)    award CoStar its attorney's fees, costs, and disbursements; and

(vi)    grant such other and further relief as the Court deems just and appropriate.

CoStar demands a trial by jury.

Respectfully submitted,

Nels T. Lippert
WILMER CUTLER PICKERING HALE AND DORR LLP
Attorneys for Plaintiff CoStar Group, Inc.
399 Park Avenue
New York, NY 10022
(212) 230-8800
nels.lippert@wilmerhale.com

Thomas P. Olson
Katherine A. Oyama*
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363
thomas.olson@wilmerhale.com
katherine.oyama@wilmerhale.com


Mark D. Selwyn*
WILMER CUTLER PICKERING HALE AND DORR LLP
1117 California Avenue
Palo Alto, California 94304
Telephone: (650) 858-6031
Facsimile:  (650) 858-6100
mark.selwyn@wilmerhale.com

Counsel for Plaintiff CoStar Group, Inc.

DATED:  February 5, 2008

---

\*    Not admitted to the Bar of this Court.