**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
)
COSTAR GROUP, INC.,                   )
                                      )
                Plaintiff,            )          Civil Action No. 08- CV 1156
                                      )
        v.                            )
                                      )
LOOPNET, INC.,                        )
                                      )
                Defendant.            )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A**
**PRELIMINARY INJUNCTION**

PATTERSON BELKNAP WEBB & TYLER LLP
    Steven A. Zalesin (SZ 0901)
    Karla G. Sanchez (KS 7247)
    Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Facsimile:  (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
    Patrick J. Carome (admitted _pro hac vice_)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

_Attorneys for Plaintiff CoStar Group, Inc._

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................3

ARGUMENT ...................................................................................................................10

I.     CoStar Is Likely To Succeed on the Merits......................................................10

     A.     The "950,000 Unique Visitors Each Month" Claim Is Facially False ...................12

     B.     The "2.75 Million Registered Members" Claim Is Facially False..........................13

     C.     The "18 Million" Claims Are Facially False ........................................................17

     D.     The "Largest Database of Commercial Listings" Claim Is Facially False .............18

II.    CoStar Will Suffer Irreparable Injury Absent Preliminary Relief.......................19

CONCLUSION................................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*American Home Prods. Corp. v. Johnson & Johnson,*
     654 F. Supp. 568 (S.D.N.Y. 1987) ............................................................21

*Avis Rent A Car System, Inc. v. Hertz Corp.,*
     782 F.2d 381 (2d Cir. 1986).....................................................................16

*Castrol, Inc. v. Quaker State Corp.,*
     977 F.2d 57 (2d Cir. 1992)........................................................................19

*Coca-Cola Co. v. Tropicana Prods.,*
     690 F.2d 312 (2d Cir. 1982) ...............................................................11, 19

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,*
     No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982)............................15

*Johnson & Johnson v. GAC Int'l, Inc.,*
     862 F.2d 975 (2d Cir. 1988) ....................................................................11

*Johnson & Johnson*Merck Consumer Pharmaceuticals Co. v. Smithkline*
     *Beecham Corp.,*
     960 F.2d 294 (2d Cir. 1992)......................................................................17

*Johnson & Johnson-Merck Consumer Pharms. Co. v.  P&G,*
     285 F. Supp. 2d 389 (S.D.N.Y.), *aff'd* 90 F. App'x 8, 9 (2d Cir. 2003)....................21

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,*
     348 F. Supp. 2d 165 (S.D.N.Y. 2004)...........................................................11

*McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.,*
     755 F. Supp. 1206 (S.D.N.Y. 1990)..............................................................11

*McNeilab, Inc. v. American Home Prods. Corp.,*
     501 F. Supp. 517 (S.D.N.Y. 1980)  ...........................................................12

*McNeilab, Inc. v. American Home Prods. Corp.,*
     848 F.2d 34 (2d Cir. 1988).................................................................19, 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.,*
     290 F.3d 578 (3d Cir. 2002).....................................................................11

i

*Novo Nordisk A/S v. Becton Dickinson & Co.,*
   997 F. Supp. 470 (S.D.N.Y. 1998) ...........................................................................21

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,*
   32 F.3d 690 (2d Cir. 1994).......................................................................................19

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,*
   926  F.2d 134 (2d Cir. 1991)....................................................................................16

*Schering Corp. v. Pfizer Inc.,*
   189 F.3d 218 (2d Cir. 1999) ....................................................................................11

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
   Consumer Pharmaceuticals Co., Inc.,*
   906 F. Supp. 178 (S.D.N.Y. 1995) ...........................................................................14

*Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
   Consumer Pharm. Co.,*
   No. 01 Civ. 2775-DAB, 2001 WL 588846 (S.D.N.Y. June 1, 2001) ........................15

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
   497 F.3d 144 (2d Cir. 2007).........................................................................10, 11, 19

## STATUTES

Lanham Act, 15 U.S.C. § 1125(a) .................................................................................10

Plaintiff CoStar Group, Inc. ("CoStar") respectfully submits this Memorandum of Law in support of its motion for a preliminary injunction to stop a new wave of false advertising by defendant LoopNet, Inc. ("LoopNet").  LoopNet's latest ads, aimed directly at CoStar, grossly exaggerate the size of LoopNet's online audience and make numerous false and misleading comparisons between LoopNet's products and those of CoStar.  LoopNet's new advertising threatens to stop the multi-million dollar launch of CoStar Showcase® – a new product offering that competes directly in LoopNet's core market – dead in its tracks.  CoStar seeks an immediate injunction to prevent the occurrence of such irreparable injury.

## PRELIMINARY STATEMENT

CoStar and LoopNet are major competitors in the online commercial real estate marketing business.  Historically, LoopNet has served primarily as an advertising vehicle through which owners and brokers have promoted specific properties for sale or lease.  Meanwhile, CoStar has focused its efforts on providing information services (*e.g*., space available for lease, comparable sales information, tenant information, information about properties for sale, etc.) to commercial real estate professionals.

This marketplace alignment fundamentally changed on May 15, 2008, when CoStar launched CoStar Showcase®, an online commercial real estate marketing service that promotes individual listings.  Showcase not only competes directly in the arena that LoopNet has long occupied, but offers distinct advantages – including ease of use (for both buyers and sellers) and a more favorable pricing system – in comparison to LoopNet.  CoStar Showcase, which is backed by a multi-million dollar investment by CoStar, presents a serious commercial threat to LoopNet's business.

In the face of this new competition, and in an effort to prevent CoStar Showcase from gaining any traction in LoopNet's primary market, LoopNet recently unleashed a barrage of new advertisements that make false and misleading claims concerning the relative benefits of each party's products. The thrust of this new comparative ad campaign is that LoopNet has a vast online audience that dwarfs that of CoStar, such that customers should always choose to advertise on LoopNet instead of CoStar Showcase.

For example, one brochure that LoopNet is currently distributing poses the question "Does your online marketing compare?" and points to LoopNet's "2.75 million registered members" as supposed proof of LoopNet's expansive user base. But as LoopNet now has publicly admitted, it does not have an audience that large. The "registered member" figure that LoopNet cites merely represents the cumulative number of user accounts that have been created on the LoopNet website since its inception *in 1995* – more than a dozen ago. The actual number of individuals who actively search listings on LoopNet's site today is but a fraction of the "2.75 million registered members" LoopNet advertises. LoopNet has knowingly touted its bogus "registered members" statistic in order to exaggerate its online distribution for some time. But only in recent weeks has LoopNet turned this weapon directly against CoStar, and begun to make false *comparative* claims about CoStar Showcase.

LoopNet's new ad campaign goes well beyond this deceptive new use of its "registered members" metric. LoopNet has also begun to make false comparative claims about the actual number of visitors – or "traffic" – that each website attracts. For instance, LoopNet now advertises that, in comparison to the supposedly meager traffic enjoyed by CoStar, LoopNet receives a whopping "950,000 unique visitors each month." In the next breath, LoopNet claims that this figure is actually *understated* in that it "doesn't include the traffic from [LoopNet's]

2

exclusive network of newspaper web site partners[,] which generates more than 18 million unique visitors each month."

These claims are deceptive and untrue. In fact, according to the very data source that LoopNet cites, LoopNet typically attracts significantly *fewer than* the 950,000 unique monthly visitors claimed in its advertising. LoopNet falls short of this level of traffic even when those visitors who reach LoopNet's site through referrals from "partner" websites are counted. And LoopNet's online partnerships with various newspapers do not result in LoopNet's ads being viewed by anywhere near the "18 million unique visitors" that LoopNet claims.

LoopNet's false comparative claims are not limited to the relative size of its online audience. LoopNet has also begun to advertise that it offers "the largest database of commercial listings." In fact, LoopNet's listings database is less than 60% the size of CoStar's.

LoopNet's new ad campaign threatens to stamp out the competition posed by CoStar's Showcase product at its very inception. The launch of Showcase is crucial to CoStar's business, and the success of the product will largely turn on whether it can reach "critical mass" within the first few months of its debut. If permitted to continue, LoopNet's false and misleading advertising will cause CoStar to suffer an immediate loss of market penetration, goodwill and momentum that will not be compensable in money damages. To prevent such irreparable harm and to allow the parties' products to compete fairly in the marketplace, CoStar seeks preliminary injunctive relief to halt LoopNet's deceptive advertising.

## STATEMENT OF FACTS

The market for commercial real estate in the United States is in the process of being revolutionized by the availability of online research tools that provide fast, ready access to detailed information about properties and listings. Gone are the days in which listings were

3

found only in local newspapers, and leads were passed primarily by word of mouth among

brokers and others "in the know." *See, e.g.*, Vivian Marino, *Real Estate Investing, Made Easier*

*Online*, N.Y. TIMES, Feb. 3, 2008, *available at* http://www.nytimes.com/2008/02/03/realestate

/commercial/03sqft.html. Today, such information is available from a number of websites that

supply critical facts about the marketplace and provide a searchable database of listings for

individual properties.

***The Parties and Their Products***

> Two of the leading companies in this emerging industry are CoStar and LoopNet,

the parties to this action.  CoStar is the marketplace leader in the sale of information to

commercial real estate professionals.  *See* Declaration of Andrew C. Florance ("Florance Decl.")

¶ 7.  LoopNet also provides market information but, unlike CoStar, its business model is based

primarily upon the advertising and marketing of individual property listings.  LoopNet functions

essentially as a modern version of the newspaper classified pages, charging property owners or

brokers a fee in exchange for distributing their listings to an audience of potential buyers or

lessors.  For several years, LoopNet has been the only large player in this particular market

segment.  *See id*. ¶ 2.

> In late 2007, CoStar announced a plan to expand its product line to compete

directly in LoopNet's core business – online property marketing and lead generation.  Since that

time, CoStar has completed development and launched its competing product, called CoStar

Showcase.  *See id*. ¶¶ 8-10.  Showcase offers several distinct advantages over LoopNet's

products.  For example, to advertise on CoStar Showcase, customers do not have to input or

upload data about their property.  CoStar's online tools pull the relevant information, such as

photographs, maps and statistics, into the listing from CoStar's existing research databases.  To

entice users who are searching for available properties, CoStar designed a clean, content-rich

4

format for Showcase that is unrivalled in the industry.  And CoStar has carefully calibrated its

pricing levels and incentives to be more attractive to commercial real estate professionals than

those of LoopNet.  *See id.* ¶ 40.

Co-Star began disseminating promotional literature about its Showcase product to

commercial real estate professionals in early April 2008.  *See id.* ¶ 10.  On May 15, 2008,

Showcase was officially launched.  *See id.* ¶ 8.  CoStar Showcase is the most serious commercial

threat that LoopNet currently faces.

### *LoopNet's False Claims About the Size of Its Online Audience*

In the battle for primacy in the developing market for internet-based commercial

real estate advertising or lead generation, a critical element is the perceived size of the online

community of buyers and sellers who actively use a website platform.  Buyers want to be able to

search the most comprehensive universe of listings.  Sellers wish to expose their properties to the

largest possible audience of buyers.  Accordingly, customers are attracted to the platform that

they believe to be most widely used.  *See* Florance Decl. ¶ 3.

With full knowledge of this dynamic, LoopNet has undertaken a methodical – and

successful – campaign to convince the relevant market that it has a vast, and constantly growing,

audience.  LoopNet's efforts in this regard have centered upon the claim that it has a staggering

number of "registered members," which LoopNet intentionally equates with active users of its

website.  For example, LoopNet's website and essentially all of its advertising materials

currently assert that LoopNet has "more than 2.75 million registered members."

The unmistakable impression created by LoopNet's ads is that millions of people

actively view LoopNet listings.  For example, on December 31, 2007, The Motley Fool, a widely

followed source of online investment advice, recommended the purchase of LoopNet stock,

emphasizing that LoopNet's "website [is] ***frequented by*** more than 2.5 million members."  *See*

5

Ex. 2 to Florance Decl. at 2 (emphasis added).  This is not surprising, since LoopNet itself often

proclaims that its ads are "seen by" and "viewable to" its entire roster of 2.75 million registered

members.

But as LoopNet has recently acknowledged, this claim is false.  A "registered

member," in LoopNet's parlance, is merely a user account that was created at any time since the

inception of LoopNet's website roughly 13 years ago.  Any time an account – which requires

only the submission of a working email address – is established, LoopNet adds another

"registered member" to its cumulative total.  A substantial proportion of these accounts are

inactive, and have been for years.  Nevertheless, LoopNet routinely promotes its historical total

of "registered members" as though each and every "member" were a current, active user of the

LoopNet website.  *See* Florance Decl. ¶¶ 23-25.

***LoopNet's New Comparative Ad Campaign***

LoopNet has perpetrated its "registered members" fraud on the commercial real

estate and investment communities for some time.  But it was not until the launch of CoStar

Showcase a few weeks ago that LoopNet aimed this misinformation campaign directly at CoStar.

In seeking to hold off the new threat from CoStar Showcase, LoopNet has launched a revamped

and expanded promotional campaign designed to convince prospective customers that there is no

reason even to consider listing their properties with CoStar.

Within days after the Showcase launch, LoopNet's CEO Richard Boyle falsely

and publicly dismissed CoStar's new product as having "no marketing audience."  *See* Florance

Decl. ¶ 12 and Ex. 2 at 7.  That essential message has since been repeated by LoopNet in a

variety of advertising and promotional materials that not only belittle the size of CoStar's

audience, but greatly exaggerate the scope of LoopNet's.  In these current ads, which are

carefully designed to fend off the threat from CoStar Showcase, LoopNet has changed its

6

traditional messaging, in which it talked exclusively about its own audience, and adopted a

*comparative* advertising approach, in which it contrasts its purported distribution or "traffic"

with that of competitors including CoStar.  For instance, in a press release issued *within the past*

*24 hours*, LoopNet announced that it not only "operates the largest online commercial real estate

marketplace with more than 2.75 million members," but "has increased its leadership position as

the most heavily trafficked commercial real estate website."  *See* Press Release, ComScore

Report Shows that LoopNet Extends Its Commanding Lead Among Online Commercial Real

Estate Websites, *available at* http://www.sunherald.com/prnewswire/story/634605.html.

LoopNet's new comparative ads emphasize three purported measures of its audience size:

"registered members," "unique visitors" and "traffic from" its "exclusive network of newspaper

websites."

> For example, a new LoopNet marketing brochure, an excerpt from which appears

below, claims that LoopNet has:

## More Members. More Traffic. More Partners.

- Over 2.75 million registered members
- 950,000 unique visitors each month*
- Exclusive distribution network of 125+ newspaper web sites
- Trusted by the nation's leading brokerage firms

*See* Ex. 3 to Florance Decl. at 1.  The same advertisement claims that a "Premium" listing

enables realtors to "Reach LoopNet's Entire Member Base," and that such listings are "viewable

to 2.75 million registered members."  *See* Ex. 3 to Florance Decl. at 2.

> This LoopNet flyer goes on to detail LoopNet's purported reach as compared to

its (unnamed) competitors.  Among other things, the ad claims that LoopNet attracts "950,000

unique visitors **each month**" and that this figure "doesn't include traffic from our exclusive

network of newspaper web site partners[,] which generates more than 18 million unique visitors

each month."  *See* Ex. 3 to Florance Decl. at 1 (emphasis added).  The portion of the ad that

contains these claims appears below:



The dark blue bar on the above graph, immediately adjacent to the red LoopNet bar, is intended

to reflect the "web site traffic" generated by CoStar, and readers understand that LoopNet's

"More Members, More Traffic, More Partners" claim is directed at CoStar.  Florance Decl. ¶ 15.

Another brochure currently being distributed by LoopNet not only repeats these

claims, but explicitly asks the reader to use them as a basis for comparison:



*See* Ex. 4 to Florance Decl. at 4.

Similar claims are repeated on LoopNet's website:

When you advertise on LoopNet, your property is seen by:

| | |
|---|---|
| **Registered Members:** | **2.75 million** |
| **Unique Visitors:** | **950,000 per month** |
| **Market Coverage:** | **All US & Canada** |
| **User Sessions:** | **14 million per month** |

*See* Ex. 5 to Florance Decl. at 1.

The LoopNet website also claims that LoopNet has "the largest database of commercial listings":

**Frequently Asked Question**

What are the benefits of LoopNet membership?

**Answer**

LoopNet membership provides access to the largest database of commercial listings.

*See* Ex. 6 to Florance Decl.

All of these claims of relative size, which form the heart of LoopNet's new marketing offensive in response to CoStar Showcase, are false and misleading. As stated above, LoopNet does not have a member base of 2.75 million people who actively use its website. LoopNet's site does not receive 950,000 unique visitors each month, as shown by the very data upon which LoopNet claims to rely. LoopNet's listings are not "seen by" or "viewable to" such inflated audiences – let alone by an additional "18 million" individuals who supposedly are directed to LoopNet's website each month by the websites of major newspapers. And it is CoStar, not LoopNet, that actually offers the largest database of commercial real estate listings.

9

*Irreparable Harm to CoStar*

CoStar Showcase is in the midst of a critical launch period during which the product either will gain marketplace momentum and acceptance, or may fail within a period of months. *See* Florance Decl. ¶ 39. Advertisers will not pay to list their properties on Showcase if they believe its audience is dwarfed by LoopNet's, and potential customers for these properties will not continue to search CoStar's Showcase listings if they believe that the size of its database is insufficient. In other words, if allowed to continue, LoopNet's false and misleading comparative claims will permanently poison the waters against Showcase, potentially wiping out CoStar's investment and destroying an invaluable market opportunity.

## ARGUMENT

The standard for granting a preliminary injunction in this Circuit is well-established. The movant must show: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting the preliminary relief; and (2) a likelihood of irreparable harm if relief is denied. *See, e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). This standard is satisfied here.

**I.    CoStar Is Likely To Succeed on the Merits**

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a federal cause of action for false advertising. The statute provides that:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

There are two theories of recovery available to a plaintiff under Section 43(a).[1] *Time Warner Cable*, 497 F.3d at 153. First, a plaintiff can show that the advertisement in question is literally false – *i.e.*, false on its face. *Id.* at 153 (citing *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988)). An advertisement can be deemed literally or facially false either if it makes an explicit statement or representation that "conflicts with reality," *id.* (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)), or if its "words and images, considered in context, necessarily imply a false message." *Id.* at 158 (quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586-87 (3d Cir. 2002) ("A 'literally false' message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated") (internal citations and quotations omitted)). Ads that are facially or unambiguously false may be enjoined without extrinsic evidence of consumer perception – *i.e.*, without "reference to the advertisement's [actual] impact on the buying public." *Id.* at 153-58 (quoting *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

Alternatively, a plaintiff can show that the challenged advertisement, "while not literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable*, 497 F.3d at 153. The extent to which consumers are deceived need not be established to obtain relief against a misleading advertisement. *McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.,* 755 F. Supp. 1206, 1211 (S.D.N.Y. 1990), *aff'd*, 938 F.2d 1544 (2d Cir. 1991). "[A]ll that is required is a 'qualitative showing [to] establish that a not insubstantial number of consumers received a false

---

[1] The standards for analysis of false advertising claims under New York law are the same as under the Lanham Act. *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F. Supp. 2d 165, 177 n.6 (S.D.N.Y. 2004).

or misleading impression from it.'"  *Id.* (quoting *McNeilab, Inc. v. American Home Prods. Corp.*, 501 F. Supp. 517, 525 (S.D.N.Y. 1980)).

Here, LoopNet's claims all are facially false or, at a minimum, "likely to mislead or confuse" their intended audience.  Accordingly, the ads violate the Lanham Act and should be enjoined.

### A.    The "950,000 Unique Visitors Each Month" Claim Is Facially False

LoopNet's claims regarding the monthly number of unique visitors to its website are false on their face.  According to its ads, LoopNet's assertion that it receives "950,000 unique visitors each month" is based upon data from comScore, an Internet audience measurement service.  In fact, the very data that LoopNet cites shows that actual visits to LoopNet.com fall far short of this claim.

In the 15 months from February 2007 to April 2008, the number of total unique monthly visitors to LoopNet.com exceeded 950,000 only three times (April 2007, July 2007, and January 2008).  *See* Ex. 18 to Florance Decl.  Each of these spikes was preceded, and followed, by a monthly traffic level below the 950,000 claimed by LoopNet.  *Id.*  Indeed, in eight of the remaining 12 months, LoopNet had fewer than 900,000 unique monthly visitors, including as recently as March 2008, when it had fewer than 850,000.  *Id.*  Thus, LoopNet's claim that its website receives "950,000 unique visitors *each* month" is literally false.[2]

Moreover, even an accurate count of "unique monthly visitors" presents a misleading picture of LoopNet's true usage.  Based on data provided to CoStar by comScore, only about a quarter of LoopNet's unique visitors actually log in or run searches for real estate.

---

[2] It is similarly false to claim, as LoopNet does, that LoopNet premium listings are "[v]iewable to . . . 950,000 unique visitors per month," or that listings on LoopNet's website are "seen by" 950,000 unique visitors per month.  As outlined above, LoopNet's website does not receive 950,000 unique visitors each month.  Moreover, even in months in which LoopNet does receive 950,000 unique visitors, there is no guarantee that they will view or see any particular listing.

12

The other traffic includes, for example, people who are put off by having to create an account and input personal information on the website and decide not to run any searches. It also includes others who may be interested in the company only as an investment. *See* Florance Decl. ¶ 31 and Exhs. 17-18.

### B.    The "2.75 Million Registered Members" Claim Is Facially False

In its promotional materials and on its website, LoopNet claims to have "2.75 million registered members." When considered in context, the necessary implication of these claims is that each "registered member" is a unique individual who actually uses the LoopNet website. *See, e.g.*, Ex. 17 to Florance Decl. at 2 (emphasis added) (recommending LoopNet as an investment because its website is "*frequented by* more than 2.5 million members"). This is false. The "registered member" figure that LoopNet touts is merely a cumulative total – dating back to the company's inception in 1995 – of each and every instance in which an online user account has been set up on the LoopNet website. *See* Florance Decl. ¶¶ 23-25. An account that, for instance, was created in 1998, used to view the site's contents (for free) only once, and never accessed again is included in LoopNet's advertised total of 2.75 million "registered members." By definition, LoopNet's current online audience is only a fraction of its historical total of registered accounts.

Shortly after the commencement of this action, LoopNet acknowledged, for the first time, that not all of its "registered members" are active users of the LoopNet website. On February 27, 2008, LoopNet CEO Richard Boyle addressed the Jeffries Fourth Annual Internet Conference. Asked to explain LoopNet's claim (at that time) that it had 2.6 million "registered members," Mr. Boyle stated that "We don't break out the different segments of active users.

Basically the 2.6 million is total registered users over time." *See* Florance Decl. ¶ 25 & Ex. 11 at 8-9.

Despite this recent admission, LoopNet's advertisements continue to tout its "2.75 million registered members" as a measure of its user base and, in many instances, to claim that LoopNet ads are "seen by" or "viewable to" this entire audience. These "seen by" and "viewable to" claims are literally false because, as explained above, ads on LoopNet are neither "seen by" nor "viewable to" 2.75 million people. And even in those instances in which LoopNet does not use this specific language, its advertising necessarily implies that its "registered members" are actual individuals to whom LoopNet ads are exposed. Otherwise, why would the reader care how many "registered members" LoopNet has?

Courts in this District routinely enjoin ads that make use of impertinent or misleading statistics on the grounds that they necessarily imply a false message. For instance, in *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc.*, 906 F. Supp. 178 (S.D.N.Y. 1995), SmithKline disseminated a print ad with a banner headline that read "Doctors Have Already Endorsed Tagamet In The Strongest Possible Way. With Their Prescription Pads." Beneath this headline was a bar chart that showed that physicians had written 237 million prescriptions for Tagamet compared to only 36 million for Pepcid – roughly a 7-fold advantage. That comparison was literally true, but there was a catch: Tagamet had gotten to market nearly a decade earlier, so had amassed prescriptions over a much longer period of time. The Court found "that the ad conveys clearly and unequivocally the false message that doctors prescribed Tagamet HB 200 million times more than they prescribed Pepcid over an equal period of time," and entered a preliminary injunction. 906 F. Supp. at 185-86.

14

Similarly, in *Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 2001 WL 588846 (S.D.N.Y. June 1, 2001), the advertiser – the maker of Tums antacid – aired a commercial claiming that Tums' competitor, Pepcid Complete, relieves "less than half of the heartburn episodes within 30 minutes. Less than half." What the ad did not mention was that Tums itself was significantly less effective at relieving heartburn within the same time frame. The Court determined that the "necessary implication" of the advertisement was the "unambiguous and concededly false claim that Tums provides for faster relief than Pepcid Complete," *id.* at *13, and enjoined the commercial on that basis. *See also, e.g., Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (finding literally false a claim comparing the number of times professional chefs had chosen defendant's food processor over plaintiff's food processor where plaintiff did not market a professional model).

LoopNet's claim here is no different. LoopNet cites its "2.75 million registered members" in the context of an advertisement touting the popularity and reach of its website. In that context, those 2.75 million "members" would only be relevant if they were current, active users. LoopNet's "registered members" claim is therefore false by necessary implication.

LoopNet may argue that its "2.75 million registered members" claim does not convey a false impression because it appears alongside its "950,000 unique visitors each month" claim. While in some recent advertisements these two claims have appeared in close proximity to one another, LoopNet continues to use the "2.75 million registered members" claim on its own, most conspicuously in the prominent banner that greets every visitor to the LoopNet website:

**#1 in Commercial Real Estate Online**

**$500 billion of properties for sale ● 4.3 billion sq. ft. of properties for lease ● 2.75 million members**

15

And even when the "2.75 million registered members" claim appears alongside the "950,000 unique visitors each month" claim, it remains facially false.  As noted above, the overall context of LoopNet's advertising makes clear that it is talking about the size of LoopNet's *current* online audience – not some irrelevant count of the number of people who, historically, have signed up for user accounts.  Thus, the only reasonable interpretation of LoopNet's ads is that it has 2.75 million *active* members, roughly 950,000 of which visit the LoopNet.com website in a given month.  This unambiguous message concerning LoopNet's 2.75 million members is false, regardless of whether or not it is coupled to the (similarly false) claim that LoopNet receives 950,000 unique visitors each month.  *See Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 381-82 and 85 (2d Cir. 1986) (holding that advertising claim that "Hertz has more new cars than Avis has cars," *in context*, "could only be understood as referring to companies' rental fleets" and noting that "[f]undamental to any task of interpretation is the principle that text must yield to context" and "there is no surer way to misread any document than to read it literally") (internal quotations and citations omitted).

Even if LoopNet's "registered members" claims were not facially false (and they are), they would nonetheless violate they Lanham Act because they are highly misleading – and intentionally so.  In the Second Circuit, when a false advertising plaintiff demonstrates that the defendant has "intentionally set out to deceive the public" in an "egregious" manner, a presumption of consumer deception arises, and the plaintiff is relieved "of the burden of producing consumer survey evidence that supports its claim."  *Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992) (citing *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926

16

F.2d 134, 140 (2d Cir. 1991) ("Once it is shown that a defendant deliberately engaged in a

deceptive commercial practice, we agree that a powerful inference may be drawn that the

defendant has succeeded in confusing the public.  Therefore, upon a proper showing of such

deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer

confusion.")).

Such a presumption is warranted here.  Indeed, LoopNet not only *intends* that its

ads convey the false message that it has an actual audience of 2.75 million people, it *says so*

explicitly in numerous advertisements.  That LoopNet occasionally omits the words "seen by" or

"viewable to" does not change the fact that LoopNet uses the words "registered members"

interchangeably to describe "active users."  Moreover, LoopNet is undoubtedly aware that the

relevant public have been taken in by its claims and reported that LoopNet has an online

audience equal to its number of "registered members."  As detailed in the Florance Declaration,

numerous commercial real estate and investment analysts have publicly construed LoopNet's

"registered members" claims to equate to "active users."  *See* Florance Decl. ¶ 26 (collecting

examples).  Especially given the fact that LoopNet has never taken any affirmative action to

dispel the widespread confusion it has created, it is evident that LoopNet intended the confusion

all along.

### C.    The "18 Million" Claims Are Facially False

LoopNet has also undertaken to advertise that its audience is even larger than its

"2.75 million registered members," or its purported 950,000 unique monthly users.  According to

LoopNet's most recent ads, these figures are actually understated because they do not include

traffic from LoopNet's "exclusive network of newspaper web site partners[,] which generates

more than 18 million unique visitors each month."  *See* Florance Decl. ¶ 15 & Ex. 3.  This claim

17

is literally false. The Internet audience measurement service that LoopNet cites for its "950,000 unique visitors each month" claim measures traffic on LoopNet's website *regardless of how it gets there*. A visitor who arrives at the LoopNet site by clicking on a link found on a newspaper website is counted the same as one who reaches LoopNet's site by typing in the URL, or using a search engine such as Google. *See id.* ¶ 33. LoopNet's claim that its traffic as reported by comScore "doesn't include the traffic from our . . . newspaper web site partners" is therefore contrary to the facts. For the same reason, the claim that this nonexistent incremental traffic adds another "18 million unique visitors each month" to LoopNet's monthly total is facially false.

Moreover, even if the reader were to understand that the "18 million" figure refers to the aggregate number of monthly visitors to the *newspaper* websites (though that is contrary to what the ads literally say), the claim would still have a false implication. There is no basis to think that more than a tiny fraction of these "18 million" online newspapers readers, who typically are searching for updated news reports, sports scores or weather forecasts, is even exposed to the commercial real estate classified ads that LoopNet places. It is therefore grossly misleading for LoopNet to suggest that its partnerships with online newspapers result in its ads being seen by another "18 million" people every month. *See* Florance Decl. ¶¶ 32-36.

### D. The "Largest Database of Commercial Listings" Claim Is Facially False

Finally, LoopNet's claim that it offers the "largest database of commercial listings" is literally false. See Ex. 6 to Florance Decl. LoopNet currently has approximately 595,000 listings on its website, whereas CoStar has over a million. *See id.* ¶ 38. Accordingly, CoStar – not LoopNet – offers the largest database of commercial listings. Indeed, LoopNet's database is less than 60% the size of CoStar's.

18

## II.    CoStar Will Suffer Irreparable Injury Absent Preliminary Relief

Because "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement," the Second Circuit has held that a plaintiff seeking a preliminary injunction need only demonstrate "a reasonable basis" for the belief that false and misleading advertisements of a competitor will cause it irreparable harm. *Coca-Cola Co.*, 690 F.2d at 316.[3]  When the challenged ads are directly comparative and the plaintiff has demonstrated a likelihood of success on the merits, irreparable harm is presumed. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992); *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir. 1988); *see also Time Warner Cable, Inc.*, 497 F.3d at 162-63 (affirming District Court's decision to presume irreparable harm even though the challenged ads did not mention plaintiff by name when plaintiff was defendant's main competitor in the relevant marketplace).

Here, the evidence both supports a presumption and supplies a "reasonable basis" for a factual finding of irreparable harm.  With respect to the presumption, LoopNet's new ads are comparative in nature and are targeted directly against CoStar, which is now LoopNet's main competitor in the online commercial real estate listing business. *See* Florance Decl. ¶¶ 9-19.  As the Second Circuit recently held in *Time Warner Cable*, a false comparative ad need not mention the competitor by name to support a presumption of irreparable injury.  All that is required is a showing that the audience will understand that the claims in the advertisement are directed at the plaintiff. *See Time Warner Cable*, 497 F.3d at 162 (upholding application of presumption of irreparable harm where "consumers in the markets covered by the preliminary injunction would

---

[3] This "flexible approach" requires "a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two." *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).

undoubtedly understand [the ad's] derogatory statement . . . as referring to [plaintiff]" or where "it would be obvious to consumers that [defendant's] claims of superiority are aimed at diminishing the value of [plaintiff's product]").   As detailed in the Florance Declaration, the commercial real estate marketplace well understands that LoopNet's current spate of comparative claims are directed at CoStar and its new Showcase product.  Florance Decl. ¶ 19; *see McNeilab, Inc.*, 848 F.2d at 38 (a false "comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer" and establishes irreparable harm).

But the availability of the presumption is academic here, because CoStar can readily demonstrate a "reasonable basis" for a finding that it will be injured absent a preliminary injunction.  CoStar is in the midst of a critical new product launch whose ultimate fate is closely tied to its success in the market over the next few months.  If LoopNet is permitted to continue to make false and disparaging claims about CoStar Showcase until this case is finally resolved, CoStar will have serious difficulty in attempting to quantify or recoup the loss of its current opportunity:  to expand its business to compete head-to-head, and on even par, with LoopNet in the marketing of individual commercial real estate listings.  As explained by CoStar's CEO Mr. Florance, "CoStar Showcase may not get a second chance to succeed in the market" if its initial launch fails.  Florance Decl. ¶ 39.  Only by gaining enough sales and momentum to reach "critical mass" can CoStar realize the full value of its investment and establish CoStar Showcase as a viable alternative to LoopNet.

Courts in this District have previously recognized that the risk of immediate and irreparable injury from a false advertising campaign is especially high when a new product is being introduced to the market.  *See, e.g.*, *Johnson & Johnson-Merck Consumer Pharms. Co. v.*

*P&G*, 285 F. Supp. 2d 389, 394 (S.D.N.Y.), *aff'd* 90 F. App'x 8, 9 (2d Cir. 2003) ("[I]t is very clear to the Court that there is irreparable injury in this case stemming from the very nature of the advertising campaign involved.  P&G's false advertising is occurring at the inception of a new product launch, a time when the buying public is particularly attentive and educable.  Correcting the false impressions made on consumers will therefore be difficult."); *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F. Supp. 470, 473 (S.D.N.Y. 1998) (noting that "because Becton's claims relate to the Ultra-Fine II, which is a relatively new entrant in the needle market, Becton would have a particularly difficult time proving money damages if it were to succeed ultimately in its claims").  Indeed, CoStar has already begun to feel the bite of LoopNet's deceptive advertising, as some customers have expressed concern about CoStar's ability to compete with the LoopNet's purportedly massive audience.  Unless an injunction is issued, such misconceptions – and resulting defections from CoStar Showcase – will proliferate, causing irreparable injury to CoStar's business.  *See* Florance Decl. ¶¶ 39-42.

Not only will CoStar be severely injured if preliminary relief is denied; so too will the public at large.  Courts in this District have long recognized that there is a strong public interest in the prevention of false or misleading advertising.  *See, e.g, American Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987).  That interest is especially acute here because CoStar is attempting to establish Showcase – a superior product with lower pricing – as a viable competitor to LoopNet, the dominant player in the market.  If LoopNet's false advertising campaign is allowed to continue, CoStar's bid to establish itself in LoopNet's market may fail, and the marketplace will be denied the benefits of fair and robust competition between the parties.

21

## CONCLUSION

In the end, LoopNet's claims about its "registered members" are no different than a traditional newspaper that knowingly inflates its circulation figures in order to drive up advertising sales and revenue. LoopNet is deliberately communicating to the marketplace false information about the size of its online audience. Such claims violate the Lanham Act and should be enjoined. CoStar's motion for a preliminary injunction should be granted.

Dated: June 20, 2008

Respectfully submitted,


PATTERSON BELKNAP WEBB & TYLER LLP


By: ___/s Steven A. Zalesin_____
Steven A. Zalesin (SZ 0901)
Karla G. Sanchez (KS 7247)
Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
Patrick J. Carome (admitted *pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363


*Attorneys for Plaintiff CoStar Group, Inc.*

Of counsel:

Christopher Winters, Esq.
CoStar Group, Inc.

22