Steven A. Zalesin (SZ 0901)
Karla G. Sanchez (KS 7247)
Adeel A. Mangi (AM 5322)
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000
Facsimile 212-336-2222

Patrick J. Carome (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

Attorneys for Plaintiff CoStar Group, Inc.



**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COSTAR GROUP, INC., | ) |
| Plaintiff, | ) Civil Action No. 08- CV 1156 |
| v. | ) **FIRST AMENDED COMPLAINT** |
| LOOPNET, INC., | ) **JURY TRIAL DEMANDED** |
| Defendant. | ) |

Plaintiff CoStar Group, Inc. ("CoStar"), by its attorneys Patterson Belknap Webb & Tyler

LLP and Wilmer Cutler Pickering Hale and Dorr LLP, for its complaint against defendant

LoopNet, Inc. ("LoopNet"), alleges as follows:

1717969v.2

## INTRODUCTION

1.      For the past several years, LoopNet has engaged in a systematic and deliberate effort to misinform and deceive the American public about the size of LoopNet's online audience. Pursuant to the Lanham Act, CoStar seeks a permanent injunction, corrective advertising, compensatory damages, enhanced damages, and attorneys fees on account of LoopNet's purposefully false and misleading ad campaign. In addition, in recent weeks, in response to a new competitive threat from CoStar, LoopNet has unleashed a fresh wave of advertising in which it falsely claims to offer performance and value advantages over CoStar that LoopNet does not possess. To prevent immediate irreparable injury, CoStar seeks, in addition to the remedies enumerated above, a preliminary injunction to put an immediate stop to this new campaign of deceptive and false comparative advertising.

2.      CoStar and LoopNet are competitors in the online commercial real estate marketing business. Both offer website platforms for the listing of commercial properties for sale or lease.

3.      In the battle for primacy in this developing market, the perceived size of the online community of buyers and sellers who actively use a website platform is critical. Buyers want to be able to search the most comprehensive universe of listings. Sellers wish to expose their properties to the largest possible audience of buyers. Accordingly, customers are attracted to the platform that they consider to be the most widely used.

4.      With full knowledge of this market dynamic, LoopNet has undertaken a methodical – and successful – campaign to communicate the false impression that it has a vast, and constantly growing, number of users. LoopNet's efforts in this regard have centered upon the claim that it has a staggering number of "registered members." For example, LoopNet's

- 2 -

website and essentially all of its current advertising materials assert that LoopNet has "more than 2.75 million registered members."

5.     LoopNet's "registered members" claim is designed to create and foster the belief that each "registered member" is a unique individual who actually uses the LoopNet website. Indeed, for years, LoopNet has conflated the term "registered members" with "active users." For example, LoopNet's website asserts that its real estate listings are "seen by" 2.75 million registered members. LoopNet's advertising similarly claims that the listings it carries are "viewable to" all of its 2.75 million registered members.

6.     LoopNet's claim to an online community or audience that numbers in the millions is false. In fact, the "registered member" metric that LoopNet touts is merely a cumulative total – dating back to the company's inception *in 1995* – of each and every instance in which an online user account has been set up on the LoopNet website. An account that, for instance, was created in 1998, used to view the site's contents (for free) only once, and never accessed again is included in LoopNet's advertised total of 2.75 million "registered members." In point of fact, LoopNet's *current* online audience is only a fraction of its historical total of registered accounts.

7.     LoopNet has employed its false and misleading "registered member" metric as a weapon to compete unfairly against others, including CoStar, for several years. Until recently, CoStar focused its business on the sale of information about commercial real estate markets and listings to paid subscribers, whereas LoopNet primarily sells space on its site to owners or brokers who wish to advertise their properties for lease or sale. Nevertheless, CoStar has suffered a competitive injury by virtue of LoopNet's longstanding efforts to distort and exaggerate the size of its online audience.

- 3 -

1717969v.2

8.     The competition between CoStar and LoopNet – and the proximity of the harm to CoStar from LoopNet's false advertising – has greatly increased as a result of recent events. On May 15, 2008, CoStar introduced a new service called CoStar Showcase®. Showcase is CoStar's first foray into the business of marketing individual commercial real estate listings. With the launch of Showcase, CoStar now competes directly with LoopNet in its core business.

9.     LoopNet has responded to the launch of CoStar Showcase with a new, comparative advertising campaign that touts the purported size of LoopNet's user base as a reason why customers should list properties on LoopNet rather than CoStar. For example, LoopNet's advertising materials now ask "Does your online marketing compare?" and point to LoopNet's "2.75 million registered members" as proof of LoopNet's supposed market dominance. Meanwhile, LoopNet's Chief Executive Officer has publicly dismissed CoStar's new Showcase product on the grounds that CoStar purportedly has "no marketing audience."

10.     LoopNet's response to the introduction of CoStar Showcase not only builds upon the duplicitous use of LoopNet's "registered members" metric, but also features new and expanded claims that are equally false and misleading. For example, LoopNet's most recent ads assert that LoopNet has "950,000 unique visitors each month" – a figure that not only gives the lie to the "2.75 million register members" claim, but is itself contradicted by the very data source that LoopNet cites. In addition, LoopNet has begun to advertise that it offers "the largest database of commercial listings." In fact, CoStar's website includes nearly double the number of listings that LoopNet's does.

11.     LoopNet has also undertaken to advertise that its audience is even larger than its "2.75 million registered members," or its purported 950,000 unique monthly users. According to LoopNet's most recent ads, these figures are actually *understated* because they do not

- 4 -

include traffic from LoopNet's "exclusive network of newspaper web site partners which generates more than 18 million unique visitors each month." This new claim is grossly misleading. In fact, there is no basis to suggest that more than a tiny fraction of these "18 million" online newspapers readers – who typically access these websites to receive updated news reports, sports scores or weather forecasts – is ever even exposed to the commercial real estate classified ads that LoopNet places.

12.    LoopNet's new ad campaign threatens to stifle the competition posed by CoStar's Showcase service at its very inception. Unless enjoined, LoopNet's false and misleading claims will cause CoStar to suffer an immediate loss of market penetration, goodwill and momentum that will not be compensable in money damages. To prevent such irreparable harm and to allow the parties' products to compete fairly in the marketplace, CoStar seeks preliminary as well as permanent injunctive relief to halt LoopNet's deceptive advertising.

### THE PARTIES, JURISDICTION AND VENUE

13.    CoStar is a Delaware corporation with its principal place of business and corporate offices at 2 Bethesda Metro Center, Bethesda, MD 20814-5388. CoStar is licensed by the New York Department of State to conduct business in this State and operates an office in this District.

14.    LoopNet is a Delaware corporation with its principal place of business at 185 Berry Street, San Francisco, California. On information and belief, LoopNet is licensed with the New York Department of State to conduct business in this State. On information and belief, LoopNet also operates a wholly-owned subsidiary, CityFeet.com, from a headquarters located in this District.

- 5 -

15.    This action is based on Section 43 of the Lanham Act, 15 U.S.C. § 1125, Sections

349, 350, and 350-a of the New York General Business Law, and New York's common law of

unfair competition. This Court has jurisdiction over the subject matter of the action pursuant to

15 U.S.C. § 1121 and 28 U.S.C. §§ 1331.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## FACTS

### LoopNet's False Claims Regarding "Registered Members"

17.    For several years, LoopNet's advertising has focused on the claim that LoopNet

has a vast and growing number of "registered members." In making this claim, LoopNet has

systematically conflated the term "registered members" with active users of its website.

LoopNet began making such claims in 2006 when it had just over a million "registered

members," and has continued to repeat them without interruption ever since.

*LoopNet's History of Conflating "Registered Members" and Active Users*

18.    In 2006, LoopNet sponsored a prominent advertisement in an issue of the RCA

Report, a commercial real estate journal published by the National Association of Realtors, in

which it claimed that it had "*over 1.2 million members viewing* 100 million property listings

each month." (Emphasis added here and throughout).

19.    In marketing literature co-branded with Microsoft, LoopNet similarly claimed that

it "has *more than 1.2 million registered members. . . . For LoopNet members, the company's

products and services provide value* by allowing them to list, search, market, and finance

commercial real estate properties over the Internet, reducing their marketing costs, expanding

their reach, and accelerating the pace of transactions."

20.    On November 9, 2006, LoopNet CEO Richard Boyle was interviewed by John

Duncan, Pacific Growth Equities' Internet Infrastructure & Services Analyst. Mr. Boyle

- 6 -

repeatedly referred to LoopNet's registered members as "users" of its service and "transaction

participants" on the LoopNet marketplace. He stated that the first of "three key metrics that we

look at in terms of measuring against our primary goal of bringing the marketplace online . . . is

*registered users*," which Mr. Boyle defined as "*how many people are the registered users who*

*have come on and become transaction participants on the LoopNet marketplace,* as I said,

ending Q3 just under *1.6 million*." One of LoopNet's "[p]rimary areas of investment,"

according to Mr. Boyle, was "to drive further growth in the registered *user* base, so bringing

more participants online . . . ."

    21.    On August 2, 2007, Mr. Boyle, in responding to a question from a Morgan

Stanley securities analyst (Jennifer Pinnick) about LoopNet's growth trajectory after acquiring

a company called CityFeet, said that LoopNet would "marry[] [CityFeet's] distribution network

. . . with the *massive users* on LoopNet." And during an October 24, 2007 conference call, Mr.

Boyle similarly described LoopNet's registered members as LoopNet's "**registered *user* base**."

    22.    Around the same time, in a brochure entitled "LoopNet Product Summary,"

LoopNet described its membership as "the largest *audience of 2.2 million active commercial*

*real estate professionals*."

    23.    In November 2007, Mr. Boyle claimed that LoopNet had "about 2.4 million

registered *users*" as of September 2007, which he described as reflecting "50% year to year

*growth*." And in a December 2007 email urging customers to pay $1,139 for an annual

premium subscription to LoopNet, defendant's first bullet point described LoopNet's 2.5

million "members" as its "*audience of potential prospects* for your listings."

24.    In a subsequent brochure called "Premium Membership for Professionals," LoopNet sought to attract customers to pay for listings on LoopNet by promising them that paid listings are *"immediately expos[ed] to more than 2.4 million LoopNet members*."

25.    In a November 28, 2007 press release announcing that it had "surpassed 2.5 million registered members" and that "[a]s of November 25, 2007, LoopNet had 2,511,813 registered members, more than any other commercial real estate service." LoopNet assured potential customers that *"Members of LoopNet use the company's suite of information services* to search for property sale and lease opportunities, expose their available properties widely, research property values and transaction history, identify buyers and tenants, and analyze property data trends."

26.    In the same time period, the LoopNet website stated that "Premium Member Listings appear in the first section of Search Results and can be viewed by **ALL 2.5 million LoopNet members**, whereas Basic Listings are available to fewer than 10% of LoopNet members." LoopNet also invited customers to use its LoopLink product as follows: *"Promote your company to over 2.5 million registered members* with your logo and web site link on every listing profile."

27.    In another section headlined "Advertise with LoopNet," the website stated that ads on LoopNet were *"seen by*" 2.5 million people:

- 8 -

## Advertise with LoopNet

### Property Advertising with LoopNet

Advertising on LoopNet.com can triple the number of times your property is viewed. Choose from additional exposure on our web page or go beyond our website and advertise in LoopNews, our weekly E-Newsletter sent to more than 800,000 subscribers.

LoopNet, Inc. is the leading commercial real estate web site and the largest listing service online. In addition to listing your property on our site, you can also customize your own marketing campaign for your properties.

When you advertise on LoopNet, your property is seen by:

| | |
|---|---|
| Registered Members: | 2.5 million |
| Unique Visitors: | 915,000 per month |
| Market Coverage: | All US & Canada |
| User Sessions: | 12 million per month |

This language remains on the LoopNet website today with updated figures claiming that ads are now "seen by" 2.75 registered members and 950,000 unique visitors per month.

28.    As this chronology indicates, LoopNet also works hard – and successfully – to convey the impression that the number of people who use its site is constantly *growing*. Having repeatedly told the marketplace that "registered members" means "users," each of LoopNet's many statements about growth in registered members is a claim that LoopNet has a growing number of *users*. At a conference in November 2006, LoopNet CEO Richard Boyle made this claim explicit in presenting a slide showing growth in registered *users* (then at almost 1.6 million). Mr. Boyle said the slide showed "how many people are the registered *users* who have come on and *become transaction participants* on the LoopNet marketplace." A year later, in November 2007, in a presentation posted on LoopNet's website, Mr. Boyle asserted that LoopNet had "about 2.4 million *users*" at the end of the third quarter of 2007, "which is 50% year to year growth."

- 9 -

*LoopNet's Focus On The Importance Of Size*

29.     LoopNet is well aware of the importance the marketplace attaches to LoopNet's claims about the size – and the supposed ceaseless growth – of its "membership." LoopNet's strategy is to convince the marketplace that it has a vast user population – what LoopNet's CEO Richard Boyle refers to as "critical mass" – because people who believe that LoopNet is widely used are more likely to use LoopNet themselves. Reflecting this strategy, LoopNet's CEO, Richard Boyle used the expression "*critical mass*" three times in explaining the company's strategy during a November 2006 conference call: "the *critical mass* we have built"; "we have been able to build a *critical mass* of searching activity very quickly and substantially larger than any other player"; "[t]hat *critical mass* then becomes itself a source of significant competitive differentiation." In the same vein, LoopNet's Chief Marketing Officer, Thomas Byrne, was quoted in a February 3, 2008 article in the *New York Times* as referring to LoopNet as "the eBay of commercial real estate."

30.     LoopNet considers its registered member statistic, and the (supposed) growth in that statistic, to be a critical indicator of its health as a business, and has made representations concerning the importance of that statistic in many public filings. In its annual and quarterly reports, for example, LoopNet has repeatedly told the Securities and Exchange Commission that its number of registered members is one of the five "key metrics" that are "material to an analysis of our business."

31.     Similarly, in an August 22, 2006 press release, Thomas Byrne, LoopNet's Chief Marketing Officer, asserted that "[n]o other commercial real estate service delivers the reach and exposure of the LoopNet marketplace," claimed "that more than 1.5 million commercial real estate professionals *are* 'In the Loop' with LoopNet" and stated that LoopNet was "very excited about the potential to deliver value to such a diverse *user* base." In the same press

- 10 -

release, LoopNet also stated that its "entire organization is *focused on delivering exceptional service and results to our 1.5 million registered commercial real estate members*."

32.   The marketplace relies on, and places great importance on, LoopNet's claim to have a large and growing number of members. In an announcement dated January 16, 2008, for example, Zacks.com urged investors to purchase LoopNet stock, stating: "Despite a terrible real estate market, *LoopNet continues to do well. The company recently said it surpassed 2.5 million registered members.*" Similarly, in an article discussing online real estate databases in the *New York Times* on February 3, 2008, the first statistic quoted about LoopNet is its claim to have "*more than 2.5 million registered members*."

33.   LoopNet uses the same "key metric" to make grossly misleading comparisons to CoStar in an attempt to persuade customers to do business with LoopNet instead of CoStar. In a Michigan Business Review article dated June 14, 2007, for example, LoopNet Chief Marketing Officer Thomas Byrne is quoted as follows: "LoopNet counts two million members, he said, whereas the next-closest national commercial platform [*i.e.*, CoStar] tallies only 50,000 to 60,000."

*The Falsity of LoopNet's Claims Regarding "Registered Members"*

34.   LoopNet's claims are false and misleading, and are harmful to CoStar in its competition with LoopNet. A "member" of LoopNet is not a unique person, much less a unique person who actively uses the LoopNet site. Rather, a LoopNet "member" is just an email address. That is because LoopNet records an additional "member" whenever its computers reflect the submission of a valid email address and a password. LoopNet uses the term "member" in this way so it can claim a large, and always-growing number of "members," even though LoopNet knows that the number of such "members" it has collected over the years

- 11 -

is meaningless and does not support LoopNet's assurances to the marketplace about how many

*users* it has.

35.    LoopNet has been accumulating such "registered members" (*i.e.*, email addresses)

for more than a decade – since 1995. Thus, on information and belief, LoopNet's claimed 2.5

million "members" include large numbers of:

- email addresses of people who signed up for LoopNet (at any time from 1995 to the present) but did not view a single property at the time

- email addresses of people who clicked on a link to LoopNet from another site (at any time from 1995 to the present), created a user name and password out of curiosity, but decided after a single visit that the LoopNet site was of no interest to them

- email addresses of potential LoopNet investors or business analysts who simply wanted to learn about LoopNet's products, and had no interest in buying, selling, leasing, or marketing commercial real estate properties

- email addresses of people who registered under invented names, since LoopNet has no way of knowing whether the "names" submitted by basic members are real

- email addresses of "bots" or other nonhuman "visitors"

- duplicative "memberships" for a single individual using different email addresses (such as janedoe12345@yahoo.com, janedoenyc@hotmail.com, janewdoe@aol.com, janedoerealestate@gmail.com, and jane.doe@company.com), and

- email addresses of individuals who once signed up for LoopNet but are now retired, are no longer in the commercial real estate business, have long since sold the only property they hoped to market, or are deceased

36.    Not only are LoopNet's claims about the absolute *number* of users of the LoopNet

service false, its claims about *growth* in the number of users are, on information and belief, also

false.  In April 2007, for example, LoopNet assured the market that it had 2 million members;

by November 2007, LoopNet boasted that it had increased its total membership to 2.5 million; it

now claims over 2.75 million members.  But while LoopNet successfully communicated the

impression that its user numbers were rapidly *growing*, on information and belief, the number

of unique individuals actually signing into LoopNet as members was actually *declining*.

- 12 -

1717969v.2

*The Market Impact of LoopNet's Claims*

37.    LoopNet's misinformation campaign is intended to deceive the relevant public, and it has succeeded. For example, one target of LoopNet's promotional claims, a regional real estate alliance, repeated LoopNet's statement (at a time when LoopNet claimed 1.5 million members) that paid listings are *"immediately expos[ed] to more than 1.5 million LoopNet members."* Similarly, the real estate website RetailTraffic stated in an October 1, 2007, report that "LoopNet reports having *more than 2.2 million registered users.*" As quoted by LoopNet on its own website, the California Real Estate Journal reported on April 9, 2007, that "LoopNet has *1.77 million* **registered** *users.*" In the *Guide to Real Estate and Construction for Small Business*, the author recommends "[signing] up for the free basic service at LoopNet, the commercial real estate listing service . . . *that 2.2 million members use* to find the perfect real estate and construction listings for small businesses." The Virtual Earth website, in a posting entitled "Solution Highlight: LoopNet," stated on April 27, 2006 that "LoopNet's solution powers over 1000 websites *used by over 1.2 million members.*" And the website of a real estate broker assures customers that because the broker uses LoopNet, his customers' properties are "***Marketed*** *locally and nationally to over* ***2.5 Million*** *registered members.*"

38.    LoopNet's false claims have misled not only the real estate industry but also securities analysts. For example, SunTrust Robinson Humphrey analysts Andrew W. Jeffrey and Jack D. Ancich reasonably accepted at face value the repeated, specific assurances made by LoopNet, a publicly traded company regulated by the SEC. As a result, Mr. Jeffrey and Mr. Ancich were deceived by LoopNet's false claims about its total membership, as reflected in a June 2007 report in which the analysts wrote:

> *"[W]e encourage investors to note that LoopNet currently has two million registered members.* Of these, all but 84,500 are currently non-paying members.

- 13 -

The company estimates that roughly 40% of its non-paying members are agents. *By this measure, the company already has relationships with about 768,000 agents.* This exceeds our estimate of the entire commercial real estate agent market! From this, we infer that LoopNet's appeal extends beyond traditionally defined commercial real estate agents."

39. Similarly, Jake Fuller and Timothy Forrester, two securities analysts at Thomas Weisel Partners, commenting on LoopNet's November 28, 2007 press release, understood LoopNet's claim about "2.5 million members" to mean that LoopNet has 2.5 million "users": "LOOP also announced today (November 28) that it hit *2.5 [million] registered users* (includes free *users* and paid subs)."

40. The influential online investing site, The Motley Fool, has been repeatedly misled by LoopNet's false claims.

41. On December 31, 2007, for example, The Motley Fool, in an article written by Katrina Chan, stated (in recommending LoopNet as an investment) that a crucial feature of LoopNet is that it has "a website *frequented by* more than 2.5 million members." The Motley Fool's description of LoopNet as being "frequented" by 2.5 million people reflects the success of LoopNet's misinformation campaign.

42. Similarly, in an October 2007 piece, Rick Aristotle Munarriz, a Motley Fool analyst, accepted LoopNet's (false) claims and described LoopNet as having "2.4 million registered *users*." A few months earlier, Mr. Munarriz (writing on July 26, 2007) was again deceived by LoopNet's claim that its registered members actually *use* the site: "Most of LoopNet's *2.2 million registered users* hold free accounts."

- 14 -

43.    In an October 2006 article, Mr. Munarriz of The Motley Fool was again taken in by LoopNet's claim that its registered members represent *people* who are *actually exposed* to the LoopNet site, writing: "The LoopNet concept is clicking within the commercial real estate sector. *Over the past year, the company has seen its registered member base grow 58% higher, to 1.6 million*. Only slightly more than 76,000 of those members pay for premium access and exposure, but even so, *there's no such thing as a bad set of eyeballs in cyberspace*." Much the same happened in June 2006, when The Motley Fool's Tom Taulli wrote that "[t]he LoopNet marketplace has *1.2 million registered users*."

44.    *Forbes* magazine also has been deceived by LoopNet's false claims: in a June 2, 2006 article written by Scott Reeves, *Forbes* reported that LoopNet had "*1.2 million registered users*." The website TheStreet.com was likewise misled by LoopNet's false claims: in a July 17, 2007 video, commentator Lindsay Campbell told viewers that LoopNet has "*2 million registered users*." And the July 2007 issue of the Urban Land Institute newsletter reported that LoopNet "has built a base of *2 million registered users*, an increase of 59% from just one year earlier." Bloggers have likewise been misled: the PaperClipCMS site stated in June 2007 that LoopNet has "*2 million* **registered site** *users*." And a participant on the blog run by TheStreet.com stated in April 2007, that "[LoopNet] stock recently spiked after news that it hit *2 million members online*."

45.    Similarly, Andrew Jeffrey and Richard Cheever, securities analysts at SunTrust Robinson Humphrey, wrote in November 2007 that "the value of the [LoopNet] network reflects total registered users more than paying subscribers. In other words, *the value of LoopNet to a paying member is his access to 2.5+ million total potential customers*."

- 15 -

46.    To CoStar's knowledge, LoopNet has made no effort to correct the false impressions that it has carefully cultivated through its many public statements and presentations. Rather, LoopNet is now building upon this foundation by deploying the "registered members" metric as a basis for comparison with CoStar's new Showcase product.

*LoopNet Has Conceded Its Claims Are False*

47.    Even before CoStar filed this lawsuit, LoopNet apparently had admitted that it has a history of overstating its size: based on 2007 interviews with LoopNet CEO Richard Boyle and with a LoopNet investor, the online journal Startup Review reported that, in its early years, LoopNet relied on *"the art of exaggeration" to "convince[] prospects it was larger than it actually was."*

48.    Shortly after the commencement of this action, LoopNet acknowledged publicly – for the first time – that its "registered members" metric is meaningless. On February 27, 2008, LoopNet CEO Richard Boyle addressed the Jeffries Fourth Annual Internet Conference. Asked about LoopNet's claim (at that time) that it had 2.6 million "registered members" and how this figure compared with "active users," Mr. Boyle stated that "We don't break out the different segments of active users. Basically the 2.6 million is total registered users over time."

49.    That LoopNet knows its claims about its "registered members" are false is also shown by the fine print in the prospectus it filed with the Securities & Exchange Commission when it went public. In its June 2006 Prospectus, LoopNet disclosed how it defines the term "registered member": "Registration requires that a user create a user record, which includes basic contact information such as *name and a working email address*, and also requires that a user accepts our Terms of Service." In other words, "membership" has nothing to do with whether a human being actually visits (or uses) the LoopNet website, views listings, is exposed to ads, or is even still alive. Rather, LoopNet records (and continues to claim thereafter) an

- 16 -

additional "member" whenever its computers reflect the submission of a valid email address and a password.

50. As a further indication of LoopNet's knowledge that its claims concerning its "user base" are false and misleading, on information and belief, LoopNet uses website tracking technology to maintain accurate information -- which LoopNet does not (except inadvertently) disclose to the marketplace -- about how many people actually *use* the LoopNet service on a regular basis. For example, on information and belief, LoopNet has internal data showing how many unique individuals sign in to the password-protected areas of its website each month. In effect, on information and belief, LoopNet maintains two sets of books about its user metrics.

51. Although LoopNet has worked hard to communicate its claim about a vast user community to the marketplace, it has several times indirectly admitted -- perhaps unwittingly -- that the claim is wildly exaggerated.

52. *First*, in its "Basic Membership Reference Guide," LoopNet states that listings by non-paying (or "Basic") members "are accessible to ***almost 10% of LoopNet's audience***." The "10% of LoopNet's audience" to which LoopNet refers are LoopNet's paying ("Premium") members, who are the only ones allowed to see listings by non-paying ("Basic") subscribers. As of October 2007, LoopNet claimed to have approximately 90,000 Premium members. LoopNet's statement in its Basic Membership Reference Guide, therefore, means that its total "audience" is ten times the size of its Premium member group (*i.e.*, 10 times 90,000), or 900,000, rather than the 2.5 million it was then claiming in the marketplace. By its own inadvertent admission, LoopNet's "2.5 million member" claim was thus overstated ***by at least 170%***.

- 17 -

53.    LoopNet has separately – and again inadvertently – revealed how few people actually use its website. On the "Self-Service Support" feature that LoopNet makes available to the public, for example, LoopNet states that "Premium Listings get up to four times more exposure than LoopNet basic listings." The implications of this statement are as follows: the exposure of "LoopNet basic listings" is about 90,000 (the number of LoopNet Premium members, who are the only ones allowed to see Basic Listings). The total exposure of LoopNet's paid ("Premium") Listings is therefore no more than 360,000 ("up to four times" 90,000). By LoopNet's own (unintentional) admission, *premium ads on LoopNet were "exposed" not to the then claimed 2.5 million people but to only 360,000, an overstatement of more than 590%.*

54.    In another context, LoopNet has – again apparently by accident – disclosed facts that, once analyzed, are revealing about the actual size of LoopNet's audience. In a November 14, 2007 press release, LoopNet stated that a new type of listings, called LoopNet Showcase Property Listings, "deliver up to triple the exposure of Premium Listings and 10 times the exposure of Basic Listings." The implications of these statistics are as follows: the "exposure of Basic Listings" is about 90,000 (the number of LoopNet Premium members, who are the only ones allowed to see Basic Listings). According to LoopNet, therefore, its "Showcase Property Listings" are "exposed" to 900,000 individuals ("ten times the exposure of Basic Listings"). This 900,000 figure, according to the LoopNet press release, is "triple the exposure of LoopNet's Premium Listings," which are available to all LoopNet members. The total "exposure of LoopNet's Premium Listings," therefore, is 1/3 of 900,000, or 300,000. Accordingly, by LoopNet's own inadvertent admission, premium ads on LoopNet *are*

- 18 -

*"exposed" not to the then claimed 2.5 million people but to only 300,000, an overstatement of 830%.*

55.     All of these calculations are based on the assumption that 100% of LoopNet's paying members actually use LoopNet. In fact, on information and belief, a substantial number of paying members do not – such as individuals whose companies purchase a subscription for them that they do not use. If this reality is taken into account, the fair calculations of LoopNet's actual users above would reveal even greater overstatement by LoopNet.

56.     Similar facts emerge from an analysis of LoopNet's unique website visitors. If LoopNet's claims about its vast number of *users* were true, they would be reflected in corresponding increases in *unique visitors* to its website. But in fact, LoopNet's own reports about unique visitors show the falsity of its claims about growth in users.

57.     LoopNet has told the public that its users grew by 720% (from 305,000 to 2.5 million) between April 2002 and December 2007; however, by its own account, LoopNet's unique visitors grew by far less (from 341,000 to 915,000, or 168%) over that same period. In other words, *LoopNet's claimed growth in users is over four times larger than its growth in unique monthly visitors.* The following chart tells the story:

1717969v.2



<u>LoopNet Executives Have Been Selling Stock While Propagating These Claims of Growth</u>

58.    LoopNet conducted an initial public offering of its stock in June 2006.  Since then, in an effort to attract more customers and to boost the trading prices for the company's stock, LoopNet has issued repeated press releases calling the market's attention to supposed increases in LoopNet "members."  LoopNet has issued such press releases on at least the following dates:  August 22, 2006 (1.5 million members), April 26, 2007 (2 million members); November 28, 2007 (2.5 million members); and March 19, 2008 (2.75 million members).

59.    LoopNet's executives are fully aware that, through those press releases and similar statements, the company has communicated to the marketplace a false picture of the number and nature of the users of the company's website.  LoopNet's communication of false and misleading information to the marketplace has thus been deliberate and intentional.

- 20 -

60.    During the time that LoopNet has engaged in this deliberate campaign to deceive the marketplace, its top executives have sold large amounts of their company stock. Since the IPO in 2006, for example, LoopNet CEO Richard Boyle has disposed of more than $6.4 million of his LoopNet stock, or over 27% of his total shares. Mr. Boyle has done so through over 1,100 different transactions.

61.    During the same period, LoopNet's CFO, Brent Stumme, disposed of more than $5 million of LoopNet stock, or more than 41% of his LoopNet shares. Mr. Stumme has done so through over 800 different transactions.

62.    Similarly, LoopNet's Chief Marketing Officer, Thomas Byrne, who is quoted in press releases boasting (falsely) about LoopNet's vast "membership," disposed of over $7.2 million of LoopNet stock since the IPO, or almost 60% of his total shares. Mr. Byrne has done so through more than 900 different transactions.

63.    LoopNet Chief Technology Officer, Wayne Warthen, disposed of more than $2.7 million of LoopNet stock since the IPO, or more than 15% of his total shares. Mr. Warthen has made these sales in over 500 different transactions.

64.    LoopNet Chief Product Officer, Jason Greenman, has disposed of almost $2 million of LoopNet stock since the IPO, or over 17% of his total shares. Mr. Greenman has done so through nearly 500 different transactions.

65.    On information and belief, the intentional nature of LoopNet's violations of the Lanham Act is shown by the fact that LoopNet executives have sought to dispose of their holdings of company stock before the marketplace becomes aware of the truth about the size of LoopNet's user base.

### LoopNet's New Marketing Offensive

66.    On May 15, 2008 CoStar announced the launch of CoStar Showcase, an online commercial property marketing service. CoStar Showcase is designed to provide commercial real estate professionals with an online platform for listing their properties before a large audience of online prospects.

67.    Prior to launching Showcase, CoStar had focused on the provision of information services to commercial real estate professionals in the United States. The launch of Showcase marks CoStar's expansion from the provision of information *about* markets and listings into the business of marketing specific properties through online listings.

68.    The launch of CoStar Showcase opened up a new front of competition between CoStar and LoopNet. Indeed, CoStar has now moved into LoopNet's core business: the online marketing of commercial real estate listings.

69.    In seeking to hold off this new threat from CoStar, LoopNet has launched an advertising and promotional campaign designed to spread false information about the size of LoopNet's user community in comparison to CoStar's. Some of the claims that LoopNet makes as part of this new campaign build on its prior marketing tactics, while others are new.

70.    Just days after the launch of CoStar's Showcase, LoopNet's CEO Richard Boyle made a presentation at the Seventh Annual JMP Securities Research Conference during which he falsely dismissed CoStar's Showcase product as having "no marketing audience."

71.    By comparison, LoopNet claims to have a vast and unparalleled audience. In recent ads that, on information and belief, are designed to fend off the threat from CoStar Showcase, LoopNet has focused on three purported metrics of its size: "registered members," "unique visitors" and "traffic from" its "exclusive network of newspaper websites."

- 22 -

72.   For example, a new LoopNet marketing brochure, an excerpt from which appears below, emphasizes that LoopNet has:

# More Members. More Traffic. More Partners.

- Over 2.75 million registered members
- 950,000 unique visitors each month*
- Exclusive distribution network of 125+ newspaper web sites
- Trusted by the nation's leading brokerage firms

73.   The same advertisement falsely claims that a "Premium" listing enables realtors to "Reach LoopNet's Entire Member Base," and that such listings are "viewable to 2.75 million registered members."

74.   This LoopNet flyer goes on to detail LoopNet's purported size as compared to its (unnamed) competitors. Among other things, the ad falsely claims that LoopNet attracts "950,000 unique visitors *each month*" and that this figure "doesn't include traffic from our exclusive network of newspaper web site partners which generates more than 18 million unique visitors each month." The portion of the ad that contains these claims appears below:



On information and belief, the dark blue bar on the above graph, immediately adjacent to the red LoopNet bar, is intended to reflect the "web site traffic" generated by CoStar.

- 23 -

1717969v.2

75.    Other LoopNet ads that, on information and belief, are part of the same

comparative marketing initiative, make the same claims.  For example, another brochure

currently being distributed by LoopNet not only repeats these claims, but explicitly asks the

reader to use them as a basis for comparison:

## Does your online marketing compare?

**STRENGTH IN NUMBERS**

• **2.75 million** registered members

• **950,000** unique visitors per month

• **125+** national and local newspaper web site partners

• Powering listings to **1000+** commercial real estate web sites

**LoopNet**

\* Ic mans traffic than any other commercial real estate web site. comScore. 2007

76.    Similar claims are also repeated on LoopNet's website:

## About LoopNet

LoopNet is a leading commercial real estate information services provider offering a suite of
products and services tailored to the national and local needs of the commercial
investments industry. LoopNet operates the largest and most heavily trafficked commercial
real estate listing service online with more than 2.75 million registered members and
950,000 unique visitors monthly.

77.    The LoopNet website has also recently claimed that LoopNet has "the largest

database of commercial listings."

78.    All of these claims of relative size, which form the heart of LoopNet's new

marketing offensive to combat CoStar's Showcase, are false or misleading.

- 24 -

1717969v.2

79.    As detailed above, LoopNet's claims regarding "registered members" are false and misleading in that they erroneously conflate "registered members" with active users. As LoopNet has conceded in its own public statements, LoopNet does not have a "Member Base" of 2.75 million individuals to whom listings are actually "viewable."

80.    LoopNet's claims regarding the monthly number of unique visitors to its website are similarly false. According to its ads, LoopNet's claim that it has "950,000 unique visitors each month" purportedly is based upon data from an internet traffic monitoring service. In fact, the very data that LoopNet cites shows that actual visits to LoopNet.com fall short of this claim.

81.    In the 15 months from February 2007 to April 2008, the number of total unique monthly visitors to LoopNet.com exceeded 950,000 only three times (April 2007, July 2007, and January 2008). Each of these spikes was preceded, and followed, by a monthly traffic level *below* the 950,000 claimed by LoopNet. Indeed, in eight of the remaining 12 months, LoopNet had fewer than 900,000 unique monthly visitors, including as recently as March 2008, when it had fewer than 850,000.

82.    LoopNet's claims regarding supposed additional "traffic from [its] exclusive network of newspaper web site partners," which LoopNet claims "generates more than 18 million unique visitors each month," are also false and misleading.

83.    In fact, based on the source relied upon by LoopNet, LoopNet.com typically attracts fewer than 900,000 unique visitors to its website in a given month. Those visitors are counted whether they arrived at LoopNet's site by manually entering an internet address, using a search engine, or clicking on a link provided by one of LoopNet's online marketing partners. LoopNet's claim that its audience "doesn't include" traffic from online newspapers that "generate more than 18 million unique visitors each month" is therefore false and deceptive.

- 25 -

84.    Moreover, on information and belief, the "18 million" figure to which LoopNet refers in its advertising represents *all* visitors to these newspaper websites, regardless of what content they view. A person who accesses the New York Times website to check the latest headlines or sports scores is no more likely to read one of LoopNet's commercial real estate listings than anyone else who happens to be surfing the internet. LoopNet's assertions concerning the "18 million unique visitors" to these websites are therefore meaningless and deceptive.

85.    Finally, LoopNet's claim that it offers the "largest database of commercial listings" is false. Upon information and belief, LoopNet currently has approximately 595,000 listings on its website, whereas CoStar has over a million. Accordingly, CoStar – not LoopNet – offers the largest database of commercial listings.

### Harm to CoStar and the Public

86.    The marketplace understands LoopNet's representations about its registered members to mean that LoopNet has 2.75 million active users. This figure is critically important to the marketplace. LoopNet has worked hard, and with success, to convince consumers in the commercial real estate industry that providing property listings to LoopNet results in those listings being "seen" by or otherwise "exposed' to millions of unique individuals. Similar false impressions are conveyed by LoopNet's inaccurate claims concerning "950,000 unique visitors each month," additional traffic from "18 million" online newspaper readers, and "the largest database of commercial listings." The result of these false impressions is that consumers are likely to be more willing to provide such property listings to LoopNet, to sign up as a registered member of LoopNet, and to subscribe to LoopNet's premium or other pay services, rather than to do business with CoStar.

- 26 -

1717969v.2

87.    LoopNet's false and misleading statements are perceived as so credible that they have even misled securities analysts into misgauging the value and growth of LoopNet as a business. For example, in a July 18, 2006 report on the company, Heath Terry and Andrew Thomas of Credit Suisse stated that the expansion of LoopNet's "base of registered members" was one of the *"five major opportunities"* for growth.

88.    As discussed above, LoopNet's false claims have deceived both the real estate industry and the securities industry and have harmed CoStar in its competition with LoopNet. The harm to CoStar is especially acute because LoopNet is utilizing these false claims in order to compete with CoStar's new Showcase product. Unless enjoined, LoopNet's ongoing false advertising will impede CoStar's ability to gain market share, sales, momentum, and goodwill and will injure CoStar in a manner that cannot be readily quantified or recaptured. CoStar thus has a strong commercial interest in preventing the further dissemination of LoopNet's false and misleading claims.

89.    CoStar has no adequate remedy at law.

- 27 -

## COUNT I (LANHAM ACT)

90.    CoStar repeats and realleges the allegations contained in paragraphs 1 through 89 above.

91.    In connection with its services, which are offered in interstate commerce, LoopNet has made false or misleading descriptions or representations of fact. These false or misleading statements misrepresent the nature, characteristics, or qualities of LoopNet's services or commercial activities. LoopNet's statements are expressly false, impliedly false, or both.

92.    LoopNet's false or misleading statements have deceived, or have the tendency to deceive, a substantial portion of the intended audience, about matters that are material to purchasing decisions.

93.    LoopNet's misrepresentations about the number of its members are made in commercial advertising and promotion in interstate commerce and violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

94.    CoStar is likely to suffer, has suffered, and will continue to suffer damage as a result of LoopNet's wrongful acts.

## COUNT II (NEW YORK GENERAL BUSINESS LAW §§ 349 AND 350)

95.    CoStar repeats and realleges the allegations contained in paragraphs 1 through 94 above.

96.    In connection with its services, which are offered in interstate commerce, LoopNet has made false or misleading descriptions or representations of fact. LoopNet's statements are expressly false, impliedly false, or both. These false or misleading statements

- 28 -

misrepresent the nature, characteristics, or qualities of LoopNet's services or commercial activities in violation of sections 349, 350, and 350-a of the New York General Business Law.

97.    LoopNet's false AND misleading statements are material to consumer purchasing decisions in the market for commercial real estate advertising. These statements have caused, or have the tendency to cause, consumer confusion and, upon information and belief, have led some customers to purchase LoopNet's services instead of CoStar's services, or to refrain from switching from LoopNet's services to CoStar's services, thereby harming CoStar.

98.    CoStar is likely to suffer, has suffered, and will continue to suffer damage as a result of LoopNet's wrongful acts.

## COUNT III (COMMON LAW UNFAIR COMPETITION)

99.    CoStar repeats and realleges the allegations contained in paragraphs 1 through 98 above.

100.    In connection with its services, which are offered in interstate commerce, LoopNet has made false or misleading descriptions or representations of fact. These statements misrepresent the nature, characteristics, or qualities of LoopNet's services or commercial activities.

101.    LoopNet's false and misleading statements have misappropriated CoStar's labors, skills, expenditures, and good will by causing, or having the tendency to cause, consumer confusion and, upon information and belief, have led some customers to purchase LoopNet's services instead of CoStar's services, or to refrain from switching from LoopNet's services to CoStar's services, thereby harming CoStar.

102.    LoopNet's conduct was undertaken in bad faith.

- 29 -

103. CoStar is likely to suffer, has suffered, and will continue to suffer damage as a result of LoopNet's wrongful acts.

WHEREFORE, CoStar respectfully requests that the Court:

A.    Issue an order that preliminarily and permanently enjoins LoopNet, its agents, servants, employees, representatives, subsidiaries and affiliates refrain from:

      i.    Directly or indirectly using in commerce or causing to be published or otherwise disseminated any advertising or promotional materials or activities containing any of the false and misleading claims described in the First Amended Complaint;

      ii.    Directly or indirectly using in commerce any claim, statement, or representation that states or implies that the number of members of LoopNet is greater than the number of members that actively use the LoopNet service.

B.    Issue an order directing LoopNet to issue appropriate corrective advertisements and promotional materials, reasonably designed to reach all people to whom its false and misleading advertising and promotional materials were disseminated, retracting the false and misleading claims contained in the advertising and promotional materials;

C.    Award the maximum dollar amount permitted by the Lanham Act, including damages and/or profits (trebled as provided by law);

D.    Award CoStar its attorney's fees, costs, and disbursements; and

E.    Grant such other and further relief as the Court deems just and appropriate.

- 30 -

1717969v.2

## Jury Demand

CoStar respectfully demands a jury trial on all issues triable to a jury in this action.

Dated:  June 19, 2008

Respectfully submitted,

Steven A. Zalesin
Karla G. Sanchez
Adeel A. Mangi
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000
Facsimile 212-336-2222

Patrick J. Carome
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone 202-663-6000
Facsimile 202-663-6363

Attorneys for Plaintiff CoStar Group, Inc.

Of counsel:

Christopher Winters, Esq.
CoStar Group, Inc.

- 31 -

# AFFIDAVIT OF SERVICE

STATE OF NEW YORK          )
                           :ss.:
COUNTY OF NEW YORK         )

CHRISTINA I. BELANGER, being duly sworn, deposes and says:

1.     I am over 18 years of age, not a party to this action, and employed by the law firm of Patterson, Belknap, Webb & Tyler LLP, located at 1133 Avenue of the Americas, New York, New York 10036.

2.     On June 23, 2008, I served a copy of the foregoing *FIRST AMENDED COMPLAINT* upon the following by enclosing a true copy of same in a postage prepaid wrapper and depositing it in a depository maintained by the U.S. Postal Service at 1133 Avenue of the Americas, New York, New York, directed to them at the addresses below:

> Jacques Semmelman, Esq.
> CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
> 101 Park Avenue
> New York, New York 10178-0061

> Elliot Noah Brown, Esq.
> IRELL & MANELLA LLP
> 1800 Avenue of the Stars
> Suite 900
> Los Angeles, California 90067-4276

CHRISTINA I. BELANGER

Sworn to before me this
23rd day of June, 2008

Notary Public
ELIZABETH WILLIS
Notary Public, State of New York
No. 31-01WI6014358
Qualified in New York County
Commission Expires October 13, 2010