UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
COSTAR GROUP, INC.,
                                                           :
                              Plaintiff,         No. 08-CV-1156 (GWG)
                                                           :
              v.
                                                           :   **ANSWER TO COSTAR'S FIRST**
                                                               **AMENDED COMPLAINT AND**
                                                           :   **COUNTERCLAIMS**
LOOPNET, INC.,

                              Defendant        :
                              and Counter-
                              Plaintiff.
-----------------------------------------------------------X
                                                           :
LOOPNET, INC.,
                                                           :
                              Counterclaim
                              Plaintiff,
                                                           :
              v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

                              Counterclaim  :
                              Defendants.
-----------------------------------------------------------X

## ANSWER

Defendant LoopNet Inc. ("LoopNet"), as and for its Answer to Plaintiff CoStar

Group, Inc.'s ("CoStar") First Amended Complaint, states as follows:

1.      LoopNet admits that the First Amended Complaint purports to be an action under

the Lanham Act that seeks various forms of relief.  LoopNet otherwise denies the allegations in

paragraph 1 of the First Amended Complaint.

2.      LoopNet admits the allegations in paragraph 2 of the First Amended Complaint.

3.      LoopNet admits that its understanding is that sellers of commercial real estate

generally wish to expose their property listings to the largest possible audience of potential

buyers. LoopNet admits that its understanding is that buyers, depending on their specific needs, generally prefer to search a comprehensive collection of listings. LoopNet admits that its understanding is that the audience and scope of an online listing service are among the considerations that are important to consumers. LoopNet otherwise denies the allegations in paragraph 3 of the First Amended Complaint.

4.      LoopNet admits that its website and certain of its advertising contain, among other statements, the words "more than 2.75 million registered members" and that the referenced material, in context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 4 of the First Amended Complaint.

5.      LoopNet admits that its Premium Listings can be viewed by any of its 2.75 registered members. LoopNet otherwise denies the allegations in paragraph 5 of the First Amended Complaint.

6.      LoopNet admits that, as is typically true of websites that have registered members, the number of LoopNet's registered members who are accessing LoopNet's site at any given moment is likely less than the totality of its registered membership. How much less, and therefore what "fraction" corresponds to the ratio between the number of members accessing LoopNet's site at any given moment and the totality of its registered membership, will vary based on time period. LoopNet lacks sufficient knowledge and information to identify the alleged account referenced in paragraph 6; therefore; LoopNet is unable to confirm the accuracy of the allegation, and, on that basis, LoopNet denies the allegations related to that alleged account. LoopNet otherwise denies the allegations in paragraph 6 of the First Amended Complaint.

7.      LoopNet admits that, as part of its business operations, it permits its registered members to post real estate listings on LoopNet's website where such listings are available in a

searchable format. LoopNet lacks sufficient knowledge and information to characterize CoStar's business operations and, on that basis, denies the allegations related to those operations. LoopNet otherwise denies the allegations in paragraph 7 of the First Amended Complaint.

8. LoopNet admits that it is aware that CoStar has launched something called "CoStar Showcase," which followed LoopNet's launching of its Premium and Showcase listing products. LoopNet admits that "CoStar Showcase" purports to be in competition with services operated by LoopNet. LoopNet lacks sufficient knowledge and information to identify the exact date on which CoStar "introduced" CoStar Showcase, except that LoopNet admits that it was after LoopNet introduced both its Premium and Showcase listing products; therefore, LoopNet cannot confirm the accuracy of the allegation related to the inception of that service, and, on that basis, LoopNet denies that allegation. LoopNet specifically denies that Showcase is CoStar's first foray into the business of marketing commercial real estate listings. LoopNet otherwise denies the allegations in paragraph 8 of the First Amended Complaint.

9. LoopNet admits that certain of its advertising refers to various metrics related to the number of LoopNet's registered members and/or unique users. LoopNet admits that certain of its advertisements have contained, among other statements, the words "Does your online marketing compare?" and "2.75 million registered members" and that the referenced material, in context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 9 of the First Amended Complaint.

10. LoopNet admits that certain of its advertisements have contained, among other statements, the words "950,000 unique visitors each month" and that the referenced material, in context, speaks for itself. LoopNet admits that, among other statements, the words "the largest database of commercial listings" have appeared on LoopNet's website in reference to LoopNet's

services and that the referenced material, in context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 10 of the First Amended Complaint.

11. LoopNet admits that, among other statements, certain of LoopNet's advertising has contained the words selectively quoted out of context by CoStar, and that, taken in context, LoopNet's advertising speaks for itself. LoopNet lacks knowledge or information to form a belief as to why "readers" access online newspaper sites and as to what percentage of those "readers" are exposed to commercial real estate classified ads; therefore, LoopNet cannot confirm the accuracy of these allegations related to "readers," and, on that basis, LoopNet denies these allegations. LoopNet otherwise denies the allegations in paragraph 11 of the First Amended Complaint.

12. LoopNet denies the allegations in paragraph 12 of the First Amended Complaint.

13. Upon information and belief, LoopNet admits that CoStar is a Delaware corporation with its principal place of business and corporate offices at 2 Bethesda Metro Center, Bethesda, MD 20814-5388. LoopNet otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 13 of the First Amended Complaint, and on this basis denies them.

14. LoopNet admits the allegations in paragraph 14 of the First Amended Complaint.

15. Paragraph 15 of the First Amended Complaint pleads issues of law and therefore requires no response.

16. Paragraph 16 of the First Amended Complaint pleads issues of law and therefore requires no response.

17.    LoopNet admits that, at various times, its advertising has included statements referring to its growing number of its registered members. LoopNet otherwise denies the allegations in paragraph 17 of the First Amended Complaint.

18.    LoopNet is informed and believes that the RCA Report is a commercial real estate journal published by the National Association of Realtors. LoopNet admits that it sponsored the referenced advertisement and that the advertisement contained, among other statements, the words that CoStar has selectively quoted, and that the referenced material, in context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 18 of the First Amended Complaint.

19.    LoopNet is informed and believes that the material referenced in the allegation is a third-party case study initially drafted by Microsoft, which contains the words selectively quoted in the allegation, and to which Microsoft later appended LoopNet's logo. LoopNet otherwise denies the allegations in paragraph 19 of the First Amended Complaint.

20.    LoopNet admits that, on November 9, 2006, LoopNet's CEO Richard Boyle was interviewed by John Duncan, who purportedly is an Internet Infrastructure and Services Analyst with the firm Pacific Growth Equities. LoopNet admits that a purported transcript of the interview prepared by Thompson Financial contains, among other statements, the words selectively quoted by CoStar and attributed to Mr. Boyle. LoopNet admits that public comments made by Mr. Boyle, taken in context, speak for themselves. After reasonably diligent investigation, LoopNet has been unable to ascertain the accuracy of the transcript and quoted material attributed to Mr. Boyle; therefore, at this time LoopNet lacks knowledge or information sufficient to form a belief as to the truth of these allegations, and, on this basis, LoopNet denies

them. LoopNet otherwise denies the allegations in paragraph 20 of the First Amended Complaint.

21.     LoopNet admits that it participated in a conference call on October 24, 2007, during which Mr. Boyle spoke. LoopNet admits that Mr. Boyle's comments, which included the three words selectively quoted by CoStar, taken in context, speak for themselves. LoopNet admits that on August 2, 2007, Mr. Boyle made, among other statements, the respective alleged statement or one similar to it during a conference call, and that, taken in context, Mr. Boyle's statements speak for themselves. LoopNet otherwise denies the allegations in paragraph 21 of the First Amended Complaint.

22.     LoopNet admits that one of its past brochures contained, among other statements, the words "LoopNet Product Summary" and the other text selectively quoted by CoStar. LoopNet admits its statements, taken in context, speak for themselves. LoopNet otherwise denies the allegations in paragraph 22 of the First Amended Complaint.

23.     CoStar's allegations regarding Mr. Boyle's alleged statements provide insufficient information regarding the time, place, or manner in which these alleged statements were made. After reasonably diligent investigation, LoopNet does not have sufficient knowledge and information at this time to form a belief as to whether Mr. Boyle made these alleged statements, and, on that basis, LoopNet denies them. LoopNet admits that, in emails to customers, it has previously used, among other statements, the words selectively quoted by CoStar, and that, taken in context, those emails speak for themselves. LoopNet otherwise denies the allegations in paragraph 23 of the First Amended Complaint.

24.     After reasonably diligent investigation, LoopNet has been unable to locate any material that recites the statement alleged by CoStar to be found in a brochure called "Premium

Membership for Professionals"; therefore, LoopNet does not have sufficient knowledge and information at this time to form a belief as to the truth of the allegation and on that basis denies the allegation. LoopNet otherwise denies the allegations in paragraph 24 of the First Amended Complaint.

25.    LoopNet admits that it issued a press release on November 28, 2007, that contained, among other statements, the words selectively quoted by CoStar, and that, taken in context, the press release speaks for itself. LoopNet otherwise denies the allegations in paragraph 25 of the First Amended Complaint.

26.    LoopNet denies the allegations in paragraph 26 of the First Amended Complaint as stated, except LoopNet admits that its website has previously contained, among other statements, the words selectively quoted by CoStar, and that the referenced material, taken in context, speaks for itself.

27.    LoopNet admits that the quoted words have appeared on its website and that the referenced material, taken in context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 27 of the First Amended Complaint.

28.    LoopNet admits that, on November 9, 2006, LoopNet's CEO Richard Boyle was interviewed by John Duncan, who purportedly is an Internet Infrastructure and Services Analyst with the firm Pacific Growth Equities. LoopNet admits that a purported transcript of the interview prepared by Thompson Financial contains, among other statements, the words selectively quoted by CoStar and attributed to Mr. Boyle as his November 2006 statement. LoopNet admits that public comments made by Mr. Boyle, taken in context, speak for themselves. After reasonably diligent investigation, LoopNet has been unable to ascertain the accuracy of the transcript and quoted material attributed to Mr. Boyle; therefore, at this time

LoopNet lacks knowledge or information sufficient to form a belief as to the truth of this allegation, and, on this basis, LoopNet denies it. After reasonably diligent investigation, LoopNet has been unable to locate evidence of the oral statements allegedly attributed to Mr. Boyle in November 2007; therefore, LoopNet lacks sufficient knowledge and information at this time to form a belief as to whether Mr. Boyle made the alleged oral statements, and, on that basis, LoopNet denies them. LoopNet otherwise denies the allegations in paragraph 28 of the First Amended Complaint.

29.     LoopNet admits that, as part of its marketing, LoopNet has from time to time reported data concerning the size of its membership. LoopNet admits that, on November 9, 2006, LoopNet's CEO Richard Boyle was interviewed by John Duncan, who purportedly is an Internet Infrastructure and Services Analyst with the firm Pacific Growth Equities. LoopNet admits that a purported transcript of the interview prepared by Thompson Financial contains, among other statements, the words selectively quoted by CoStar and attributed to Mr. Boyle as his November 2006 statement. LoopNet admits that public comments made by Mr. Boyle, taken in context, speak for themselves. After reasonably diligent investigation, LoopNet has been unable to ascertain the accuracy of the transcript and quoted material attributed to Mr. Boyle; therefore, at this time LoopNet lacks knowledge or information sufficient to form a belief as to the truth of this allegation, and on this basis LoopNet denies it. LoopNet is informed and believes that the New York Times website currently posts an article dated February 3, 2008, that states, among other statements, that Mr. Byrne had made the statement alleged. LoopNet otherwise denies the allegations in paragraph 29 of the First Amended Complaint.

30.     LoopNet denies the allegations in paragraph 30 of the First Amended Complaint as stated, except that LoopNet admits that its number of registered members, and the growth of

that number, are among the important statistics that it has accurately and truthfully disclosed in public filings, which speak for themselves.

31.    LoopNet denies the allegations in paragraph 31 of the First Amended Complaint as stated, except that LoopNet admits that it issued a press release dated August 22, 2006, that contains, among other statements, the words selectively quoted by CoStar and that the referenced material, taken in context, speaks for itself.

32.    LoopNet does not have sufficient information or knowledge to ascertain how CoStar defines "marketplace" and the extent to which that "marketplace" relies on any particular information; therefore, on that basis, LoopNet denies allegation. LoopNet is informed and believes that third-parties the New York Times online and Zacks.com currently have entries purportedly dated with the respective dates alleged that contain the words, among other statements, that CoStar has selectively quoted. LoopNet admits that it has a large and growing number of registered members. LoopNet otherwise denies the allegations in paragraph 32 of the First Amended Complaint.

33.    LoopNet is informed and believes, based on what is currently available on the internet, that the third-party Michigan Business Review ran an article dated June 14, 2007, that contained the words, among other statements, quoted by CoStar. LoopNet is informed and believes that this purported "quote" does not actually quote any statement Mr. Byrne ever made verbatim, and on that basis, LoopNet denies the allegation. LoopNet otherwise denies the allegations in paragraph 33 of the First Amended Complaint.

34.    LoopNet admits that its term "registered members" has the meaning commonly understood in its industry. LoopNet otherwise denies the allegations in paragraph 34 of the First Amended Complaint.

35.    LoopNet admits that it has allowed members to register with its service during the years that it has provided that service to the public and that its registered members are constituted as commonly understood in the industry. LoopNet otherwise denies the allegations in paragraph 35 of the First Amended Complaint.

36.    LoopNet admits that, as its registered membership has grown and continues to grow, it has variously reported publicly on its total number of registered member accounts, which totaled approximately 2 million in April 2007 and 2.5 million in November 2007, and which currently total over 2.75 million. LoopNet otherwise denies the allegations in paragraph 36 of the First Amended Complaint.

37.    LoopNet is informed and believes that third-party website RetailTraffic currently has an online post that contains, among other statements, the alleged quote made by a third-party poster. *See* http://retailtrafficmag.com/management/technology/technology_bit_byte/index.html. LoopNet admits that on its website, it quotes third-party California Real Estate Journal's report of Apri 19, 2007, wherein that third-party stated, among other statements: "According to Comscore, which tracks Internet activity, LoopNet has 1.77 million registered users, with 875,000 unique users per month in 2006." LoopNet is informed and believes that the third-party Virtual Earth website currently contains the words alleged in a blog posting dated April 27, 2006, under the header "Solution Highlight: LoopNet," which are quoted out of context. This third-party blog posting refers to part of LoopNet's LoopLink technology, and not to LoopNet's main site accessible at www.LoopNet.com. The third-party blogger states: "LoopNet's [LoopLink] solution powers over 1000 websites used by over 1.2 million members. " *See* http://blogs.msdn.com/virtualearth/archive/2006/04/27/585614.aspx. LoopNet does not have sufficient information or knowledge to confirm the accuracy of this third-party statement and on

that basis denies it.  LoopNet also is informed and believes that, in a third-party internet posting

currently available on the internet entitled "Guide to Real Estate and Construction for Small

Business" and attributed to third-party LaRita M. Heet, the third-party poster's statements of

opinion recite the words alleged by CoStar. *See*

http://www.business.com/directory/real_estate_and_construction/.  LoopNet lacks sufficient

knowledge and information to form a belief as to the truth of CoStar's allegations regarding

purported statements made by unnamed sources and, on that basis, LoopNet denies these

allegations.  LoopNet otherwise denies the allegations in paragraph 37 of the First Amended

Complaint.

      38.    LoopNet admits that it is a publicly-traded company subject to the legal

requirements applicable to public companies.  LoopNet is informed and believes that the third-

party report identified by CoStar exists and contains, among other statements, the words CoStar

selectively quotes.  LoopNet lacks knowledge or information sufficient to form a belief as to the

truth of the allegations regarding Mr. Jeffrey and Mr. Ancich, including their respective states of

mind, and on this basis denies these allegations.  LoopNet otherwise denies the allegations in

paragraph 38 of the First Amended Complaint.

      39.    LoopNet is informed and believes that the third-party press release exists and

contains, among other statements, the words CoStar selectively quotes.  LoopNet lacks

knowledge or information sufficient to form a belief as to the truth of the allegations regarding

Mr. Fuller and Mr. Forrester, including their respective states of mind, and on this basis denies

these allegations.  LoopNet otherwise denies the allegations in paragraph 39 of the First

Amended Complaint.

40.    LoopNet is informed and believes that there exists a third-party website named "The Motley Fool." LoopNet lacks knowledge or information sufficient to form a belief as to whether that website is "influential" and therefore denies it. LoopNet denies that it has made alleged "false claims," and therefore denies that The Motley Fool website has been misled by any such alleged false claims. LoopNet otherwise denies the allegations in paragraph 40 of the First Amended Complaint.

41.    LoopNet is informed and believes that, in a third-party posting dated on December 31, 2007, attributed to Katrina Chan, and currently available on the third-party The Motley Fool website (www.fool.com), the respective third-party posting contains, among other statements, the words selectively quoted by CoStar. LoopNet lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the third-party website's, its employees' or contributors' respective states of mind, and, on this basis, denies them. LoopNet otherwise denies the allegations in paragraph 41 of the First Amended Complaint.

42.    LoopNet is informed and believes that the words selectively quoted by CoStar currently appear, among other statements, in third-party internet postings on the third-party website The Motley Fool, dated as alleged by CoStar and with bylines as alleged by CoStar. LoopNet lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the third-party website's employees' or contributors' respective states of mind, and, on this basis, denies them. LoopNet otherwise denies the allegations in paragraph 42 of the First Amended Complaint.

43.    LoopNet is informed and believes that the words selectively quoted by CoStar currently appear, among other statements, in third-party internet postings on the third-party website The Motley Fool, dated as alleged by CoStar and with bylines as alleged by CoStar.

LoopNet lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the third-party website's, its employees' or contributors' respective states of mind, and, on this basis, denies them. LoopNet otherwise denies the allegations in paragraph 43 of the First Amended Complaint.

44.    LoopNet is informed and believes that the third-party website www.PaperClipCMS.com currently has a posting dated June 1, 2007, under the heading "LoopNet: Successful Commercial Website" that includes, among other statements, the words selectively quoted by CoStar. LoopNet is informed and believes that the third-party website TheStreet.com's "stockpickr" blog (www.stockpickr.com) currently posts a blog entry dated April 29, 2007, and purportedly made under the name "sarah z" that includes, among other statements, the words selectively quoted by CoStar. LoopNet also is informed and believes that the third-party Forbes website (www.forbes.com) currently has an entry dated June 2, 2006, under the byline of Scott Reeves that contains, among other statements, the words selectively quoted by CoStar. Despite a reasonably diligent search, LoopNet has been unable to locate evidence of the existence of a purported TheStreet.com video commentary dated July 17, 2007, by Lindsay Campbell or of a quote matching that purportedly attributed by CoStar to the Urban Land Institute newsletter, and as such, LoopNet lacks knowledge or information sufficient to form a belief as to the truth of these allegations and, on this basis, denies them. LoopNet also lacks knowledge or information sufficient to form a belief as to the truth of the allegations regarding the third-party websites', their employees' or contributors' respective states of mind, and, on this basis, denies them. LoopNet otherwise denies the allegations in paragraph 44 of the First Amended Complaint.

45.     LoopNet is informed and believes that there exists a third-party report dated November 2007 that purports on its face to be written by Andrew Jeffrey and Richard Cheever, purportedly securities analysts at SunTrust Robinson Humphrey.  LoopNet is informed and believes that this third-party report contains, among other statements that may provide context, the words selectively quoted by CoStar.  LoopNet otherwise denies the allegations in paragraph 45 of the First Amended Complaint.

46.     LoopNet denies that it has cultivated any false impressions through its public statements and presentations, or otherwise.  There is, therefore, nothing for LoopNet to correct.  LoopNet otherwise denies the allegations in paragraph 46 of the First Amended Complaint.

47.     LoopNet is informed and believes that third-party website StartupReview.com currently has a posting dated June 3, 2007, attributed to a Mr. Rob Finn, that contains the words selectively quoted out of context by CoStar in its allegation.  In the posting, the author continues to opine that the statements CoStar alleges evidence falsity are in fact "absolutely true."  *See* http://www.startup-review.com/blog/loopnet-case-study-partnerships-build-data-asset.php.  LoopNet otherwise denies the allegations in paragraph 47 of the First Amended Complaint.

48.     LoopNet admits that, on February 27, 2008, LoopNet's CEO Richard Boyle participated in the Jeffries Fourth Annual Internet Conference.  LoopNet admits that public comments made by Mr. Boyle, taken in context, speak for themselves.  After reasonably diligent investigation, LoopNet does not have sufficient knowledge or information to determine the accuracy of the statements attributed to Mr. Boyle or other conference participants; therefore, at this time LoopNet lacks knowledge or information sufficient to form a belief as to the truth of this allegation, and, on this basis, LoopNet denies it.  LoopNet otherwise denies the allegations in paragraph 48 of the First Amended Complaint.

49.    LoopNet admits that its June 2006 Prospectus contains, among many other statements, the words selectively quoted by CoStar and that those statements, taken in context, speak for themselves.  LoopNet admits that its term "registered members" has the meaning as commonly understood in its industry.  LoopNet otherwise denies the allegations in paragraph 49 of the First Amended Complaint.

50.    LoopNet admits that it obtains information regarding its website's usage, some of which is publicly disclosed.  LoopNet otherwise denies the allegations in paragraph 50 of the First Amended Complaint.

51.    LoopNet admits that it has worked diligently to promote its business and its customers' real estate listings.  LoopNet otherwise denies the allegations in paragraph 51 of the First Amended Complaint.

52.    LoopNet admits that, as of September 30, 1997, LoopNet's service had over 90,000 Premium Members.  LoopNet admits that it previously has included, among other statements, the words selectively quoted by CoStar on the "Basic Membership Reference Guide" portion of its website, and that the referenced material, taken in context, speaks for itself.  LoopNet otherwise denies the allegations in paragraph 52 of the First Amended Complaint.

53.    LoopNet admits that it previously has included, among other statements, the words selectively quoted by CoStar on LoopNet's "Self-Service Support" area of its website, and that the referenced material, taken in context, speaks for itself.  LoopNet otherwise denies the allegations in paragraph 53 of the First Amended Complaint.

54.    LoopNet admits that its November 14, 2007, press release contains, among other statements, the words selectively quoted by CoStar, and that the referenced material, taken in

context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 54 of the First Amended Complaint.

55.    LoopNet lacks sufficient knowledge and information to verify the assumptions CoStar has purportedly made in its supposed calculations, and, on that basis, LoopNet denies the allegation related to CoStar's assumptions. LoopNet otherwise denies the allegations in paragraph 55 of the First Amended Complaint.

56.    LoopNet denies the allegations in paragraph 56 of the First Amended Complaint.

57.    LoopNet admits that it has made accurate and truthful public statements regarding its growth, and that those statements, taken in context, speak for themselves. LoopNet otherwise denies the allegations in paragraph 57 of the First Amended Complaint.

58.    LoopNet admits that it conducted an initial public offering of its stock in June 2006; that, in accordance with its business activities, it issued press releases on the referenced dates that, as cited in paragraph 58, accurately made reference to LoopNet's total number of registered members; and that the referenced material, taken in context, speaks for itself. LoopNet otherwise denies the allegations in paragraph 58 of the First Amended Complaint.

59.    LoopNet denies the allegations in paragraph 59 of the First Amended Complaint.

60.    LoopNet admits that Mr. Boyle has been LoopNet's CEO and that, as and to the extent reported in public SEC Form 4 filings, and on terms disclosed in those filings, certain sales of stock occurred that were effected pursuant to a Rule 10b5-1 trading plan adopted by Mr. Boyle or as a selling shareholder at the time of LoopNet's initial public offering. LoopNet otherwise denies the allegations in paragraph 60 of the First Amended Complaint.

61.    LoopNet admits that Mr. Stumme has been LoopNet's CFO and that, as and to the extent reported in public SEC Form 4 filings, and on terms disclosed in those filings, certain

sales of stock occurred that were effected pursuant to a Rule 10b5-1 trading plan adopted by Mr. Stumme or as a selling shareholder at the time of LoopNet's initial public offering. LoopNet otherwise denies the allegations in paragraph 61 of the First Amended Complaint.

62.     LoopNet admits that Mr. Byrne has been LoopNet's Chief Marketing Officer and that, as and to the extent reported in public SEC Form 4 filings, and on terms disclosed in those filings, certain sales of stock occurred that were effected pursuant to a Rule 10b5-1 trading plan adopted by Mr. Byrne or as a selling shareholder at the time of LoopNet's initial public offering. LoopNet otherwise denies the allegations in paragraph 62 of the First Amended Complaint.

63.     LoopNet admits that Mr. Warthen has been LoopNet's Chief Technology Officer and that, as and to the extent reported in public SEC Form 4 filings, and on terms disclosed in those filings, certain sales of stock occurred that were effected pursuant to a Rule 10b5-1 trading plan adopted by Mr. Warthen or as a selling shareholder at the time of LoopNet's initial public offering. LoopNet otherwise denies the allegations in paragraph 63 of the First Amended Complaint.

64.     LoopNet admits that Mr. Greenman has been LoopNet's Chief Product Officer and that, as and to the extent reported in public SEC Form 4 filings, and on terms disclosed in those filings, certain sales of stock occurred that were effected pursuant to a Rule 10b5-1 trading plan adopted by Mr. Greenman or as a selling shareholder at the time of LoopNet's initial public offering. LoopNet otherwise denies the allegations in paragraph 64 of the First Amended Complaint.

65.     LoopNet denies the allegations in paragraph 65 of the First Amended Complaint.

66.     LoopNet admits that it is aware that CoStar has launched something called "CoStar Showcase." LoopNet lacks sufficient knowledge and information to identify the exact

date on which CoStar "introduced" CoStar Showcase or the purpose for which CoStar Showcase was "designed;" therefore, LoopNet cannot confirm the accuracy of these allegations, and, on that basis, LoopNet denies the allegations. LoopNet otherwise denies the allegations in paragraph 66 of the First Amended Complaint.

67.    LoopNet denies that CoStar's Showcase product marks CoStar's expansion into "the business of marketing specific properties through online listings." To the contrary, CoStar has offered online internet real estate listing services for at least several years. LoopNet lacks sufficient knowledge and information to characterize the "focus" of CoStar's business operations, and, on that basis, LoopNet denies the allegation characterizing that focus. LoopNet otherwise denies the allegations in paragraph 67 of the First Amended Complaint.

68.    LoopNet admits that CoStar's Showcase product competes with LoopNet's service. LoopNet denies that CoStar has only "now" begun to compete with LoopNet via CoStar's Showcase product. To the contrary, CoStar has offered online internet real estate listing services for at least several years. LoopNet otherwise denies the allegations in paragraph 68 of the First Amended Complaint.

69.    LoopNet admits that its current marketing efforts combine both new information and formats as well as information and formats that have been previously disseminated. LoopNet otherwise denies the allegations in paragraph 69 of the First Amended Complaint.

70.    LoopNet admits that its CEO Richard Boyle participated in the Seventh Annual JMP Securities Research Conference and that his statements, taken in context, speak for themselves. LoopNet otherwise denies the allegations in paragraph 70 of the First Amended Complaint.

71.     LoopNet admits that, among other statements, certain of LoopNet's advertising has contained the words selectively quoted out of context by CoStar, and that, taken in context, LoopNet's advertising speaks for itself. LoopNet admits that it offers its customers unparalleled exposure for their property listings via LoopNet's website, which is the most heavily trafficked real estate listing service online. LoopNet otherwise denies the allegations in paragraph 71 of the First Amended Complaint.

72.     LoopNet denies the allegations in paragraph 72 of the First Amended Complaint as stated, except that LoopNet admits that, among other statements, the language selectively quoted and reproduced by CoStar appears in certain of LoopNet's advertising, which, taken in context, speaks for itself.

73.     LoopNet admits that, among other statements, certain of LoopNet's advertising has contained the words selectively quoted out of context by CoStar, and that, taken in context, LoopNet's advertising speaks for itself. LoopNet otherwise denies the allegations in paragraph 73 of the First Amended Complaint.

74.     LoopNet admits that certain of its advertising has contained a graphic that compares LoopNet's unique monthly website traffic to other leading commercial real estate websites that remain unnamed in the advertising. LoopNet admits that, among other statements, the portion from one of LoopNet's advertisements reproduced in paragraph 74 of the First Amended Complaint was included in certain of LoopNet's marketing material. LoopNet admits that certain of its advertising included, among other statements, the words "950,000 unique visitors each month." LoopNet admits that, taken in context, LoopNet's advertising speaks for itself. LoopNet otherwise denies the allegations in paragraph 74 of the First Amended Complaint.

75.    LoopNet admits that the portion from one of LoopNet's advertisements reproduced in paragraph 75 of the First Amended Complaint was included in certain of LoopNet's marketing material, which, taken in context, speaks for itself.  LoopNet admits that facts referenced in the reproduced material have also been referenced in certain of LoopNet's other marketing materials.  LoopNet otherwise denies the allegations in paragraph 75 of the First Amended Complaint.

76.    LoopNet denies the allegations in paragraph 76 of the First Amended Complaint as stated, except that LoopNet admits that, among other statements, the language selectively quoted and reproduced by CoStar appears on LoopNet's website, which, taken in context, speaks for itself.

77.    LoopNet denies the allegations in paragraph 77 of the First Amended Complaint as stated, except that LoopNet admits that, among other statements, the language selectively quoted by CoStar has previously appeared on part of LoopNet's website, which, taken in context, speaks for itself.

78.    LoopNet denies the allegations in paragraph 78 of the First Amended Complaint.

79.    LoopNet denies the allegations in paragraph 79 of the First Amended Complaint.

80.    LoopNet admits that, among other statements, certain of LoopNet's advertising has contained the words selectively quoted out of context by CoStar, and that, taken in context, LoopNet's advertising speaks for itself.  LoopNet admits that the "950,000" number selectively quoted by CoStar is based in part on data reported by non-party comScore.  LoopNet otherwise denies the allegations in paragraph 80 of the First Amended Complaint.

81.    LoopNet denies the allegations in paragraph 81 of the First Amended Complaint.

82.    LoopNet admits that, among other statements, certain of LoopNet's advertising has contained the words selectively quoted out of context by CoStar, and that, taken in context, LoopNet's advertising speaks for itself.  LoopNet otherwise denies the allegations in paragraph 82 of the First Amended Complaint.

83.    LoopNet lacks sufficient knowledge and information to determine what CoStar means by "typically" and by which mechanism CoStar is referring to visitors being "counted"; therefore, LoopNet cannot determine the accuracy of the related allegations as their meaning depends on how CoStar defines those terms.  On that basis, LoopNet denies the related allegations.  LoopNet otherwise denies the allegations in paragraph 83 of the First Amended Complaint.

84.    LoopNet admits that its exclusive network of newspaper website partners generated more than 18 million unique visitors in, for example, February 2008, and that, taken in context, LoopNet's references in its advertising to that network speak for themselves.  LoopNet lacks knowledge or information to form a belief as to why individual persons access the New York Times website or how New York Times website visitors differ from internet users in general. Therefore, LoopNet cannot confirm the accuracy of allegations related to New York Times website users, and, on that basis, LoopNet denies those allegations.  LoopNet otherwise denies the allegations in paragraph 84 of the First Amended Complaint.

85.    LoopNet lacks sufficient knowledge and information to determine how CoStar defines one of its "listings," whether the definition is consistent with LoopNet's use or industry practice, whether the definition is limited to *current* for sale or lease listings, and whether this definition is limited to its Showcase product; therefore, LoopNet cannot confirm the accuracy of

the related allegations, and, on that basis, LoopNet denies the related allegations. LoopNet

otherwise denies the allegations in paragraph 85 of the First Amended Complaint.

86.    LoopNet admits that, among other statements, certain of LoopNet's advertising

has contained the words selectively quoted out of context by CoStar, and that, taken in context,

LoopNet's advertising speaks for itself. LoopNet otherwise denies the allegations in paragraph

86 of the First Amended Complaint.

87.    LoopNet is informed and believes that the third-party report alleged by CoStar

includes, among other statements, the words selectively quoted by CoStar. LoopNet lacks

knowledge or information sufficient to form a belief as to the allegation regarding the states of

mind of securities analysts including Heath Terry and Andrew Thomas and therefore denies

those allegations. LoopNet otherwise denies the allegations in paragraph 87 of the First

Amended Complaint.

88.    LoopNet denies the allegations in paragraph 88 of the First Amended Complaint.

89.    LoopNet denies the allegations in paragraph 89 of the First Amended Complaint.

## RESPONSES TO COUNT I

90.    LoopNet incorporates by reference its responses to the allegations in paragraphs 1

through 89 of the First Amended Complaint as stated above.

91.    LoopNet admits that its services are offered in interstate commerce and otherwise

denies the allegations in paragraph 91 of the First Amended Complaint.

92.    LoopNet denies the allegations in paragraph 92 of the First Amended Complaint.

93.    LoopNet denies the allegations in paragraph 93 of the First Amended Complaint.

94.    LoopNet denies the allegations in paragraph 94 of the First Amended Complaint.

### RESPONSES TO COUNT II

95.    LoopNet incorporates by reference its responses to the allegations in paragraphs 1 through 94 of the First Amended Complaint as stated above.

96.    LoopNet admits that its services are offered in interstate commerce and otherwise denies the allegations in paragraph 96 of the First Amended Complaint.

97.    LoopNet denies the allegations in paragraph 97 of the First Amended Complaint.

98.    LoopNet denies the allegations in paragraph 98 of the First Amended Complaint.

### RESPONSES TO COUNT III

99.    LoopNet incorporates by reference its responses to the allegations in paragraphs 1 through 98 of the First Amended Complaint as stated above.

100.    LoopNet admits that its services are offered in interstate commerce and otherwise denies the allegations in paragraph 100 of the First Amended Complaint.

101.    LoopNet denies the allegations in paragraph 101 of the First Amended Complaint.

102.    LoopNet denies the allegations in paragraph 102 of the First Amended Complaint.

103.    LoopNet denies the allegations in paragraph 103 of the First Amended Complaint.

### AFFIRMATIVE DEFENSES

#### First Affirmative Defense

CoStar fails to state valid claims upon which relief may be granted.

#### Second Affirmative Defense

CoStar's claims are barred by the doctrine of laches.

#### Third Affirmative Defense

CoStar's claims are barred in whole or in part by the statute of limitations.

### Fourth Affirmative Defense

CoStar's claims are barred by the doctrine of estoppel.

### Fifth Affirmative Defense

CoStar's claims are barred by the doctrine of unclean hands.

### Sixth Affirmative Defense

CoStar has in whole or in part released by contract the right to bring these claims.

### Seventh Affirmative Defense

CoStar's claims are barred by the doctrine of waiver.

### COUNTERCLAIMS

Plaintiff LoopNet, Inc. ("LoopNet") hereby alleges for its Counterclaims against Defendants CoStar Group, Inc. ("CoStar Group") and CoStar Realty Information, Inc. ("CRI") (CoStar Group and CRI collectively "CoStar"), on personal knowledge as to its own activities and on information and belief as to the activities of others, as follows:

### The Parties, Jurisdiction and Venue

1.     LoopNet is a Delaware corporation with its principal place of business at 185 Berry Street, San Francisco, California 94107.  LoopNet is licensed with the New York Department of State to conduct business in this state.

2.     CoStar Group is a Delaware corporation with its principal place of business and corporate offices at 2 Bethesda Metro Center, Bethesda, Maryland 20814-5388.  CoStar is licensed by the New York Department of State to conduct business in this State and operates an office in this District.

3.     CRI is a Delaware corporation with its principal place of business and corporate offices at 2 Bethesda Metro Center, Bethesda, Maryland 20814-5388.

4.      Both LoopNet and CoStar advertise, promote, offer for sale, and sell information-related internet services to residents of New York and this District.

5.      This Court has jurisdiction over this action pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331, 1338, 1367.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391.

### LoopNet's Preeminent Listing Marketplace And CoStar's Knock-Off Product

7.      LoopNet operates the leading online commercial real estate marketplace through its website, http://www.loopnet.com. LoopNet.com has become the preeminent site for real estate professionals to market their commercial real estate listings for many reasons, including its heavily trafficked website and powerful suite of tools that tracks and reports on the marketing exposure LoopNet provides to listings. LoopNet customers include virtually all of the top commercial real estate firms in the United States including CB Richard Ellis, Century 21 Commercial, Coldwell Banker Commercial, Colliers International, The CORE Network, Cushman & Wakefield, First Industrial Realty Trust, Grubb & Ellis, Lincoln Property Company, Marcus & Millichap, NAI Global, ONCOR International, Prudential, RE/MAX, Sperry Van Ness, The Staubach Company, and TCN Worldwide.

8.      LoopNet offers real estate professionals the opportunity to receive unmatched online exposure for their commercial real estate listings. LoopNet's Premium Listings are accessible to 2.75 million registered LoopNet members. LoopNet.com is the most heavily trafficked commercial real estate website by a wide margin. LoopNet.com receives millions of unique visitors each quarter. In the most recent quarter, listings on LoopNet were pulled up and viewed by searchers over forty-four million times. LoopNet also distributes select listings to and/or powers the websites of over 125 online newspaper partner websites with which LoopNet has exclusive relationships, including the New York Times, the Los Angeles Times, the Boston

Globe, the Chicago Tribune, the Dallas Morning News, the Miami Herald, the Wall Street Journal's RealEstateJournal.com, and BizJournals.com.

9.    In addition, LoopNet offers extensive third-party web-hosting and data-solution services to other commercial real estate companies with a presence on the internet. Numerous leading commercial real estate firms license and use LoopNet's LoopLink product and other LoopNet products in order to power their own real estate listing search portals on the internet.

10.    LoopNet offers its members different products to market their listings and to give their listings more exposure. LoopNet's Premium Listings make available a LoopNet listing to all of LoopNet's registered members as well as other visitors to LoopNet.com. LoopNet also uses advanced search engine optimization algorithms to expose its Premium Listings to the millions of web users who search on Google and Yahoo!. LoopNet's Premium Listings can be given further exposure through a feature called "Showcase Property Listings" ("LoopNet Showcase"), which LoopNet began to offer in its initial form since at least 2004. LoopNet Showcase boosts a listing's exposure by giving the listing preferential treatment in relevant search results and by distributing the listing to LoopNet's exclusive network of over 125 national and local newspaper websites (which in New York include the websites of the New York Times, The Buffalo News, The Post Standard, Staten Island Advance, and Syracuse.com). LoopNet's Premium Listings and LoopNet Showcase enable LoopNet's members to expose their listings to substantially more traffic than competing listing services such as CoStar's.

### CoStar's Campaign Of Deception To Market Its Knock-Off Listing Product

11.    Counterclaim-Defendant CoStar has for several years attempted to compete with LoopNet by offering its own online product for commercial real estate listings, including CoStar's Commercial MLS product which it introduced in 2005 as a supposed alternative to LoopNet. In contrast to LoopNet Premium and LoopNet Showcase listings, which can be

searched for free by members of the public without logging into LoopNet's website, CoStar's

listing products have typically exposed CoStar listings only to paid subscribers of CoStar

services who had logged into CoStar's website, http://www.costar.com.

12.    Recently, however, in tacit acknowledgement of LoopNet's greater popularity and

success in the marketplace, CoStar began to secretly develop and to market a new listing product

that more closely imitated LoopNet's more successful product by exposing listings to members

of the public, not just subscribers.  CoStar confusingly and parasitically called its knock-off

product "CoStar Showcase."

13.    CoStar's advertising for CoStar Showcase makes no mention of the fact that it is

priced higher than the LoopNet product it imitates or that CoStar Showcase exposes listings to a

vastly smaller audience than LoopNet.  Instead, CoStar's advertising falsely suggests that CoStar

Showcase offers exposure to listings that is superior to LoopNet's competitive product.  CoStar

also falsely disparages LoopNet's superior product.

14.    In any given month, LoopNet has significantly more unique visitors than CoStar.

For example, according to comScore, in May 2008 LoopNet had *over 5 times as many* unique

visitors as CoStar.  LoopNet also has exclusive rights to distribute listings to over 125 online

newspaper partner websites.  The retail price for CoStar's Showcase service is significantly

higher than the cost of marketing a listing with LoopNet's services.  CoStar was accordingly at a

competitive disadvantage in attempting to launch a copycat product.  Consumers would not want

to pay significantly more for an inferior product.  In an unlawful attempt to erase its natural

disadvantage, CoStar has resorted to a campaign of false advertising and unfair competition that

combines false and misleading statements about CoStar's inferior knock-off Showcase product

with false and misleading statements about LoopNet.

**CoStar's False And Misleading Claim That Listings On CoStar's Knock-Off Showcase "Can Be Seen By Over 400,000 Prospects That You Won't Find On LoopNet"**

15.    CoStar's advertising for its Showcase product prominently features the claim that the product will "reach" an audience that includes "400,000+ prospects each quarter you won't find on LoopNet." CoStar characterizes these "prospects" as "motivated" and that connecting with them will "get the deal done faster." These claims are false and misleading. CoStar made these claims when its knock-off Showcase product had not yet even been commercially launched. When CoStar supposedly determined the number of prospects reached by its Showcase listings, CoStar Showcase reached *zero* prospects at all, including *zero* who customers purportedly "won't find on LoopNet."

16.    To deceive the public into thinking that its false claim about the reach of CoStar Showcase was based on impartial, objective data, some of CoStar's advertising states in its fine print that the number comes from "Q4'07 comScore Data, Costar Custom Analysis." But as CoStar knew when it spread its false claim, comScore did not collect "data" concerning "prospects" (much less "motivated" ones) or conduct a "custom analysis" to identify "prospects" who have been reached by a CoStar Showcase listing or any CoStar listing at all. Nor did comScore collect data on "prospects" that "you won't find on LoopNet." CoStar's claim that comScore is the source of its false statements is simply another CoStar deception.

17.    In reality, comScore is a source of panel-based data about website traffic, most often cited as a source for estimates of the monthly unique visitors to a given website. One of the reports available from comScore—and the apparent basis of CoStar's false claim—is a "cross-visitation" report in which comScore uses the data it collects from an unspecified number of its panel members to project how many unique visitors visited one website but did not "cross-visit" a different website during a specified period of time. CoStar's misleading claim that a

listing on CoStar Showcase will reach "400,000+ prospects you won't find on LoopNet" and CoStar's suggestion that comScore is the source of this claim are false and deceptive for multiple reasons.

18.    First, comScore's data is not about "prospects." comScore only counts which of its panel members visit a website during a relevant period. Contrary to the false and misleading impression created by CoStar, comScore did not conduct a survey of over 400,000 unique visitors to CoStar to verify that they were "prospects" (or "motivated") with an intention of purchasing or leasing commercial real estate, or that, if they were prospects, they would never look for property on LoopNet. CoStar's suggestion that comScore's data and analysis concerned "prospects" rather than estimated unique visitors is a CoStar fabrication.

19.    Second, if the "400,000+" number was derived from comScore data and analysis, it is an estimate extrapolated from comScore's sample panel of undisclosed size, and subject to an undisclosed (and possibly large) margin of error. comScore reports are drawn from data collected from its panelists, which, in the case of a relatively less trafficked website, may be only several dozen during the relevant time period. comScore then extrapolates the data from this sample set against its own "estimate" of internet users in order to reach a much larger, and again estimated, traffic number. But, aside from tracking comScore's limited panel, comScore did not count CoStar's actual traffic, much less survey all actual visitors to CoStar.com during Q4'07. CoStar's suggestion that its claim is based on a survey of over 400,000 actual people who visited CoStar.com in Q4'07 is a fabrication.

20.    Third, comScore's traffic estimates typically are not limited to visits to CoStar for the purpose of viewing listings. comScore's estimates cover any unique visit to CoStar.com for any reason whatsoever. comScore is not the source of any data or analysis that (falsely) suggests

that 100% of the unique visitors to CoStar.com in Q4'07 (or estimated visitors, which comScore actually measures) came to CoStar for the purpose of viewing listings.

21.    Fourth, comScore never measured how many prospects were reached by Showcase listings. CoStar Showcase was not in existence as of Q4'07 when comScore collected its data. CoStar's suggestion that comScore measured data about CoStar's Showcase is another fabrication.

22.    Fifth, CoStar's advertisement further falsely states that comScore shows that CoStar's bogus claim of over 400,000 prospects is true "each quarter." The comScore cross-visitation report refutes this claim. For example, comScore's numbers for the immediately preceding quarter (Q3'07) show comScore's estimate was that fewer than 400,000 people in that quarter visited CoStar.com but not LoopNet.com.

23.    Sixth, CoStar's advertisement falsely and deceptively suggests that these purported "400,000+" individuals "won't" be found "on LoopNet" *ever*. But a comScore report for Q4'07 would only attempt to estimate how many visitors *in that particular period* visited one website but not another. comScore did not make any determination that the panel members from whom it extrapolated its estimates did not visit LoopNet in any prior period, such as Q3'07, much less determine that those panel members will never in the future be found searching LoopNet property listings. As far as comScore's data and analysis are concerned, the "400,000+" people that CoStar represents "you won't find on LoopNet" may in fact be found on LoopNet. CoStar's contrary spin is false.

24.    CoStar's advertising claims are calculated to create the false impression that comScore's estimates show that a listing on CoStar's knock-off Showcase will reach a significantly larger unique audience than a listing placed on LoopNet. But, to the extent

comScore's cross-visitation analysis demonstrates anything about the reach of CoStar's listings, it proves the *opposite* of what CoStar's false and misleading advertisement suggests. According to comScore's cross visitation analysis, in Q4'07, **over 2.1 million people visited LoopNet.com but did not visit CoStar.com**. Applying CoStar's assumptions to comScore's data, a listing on LoopNet will reach "over 2.1 million prospects that you won't find on CoStar," or **almost five times** the unique reach of CoStar. comScore's data and analysis conveys the opposite message that CoStar presents.

25.    comScore's Media Metrix monthly unique numbers for Q4'07 further highlight the false and deceptive nature of CoStar's advertisement. According to comScore's data and analysis in October 2007, CoStar.com only had about 190,000 unique visitors whereas LoopNet.com had about 935,000 unique visitors; in November 2007, CoStar.com only had about 171,000 unique visitors whereas LoopNet.com had about 946,000; and in December 2007, CoStar.com only had about 174,000 unique visitors whereas LoopNet.com had about 828,000. comScore's measurement of unique monthly visitors, like the cross-visitation report, show that LoopNet's audience during Q4'07, and therefore the reach of listings on its site according to CoStar's logic, is **450 to 550%** of CoStar's reach. This inconvenient truth is completely obscured by CoStar's false and deceptive advertising.

26.    In fact, the false and misleading nature of CoStar's claims is demonstrated by the fact that CoStar *itself* has separately conceded that there is no assurance that a CoStar Showcase listing will "reach more prospects and generate more leads" online than a listing on a competing product, like LoopNet's. But CoStar continues to attempt to deceive consumers otherwise.

## CoStar's False And Misleading Claim To 400,000 Prospects "Each Month"

27.     CoStar was apparently dissatisfied with the tepid market response to its false

claim that CoStar's Showcase delivers 400,000 unique prospects each quarter.  In a recent direct

mail advertising campaign following the launch of its knock-off product, CoStar therefore

further embroidered and now advertises that CoStar's knock-off product enjoys "400,000

prospects *each month* that you won't find on LoopNet" (emphasis added).  This claim is false, as

is CoStar's attribution, once again, of its false claim to comScore.  According to comScore, in

May, 2008, while CoStar was spreading this false advertising about its supposed advantage over

LoopNet, **CoStar.com had fewer than 156,000 unique visitors *in total*.**  It is a fabrication for

CoStar to claim 400,000 unique visitors *each month*, much less 400,000 *monthly* "prospects you

won't find on LoopNet."

## CoStar's False And Misleading Claim That "86%" Of Those "400,000+" "Prospects" Are "Purchase Decision Makers And Influencers For Their Firm"

28.     Compounding CoStar's false and misleading advertisements about its alleged

"premiere audience" is its further false and deceptive claim that "86% are purchase decision

makers and influencers for their firm."  CoStar's advertising suggests that this is a fact applicable

to the same audience it claims included the "400,000+ prospects," i.e., that 86% of prospects

allegedly not found on LoopNet are purchase decision makers and influencers for their firms.

29.     In reality, the source for this supposed data is revealed only in the fine print of

certain versions of CoStar's advertisements as an online survey that had nothing to do with

comScore's data, CoStar's knock-off Showcase product, or the purported Q4'07 CoStar visitors

who allegedly will never visit LoopNet.  CoStar does not reveal what the survey asked, how

many responses it relied upon, the margin of error in its reported number, or any other

information necessary to evaluate this claim.  By concealing this information—and concealing

the truth—CoStar falsely exaggerated the quality of the exposure given to a CoStar Showcase listing. CoStar's survey, like its comScore data, could not have tested the composition of the audience for CoStar Showcase listings, which was not in existence at the time of the survey.

30.     If CoStar conducted a survey of its subscribers, it failed to take account of the fact that the audience for CoStar's Showcase product is designed to include members of the general public that are not subscribers to CoStar's products, and not necessarily "purchase decision makers" or "influencers for their firms." comScore's estimates—which CoStar supposedly relied on for its "400,000+" number—also counts casual non-subscriber visits to CoStar's site. Thus, CoStar's claim that "86%" of the visitors to CoStar's Showcase will be "purchase decision makers and influencers for their firm" is false and misleading.

### CoStar's False And Misleading Claim That "75%" Of Commercial Real Estate Brokers Prefer CoStar Showcase To LoopNet

31.     In a further attempt to convey the false impression that consumers prefer CoStar Showcase to LoopNet's Premium and Showcase listings, CoStar's advertising for its knock-off Showcase product further claims that "75% of commercial real estate brokers prefer CoStar information products over other information sources." CoStar's advertising is misleadingly designed to convey the impression that 75% of commercial real estate brokers prefer CoStar Showcase to other sources, namely LoopNet.

32.     To convey the false impression that this claim is based on objective data, CoStar claims in the fine print of certain versions of its advertisements that its source is a "blind survey amongst top 500 U.S. brokerage firms conducted by CSRS in December 2007." But whatever "survey" CoStar is referring to could not have been related to its Showcase product at all—the alleged survey was conducted in December 2007, six months before CoStar's knock-off Showcase product was commercially launched. Furthermore, as has been CoStar's practice,

CoStar does not reveal what the alleged survey respondents were told or asked, how many responses CoStar relied upon, or the margin of error in its reported number. Accordingly, CoStar's purported survey did not and could not test commercial brokers' preference for CoStar Showcase over any other product, such as LoopNet's. Any claim that "75% of commercial brokers" prefer CoStar Showcase to LoopNet is false and misleading.

**CoStar Makes Numerous Other False Or Misleading Claims About Its Knock-Off Product**

33.     Among other statements, CoStar advertises that its knock-off Showcase product will provide "unmatched exposure," "will harness" traffic from Google and Yahoo!, and "will be exposed to an enormous online audience, including 1.3 million unique visitors who go to www.CoStar.com each quarter, and thousands more expected" from "Google, Yahoo, and other major search engines," which CoStar characterizes as including "top prospects." CoStar touts that its copycat product is an "unprecedented way" to get listings "in front of a vast new audience" and "generate more leads." CoStar also advertises that its knock-off Showcase product will feature only listings from "commercial real estate professionals" and be free of "listing clutter from non-professionals." CoStar guarantees that it will make "every effort" to ensure that its product is "accurate, up-to-date and free from mislabeled, outdated or 'dead' listings that clutter other online property search services."

34.     But CoStar has separately admitted that there is no assurance CoStar Showcase will actually "harness" traffic from Google and Yahoo, or other any other search engines. CoStar has also admitted that there is really no assurance that a CoStar Showcase listing will in reality be "exposed to an enormous online audience," or that CoStar Showcase listings will actually be provided only from "commercial real estate professionals" as advertised. Similarly, CoStar has separately admitted that its new product may not in fact be "accurate, up-to-date and

free from mislabeled, outdated or 'dead' listings" or necessarily feature only "active" listings as advertised.

35.    In fact, while touting its new knock-off product as offering a "competitive advantage" and being "uniquely positioned" with "numerous advantages" over "other online property marketing services," CoStar has admitted that, in reality, there is no assurance CoStar Showcase will offer the very advantages advertised.  CoStar has even confessed that, contrary to the advantages advertised, CoStar Showcase might not offer "a true competitive advantage for commercial real estate professionals;" it may not be "uniquely positioned;" and it may not offer real estate professionals "additional valuable exposure for their available property listings."  In fact, CoStar has even conceded that its users may not be "reaching more prospects and generating more leads online" with its knock-off product.

36.    CoStar's advertising makes unqualified representations that even CoStar has had to admit are not necessarily true.  CoStar's purportedly "unmatched" exposure and "unprecedented way" of marketing listings is merely a pale copy of LoopNet's long-existing product.  This makes CoStar's claims of "unprecedented" novelty and "unique[] position[ing]" false.  CoStar's false advertising misleads, confuses, and deceives consumers into believing that CoStar Showcase has features that it does not necessarily have and that it will provide benefits that the product may not even offer or deliver.  Considering the superior reach and traffic of LoopNet's product, CoStar's "Showcase" advertising is a classic example of a company trying to pass-off an inferior product as being of better quality than it actually is.

**CoStar Disparagingly Misrepresents The Size And Scope Of LoopNet's Listing Product**

37.    CoStar has publicly admitted that the "market's perception" of the relative audience between LoopNet and CoStar "will become even more important" as CoStar rolls out

its own competing "Showcase" product. To unlawfully influence the "market's perception,"
when CoStar began pre-marketing its inferior knock-off product, CoStar also began a campaign
of falsely and misleadingly representing that LoopNet's product has significantly less traffic and
users than it actually does. In fact—contrary to CoStar's disparaging falsities—traffic to
LoopNet's website is many times higher than CoStar's traffic—**by more than 400%** in many
months according to comScore's data.

38.     According to comScore, LoopNet often receives **at least three to five times** the
number of total visits as CoStar per month. For example, for January 2008, comScore reported
that LoopNet received over 1.9 million total visits, but reported that CoStar only received
310,000 total visits—that is over **six times** as many visits in January for LoopNet than for
CoStar. comScore also reports that LoopNet typically receives from **three to five times** as many
unique visitors as CoStar receives per month. For example, for January 2008, comScore
estimated that LoopNet received over 1.1 million unique visitors compared to only 135,000 for
CoStar—that is over **eight times** as many unique visitors in January for LoopNet than for
CoStar.

39.     In contradiction to the facts, CoStar has attempted to deceive consumers into
believing that LoopNet's products reach far fewer people than they actually do. CoStar has then
attempted to inflate the relative traffic its product receives to falsely make it appear to be a more
widely used product than LoopNet's, which CoStar's is not.

40.     For example, in a statement CoStar widely disseminated in February 2008, CoStar
noted that LoopNet's CEO Richard Boyle had reported that, according to comScore, LoopNet's
website was currently receiving "about one million" monthly unique visitors. This statement
was true, as CoStar knew. comScore had reported that LoopNet had 1,134,000 unique visitors in

January 2008. CoStar also noted that LoopNet's CEO stated that this "number is up a little bit on a year-over-year basis." That statement was also true—comScore had estimated that there had been 947,000 unique visitors to LoopNet in January 2007, and thus LoopNet's traffic was up on a year-to-year basis according to comScore.

41. Incredibly, however, CoStar then publicly advertised that it "does not believe this to be accurate." This statement represents a knowingly false and misleading statement intentionally disseminated by CoStar to disparage LoopNet. LoopNet's CEO had in fact accurately described the most recent comScore data, which showed that LoopNet's number of unique visitors was increasing and had exceeded the one million mark in January 2008—*which is over eight times the number of unique visitors comScore estimated visited CoStar in January of 2008.*

42. To compound its deception, CoStar falsely stated that LoopNet's CEO "appeared to be" referring to the number of people who "log in to LoopNet every month" when CoStar knew that LoopNet's CEO was referring to comScore's report of monthly unique visitors. Building on this knowingly false statement, CoStar then falsely stated that "the number of people who actually signed into LoopNet was 420,243 *for the last three months* of 2007—in total—or less than half the number of users claimed by Mr. Boyle *for one month.*"

43. Through these false and misleading statements, CoStar sought to convey the false impression that LoopNet's CEO had lied about LoopNet's traffic to inflate LoopNet's numbers and that LoopNet's reported number of monthly users is inflated by as much 500%. CoStar knew that these statements were false and misleading and that LoopNet's CEO had accurately described comScore's data.

44.    CoStar made these false and misleading statements in conjunction with other false and misleading statements intended to convey the impression that not only were LoopNet's reported traffic numbers inflated—when CoStar knew they were not—but that LoopNet's traffic was also declining—when CoStar knew that just the opposite was true.  CoStar has made public statements likening LoopNet to a newspaper whose circulation is "declining" and analogized that LoopNet's products are therefore "worth less" to advertisers.  CoStar has also widely and publicly insinuated that LoopNet is "shrinking."

45.    CoStar's disparaging statements suggesting that LoopNet's traffic was shrinking were false and misleading.  CoStar was fully aware of the false and misleading nature of its statements and has nevertheless intentionally or with reckless disregard for their truth continued to publicly disseminate and advertise them.

46.    For example, the same January 2008 comScore data that LoopNet's CEO cited showed a year-over-year increase in monthly unique visitors to LoopNet.  CoStar knew that traffic metrics counting "unique visitors" are not the same as a measurement of "logins."  CoStar knew that it was false and deceptive to use a "login" metric to suggest that LoopNet's monthly unique visitors were declining or were just a fraction of what LoopNet had publicly reported.  In fact, CoStar has separately admitted that there is no assurance that its statement that LoopNet's CEO was referring to logins was true.  CoStar also has admitted that LoopNet's CEO's statement about LoopNet's traffic may in fact be accurate.

47.    CoStar is well aware that much of LoopNet's site is open to the public without requiring any login—CoStar in fact is currently being sued by LoopNet for its theft of information it has copied from listings that can be accessed on LoopNet's site without logging in.  In fact, thousands of LoopNet members and non-members alike—and apparently untold numbers

of CoStar employees—come to LoopNet's website each month and search and view real estate listings without "logging in." CoStar nevertheless persists in its campaign to cultivate the false impression that the number of people who log in to LoopNet is the more accurate measure of LoopNet's traffic rather than its unique monthly visitors, which is the commonly accepted metric of website traffic number that CoStar knows is significantly higher.

48.    CoStar has also endeavored to misleadingly understate the number of LoopNet members who are logged into LoopNet's site each quarter. For example, CoStar has falsely and misleadingly suggested that there were only 420,243 visitors to LoopNet's site during all of the fourth-quarter of 2007. But, as CoStar is aware, this number significantly misrepresents and undercounts both the actual number of unique visitors to LoopNet during that period and the number of LoopNet members who were logged in during that period.

49.    First, CoStar has itself separately admitted its misleading picture of declining traffic does not count LoopNet members who use web browser "cookies" to remain logged into the LoopNet site. But CoStar has failed to bring that fact to the public's attention when advertising what CoStar claims to be LoopNet's relevant traffic metric.

50.    Second, CoStar has itself separately admitted that the misleading numbers it publicly disseminated are extrapolated from comScore panel members that logged into LoopNet *and landed on only four* of LoopNet's pages, thus excluding visitors who logged into or through other areas of LoopNet's site  Yet CoStar has sought to convey the impression that its figures represent *all* logins to LoopNet's site when they do not.

51.    The intent and effect of CoStar's statements is to convey the false impression that LoopNet's traffic and number of unique visitors are much lower than they really are. In its initial advertising for CoStar Showcase, CoStar claimed (using comScore data) that its website received

over 625,000 unique visitors on average and over 2.4 million total visits per quarter. While

disseminating these numbers about its own website traffic, CoStar was falsely and misleadingly

suggesting that LoopNet receives less traffic, only 420,243 visitors per quarter. CoStar has thus

attempted to mislead the public into believing that LoopNet's listings are exposed to

significantly less traffic than CoStar's listings, when just the opposite is true.

52.    In truth, according to comScore, LoopNet is reported to have had significantly

more unique visitors and total visits than CoStar in every period referenced by CoStar's false and

misleading advertisements and public statements. In fact, according to comScore, for some

periods, LoopNet's traffic metrics dwarfed CoStar's *by over 500%*, with LoopNet reported to

have *over eight times as many unique visitors as CoStar had in January 2008 alone.*

### CoStar's Deceptive Use Of Statistics

53.    With the planned rollout and eventual release of CoStar Showcase, CoStar

evidently recognized the need to reshape the "market's perception" of CoStar's traffic relative to

LoopNet's. By all objective measures, LoopNet's traffic consistently dwarfs CoStar's. As part

of CoStar's campaign of deception for its knock-off Showcase product, CoStar has sought to

obscure the inconvenient truth of LoopNet's superior traffic statistics by conveying the message

that CoStar has significantly more unique visitors than LoopNet. CoStar has sought to convey

this falsehood by the deceptive use of website traffic statistics.

54.    While CoStar was attempting to persuade consumers that LoopNet's traffic for

Q4'07 was really only slightly more than 420,000 unique visitors (based on comScore's report

on a subset of logins to LoopNet.com), CoStar relied on a different comScore metric,

comScore's estimates of quarterly unique visitors, to make the claim that "625,000+ unique

CoStar.com visitors on average per quarter" constituted CoStar Showcase's purported "Prospect

quantity."

55.     This statement, like CoStar's false statements about unique prospects reached by CoStar Showcase, falsely assumes that every unique visitor to CoStar estimated by comScore is necessarily a "prospect." In reality comScore's numbers are merely estimates of website traffic.

56.     CoStar also failed to disclose that it was applying different metrics to LoopNet than it applied to its own website. CoStar suggested that LoopNet acted deceptively when its CEO accurately reported on comScore monthly unique numbers. CoStar suggested that the more accurate number was a specially created comScore's Q4'07 estimate of logins to certain portions LoopNet's website. When CoStar accused LoopNet of acting dishonestly, it knew that LoopNet's report of its website traffic according to comScore was accurate. Moreover, having suggested to the public that it was dishonest to use comScore unique visitor data and that the preferred way to measure website traffic is by just looking at logins to *portions* of a website, CoStar then proceeded to use comScore estimates of CoStar's own quarterly unique visitors to tout CoStar Showcase's supposed "prospect quantity" as surpassing 625,000 unique CoStar.com visitors on average per quarter.

57.     CoStar's attempt to tar LoopNet's CEO as a liar for using comScore unique visitor data while relying on precisely the same type of data to tout the supposed advantages available by marketing listings on CoStar's website is not simply an isolated instance of hypocrisy. Rather, it was part of CoStar's effort to create the false impression that CoStar is a more heavily trafficked site, by suggesting that CoStar's quarterly traffic was running at over 625,000 unique visitors per quarter, while LoopNet's traffic was barely more than 420,000.

58.     An apples-to-apples comparison leads to precisely the opposite fact from what CoStar has conveyed—LoopNet had much more traffic than CoStar in the time periods CoStar is allegedly comparing. According to comScore's quarterly site traffic reports, for example, in

Q4'07, LoopNet had *over 2.34 million unique visitors*, not the barely more than 420,000 unique

visitors as falsely suggested by CoStar to be the accurate number. In contrast, according to

comScore, CoStar had only 660,617 unique visitors in the same period. Had CoStar engaged in

a fair comparison applying the same comScore metrics it applied to its own site to LoopNet,

CoStar would have been forced to reveal that during Q4'07, LoopNet had *over three-and-a-half*

*times* the unique visitor traffic that CoStar had, not *40% less traffic* as falsely suggested.

59.    To further falsely inflate CoStar's perceived size relative to LoopNet, CoStar then

rolled out new advertising to accompany the launch of CoStar Showcase. Whereas CoStar's

earlier advertising cited comScore Q4'07 data to claim that CoStar's "vast new marketplace" of

"prospects" numbered "625,000 to be exact," CoStar's new advertising asserted that CoStar's

"unique CoStar.com visitor" count in Q1'08 was 1.3 million unique visitors. CoStar never

explained, of course, how it was supposedly able to double its website traffic in just one quarter.

It is only by searching through the fine print of some of CoStar's statements that one can learn

that CoStar was no longer using comScore quarterly traffic data. Rather, CoStar had quietly

switched from using comScore, which it had previously held out as the authoritative source when

falsely criticizing LoopNet, to using CoStar's own internal count of website visitors. Moreover,

to further embroider upon this new assertion, CoStar's recent direct mail advertising claimed

"1.3 million unique visitors *each* quarter." This claim is refuted by CoStar's own earlier

advertisements, which claim that in Q4'07 CoStar had less than half the number of unique

quarterly visitors that CoStar now asserts it has "each quarter."

60.    With its new and more aggressive statements about its own alleged traffic,

CoStar's statements conveyed the false impression that LoopNet had barely 420,000 unique

visitors per quarter, while CoStar's traffic had ballooned to over three times that size. Once

again, CoStar's false and misleading statements never clarified that CoStar was applying

different metrics to LoopNet (third-party data for logins to portions of the website) than CoStar

was applying to its own website (internal traffic data for the whole website). Although it

suggested that LoopNet had deceived the public by accurately referring to comScore's monthly

unique visitor data, CoStar applied an entirely different metric for measuring its own website

traffic so that it could falsely suggest that CoStar receives three times the traffic that LoopNet

receives. In fact, CoStar's traffic in that quarter remained just a fraction of LoopNet's in an

apples-to-apples comparison. According to comScore's quarterly site traffic report, in Q1'08,

LoopNet had **over 2.87 million unique visitors**, while CoStar had just under 787,000 unique

visitors. Thus, once again, when the same measure of internet traffic is applied, LoopNet had

*over 350%* of the unique visitor traffic in Q1'08 that CoStar had, not approximately just *a third

of CoStar's traffic*, as falsely suggested by CoStar's new advertising.

### CoStar's False And Misleading Claims About The Initial Success of Its Knock-Off Product

61.    CoStar has also steered its campaign of false and misleading advertising to

exaggerate the success of its knock-off Showcase product and to convey the impression that the

product has been widely accepted. CoStar claims that CoStar Showcase has received

"tremendous market reception" of over $2 million in subscription orders. CoStar advertises that

this means that "more than 300 firms find" that its product "delivers on [CoStar's] promise to

provide enhanced property exposure and more qualified lead-generation." CoStar claims that

this "enthusiastic response" indicates that consumers "find CoStar's Showcase to be a very

compelling and effective solution for marketing their listings online."

62.    In fact, and contrary to CoStar's representations, at least half of these "initial

subscription orders"—$1 million or more in contracts—were obtained by giving away the

product for free. Even CoStar has conceded that an undisclosed percentage of these "subscribers" have the right to cancel when the free period is over. In the fine print, CoStar has conceded that signing up firms for its no-obligation free giveaway provides no assurance that its customers actually find CoStar's Showcase "to be a very compelling and effective solution for marketing their listings online," as advertised. Moreover, CoStar had no basis to advertise that each of its more than 300 "subscribers" "find" that CoStar's knock-off product "delivers on" any of CoStar's promises. CoStar is falsely representing that customers who accepted CoStar's free trial offer have thus—merely by accepting the no-obligation free offer—agreed that the product "delivers on [CoStar's] promise[s]."

63.    CoStar has misleadingly spun its giveaway promotion into purported proof of market success, stating: "Based on the enthusiastic response CoStar Showcase [has] received . . . it's clear there is substantial demand among commercial property professionals for a more effective way to market their property listings online." In truth, however, it is neither "clear" that there is a "substantial demand" for CoStar Showcase nor that its Showcase is "a more effective way to market . . . property listings online." CoStar's suggestion that acceptance of a no-obligation free trial offer establishes these purported claims is false and misleading.

64.    Although CoStar is aware of the falsity of its statements about the purported "enthusiasm" for its knock-off product, CoStar CEO Andrew Florance embroidered yet further, proclaiming in a June press release that CoStar "couldn't be more pleased with the market response for our new online marketing service," i.e., CoStar Showcase. Florance's comments were calculated to create the impression that the "market response" to the introduction of CoStar Showcase in May was unambiguously positive. In fact, however, just the opposite was true. According to comScore, traffic to CoStar.com *declined* in May 2008 *to under 156,000 unique*

*visitors total*, a number that includes traffic generated by CoStar's main subscription services as well as traffic purportedly resulting from CoStar's "tremendous" new Showcase product. The true number of visitors to CoStar.com in the month CoStar Showcase launched was not only less than *half* of the traffic CoStar falsely promised customers they would get every month, it was a substantial decline from the 181,000 unique visitors comScore reported that CoStar.com had in April, 2008. CoStar's CEO was apparently so "pleased" by this "market response"—a decline in traffic to CoStar.com—that CoStar's Vice President of Sales and Customer Service who was responsible for the ill-fated launch of CoStar Showcase has now resigned. CoStar's claim that it "couldn't be more pleased with the market response" to the introduction of CoStar Showcase is false and misleading.

### CoStar's False And Misleading Claims That CoStar Showcase Is Free, "Open," And Accessible Without "Roadblocks"

65.     Following the tepid market reaction to the rollout of CoStar's knock-off Showcase product, CoStar released advertising it falsely labeled as "news," in which CoStar falsely asserted that CoStar Showcase is a "better way to market your listings online" because "other listing websites" (meaning LoopNet) allegedly "put up roadblocks before visitors can view your listings." CoStar falsely suggests that, by contrast, there are no "roadblocks" put up by CoStar before a visitor can view a CoStar Showcase listing. CoStar falsely suggests that its knock-off Showcase product is superior to LoopNet's because, by contrast, it is "free" and "the first truly OPEN marketing platform in commercial real estate."

66.     CoStar Showcase is neither free (other than for the brokers to which CoStar gave a free trial so that CoStar could falsely claim it had a successful product launch) nor is it an "OPEN marketing platform." In reality, CoStar Showcase is a for-pay listing add-on service available only to persons who have already signed up for other expensive CoStar services. To

obtain access to this supposedly "free" "OPEN marketing platform," a broker must deal with a

CoStar salesperson and enter into a contract with CoStar for other services.  Only then can the

broker get a listing placed in Showcase if he or she is willing to commit to pay yet another fee

and enter into yet another contractual commitment to CoStar.  CoStar's suggestion that it offers a

superior "free" "OPEN marketing platform" with no "roadblocks" to use is false and misleading.

## FIRST COUNTERCLAIM

## FALSE ADVERTISING (VIOLATION OF LANHAM ACT)

67.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaims above as
set forth fully herein.

68.    In connection with its services and/or commercial activities, which are offered in
interstate commerce, CoStar has made false, impliedly false, and/or misleading descriptions or
representations of fact.  These false and/or misleading statements misrepresent the nature,
characteristics, and/or qualities of CoStar's services and/or commercial activities.

69.    CoStar has acted with either knowledge of the false or misleading nature of its
statements, or with reckless disregard for the false or misleading nature of the statements.

70.    CoStar's false and/or misleading statements have deceived or have the tendency to
deceive a substantial portion of the intended audience about matters that are material to
purchasing decisions.

71.    CoStar's false and/or misleading statements about its services and/or commercial
activities were made in commercial advertising and promotion in interstate commerce and
constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

72.    The nature of CoStar's acts makes this an exceptional case under 15 U.S.C.
§ 1117(a).  CoStar's actions have been with knowledge of the false or misleading nature of the

statements or in reckless disregard for the truth of the statements. CoStar's actions have also been in disregard for the impact these false and misleading statements have had and will have on the public and on LoopNet.

73.    CoStar's conduct has irreparably damaged LoopNet and will, unless stopped, impair the value of LoopNet's name, marks, reputation, and goodwill. Unless CoStar's false advertising is enjoined, it will continue to cause irreparable injury to LoopNet and to the public. LoopNet has no adequate remedy at law

## SECOND COUNTERCLAIM

## TRADE LIBEL/DISPARAGEMENT (VIOLATION OF LANHAM ACT)

74.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaims above as set forth fully herein.

75.    CoStar is in commercial competition with LoopNet.

76.    In connection with promoting its services and/or commercial activities, which are offered in interstate commerce, CoStar has made false, impliedly false and/or misleading descriptions or representations of fact. These false and/or misleading statements misrepresent the nature, characteristics, and/or qualities of LoopNet's services or commercial activities.

77.    CoStar has acted with either knowledge of the false or misleading nature of its statements, or with reckless disregard for the false or misleading nature of the statements.

78.    CoStar's false and/or misleading statements about LoopNet's services and/or commercial activities have been made for the purpose of influencing consumers to purchase CoStar's services.

79.    CoStar's false and/or misleading statements about LoopNet's services and/or commercial activities have been made with the intent to harm LoopNet's interests or with knowledge that harm will inevitably result.

80.    CoStar's false and/or misleading statements about LoopNet's services and/or commercial activities have been disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion within both CoStar and LoopNet's industry.

81.    CoStar's false and/or misleading statements about LoopNet's services and/or commercial activities were made in commercial advertising and/or promotion in interstate commerce and constitute trade libel and disparagement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

82.    The nature of CoStar's acts makes this an exceptional case under 15 U.S.C. § 1117(a). CoStar's actions have been with knowledge of the false or misleading nature of the statements or in reckless disregard for the nature of the statements. CoStar's actions have also been in disregard for the impact these false or misleading statements have had and will have on the public and on LoopNet.

83.    CoStar's conduct has irreparably damaged LoopNet and will, unless stopped, impair the value of LoopNet's name, marks, reputation, and goodwill. Unless CoStar's disparaging acts are enjoined, they will continue to cause irreparable injury to LoopNet and to the public. LoopNet has no adequate remedy at law

## THIRD COUNTERCLAIM

## TRADEMARK INFRINGEMENT (VIOLATION OF LANHAM ACT)

84.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaims above as set forth fully herein.

85.    As part of LoopNet's commercial services, LoopNet provides a platform for the hosting, display, searching, publication and distribution of third-party real estate listings to companies in the commercial real estate industry.  Among other services, LoopNet also offers services that power the real estate listings displayed on many third-party websites.

86.    Since at least 2004, LoopNet has used the marks "Showcase" and "LoopNet Showcase" to describe certain of its services which it offers in interstate commerce.

87.    LoopNet's "Showcase" mark is and has become distinctive in commerce in connection with LoopNet's services offered thereunder.

88.    CoStar has had actual knowledge of LoopNet's use of the "Showcase" mark prior to CoStar's unauthorized use of the mark in connection with CoStar's services and/or commercial activities.

89.    In connection with CoStar's services and/or commercial activities, which are offered in interstate commerce, CoStar has very recently begun to offer, promote, sell, and operate a new service that is substantially similar to LoopNet's Showcase service and that is promoted by CoStar as offering features that are substantially similar to LoopNet's Showcase service.

90.    CoStar selected, used and continues to use the marks "Showcase" and "CoStar Showcase" to describe its new service.

91.    CoStar has made and is making its unauthorized use of the "Showcase" and "CoStar Showcase" marks in an attempt to leverage and trade on the enormous goodwill and reputation that LoopNet has built in connection with its services.

92.    CoStar's use of the marks "Showcase" and "CoStar Showcase" falsely suggests that CoStar's "Showcase" service is affiliated, connected, or associated with LoopNet, and/or

supplied, operated, or powered by LoopNet, and/or conducted with LoopNet's sponsorship or approval.

93.    CoStar's unauthorized use of the Showcase mark is likely to cause confusion, or to cause mistake, or to deceive actual and prospective customers and other members of the public. The similarity between CoStar's "Showcase" marks and LoopNet's "Showcase" mark to designate the similar services of the respective parties is likely to lead consumers to mistakenly believe that Costar's services are exclusively or jointly sponsored, approved, or provided by LoopNet and/or that CoStar's services are somehow otherwise affiliated, connected, or associated with LoopNet. Consumers and others are likely to be misled as to the true source, nature sponsorship, or affiliation of the services CoStar's identifies with the Showcase mark.

94.    Based upon the above-described allegation, LoopNet alleges that CoStar has intentionally and with knowledge sought to cause confusion, mistake, and deception to consumers and others.

95.    CoStar's use of the Showcase designation to promote, market, or sell its services constitutes trademark infringement pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

96.    The nature of CoStar's acts makes this an exceptional case under 15 U.S.C. § 1117(a). CoStar's actions have been willful, malicious, and in disregard for LoopNet's superior and valuable rights in the Showcase marks.

97.    CoStar's conduct has irreparably damaged LoopNet and will, unless stopped, impair the value of LoopNet's name, marks, reputation, and goodwill. Unless CoStar's infringing acts are enjoined, they will continue to cause irreparable injury to LoopNet and to the public. LoopNet has no adequate remedy at law.

## FOURTH COUNTERCLAIM

## <u>UNFAIR COMPETITION (VIOLATION OF LANHAM ACT)</u>

98.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaims above as set forth fully herein.

99.    As described above, CoStar's use of LoopNet's Showcase mark, Costar's false and misleading statements about its own services and/or commercial activities, and CoStar's disparaging statements about LoopNet's services and/or commercial activities, separately and in concert, constitute unfair competition.

100.    LoopNet has been and will be damaged by CoStar's false and/or misleading designations, false and/or misleading descriptions, and false and/or misleading representations in that the public is likely to be induced into dealing with CoStar in the mistaken belief that CoStar's services, which have been advertised, solicited, offered for sale, and sold in interstate commerce, are superior to LoopNet's services or are authorized, endorsed, sponsored by, provided by, or connected with LoopNet.

101.    CoStar's acts constitute unfair competition pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

102.    The nature of CoStar's acts makes this an exceptional case under 15 U.S.C. § 1117(a).  CoStar's actions have been willful, malicious, and in disregard for both the false or misleading nature of CoStar's wrongful statements, as well as in disregard for LoopNet's superior and valuable rights in the Showcase marks.  CoStar's actions have likewise been in disregard for the impact that its false or misleading statements have had and will have on the public and on LoopNet.

103.    CoStar's conduct has irreparably damaged LoopNet and will, unless stopped, impair the value of LoopNet's name, marks, reputation, and goodwill.  Unless CoStar's wrongful acts are enjoined, they will continue to cause irreparable injury to LoopNet and to the public. LoopNet has no adequate remedy at law.

## FIFTH COUNTERCLAIM

## NEW YORK STATUTORY FALSE ADVERTISING

104.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaim above as set forth fully herein.

105.    In connection with its services, CoStar has made false, impliedly false, and/or misleading descriptions or representations of fact.  These false and/or misleading statements misrepresent the nature, characteristics, and/or qualities of CoStar's services and/or commercial activities.

106.    CoStar's false and/or misleading statements about its services were made in commercial advertising and promotion directed toward current and potential consumers for its services, including New York residents.

107.    CoStar's statements are false and/or misleading statements in material respects. These statements have deceived or have the tendency to deceive members of the intended audience about matters that are material to their purchasing decisions.

108.    Consumers and citizens of New York are harmed by CoStar's false and/or misleading statements.  Consumers are deceived into paying for a service that is inferior to that represented and/or deceived into paying more than they otherwise would have for that service were they not deceived by the false and/or misleading statements.

109.    LoopNet has been and will be damaged by CoStar's false and/or misleading representations in that Costar's wrongful acts threaten to harm LoopNet's reputation and goodwill, and the public is likely to be induced into dealing instead with CoStar in the mistaken belief that CoStar's services are superior to LoopNet's services.

110.    CoStar's false and/or misleading statements about its services constitute false advertising in violation of New York General Business Law Section 350.

111.    LoopNet has suffered and will continue to suffer damage as a result of CoStar's wrongful acts, including harm to LoopNet's sales and goodwill.

## SIXTH COUNTERCLAIM

## NEW YORK STATUTORY UNFAIR COMPETITION

112.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaim above as set forth fully herein.

113.    As described above, CoStar's use of LoopNet's Showcase mark, Costar's false and misleading statements about its own services, and CoStar's disparaging statements about LoopNet's services, separately and in concert, constitute unfair competition.

114.    CoStar's wrongful acts were made in commercial advertising and promotion directed toward current and potential consumers for its services, including New York residents.

115.    CoStar's wrongful acts are misleading in material respects.  These statements and acts have deceived or have the tendency to deceive members of the intended audience about matters that are material to their purchasing decisions.

116.    Consumers and citizens of New York are harmed by CoStar's wrongful acts. Consumers are deceived into paying for a service that is inferior to that represented and/or

deceived into paying more than they otherwise would have for that service were they not deceived by the false and/or misleading statements.

117.    LoopNet has been and will be damaged by CoStar's false and/or misleading designations, false and/or misleading descriptions, and false and/or misleading representations in that Costar's wrongful acts threaten to harm LoopNet's reputation and goodwill, and the public is likely to be induced into dealing with CoStar in the mistaken belief that CoStar's services are superior to LoopNet's services or are authorized, endorsed, sponsored by or connected with LoopNet.

118.    CoStar's wrongful acts constitute unfair competition in violation of New York General Business Law Section 349.

119.    LoopNet has suffered and will continue to suffer damage as a result of CoStar's wrongful acts, including harm to LoopNet's sales and goodwill.

## SEVENTH COUNTERCLAIM

## COMMON LAW UNFAIR COMPETITION

120.    LoopNet incorporates the allegations of ¶¶ 1 to 66 of its Counterclaim above as set forth fully herein.

121.    As described above, CoStar's use of LoopNet's Showcase mark, Costar's false and misleading statements about its own services, and CoStar's false and/or misleading and disparaging statements about LoopNet's services, separately and in concert, constitute unfair competition.

122.    CoStar has acted with either knowledge of the false or misleading nature of its statements, or with reckless disregard for the nature of the statements.

123.    CoStar's false and/or misleading statements about LoopNet's services have been made with the intent to harm LoopNet's interest or with knowledge that harm will inevitably result.

124.    CoStar had actual knowledge of LoopNet's use of the "Showcase" and "LoopNet Showcase" marks prior to CoStar's unauthorized use of the marks in connection with CoStar's services. CoStar has made and is making unauthorized use of the "Showcase" mark in an attempt to leverage and trade on the enormous goodwill and reputation that LoopNet has built in connection with LoopNet's Showcase service.

125.    Defendants wrongful acts are therefore voluntary, intentional acts calculated to deceive and are not made in good faith.

126.    CoStar's wrongful acts have caused or will cause confusion or mistake by the public or otherwise constitute unfair business practices.

127.    LoopNet has been and will be damaged by CoStar's false and/or misleading designations, false and/or misleading descriptions, and false and/or misleading representations in that Costar's wrongful acts threaten to harm LoopNet's reputation and goodwill, and the public is likely to be induced into dealing with CoStar in the mistaken belief that CoStar's services are superior to LoopNet's services or are authorized, endorsed, sponsored by or connected with LoopNet, which has or is likely to cause loss of sales and/or market harm to LoopNet.

128.    CoStar's acts constitute unfair common law unfair competition.

129.    CoStar's conduct has irreparably damaged LoopNet and will, unless stopped, impair the value of LoopNet's name, marks, reputation, and goodwill. Unless CoStar's wrongful acts are enjoined, they will continue to cause irreparable injury to LoopNet and to the public. LoopNet has no adequate remedy at law.

**WHEREFORE**, LoopNet prays for judgment, in favor of LoopNet and against CoStar, as follows:

(a)    Dismissing CoStar's First Amended Complaint against LoopNet with prejudice;

(b)    Issuing a preliminary and permanent injunction in favor of LoopNet and against CoStar, its present and future directors, officers, agents, servants, employees, parents, subsidiaries, affiliates, assigns, and related companies, and all those persons in active concert or participation with any of them, enjoining them from using the Showcase mark in connection with services related to the hosting and distribution of commercial real estate listings, including without limitation the licensing or use of the Showcase mark on or in connection with the advertising or promotion of any such business;

(c)    Issuing a preliminary and permanent injunction in favor of LoopNet and against CoStar, its present and future directors, officers, agents, servants, employees, parents, subsidiaries, affiliates, assigns, and related companies, and all those persons in active concert or participation with any of them, enjoining them from directly or indirectly using in commerce or causing to be published or otherwise disseminated any of the false or misleading claims described in LoopNet's Counterclaims, including without limitation in connection with the advertising or promotion of any such business;

(d)    Directing CoStar to issue appropriate corrective advertisements, promotional materials, and press releases designed to retract the false and misleading claims described in LoopNet's Counterclaims and designed to reach all people and businesses to whom CoStar's false and misleading statements, advertising, and promotional materials were disseminated, including, but not limited to, those customers to whom CoStar has presold or sold a service under the "Showcase" mark.

(e)    Directing an accounting to determine CoStar's profits resulting from its wrongful acts of trademark infringement, false advertising, trade libel and disparagement, and unfair competition;

(f)    Awarding the maximum dollar amount in damages and/or a disgorgement of CoStar's profits, as authorized under the Lanham Act and/or New York law, trebled as provided by law;

(g)    Awarding LoopNet's attorney fees, costs, and disbursements, including those as allowed pursuant to 15 U.S.C. § 1117(a)(3) and/or New York law;

(h)    Awarding such other and further relief as the Court deems just and proper.

### <u>JURY TRIAL DEMAND</u>

LoopNet hereby demands a trial by jury on all issues so triable.

Dated:    New York, New York
         June 19, 2008

                                    CURTIS, MALLET-PREVOST,
                                      COLT & MOSLE LLP

By: _____
                         Jacques Semmelman (JS 5020)
                         101 Park Avenue
                         New York, NY  10178-0061
                         Tel.: 212-696-6000
                         Fax: 212-697-1559
                         jsemmelman@curtis.com

                         *Attorneys for Defendant*
                         *LoopNet, Inc.*

*Of Counsel:*

Elliot Brown (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276
Tel.:  (310) 277-1010
Fax:  (310) 203-7199
ebrown@irell.com