Jacques Semmelman (JS 5020)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Tel: 212-696-6000
Fax: 212-697-1559

*Attorneys for Defendant and Counterclaim Plaintiff LoopNet, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
                                                         :
COSTAR GROUP, INC.,                                      :
                                                         :
                            Plaintiff,        No. 08-CV-1156 (GBD) (GWG)
                                                         :
            v.                                           :
                                                         :
LOOPNET, INC.,                                           :
                                                         :
                            Defendant    :
                            and Counter-
                            Plaintiff.
---------------------------------------------------------X
                                                         :
LOOPNET, INC.,                                           :
                                                         :
                            Counterclaim
                            Plaintiff,
                                                         :
            v.                                           :
                                                         :
COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,                                :
                                                         :
                            Counterclaim    :
                            Defendants.
---------------------------------------------------------X

**AFFIDAVIT OF JACQUES SEMMELMAN IN SUPPORT OF**
**<u>LOOPNET'S MOTION FOR EXPEDITED DISCOVERY</u>**

STATE OF NEW YORK          )
                                     ) ss.:

COUNTY OF NEW YORK    )

Jacques Semmelman, being duly sworn, deposes and says:

1.      I am an attorney duly admitted to practice law in the State of New York and in the United States District Court for the Southern District of New York.  I am a partner at Curtis, Mallet-Prevost, Colt & Mosle LLP, counsel for defendant and counterclaim plaintiff LoopNet, Inc. ("LoopNet").

2.      Attached as Exhibit A is a copy of LoopNet's Second Set of Requests for Production of Documents.

3.      Attached as Exhibit B is a copy of LoopNet's First Notice of Deposition Pursuant to Rule 30(b)(6).

4.      Attached as Exhibit C is a copy of Plaintiff CoStar Group Inc.'s ("CoStar") Memorandum of Law in Support of Plaintiff's Motion for Preliminary Injunction, dated June 20, 2008.

5.      Attached as Exhibit D is a copy of the Declaration of Andrew C. Florance dated June 19, 2008, submitted by CoStar in Support of CoStar's motion for a Preliminary Injunction (without exhibits).

_____
Jacques Semmelman

Sworn to before me this
30th day of June, 2008.

_____
JOANNE MEZZACAPPA
Notary Public, State Of New York
No. 01ME4833093
Qualified in New York County
Commission Expires June 30, 20 11

# EXHIBIT A

Jacques Semmelman (JS 5020)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Tel: 212-696-6000
Fax: 212-697-1559

*Attorneys for Defendant and Counterclaim Plaintiff LoopNet, Inc.*

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
:
COSTAR GROUP, INC.,

                         Plaintiff,       No. 08-CV-1156 (GBD) (GWG)
:
          v.
:    **LOOPNET INC.'S SECOND SET**
LOOPNET, INC.,                **OF REQUESTS FOR PRODUCTION**
                              **OF DOCUMENTS**
                    Defendant  :
                    and Counter-
                    Plaintiff.
-----------------------------------------------------------X
:
LOOPNET, INC.,

                    Counterclaim
                    Plaintiff,
:
          v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

                    Counterclaim  :
                    Defendants.
-----------------------------------------------------------X

1887572

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, defendant and counterclaim plaintiff LoopNet, Inc. hereby requests that plaintiff and counterclaim defendants CoStar Group, Inc. and CoStar Realty Information, Inc. produce the documents requested herein at the offices of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY, 10178, att: Jacques Semmelman, on or before July 15, 2008, or on such other date as may be ordered by the Court.

## DEFINITIONS AND INSTRUCTIONS

A.    Unless otherwise specified, all terms shall be interpreted as they are used in the Federal Rules of Civil Procedure and the Local Rules for the Southern District of New York. These Requests and the terms used herein shall be construed to require the fullest and most complete disclosure required by law.

B.    The terms "document," "communication," "and/or," "all/each," "identify," "concerning," "person," and "parties," respectively, shall have the respective meanings set forth for such terms in Local Civil Rule 26.3.

C.    As used herein, the present tense shall also include the past tense.

D.    As used herein, the singular form of a word shall be interpreted as plural, and the plural form of a word shall be interpreted as singular, whichever makes the request most broad.

E.    As used herein, the terms "COSTAR," "YOU" and "YOUR" shall mean CoStar Group, Inc. and CoStar Realty Information, Inc., its officers, directors, employees, partners, corporate parent, subsidiaries or affiliates.

F.    As used herein, the term "LOOPNET" shall mean LoopNet, Inc., its officers, directors, employees, partners, corporate parent, subsidiaries and affiliates.

G.    The term "including" shall be construed broadly to mean "including but not limited to" or "including without limitation."

H.    Words and phrases are to be given their ordinary meaning and shall not be unduly or restrictively construed so as to avoid responding to the fair scope of the requests.

I.    You are to supplement your responses to this request as mandated under Rule 26 of the Federal Rules of Civil Procedure.

J.    Each document request shall operate and be responded to independently and, unless otherwise indicated, no request limits the scope of any other request.

K.    If a copy of a requested document contains comments, markings, or notations not found on a prior or subsequent version, please consider the copy and any prior or subsequent versions as separate documents and produce all of them.

L.    If an objection is made to any document request herein, the objection shall state with particularity the basis therefor, and the request shall be answered to the extent not objected to. If the objection is based on the attorney-client privilege or the attorney work product doctrine, the objection shall identify the communication, and shall state the basis for the claim of privilege or work product.

M.    If a request calls for the production of a document as to which you claim any privilege or any other ground for withholding or otherwise failing to produce any requested document, please provide, at the time at which the other documents are produced, a log which, separately for each document not produced, sets forth the information required under Local Civil Rule 26.2. You shall produce the non-privileged contents of the documents, if any portion thereof is not subject to a claim of privilege.

N.    If a request calls for the production of a document which you know to exist or to have existed but which cannot now be located or has been destroyed, discarded or lost, please provide, at the time at which the other documents are produced, a log which, separately for each document not produced, sets forth: (1) the identity of the author thereof, the parties thereto, and any person who helped in the preparation of the document; (2) the title or other identifying data sufficient to describe the document; (3) the date of the document, or if no date appears thereon, the approximate date; (4) the identity of each person to whom the document, or any copy thereof, was transmitted, shown, or disclosed; (5) the name and address of the last known custodian of the document; (6) the date of destruction or loss of the document; and (7) the reasons for and circumstances concerning the destruction, discarding or loss of the document.

O.    If any document was, but no longer is in your possession or subject to your control, state what disposition was made of it, by whom, and the date or dates or approximate date or dates on which such disposition was made and why.

P.    These requests encompass documents in your possession, custody or control, wherever located, including documents that may be physically with subsidiaries, affiliates, agents, employees, principals, directors, attorneys, accountants, banks, investment advisers, brokers, computer technicians or other professionals, or with other persons or entities who are obligated upon your request to deliver them to you.

Q.    The documents produced pursuant to these requests must be produced in the same form and in the same order in which they were maintained in the ordinary course of business. documents are to be produced in the boxes, file folders, bindings or other containers in which the documents are found. The title, labels or other descriptions of the boxes, file folders, binders or other containers are to be left intact.

R.    As used herein, the "LaMagna Declaration" shall refer to the Declaration of Raymond LaMagna dated June 30, 2008, submitted in support of LoopNet's motion for a preliminary injunction.

S.     As used herein, the term "SHOWCASE" shall refer to the "online property marketing service" described in YOUR May 15, 2008, press release entitled "CoStar Showcase Launches With $1 Million in Presale Subscription Orders," a copy of which is attached as Exhibit V to the LaMagna Declaration.

T.  As used herein, the term "COSTAR CLAIMS" shall refer to CoStar's statements, claims, and/or representations that:

    i.   Showcase's audience includes "over 400,000 prospects you won't find on LoopNet," seen, for example, in the document attached as Exhibit H to the LaMagna Declaration.

    ii.   Showcase reaches "over 400,000 potential prospects you won't find on LoopNet," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

    iii.   Showcase's audience includes "1.3 million unique visitors each quarter," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

    iv.   86% of Showcase's audience "are purchase decision makers and influencers for their firm," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

    v.   Showcase's audience consists of "qualified prospects who are likely very interested" in available real estate listings, seen, for example, in the document attached as Exhibit X to the LaMagna Declaration.

    vi.   Showcase's audience includes "anyone with an interest in commercial real estate property listings across the U.S." seen, for example, in the document attached as Exhibit K to the LaMagna Declaration.

    vii.   Showcase is "free," seen, for example, in the document attached as Exhibit X to the LaMagna Declaration.

    viii.   Showcase is a "truly open service," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

    ix.   Showcase is "the First Truly OPEN Marketing Platform for Commercial Real Estate," seen, for example, in the document attached as Exhibit X to the LaMagna Declaration.

    x.   CoStar Showcase is "[t]he Website Brokers prefer 3 to 1," seen, for example, in the document attached as Exhibit S to the LaMagna Declaration.

xi.  "75% of commercial real estate brokers prefer CoStar information products over other information sources," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

xii.  Showcase "offers a true competitive advantage . . . by reaching more prospects and generating more leads online," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

xiii.  Showcase will "Reach More Prospects," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

xiv.  Showcase will "Generate More Leads," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

xv.  "More Than 300 Firms Find that . . . [Showcase] Delivers on [CoStar's] Promise to Provide Enhanced Property Exposure and More Qualified Lead-Generation," seen, for example, in the document attached as Exhibit Y to the LaMagna Declaration.

xvi.  Showcase features "over 890,000 listings," seen, for example, in the document attached as Exhibit S to the LaMagna Declaration.

xvii.  Showcase allows users to "View 900,000 Property Listings," seen, for example, in the documents attached as Exhibits P and Q to the LaMagna Declaration.

xviii.  CoStar "will make every effort to ensure the listing information [on Showcase] is accurate, up-to-date and free from mislabeled, outdated or 'dead' listings that clutter other online property search services," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

xix.  Showcase will "get the deal done faster," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

xx.  Showcase offers consumers "more opportunity to lease or sell [their] property more quickly than ever before," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

xxi.  Showcase is "an unprecedented way" to market listings, seen, for example, in the document attached as Exhibit J to the LaMagna Declaration.

xxii.  Showcase allows customers to "gain unmatched exposure," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

xxiii.  "[T]he response [to Showcase] to date clearly indicates these clients find CoStar Showcase to be a very compelling and effective solution for marketing their listing online," seen, for example, in the document attached as Exhibit Y to the LaMagna Declaration.

xxiv.  "Based on the enthusiastic response CoStar Showcase received . . . it's clear there is substantial demand among commercial property professionals for a more effective way to market their property listings online," seen, for example, in the document attached as Exhibit Y to the LaMagna Declaration.

xxv.  "Clients have responded enthusiastically to the new service, recognizing the numerous advantages it offers for marketing their listings online," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

U.  As used herein, the term "COSTAR SOURCES" shall refer to any materials or information (such as data sources or surveys) cited by YOU in YOUR marketing or advertising as support for any claims or statements made by YOU, including the COSTAR CLAIMS.  By way of example, the COSTAR SOURCES include, without limitation:

i.  The "Omniture Q1 2008 CoStar.com Data" cited, for example, in the advertisement, attached as Exhibit I to the LaMagna Declaration.

ii.  The "Q4'07 comScore Data, CoStar Custom Analysis" cited, for example, in the advertisement, attached as Exhibit I to the LaMagna Declaration.

iii.  The "online survey of randomly intercepted CoStar.com website visitors, May 2007" cited, for example, in the advertisement, attached as Exhibit I to the LaMagna Declaration.

iv.  The "blind survey amongst top 500 U.S. brokerage firms conducted by CSRS in December 2007" cited, for example, in the advertisement attached as Exhibit I to the LaMagna Declaration.

v.  The "Q4-'06-Q4'07 comScore Data, CoStar Custom Analysis," cited, for example, in the advertisement attached as Exhibit N to the LaMagna Declaration.

## REQUESTS FOR PRODUCTION

**DOCUMENT REQUEST NO. 79**:

Documents sufficient to establish the factual basis for each of the COSTAR CLAIMS.

**DOCUMENT REQUEST NO. 80**:

Any documents upon which YOU rely to support the truth or accuracy of the COSTAR CLAIMS.

**DOCUMENT REQUEST NO. 81**:

All COSTAR SOURCES.

**DOCUMENT REQUEST NO. 82**:

All documents concerning YOUR "online survey of randomly intercepted CoStar.com website visitors, May 2007," cited in the advertisement attached as Exhibit I to the LaMagna Declaration, including protocols, questionnaires, responses, and analyses.

**DOCUMENT REQUEST NO. 83**:

All documents concerning YOUR "blind survey amongst top 500 U.S. brokerage firms conducted by CSRS in December 2007" cited in the advertisement attached as Exhibit I to the LaMagna Declaration, including protocols, questionnaires, responses, and analyses.

**DOCUMENT REQUEST NO. 84**:

All documents concerning any surveys YOU relied upon as the basis for any of the COSTAR CLAIMS, including protocols, questionnaires, responses, and analyses.

**DOCUMENT REQUEST NO. 85**:

Documents sufficient to show all of the marketing, promotional, and advertising materials containing the COSTAR CLAIMS, including but not limited to copies of advertising materials, training scripts for CoStar's sales staff, and mailing lists.

**DOCUMENT REQUEST NO. 86**:

Copies of all marketing or advertising for SHOWCASE, including documents sufficient to determine to whom such advertising materials and marketing materials were distributed.

Dated:  New York, New York
        June 30, 2008

                            CURTIS, MALLET-PREVOST,
                               COLT & MOSLE LLP

By:  Jacques Semmelman (JS 5020)

                    101 Park Avenue
                    New York, NY 10178-0061
                    Tel:  212-696-6000
                    Fax:  212-697-1559
                    jsemmelman@curtis.com

                    *Attorneys for Defendant LoopNet, Inc.*

*Of Counsel*:
Elliot Brown (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010
Fax: (310) 203-7199
ebrown@irell.com

# EXHIBIT B

Jacques Semmelman (JS 5020)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Tel: 212-696-6000
Fax: 212-697-1559

*Attorneys for Defendant and Counterclaim Plaintiff LoopNet, Inc.*

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                                                           :
COSTAR GROUP, INC.,
                                                           :
                          Plaintiff,          No. 08-CV-1156 (GBD) (GWG)
                                                           :
              v.
                                                           :   **LOOPNET INC.'S FIRST NOTICE
                                                               OF DEPOSITION OF COSTAR
LOOPNET, INC.,                                                 GROUP, INC. AND COSTAR
                                                           :   REALITY INFORMATION, INC.,
                          Defendant               **PURSUANT TO RULE 30(b)(6)**
                          and Counter-
                          Plaintiff.**
-----------------------------------------------------------X
                                                           :
LOOPNET, INC.,
                                                           :
                          Counterclaim
                          Plaintiff,
                                                           :
              v.
                                                           :
COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,
                                                           :
                          Counterclaim   :
                          Defendants.
-----------------------------------------------------------X

Pursuant to Rules 26 and 30 of the Federal Rules of Civil Procedure, defendant and counterclaim plaintiff LoopNet, Inc., will take the deposition upon oral examination of (i) CoStar Group, Inc. and (ii) CoStar Realty Information, Inc., on July 24, 2008, starting at 10:00 a.m., or on such other date as may be ordered by the Court, and continuing thereafter until completed, at the offices of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, NY, 10178, before a Notary Public or other officer duly authorized to administer oaths. The examination will be recorded by stenographic and/or videographic means. You are invited to attend.

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, CoStar Group, Inc. and CoStar Realty Information, Inc. are each required to designate one or more appropriate persons to testify on their behalf with respect to each of the topics set forth in the attached Exhibit A, and the person(s) so designated shall be required to testify as to each of those topics known or reasonably available to the respective corporation.

Dated: New York, New York
        June 30, 2008

CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP

By: Jacques Semmelman (JS 5020)

101 Park Avenue
New York, NY 10178-0061
Tel: 212-696-6000
Fax: 212-697-1559
jsemmelman@curtis.com

Attorneys for Defendant LoopNet, Inc.

*Of Counsel*:
Elliot Brown (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010
Fax: (310) 203-7199
ebrown@irell.com

## EXHIBIT A

Each Counterclaim Defendant is requested to designate one or more officers, directors, managing agents, or other persons who consent to testify on behalf of the corporation who have knowledge of the matters set forth herein.

## DEFINITIONS

A.    As used herein, the "LaMagna Declaration" shall refer to the Declaration of Raymond LaMagna dated June 30, 2008, submitted in support of LoopNet's motion for a preliminary injunction.

B.    As used herein, the term "COSTAR CLAIMS" shall refer to CoStar's statements, claims, and/or representations that:

     i.    Showcase's audience includes "over 400,000 prospects you won't find on LoopNet," seen, for example, in the document attached as Exhibit H to the LaMagna Declaration.

    ii.    Showcase reaches "over 400,000 potential prospects you won't find on LoopNet," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

   iii.    Showcase's audience includes "1.3 million unique visitors each quarter," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

   iv.    86% of Showcase's audience "are purchase decision makers and influencers for their firm," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

    v.    Showcase's audience consists of "qualified prospects who are likely very interested" in available real estate listings, seen, for example, in the document attached as Exhibit X to the LaMagna Declaration.

   vi.    Showcase's audience includes "anyone with an interest in commercial real estate property listings across the U.S." seen, for example, in the document attached as Exhibit K to the LaMagna Declaration.

  vii.    Showcase is "free," seen, for example, in the document attached as Exhibit X to the LaMagna Declaration.

viii. Showcase is a "truly open service," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

ix. Showcase is "the First Truly OPEN Marketing Platform for Commercial Real Estate," seen, for example, in the document attached as Exhibit X to the LaMagna Declaration.

x. CoStar Showcase is "[t]he Website Brokers Prefer 3 to 1," seen, for example, in the document attached as Exhibit S to the LaMagna Declaration.

xi. "75% of commercial real estate brokers prefer CoStar information products over other information sources," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

xii. Showcase "offers a true competitive advantage . . . by reaching more prospects and generating more leads online," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

xiii. Showcase will "Reach More Prospects," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

xiv. Showcase will "Generate More Leads," seen, for example, in the document attached as Exhibit I to the LaMagna Declaration.

xv. "More Than 300 Firms Find that . . . [Showcase] Delivers on [CoStar's] Promise to Provide Enhanced Property Exposure and More Qualified Lead-Generation," seen, for example, in the document attached as Exhibit Y to the LaMagna Declaration.

xvi. Showcase features "over 890,000 listings," seen, for example, in the document attached as Exhibit S to the LaMagna Declaration.

xvii. Showcase allows users to "View 900,000 Property Listings," seen, for example, in the documents attached as Exhibits P and Q to the LaMagna Declaration.

xviii. CoStar "will make every effort to ensure the listing information [on Showcase] is accurate, up-to-date and free from mislabeled, outdated or 'dead' listings that clutter other online property search services," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

xix. Showcase will "get the deal done faster," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

xx.  Showcase offers consumers "more opportunity to lease or sell [their] property more quickly than ever before," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

xxi.  Showcase offers "an unprecedented way" to market listings, seen, for example, in the document attached as Exhibit J to the LaMagna Declaration.

xxii.  Showcase allows customers to "gain unmatched exposure," seen, for example, in the document attached as Exhibit L to the LaMagna Declaration.

xxiii.  "[T]he response [to Showcase] to date clearly indicates these clients find CoStar Showcase to be a very compelling and effective solution for marketing their listings online," seen, for example, in the document attached as Exhibit Y to the LaMagna Declaration.

xxiv.  "Based on the enthusiastic response CoStar Showcase received . . . it's clear there is substantial demand among commercial property professionals for a more effective way to market their property listings online," seen, for example, in the document attached as Exhibit Y to the LaMagna Declaration.

xxv.  "Clients have responded enthusiastically to the new service, recognizing the numerous advantages it offers for marketing their listings online," seen, for example, in the document attached as Exhibit V to the LaMagna Declaration.

## TOPICS

### TOPIC NO. 1:

The factual basis for each of the COSTAR CLAIMS.

### TOPIC NO. 2:

CoStar's marketing and advertising for its Showcase product.

# EXHIBIT C

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

COSTAR GROUP, INC.,

        Plaintiff,

    v.

LOOPNET, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 08- CV 1156

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

PATTERSON BELKNAP WEBB & TYLER LLP
    Steven A. Zalesin (SZ 0901)
    Karla G. Sanchez (KS 7247)
    Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
    Patrick J. Carome (admitted *pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiff CoStar Group, Inc.*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................ i

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS .......................................................................................... 3

ARGUMENT ............................................................................................................. 10

I.    CoStar Is Likely To Succeed on the Merits........................................................ 10

    A.    The "950,000 Unique Visitors Each Month" Claim Is Facially False.................... 12

    B.    The "2.75 Million Registered Members" Claim Is Facially False.......................... 13

    C.    The "18 Million" Claims Are Facially False ......................................................... 17

    D.    The "Largest Database of Commercial Listings" Claim Is Facially False ............. 18

II.   CoStar Will Suffer Irreparable Injury Absent Preliminary Relief........................ 19

CONCLUSION.......................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

*American Home Prods. Corp. v. Johnson & Johnson,*
    654 F. Supp. 568 (S.D.N.Y. 1987) .......................................................................21

*Avis Rent A Car System, Inc. v. Hertz Corp.,*
    782 F.2d 381 (2d Cir. 1986)..............................................................................16

*Castrol, Inc. v. Quaker State Corp.,*
    977 F.2d 57 (2d Cir. 1992)................................................................................19

*Coca-Cola Co. v. Tropicana Prods.,*
    690 F.2d 312 (2d Cir. 1982) .......................................................................11, 19

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,*
    No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982)............................15

*Johnson & Johnson v. GAC Int'l, Inc.,*
    862 F.2d 975 (2d Cir. 1988) ..............................................................................11

*Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.,*
    960 F.2d 294 (2d Cir. 1992)................................................................................17

*Johnson & Johnson-Merck Consumer Pharms. Co. v. P&G,*
    285 F. Supp. 2d 389 (S.D.N.Y.), *aff'd* 90 F. App'x 8, 9 (2d Cir. 2003).....................21

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,*
    348 F. Supp. 2d 165 (S.D.N.Y. 2004)..................................................................11

*McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.,*
    755 F. Supp. 1206 (S.D.N.Y. 1990)....................................................................11

*McNeilab, Inc. v. American Home Prods. Corp.,*
    501 F. Supp. 517 (S.D.N.Y. 1980) ....................................................................12

*McNeilab, Inc. v. American Home Prods. Corp.,*
    848 F.2d 34 (2d Cir. 1988).........................................................................19, 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.,*
    290 F.3d 578 (3d Cir. 2002)..............................................................................11

*Novo Nordisk A/S v. Becton Dickinson & Co.,*
   997 F. Supp. 470 (S.D.N.Y. 1998) .............................................................................21

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,*
   32 F.3d 690 (2d Cir. 1994).......................................................................................19

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,*
   926 F.2d 134 (2d Cir. 1991).....................................................................................16

*Schering Corp. v. Pfizer Inc.,*
   189 F.3d 218 (2d Cir. 1999) ....................................................................................11

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc.,*
   906 F. Supp. 178 (S.D.N.Y. 1995) ..........................................................................14

*Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.,*
   No. 01 Civ. 2775-DAB, 2001 WL 588846 (S.D.N.Y. June 1, 2001) ..........................15

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
   497 F.3d 144 (2d Cir. 2007).........................................................................10, 11, 19

## STATUTES

Lanham Act, 15 U.S.C. § 1125(a) ................................................................................10

1775462v.1

Plaintiff CoStar Group, Inc. ("CoStar") respectfully submits this Memorandum of Law in support of its motion for a preliminary injunction to stop a new wave of false advertising by defendant LoopNet, Inc. ("LoopNet"). LoopNet's latest ads, aimed directly at CoStar, grossly exaggerate the size of LoopNet's online audience and make numerous false and misleading comparisons between LoopNet's products and those of CoStar. LoopNet's new advertising threatens to stop the multi-million dollar launch of CoStar Showcase® – a new product offering that competes directly in LoopNet's core market – dead in its tracks. CoStar seeks an immediate injunction to prevent the occurrence of such irreparable injury.

## PRELIMINARY STATEMENT

CoStar and LoopNet are major competitors in the online commercial real estate marketing business. Historically, LoopNet has served primarily as an advertising vehicle through which owners and brokers have promoted specific properties for sale or lease. Meanwhile, CoStar has focused its efforts on providing information services (*e.g.,* space available for lease, comparable sales information, tenant information, information about properties for sale, etc.) to commercial real estate professionals.

This marketplace alignment fundamentally changed on May 15, 2008, when CoStar launched CoStar Showcase®, an online commercial real estate marketing service that promotes individual listings. Showcase not only competes directly in the arena that LoopNet has long occupied, but offers distinct advantages – including ease of use (for both buyers and sellers) and a more favorable pricing system -- in comparison to LoopNet. CoStar Showcase, which is backed by a multi-million dollar investment by CoStar, presents a serious commercial threat to LoopNet's business.

In the face of this new competition, and in an effort to prevent CoStar Showcase from gaining any traction in LoopNet's primary market, LoopNet recently unleashed a barrage of new advertisements that make false and misleading claims concerning the relative benefits of each party's products. The thrust of this new comparative ad campaign is that LoopNet has a vast online audience that dwarfs that of CoStar, such that customers should always choose to advertise on LoopNet instead of CoStar Showcase.

For example, one brochure that LoopNet is currently distributing poses the question "Does your online marketing compare?" and points to LoopNet's "2.75 million registered members" as supposed proof of LoopNet's expansive user base. But as LoopNet now has publicly admitted, it does not have an audience that large. The "registered member" figure that LoopNet cites merely represents the cumulative number of user accounts that have been created on the LoopNet website since its inception *in 1995* – more than a dozen ago. The actual number of individuals who actively search listings on LoopNet's site today is but a fraction of the "2.75 million registered members" LoopNet advertises. LoopNet has knowingly touted its bogus "registered members" statistic in order to exaggerate its online distribution for some time. But only in recent weeks has LoopNet turned this weapon directly against CoStar, and begun to make false *comparative* claims about CoStar Showcase.

LoopNet's new ad campaign goes well beyond this deceptive new use of its "registered members" metric. LoopNet has also begun to make false comparative claims about the actual number of visitors – or "traffic" – that each website attracts. For instance, LoopNet now advertises that, in comparison to the supposedly meager traffic enjoyed by CoStar, LoopNet receives a whopping "950,000 unique visitors each month." In the next breath, LoopNet claims that this figure is actually *understated* in that it "doesn't include the traffic from [LoopNet's]

2

exclusive network of newspaper web site partners[,] which generates more than 18 million unique visitors each month."

These claims are deceptive and untrue. In fact, according to the very data source that LoopNet cites, LoopNet typically attracts significantly *fewer than* the 950,000 unique monthly visitors claimed in its advertising. LoopNet falls short of this level of traffic even when those visitors who reach LoopNet's site through referrals from "partner" websites are counted. And LoopNet's online partnerships with various newspapers do not result in LoopNet's ads being viewed by anywhere near the "18 million unique visitors" that LoopNet claims.

LoopNet's false comparative claims are not limited to the relative size of its online audience. LoopNet has also begun to advertise that it offers "the largest database of commercial listings." In fact, LoopNet's listings database is less than 60% the size of CoStar's.

LoopNet's new ad campaign threatens to stamp out the competition posed by CoStar's Showcase product at its very inception. The launch of Showcase is crucial to CoStar's business, and the success of the product will largely turn on whether it can reach "critical mass" within the first few months of its debut. If permitted to continue, LoopNet's false and misleading advertising will cause CoStar to suffer an immediate loss of market penetration, goodwill and momentum that will not be compensable in money damages. To prevent such irreparable harm and to allow the parties' products to compete fairly in the marketplace, CoStar seeks preliminary injunctive relief to halt LoopNet's deceptive advertising.

### STATEMENT OF FACTS

The market for commercial real estate in the United States is in the process of being revolutionized by the availability of online research tools that provide fast, ready access to detailed information about properties and listings. Gone are the days in which listings were

1775462v.1

found only in local newspapers, and leads were passed primarily by word of mouth among

brokers and others "in the know." *See, e.g.,* Vivian Marino, *Real Estate Investing, Made Easier*

*Online*, N.Y. TIMES, Feb. 3, 2008, *available at* http://www.nytimes.com/2008/02/03/realestate

/commercial/03sqft.html. Today, such information is available from a number of websites that

supply critical facts about the marketplace and provide a searchable database of listings for

individual properties.

***The Parties and Their Products***

        Two of the leading companies in this emerging industry are CoStar and LoopNet,

the parties to this action. CoStar is the marketplace leader in the sale of information to

commercial real estate professionals. *See* Declaration of Andrew C. Florance ("Florance Decl.")

¶ 7. LoopNet also provides market information but, unlike CoStar, its business model is based

primarily upon the advertising and marketing of individual property listings. LoopNet functions

essentially as a modern version of the newspaper classified pages, charging property owners or

brokers a fee in exchange for distributing their listings to an audience of potential buyers or

lessors. For several years, LoopNet has been the only large player in this particular market

segment. *See id.* ¶ 2.

        In late 2007, CoStar announced a plan to expand its product line to compete

directly in LoopNet's core business -- online property marketing and lead generation. Since that

time, CoStar has completed development and launched its competing product, called CoStar

Showcase. *See id.* ¶¶ 8-10. Showcase offers several distinct advantages over LoopNet's

products. For example, to advertise on CoStar Showcase, customers do not have to input or

upload data about their property. CoStar's online tools pull the relevant information, such as

photographs, maps and statistics, into the listing from CoStar's existing research databases. To

entice users who are searching for available properties, CoStar designed a clean, content-rich

4

format for Showcase that is unrivalled in the industry. And CoStar has carefully calibrated its pricing levels and incentives to be more attractive to commercial real estate professionals than those of LoopNet. *See id.* ¶ 40.

Co-Star began disseminating promotional literature about its Showcase product to commercial real estate professionals in early April 2008. *See id.* ¶ 10. On May 15, 2008, Showcase was officially launched. *See id.* ¶ 8. CoStar Showcase is the most serious commercial threat that LoopNet currently faces.

### *LoopNet's False Claims About the Size of Its Online Audience*

In the battle for primacy in the developing market for internet-based commercial real estate advertising or lead generation, a critical element is the perceived size of the online community of buyers and sellers who actively use a website platform. Buyers want to be able to search the most comprehensive universe of listings. Sellers wish to expose their properties to the largest possible audience of buyers. Accordingly, customers are attracted to the platform that they believe to be most widely used. *See* Florance Decl. ¶ 3.

With full knowledge of this dynamic, LoopNet has undertaken a methodical – and successful – campaign to convince the relevant market that it has a vast, and constantly growing, audience. LoopNet's efforts in this regard have centered upon the claim that it has a staggering number of "registered members," which LoopNet intentionally equates with active users of its website. For example, LoopNet's website and essentially all of its advertising materials currently assert that LoopNet has "more than 2.75 million registered members."

The unmistakable impression created by LoopNet's ads is that millions of people actively view LoopNet listings. For example, on December 31, 2007, The Motley Fool, a widely followed source of online investment advice, recommended the purchase of LoopNet stock, emphasizing that LoopNet's "website [is] *frequented by* more than 2.5 million members." *See*

Ex. 2 to Florance Decl. at 2 (emphasis added). This is not surprising, since LoopNet itself often proclaims that its ads are "seen by" and "viewable to" its entire roster of 2.75 million registered members.

But as LoopNet has recently acknowledged, this claim is false. A "registered member," in LoopNet's parlance, is merely a user account that was created at any time since the inception of LoopNet's website roughly 13 years ago. Any time an account – which requires only the submission of a working email address -- is established, LoopNet adds another "registered member" to its cumulative total. A substantial proportion of these accounts are inactive, and have been for years. Nevertheless, LoopNet routinely promotes its historical total of "registered members" as though each and every "member" were a current, active user of the LoopNet website. *See* Florance Decl. ¶¶ 23-25.

### *LoopNet's New Comparative Ad Campaign*

LoopNet has perpetrated its "registered members" fraud on the commercial real estate and investment communities for some time. But it was not until the launch of CoStar Showcase a few weeks ago that LoopNet aimed this misinformation campaign directly at CoStar. In seeking to hold off the new threat from CoStar Showcase, LoopNet has launched a revamped and expanded promotional campaign designed to convince prospective customers that there is no reason even to consider listing their properties with CoStar.

Within days after the Showcase launch, LoopNet's CEO Richard Boyle falsely and publicly dismissed CoStar's new product as having "no marketing audience." *See* Florance Decl. ¶ 12 and Ex. 2 at 7. That essential message has since been repeated by LoopNet in a variety of advertising and promotional materials that not only belittle the size of CoStar's audience, but greatly exaggerate the scope of LoopNet's. In these current ads, which are carefully designed to fend off the threat from CoStar Showcase, LoopNet has changed its

traditional messaging, in which it talked exclusively about its own audience, and adopted a

*comparative* advertising approach, in which it contrasts its purported distribution or "traffic"

with that of competitors including CoStar.  For instance, in a press release issued *within the past*

*24 hours*, LoopNet announced that it not only "operates the largest online commercial real estate

marketplace with more than 2.75 million members," but "has increased its leadership position as

the most heavily trafficked commercial real estate website."  *See* Press Release, ComScore

Report Shows that LoopNet Extends Its Commanding Lead Among Online Commercial Real

Estate Websites, *available at* http://www.sunherald.com/prnewswire/story/634605.html.

LoopNet's new comparative ads emphasize three purported measures of its audience size:

"registered members," "unique visitors" and "traffic from" its "exclusive network of newspaper

websites."

>        For example, a new LoopNet marketing brochure, an excerpt from which appears

below, claims that LoopNet has:

## More Members. More Traffic. More Partners.

- Over 2.75 million registered members
- 950,000 unique visitors each month*
- Exclusive distribution network of 125+ newspaper web sites
- Trusted by the nation's leading brokerage firms

*See* Ex. 3 to Florance Decl. at 1.  The same advertisement claims that a "Premium" listing

enables realtors to "Reach LoopNet's Entire Member Base," and that such listings are "viewable

to 2.75 million registered members."  *See* Ex. 3 to Florance Decl. at 2.

>        This LoopNet flyer goes on to detail LoopNet's purported reach as compared to

its (unnamed) competitors.  Among other things, the ad claims that LoopNet attracts "950,000

unique visitors *each month*" and that this figure "doesn't include traffic from our exclusive

7

network of newspaper web site partners[,] which generates more than 18 million unique visitors

each month." *See* Ex. 3 to Florance Decl. at 1 (emphasis added).  The portion of the ad that

contains these claims appears below:



The dark blue bar on the above graph, immediately adjacent to the red LoopNet bar, is intended

to reflect the "web site traffic" generated by CoStar, and readers understand that LoopNet's

"More Members, More Traffic, More Partners" claim is directed at CoStar.  Florance Decl. ¶ 15.

Another brochure currently being distributed by LoopNet not only repeats these

claims, but explicitly asks the reader to use them as a basis for comparison:



*See* Ex. 4 to Florance Decl. at 4.

Similar claims are repeated on LoopNet's website:

When you advertise on LoopNet, your property is seen by:

| | |
|---:|:---|
| Registered Members: | 2.75 million |
| Unique Visitors: | 950,000 per month |
| Market Coverage: | All US & Canada |
| User Sessions: | 14 million per month |

*See* Ex. 5 to Florance Decl. at 1.

The LoopNet website also claims that LoopNet has "the largest database of commercial listings":

**Frequently Asked Question**

What are the benefits of LoopNet membership?

**Answer**

LoopNet membership provides access to the largest database of commercial listings.

*See* Ex. 6 to Florance Decl.

All of these claims of relative size, which form the heart of LoopNet's new marketing offensive in response to CoStar Showcase, are false and misleading. As stated above, LoopNet does not have a member base of 2.75 million people who actively use its website. LoopNet's site does not receive 950,000 unique visitors each month, as shown by the very data upon which LoopNet claims to rely. LoopNet's listings are not "seen by" or "viewable to" such inflated audiences -- let alone by an additional "18 million" individuals who supposedly are directed to LoopNet's website each month by the websites of major newspapers. And it is CoStar, not LoopNet, that actually offers the largest database of commercial real estate listings.

***Irreparable Harm to CoStar***

CoStar Showcase is in the midst of a critical launch period during which the product either will gain marketplace momentum and acceptance, or may fail within a period of months. *See* Florance Decl. ¶ 39. Advertisers will not pay to list their properties on Showcase if they believe its audience is dwarfed by LoopNet's, and potential customers for these properties will not continue to search CoStar's Showcase listings if they believe that the size of its database is insufficient. In other words, if allowed to continue, LoopNet's false and misleading comparative claims will permanently poison the waters against Showcase, potentially wiping out CoStar's investment and destroying an invaluable market opportunity.

## ARGUMENT

The standard for granting a preliminary injunction in this Circuit is well-established. The movant must show: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting the preliminary relief; and (2) a likelihood of irreparable harm if relief is denied. *See, e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). This standard is satisfied here.

## I.    CoStar Is Likely To Succeed on the Merits

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a federal cause of action for false advertising. The statute provides that:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

There are two theories of recovery available to a plaintiff under Section 43(a).[1]

*Time Warner Cable*, 497 F.3d at 153. First, a plaintiff can show that the advertisement in

question is literally false -- *i.e.*, false on its face. *Id.* at 153 (citing *Johnson & Johnson v. GAC*

*Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988)). An advertisement can be deemed literally or

facially false either if it makes an explicit statement or representation that "conflicts with

reality," *id.* (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)), or if its

"words and images, considered in context, necessarily imply a false message." *Id.* at 158

(quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d

578, 586-87 (3d Cir. 2002) ("A 'literally false' message may be either explicit or conveyed by

necessary implication when, considering the advertisement in its entirety, the audience would

recognize the claim as if it had been explicitly stated") (internal citations and

quotations omitted)). Ads that are facially or unambiguously false may be enjoined without

extrinsic evidence of consumer perception -- *i.e.*, without "reference to the advertisement's

[actual] impact on the buying public." *Id.* at 153-58 (quoting *Coca-Cola Co. v. Tropicana*

*Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

Alternatively, a plaintiff can show that the challenged advertisement, "while not

literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable*, 497

F.3d at 153. The extent to which consumers are deceived need not be established to obtain relief

against a misleading advertisement. *McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.*, 755 F.

Supp. 1206, 1211 (S.D.N.Y. 1990), *aff'd*, 938 F.2d 1544 (2d Cir. 1991). "[A]ll that is required is

a 'qualitative showing [to] establish that a not insubstantial number of consumers received a false

---

[1] The standards for analysis of false advertising claims under New York law are the same as
under the Lanham Act. *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F.
Supp. 2d 165, 177 n.6 (S.D.N.Y. 2004).

Case 1:08-cv-01156-GBD-GWG   Document 19   Filed 06/20/2008   Page 16 of 26

or misleading impression from it.'" *Id.* (quoting *McNeilab, Inc. v. American Home Prods. Corp.*, 501 F. Supp. 517, 525 (S.D.N.Y. 1980)).

Here, LoopNet's claims all are facially false or, at a minimum, "likely to mislead or confuse" their intended audience. Accordingly, the ads violate the Lanham Act and should be enjoined.

### A.   The "950,000 Unique Visitors Each Month" Claim Is Facially False

LoopNet's claims regarding the monthly number of unique visitors to its website are false on their face. According to its ads, LoopNet's assertion that it receives "950,000 unique visitors each month" is based upon data from comScore, an Internet audience measurement service. In fact, the very data that LoopNet cites shows that actual visits to LoopNet.com fall far short of this claim.

In the 15 months from February 2007 to April 2008, the number of total unique monthly visitors to LoopNet.com exceeded 950,000 only three times (April 2007, July 2007, and January 2008). *See* Ex. 18 to Florance Decl. Each of these spikes was preceded, and followed, by a monthly traffic level below the 950,000 claimed by LoopNet. *Id.* Indeed, in eight of the remaining 12 months, LoopNet had fewer than 900,000 unique monthly visitors, including as recently as March 2008, when it had fewer than 850,000. *Id.* Thus, LoopNet's claim that its website receives "950,000 unique visitors ***each*** month" is literally false.[2]

Moreover, even an accurate count of "unique monthly visitors" presents a misleading picture of LoopNet's true usage. Based on data provided to CoStar by comScore, only about a quarter of LoopNet's unique visitors actually log in or run searches for real estate.

---

[2] It is similarly false to claim, as LoopNet does, that LoopNet premium listings are "[v]iewable to . . . 950,000 unique visitors per month," or that listings on LoopNet's website are "seen by" 950,000 unique visitors per month. As outlined above, LoopNet's website does not receive 950,000 unique visitors each month. Moreover, even in months in which LoopNet does receive 950,000 unique visitors, there is no guarantee that they will view or see any particular listing.

The other traffic includes, for example, people who are put off by having to create an account and input personal information on the website and decide not to run any searches. It also includes others who may be interested in the company only as an investment. *See* Florance Decl. ¶ 31 and Exhs. 17-18.

    **B.**    **The "2.75 Million Registered Members" Claim Is Facially False**

        In its promotional materials and on its website, LoopNet claims to have "2.75 million registered members." When considered in context, the necessary implication of these claims is that each "registered member" is a unique individual who actually uses the LoopNet website. *See, e.g.*, Ex. 17 to Florance Decl. at 2 (emphasis added) (recommending LoopNet as an investment because its website is "*frequented by* more than 2.5 million members"). This is false. The "registered member" figure that LoopNet touts is merely a cumulative total – dating back to the company's inception in 1995 -- of each and every instance in which an online user account has been set up on the LoopNet website. *See* Florance Decl. ¶¶ 23-25. An account that, for instance, was created in 1998, used to view the site's contents (for free) only once, and never accessed again is included in LoopNet's advertised total of 2.75 million "registered members." By definition, LoopNet's current online audience is only a fraction of its historical total of registered accounts.

        Shortly after the commencement of this action, LoopNet acknowledged, for the first time, that not all of its "registered members" are active users of the LoopNet website. On February 27, 2008, LoopNet CEO Richard Boyle addressed the Jeffries Fourth Annual Internet Conference. Asked to explain LoopNet's claim (at that time) that it had 2.6 million "registered members," Mr. Boyle stated that "We don't break out the different segments of active users.

Basically the 2.6 million is total registered users over time." *See* Florance Decl. ¶ 25 & Ex. 11 at 8-9.

Despite this recent admission, LoopNet's advertisements continue to tout its "2.75 million registered members" as a measure of its user base and, in many instances, to claim that LoopNet ads are "seen by" or "viewable to" this entire audience. These "seen by" and "viewable to" claims are literally false because, as explained above, ads on LoopNet are neither "seen by" nor "viewable to" 2.75 million people. And even in those instances in which LoopNet does not use this specific language, its advertising necessarily implies that its "registered members" are actual individuals to whom LoopNet ads are exposed. Otherwise, why would the reader care how many "registered members" LoopNet has?

Courts in this District routinely enjoin ads that make use of impertinent or misleading statistics on the grounds that they necessarily imply a false message. For instance, in *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc.*, 906 F. Supp. 178 (S.D.N.Y. 1995), SmithKline disseminated a print ad with a banner headline that read "Doctors Have Already Endorsed Tagamet In The Strongest Possible Way. With Their Prescription Pads." Beneath this headline was a bar chart that showed that physicians had written 237 million prescriptions for Tagamet compared to only 36 million for Pepcid — roughly a 7-fold advantage. That comparison was literally true, but there was a catch: Tagamet had gotten to market nearly a decade earlier, so had amassed prescriptions over a much longer period of time. The Court found "that the ad conveys clearly and unequivocally the false message that doctors prescribed Tagamet HB 200 million times more than they prescribed Pepcid over an equal period of time," and entered a preliminary injunction. 906 F. Supp. at 185-86.

14

Similarly, in *Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 2001 WL 588846 (S.D.N.Y. June 1, 2001), the advertiser -- the maker of Tums antacid – aired a commercial claiming that Tums' competitor, Pepcid Complete, relieves "less than half of the heartburn episodes within 30 minutes. Less than half." What the ad did not mention was that Tums itself was significantly less effective at relieving heartburn within the same time frame. The Court determined that the "necessary implication" of the advertisement was the "unambiguous and concededly false claim that Tums provides for faster relief than Pepcid Complete," *id.* at \*13, and enjoined the commercial on that basis. *See also, e.g., Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (finding literally false a claim comparing the number of times professional chefs had chosen defendant's food processor over plaintiff's food processor where plaintiff did not market a professional model).

LoopNet's claim here is no different. LoopNet cites its "2.75 million registered members" in the context of an advertisement touting the popularity and reach of its website. In that context, those 2.75 million "members" would only be relevant if they were current, active users. LoopNet's "registered members" claim is therefore false by necessary implication.

LoopNet may argue that its "2.75 million registered members" claim does not convey a false impression because it appears alongside its "950,000 unique visitors each month" claim. While in some recent advertisements these two claims have appeared in close proximity to one another, LoopNet continues to use the "2.75 million registered members" claim on its own, most conspicuously in the prominent banner that greets every visitor to the LoopNet website:

#1 in Commercial Real Estate Online

$500 billion of properties for sale • 4.3 billion sq. ft. of properties for lease • 2.75 million members

15

And even when the "2.75 million registered members" claim appears alongside the "950,000 unique visitors each month" claim, it remains facially false. As noted above, the overall context of LoopNet's advertising makes clear that it is talking about the size of LoopNet's *current* online audience – not some irrelevant count of the number of people who, historically, have signed up for user accounts. Thus, the only reasonable interpretation of LoopNet's ads is that it has 2.75 million *active* members, roughly 950,000 of which visit the LoopNet.com website in a given month. This unambiguous message concerning LoopNet's 2.75 million members is false, regardless of whether or not it is coupled to the (similarly false) claim that LoopNet receives 950,000 unique visitors each month. *See Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 381-82 and 85 (2d Cir. 1986) (holding that advertising claim that "Hertz has more new cars than Avis has cars," *in context*, "could only be understood as referring to companies' rental fleets" and noting that "[f]undamental to any task of interpretation is the principle that text must yield to context" and "there is no surer way to misread any document than to read it literally") (internal quotations and citations omitted).

Even if LoopNet's "registered members" claims were not facially false (and they are), they would nonetheless violate they Lanham Act because they are highly misleading – and intentionally so. In the Second Circuit, when a false advertising plaintiff demonstrates that the defendant has "intentionally set out to deceive the public" in an "egregious" manner, a presumption of consumer deception arises, and the plaintiff is relieved "of the burden of producing consumer survey evidence that supports its claim." *Johnson & Johnson\*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992) (citing *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926

16

F.2d 134, 140 (2d Cir. 1991) ("Once it is shown that a defendant deliberately engaged in a deceptive commercial practice, we agree that a powerful inference may be drawn that the defendant has succeeded in confusing the public. Therefore, upon a proper showing of such deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer confusion.")).

Such a presumption is warranted here. Indeed, LoopNet not only *intends* that its ads convey the false message that it has an actual audience of 2.75 million people, it *says so* explicitly in numerous advertisements. That LoopNet occasionally omits the words "seen by" or "viewable to" does not change the fact that LoopNet uses the words "registered members" interchangeably to describe "active users." Moreover, LoopNet is undoubtedly aware that the relevant public have been taken in by its claims and reported that LoopNet has an online audience equal to its number of "registered members." As detailed in the Florance Declaration, numerous commercial real estate and investment analysts have publicly construed LoopNet's "registered members" claims to equate to "active users." *See* Florance Decl. ¶ 26 (collecting examples). Especially given the fact that LoopNet has never taken any affirmative action to dispel the widespread confusion it has created, it is evident that LoopNet intended the confusion all along.

### C.    The "18 Million" Claims Are Facially False

LoopNet has also undertaken to advertise that its audience is even larger than its "2.75 million registered members," or its purported 950,000 unique monthly users. According to LoopNet's most recent ads, these figures are actually understated because they do not include traffic from LoopNet's "exclusive network of newspaper web site partners[,] which generates more than 18 million unique visitors each month." *See* Florance Decl. ¶ 15 & Ex. 3. This claim

is literally false. The Internet audience measurement service that LoopNet cites for its "950,000 unique visitors each month" claim measures traffic on LoopNet's website *regardless of how it gets there*. A visitor who arrives at the LoopNet site by clicking on a link found on a newspaper website is counted the same as one who reaches LoopNet's site by typing in the URL, or using a search engine such as Google. *See id.* ¶ 33. LoopNet's claim that its traffic as reported by comScore "doesn't include the traffic from our . . . newspaper web site partners" is therefore contrary to the facts. For the same reason, the claim that this nonexistent incremental traffic adds another "18 million unique visitors each month" to LoopNet's monthly total is facially false.

Moreover, even if the reader were to understand that the "18 million" figure refers to the aggregate number of monthly visitors to the *newspaper* websites (though that is contrary to what the ads literally say), the claim would still have a false implication. There is no basis to think that more than a tiny fraction of these "18 million" online newspapers readers, who typically are searching for updated news reports, sports scores or weather forecasts, is even exposed to the commercial real estate classified ads that LoopNet places. It is therefore grossly misleading for LoopNet to suggest that its partnerships with online newspapers result in its ads being seen by another "18 million" people every month. *See* Florance Decl. ¶¶ 32-36.

**D.    The "Largest Database of Commercial Listings" Claim Is Facially False**

Finally, LoopNet's claim that it offers the "largest database of commercial listings" is literally false. *See* Ex. 6 to Florance Decl. LoopNet currently has approximately 595,000 listings on its website, whereas CoStar has over a million. *See id.* ¶ 38. Accordingly, CoStar – not LoopNet – offers the largest database of commercial listings. Indeed, LoopNet's database is less than 60% the size of CoStar's.

## II.   CoStar Will Suffer Irreparable Injury Absent Preliminary Relief

Because "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement," the Second Circuit has held that a plaintiff seeking a preliminary injunction need only demonstrate "a reasonable basis" for the belief that false and misleading advertisements of a competitor will cause it irreparable harm. *Coca-Cola Co.*, 690 F.2d at 316.[3]  When the challenged ads are directly comparative and the plaintiff has demonstrated a likelihood of success on the merits, irreparable harm is presumed. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992); *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir. 1988); *see also Time Warner Cable, Inc.*, 497 F.3d at 162-63 (affirming District Court's decision to presume irreparable harm even though the challenged ads did not mention plaintiff by name when plaintiff was defendant's main competitor in the relevant marketplace).

Here, the evidence both supports a presumption and supplies a "reasonable basis" for a factual finding of irreparable harm.  With respect to the presumption, LoopNet's new ads are comparative in nature and are targeted directly against CoStar, which is now LoopNet's main competitor in the online commercial real estate listing business. *See* Florance Decl. ¶¶ 9-19.  As the Second Circuit recently held in *Time Warner Cable*, a false comparative ad need not mention the competitor by name to support a presumption of irreparable injury.  All that is required is a showing that the audience will understand that the claims in the advertisement are directed at the plaintiff. *See Time Warner Cable*, 497 F.3d at 162 (upholding application of presumption of irreparable harm where "consumers in the markets covered by the preliminary injunction would

---

[3] This "flexible approach" requires "a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two." *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).

undoubtedly understand [the ad's] derogatory statement . . . as referring to [plaintiff]" or where "it would be obvious to consumers that [defendant's] claims of superiority are aimed at diminishing the value of [plaintiff's product]").  As detailed in the Florance Declaration, the commercial real estate marketplace well understands that LoopNet's current spate of comparative claims are directed at CoStar and its new Showcase product.  Florance Decl. ¶ 19; *see McNeilab, Inc.*, 848 F.2d at 38 (a false "comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer" and establishes irreparable harm).

But the availability of the presumption is academic here, because CoStar can readily demonstrate a "reasonable basis" for a finding that it will be injured absent a preliminary injunction.  CoStar is in the midst of a critical new product launch whose ultimate fate is closely tied to its success in the market over the next few months.  If LoopNet is permitted to continue to make false and disparaging claims about CoStar Showcase until this case is finally resolved, CoStar will have serious difficulty in attempting to quantify or recoup the loss of its current opportunity:  to expand its business to compete head-to-head, and on even par, with LoopNet in the marketing of individual commercial real estate listings.  As explained by CoStar's CEO Mr. Florance, "CoStar Showcase may not get a second chance to succeed in the market" if its initial launch fails.  Florance Decl. ¶ 39.  Only by gaining enough sales and momentum to reach "critical mass" can CoStar realize the full value of its investment and establish CoStar Showcase as a viable alternative to LoopNet.

Courts in this District have previously recognized that the risk of immediate and irreparable injury from a false advertising campaign is especially high when a new product is being introduced to the market.  *See, e.g., Johnson & Johnson-Merck Consumer Pharms. Co. v.*

*P&G*, 285 F. Supp. 2d 389, 394 (S.D.N.Y.), *aff'd* 90 F. App'x 8, 9 (2d Cir. 2003) ("[I]t is very clear to the Court that there is irreparable injury in this case stemming from the very nature of the advertising campaign involved. P&G's false advertising is occurring at the inception of a new product launch, a time when the buying public is particularly attentive and educable. Correcting the false impressions made on consumers will therefore be difficult."); *Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F. Supp. 470, 473 (S.D.N.Y. 1998) (noting that "because Becton's claims relate to the Ultra-Fine II, which is a relatively new entrant in the needle market, Becton would have a particularly difficult time proving money damages if it were to succeed ultimately in its claims"). Indeed, CoStar has already begun to feel the bite of LoopNet's deceptive advertising, as some customers have expressed concern about CoStar's ability to compete with the LoopNet's purportedly massive audience. Unless an injunction is issued, such misconceptions -- and resulting defections from CoStar Showcase -- will proliferate, causing irreparable injury to CoStar's business. *See* Florance Decl. ¶¶ 39-42.

Not only will CoStar be severely injured if preliminary relief is denied; so too will the public at large. Courts in this District have long recognized that there is a strong public interest in the prevention of false or misleading advertising. *See, e.g, American Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987). That interest is especially acute here because CoStar is attempting to establish Showcase -- a superior product with lower pricing -- as a viable competitor to LoopNet, the dominant player in the market. If LoopNet's false advertising campaign is allowed to continue, CoStar's bid to establish itself in LoopNet's market may fail, and the marketplace will be denied the benefits of fair and robust competition between the parties.

1775462v.1

## CONCLUSION

In the end, LoopNet's claims about its "registered members" are no different than a traditional newspaper that knowingly inflates its circulation figures in order to drive up advertising sales and revenue. LoopNet is deliberately communicating to the marketplace false information about the size of its online audience. Such claims violate the Lanham Act and should be enjoined. CoStar's motion for a preliminary injunction should be granted.

Dated: June 20, 2008

Respectfully submitted,


PATTERSON BELKNAP WEBB & TYLER LLP


By:    /s Steven A. Zalesin
         Steven A. Zalesin (SZ 0901)
         Karla G. Sanchez (KS 7247)
         Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
         Patrick J. Carome (admitted *pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363


*Attorneys for Plaintiff CoStar Group, Inc.*

Of counsel:

         Christopher Winters, Esq.
         CoStar Group, Inc.

# EXHIBIT D

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| COSTAR GROUP, INC., | ) |
| Plaintiff, | ) Civil Action No. 08-CV 1156 |
| v. | ) |
| LOOPNET, INC., | ) **DECLARATION OF ANDREW C.** |
| | ) **FLORANCE** |
| Defendant. | ) |

**ANDREW C. FLORANCE,** under penalty of perjury, declares as follows:

1.      I am President and CEO of CoStar Group, Inc. ("CoStar"). I have held this position since I founded CoStar in 1987. I submit this declaration in support of CoStar's motion for a preliminary injunction to prevent LoopNet, Inc. ("LoopNet") from disseminating false advertising that threatens irreparable harm to CoStar's business.

2.      CoStar and LoopNet are both in the online commercial real estate business. Throughout most of its history, CoStar has focused on the provision of information *about* the commercial real estate market to industry professionals. Within the past few weeks, however, CoStar launched a new product called CoStar Showcase®, which focuses on Internet lead generation for commercial real estate professionals. The launch of Showcase put CoStar into direct competition with LoopNet, whose online marketing product, LoopNet.com, has always been focused on Internet lead generation.

3.      For all industry competitors, the perceived size of the online community of buyers and sellers who actively use their website platform is critical. Buyers want to be able to

search the most comprehensive universe of listings. Sellers wish to expose their properties to the largest possible audience of buyers. Accordingly, customers are attracted to the platform that they consider to be the most widely used.

4.     With full knowledge of this dynamic, LoopNet has undertaken a methodical – and successful – campaign to convince the market that it has a vast, and constantly growing, number of users. LoopNet's efforts in this regard have centered upon the claim that it has a staggering number of "registered members" that actively use and view content on LoopNet's website. For example, LoopNet's site currently asserts that ads on LoopNet are "seen by" 2.75 million "registered members." LoopNet is also propagating claims about the number of users who visit its website on a monthly basis, the traffic to its website from its network of partnerships with online newspapers, and the size of its database of listings.

5.     All of these claims are false. LoopNet's "registered member" count is not only false (it has admitted that its count is based on the cumulative total of accounts that have been established over more than a decade, not on the current number of active "members"), but misleading in that the "registered member" number has no connection with usage of its website. Further, LoopNet's unique monthly visitors claims are contradicted by the very data LoopNet cites. Its presentation of claimed traffic is false and misleading. And its comparative claims regarding numbers of commercial listings are factually incorrect.

6.     LoopNet's new ad campaign is intended to stifle the competition posed by CoStar's Showcase service at its very inception. Unless enjoined, LoopNet's false and misleading claims will cause CoStar to suffer an immediate loss of market penetration, goodwill and momentum that will be difficult to quantify or recoup. Indeed, LoopNet's efforts, if successful, will substantially impede CoStar's ability to enter the Internet lead generation market

2

in which LoopNet is already entrenched. Accordingly, CoStar seeks preliminary injunctive relief to halt LoopNet's deceptive advertising so that CoStar's new Showcase product can compete fairly in the market with LoopNet.

### CoStar's Evolution and the Launch of Showcase

7.       CoStar is headquartered in Bethesda, Maryland and has approximately 1,300 employees, including the largest professional research organization in the commercial real estate industry. Twenty years ago CoStar revolutionized the commercial real estate industry with a simple yet powerful idea: create the most thoroughly researched, unbiased source of commercial property information anywhere. Today CoStar is the number one provider of information services to commercial real estate professionals in the United States. CoStar offers customers access via the Internet to a proprietary database covering more than 2.8 million U.S. and U.K. properties and almost 60 billion square feet of inventory in all commercial property types and classes, including retail. CoStar has several competitors in this information provision arena, including LoopNet.

8.       On May 15, 2008 CoStar expanded from the provision of information services into the business of Internet lead generation through the introduction of CoStar Showcase. CoStar Showcase is a listing service that is designed to provide commercial real estate professionals with an online platform for marketing their properties before a large audience of online prospects.

9.       The launch of CoStar Showcase opened up a new front of competition between CoStar and LoopNet. Indeed, CoStar has now moved into LoopNet's core business: the online marketing of commercial real estate listings. In this business, as noted above, the size of the community using the platform is of critical importance to customers.

3

## LoopNet's New Advertising Campaign Directed At CoStar Showcase

10.    CoStar's plan to launch CoStar Showcase has been known and publicly discussed within the commercial real estate industry for some time. For example, the planned launch of Showcase was the subject of considerable discussion during CoStar's October 25, 2007 Q3 2007 earnings conference call. (*See* Ex. 1 at 6, 17-18). CoStar began sending promotional literature for Showcase to prospective customers, in connection with pre-launch sales efforts, in early April 2008. LoopNet, therefore, was well aware that the competitive landscape was about to change. In fact, during the Seventh Annual JMP Securities Research Conference in May 2008, Richard Boyle, LoopNet's CEO, acknowledged that LoopNet had heard about the introduction of CoStar Showcase six or seven months earlier. (*See* Ex. 2 at 7).

11.    In anticipation of this new threat, LoopNet apparently decided to launch a preemptive strike so as to prevent CoStar from gaining any traction in LoopNet's primary market. In recent weeks, LoopNet has inaugurated a new advertising and promotional campaign designed to spread false information about the size of LoopNet's user community in comparison to CoStar's. Some of the claims that LoopNet makes as part of this new campaign build upon its prior false marketing tactics, while others are entirely new.

12.    Just days after the launch of CoStar Showcase, during the JMP Securities Conference mentioned above, LoopNet falsely dismissed CoStar's Showcase product as having "no marketing audience." (*See* Ex. 2 at 7). By comparison, LoopNet claims to have a vast and unparalleled audience. In recent ads, LoopNet has focused on three purported metrics of its size: (a) "registered members," (b) "unique visitors" and (c) "traffic from" its "exclusive network of newspaper websites."

13.    For example, a new LoopNet marketing brochure, an excerpt from which appears below, proclaims that LoopNet has "More Members" and "More Traffic" than

4

competing commercial real estate websites, then goes on to state – falsely – that LoopNet's

online community numbers in the millions (Ex. 3 at 1):

# More Members. More Traffic. More Partners.

- Over 2.75 million registered members
- 950,000 unique visitors each month*
- Exclusive distribution network of 125+ newspaper web sites
- Trusted by the nation's leading brokerage firms

        14.     The same advertisement falsely claims that a "Premium" listing enables

realtors to "Reach LoopNet's Entire Member Base," and that such listings are "viewable to 2.75

million registered members." (Ex. 3 at 2)

        15.     This LoopNet flyer goes on to detail LoopNet's purported website

"traffic" as compared to its competitors. Among other things, the ad falsely claims that LoopNet

attracts "950,000 unique visitors *each month*" and that this figure "doesn't include traffic from

our exclusive network of newspaper web site partners which generates more than 18 million

unique visitors each month." The portion of the ad that contains these claims appears below (Ex.

3 at 1):

### #1 in Exposure

With 950,000 unique visitors each month, LoopNet.com is the most heavily trafficked commercial real estate site on the Internet. LoopNet's user base represents the largest online community of commercial real estate professionals. In fact, LoopNet.com generates 4 times more traffic than any other commercial real estate web site... and that doesn't include the traffic from our exclusive network of newspaper web site partners which generates more than 18 million unique visitors each month.



5

Based on my knowledge of the market, the second bar from the left in the above graph, immediately adjacent to the LoopNet bar, is intended to reflect the "web site traffic" generated by CoStar.

16.    Other LoopNet ads that appear to be part of the same comparative marketing initiative make similar claims. For example, another brochure currently being distributed by LoopNet not only repeats these claims, but explicitly asks the reader to use them as a basis for comparison (Ex. 4 at 4):

## Does your online marketing compare?

**STRENGTH IN NUMBERS**

- **2.75 million** registered members

- **950,000** unique visitors per month*

- **125+** national and local newspaper web site partners

- Powering listings to **1000+** commercial real estate web sites



*4x more traffic than any other commercial real estate web site, comScore 2008.

17.    LoopNet's claims are also repeated on its website, as depicted below:

When you advertise on LoopNet, your property is seen by:

| | |
|---|---|
| **Registered Members:** | **2.75 million** |
| **Unique Visitors:** | **950,000 per month** |
| **Market Coverage:** | **All US & Canada** |
| **User Sessions:** | **14 million per month** |

6

This information appears on LoopNet's website at

http://www.loopnet.com/xNet/Mainsite/Marketing/Advertising/PropertyAdvertising.aspx?linkco
de=19280.  (Ex. 5).

18.     The LoopNet website also claims that LoopNet has "the largest database
of commercial listings." This claim appears on a section of LoopNet's website detailing the
purported benefits of membership as part of the "Comprehensive Help Center" accessible
through http://www.loopnet.com/xNet/MainSite/Marketing/About/Faq.aspx?LinkCode=1230 .
(Ex. 6).

19.     LoopNet's new comparative ads are squarely directed at CoStar
Showcase, and readers will understand them as such.  LoopNet and CoStar are the only two
entities of any significant size competing in this market.  And only CoStar is making a new and
aggressive push into this area such as would explain LoopNet's new ad campaign.  Indeed, at a
recent trade show around the time of the Showcase launch, LoopNet set up a booth just a few
feet away from CoStar's booth – in a massive arena – with huge banners touting LoopNet's
"More Members, More Traffic, More Partners" message.  (See Ex. 7) (photo taken at the
International Council of Shopping Centers (ICSC) RECon event – The Global Retail Real Estate
Convention, May 18-21, 2008 in Las Vegas, NV).  There was no doubt as to whom LoopNet was
addressing.

20.     As detailed below, all of these claims of relative size, which form the heart
of LoopNet's new marketing offensive to combat CoStar Showcase, are false and misleading.

### A.     LoopNet's Claims Regarding "Registered Members" Are False And Misleading

7

1775436v.1

21.    LoopNet's claims regarding its 2.75 million "registered members" depend

for their impact on a reader believing that "members" are unique individuals and active users of

the website. LoopNet actively creates and fosters this impression. For example, as discussed

above, its website claims that ads on LoopNet are "seen by" all 2.75 million registered members,

and its brochures state that listings are "viewable to" the same population.

22.    This builds upon a carefully laid foundation of market deception.

LoopNet has for some time deliberately seeded the market with misinformation that conflates

"registered members" with active users of the LoopNet website. To provide just a few examples:

- In 2006, when LoopNet claimed 1.2 million registered members, LoopNet sponsored a
  prominent advertisement in an issue of the RCA Report, a commercial real estate journal
  published by the National Association of Realtors. In that ad, LoopNet claimed that it
  had "*over 1.2 million members viewing* 100 million property listings each month."
  (Emphasis added here and throughout). (*See* Ex. 8 at 3).

- On November 9, 2006, LoopNet CEO Richard Boyle was interviewed by John Duncan,
  Pacific Growth Equities' Internet Infrastructure & Services Analyst. Mr. Boyle
  repeatedly referred to LoopNet's registered members as "users" of its service and
  "transaction participants" on the LoopNet marketplace. He stated that the first of "three
  key metrics that we look at in terms of measuring against our primary goal of bringing
  the marketplace online . . . is *registered users*," which Mr. Boyle defined as "*how many
  people are the registered users who have come on and become transaction participants
  on the LoopNet marketplace*, as I said, ending Q3 just under *1.6 million*." One of
  LoopNet's "[p]rimary areas of investment," according to Mr. Boyle, was "to drive further
  growth in the registered *user* base, so bringing more participants online . . . ." (*See* Ex.
  9).

- In a brochure entitled "LoopNet Product Summary," LoopNet described its membership
  as "the largest *audience of 2.2 million active commercial real estate professionals*."
  That brochure also stated that "Premium Membership for Professionals enables you to
  market listings to LoopNet's 2.2 million members." (*See* Ex. 10 at 1).

- In a subsequent brochure called "Premium Membership for Professionals," LoopNet
  sought to attract customers to pay for listings on LoopNet by promising them that paid
  listings are "*immediately expos[ed] to more than 2.4 million LoopNet members*." (*See*
  Ex. 11 at 1).

23.    In reality, LoopNet's count of "registered members" provides no

indication of how many unique persons are using its website. It represents nothing more than the

8

total number of user accounts that have been created – free of charge – at the LoopNet.com

website at any time since the site was launched in 1995. An account that, for instance, was set

up in 1998, used to view the site's contents only once, and never accessed again is included in

LoopNet's advertised total of "2.75 million registered members." In the same way, a second

account set up by a "member" because they received a new e-mail address, or wanted access

from home, would be counted as a separate "member" even though only one person is

responsible for both accounts.

     24.    In fact, LoopNet's current online audience is only a fraction of its

historical total of registered accounts. It's claimed 2.75 million "members" include accounts

created by:

- people who signed up for LoopNet (at any time from 1995 to the present) but did not view a single property at the time;
- people who clicked on a link to LoopNet from another site (at any time from 1995 to the present), created a user name and password out of curiosity, but decided after a single visit that the LoopNet site was of no interest to them;
- potential LoopNet investors or business analysts who simply wanted to learn about LoopNet's products, and had no interest in buying, selling, leasing, or marketing commercial real estate properties;
- people who registered under invented names, since LoopNet has no way of knowing whether the "names" submitted by basic members are real;
- "bots" or other nonhuman "visitors";
- people with duplicative "memberships," e.g., for a single individual using different email addresses (such as janedoe12345@yahoo.com, janedoenyc@hotmail.com, janewdoe@aol.com, janedoerealestate@gmail.com, and jane.doe@company.com); and
- people who once signed up for LoopNet but are now retired, are no longer in the commercial real estate business, have long since sold the only property they hoped to market, or are deceased.

     25.    LoopNet has recently conceded that "registered members" are in fact

different from active users. On February 27, 2008, LoopNet CEO Richard Boyle addressed the

9

Jeffries Fourth Annual Internet Conference and was specifically asked about LoopNet's claim (at that time) that it had 2.6 million "registered members" and how this figure compared with "active users." Mr. Boyle stated that "We don't break out the different segments of active users. Basically the 2.6 million is total registered users over time." (*See* Ex. 12 at 8-9).

26.    Despite this, LoopNet has forged ahead with its false advertising and has successfully established a marketplace perception among industry professionals, securities analysts and market journalists that its "registered members" are indeed active users of its website. For example:

- One target of LoopNet's promotional claims, a regional real estate alliance, repeated LoopNet's statement (at a time when LoopNet claimed 1.5 million members) that paid listings are *"immediately expos[ed] to more than 1.5 million LoopNet members."* (*See* Ex. 13 at 2).

- The real estate website RetailTraffic stated in an October 1, 2007, report that "LoopNet reports having *more than 2.2 million registered users.*" (*See* Ex. 14 at 2).

- SunTrust securities analysts Robinson Humphrey analysts Andrew W. Jeffrey and Jack D. Ancich wrote in a June 2007 report that: *"[W]e encourage investors to note that LoopNet currently has two million registered members.* Of these, all but 84,500 are currently non-paying members. The company estimates that roughly 40% of its non-paying members are agents. *By this measure, the company already has relationships with about 768,000 agents.* This exceeds our estimate of the entire commercial real estate agent market! From this, we infer that LoopNet's appeal extends beyond traditionally defined commercial real estate agents." (*See* Ex. 15 at 3).

- Jake Fuller and Timothy Forrester, two securities analysts at Thomas Weisel Partners, commenting on LoopNet's November 28, 2007 press release, understood LoopNet's claim about "2.5 million members" to mean that LoopNet has 2.5 million "users": "LOOP also announced today (November 28) that it hit *2.5 [million] registered users* (includes free *users* and paid subs)." (*See* Ex. 16 at 1).

- The influential online investing site, The Motley Fool, has been repeatedly misled by LoopNet's false claims. On December 31, 2007, for example, The Motley Fool, in an article written by Katrina Chan, stated (in recommending LoopNet as an investment) that a crucial feature of LoopNet is that it has "a website *frequented by* more than 2.5 million members." (*See* Ex. 17 at 2)

10

27.     In short, the cornerstone of LoopNet's comparative advertising campaign against CoStar Showcase – its claim to have millions of "registered members" – is a gross exaggeration of LoopNet's true user base. LoopNet's real audience is nowhere near as large as the inflated number its advertising broadly touts.

### B.     LoopNet's Claims Regarding "Unique Visitors" Are False and Misleading

28.     LoopNet's claims regarding the number of unique visitors to its website each month are similarly false. According to its ads, LoopNet's claim that it has "950,000 unique visitors *each* month" purportedly is based upon data from comScore, an Internet traffic monitoring service. In fact, the very data that LoopNet cites shows that actual visits to LoopNet.com fall short of this claim.

29.     In the 15 months from February 2007 to April 2008, the number of total unique monthly visitors to LoopNet.com exceeded 950,000 only three times (April 2007, July 2007, and January 2008), i.e., only one out of every five months. Each of these spikes was preceded, and followed, by a monthly traffic level well below the 950,000 claimed by LoopNet. Indeed, in eight of the remaining 12 months, LoopNet had fewer than 900,000 unique monthly visitors, including as recently as March 2008, when it had fewer than 850,000. A chart summarizing the comScore data is attached as Ex. 18.

30.     Rather than present the true facts, LoopNet appears to be cherry picking specific months of elevated usage and presenting this data as though it represents LoopNet's standard monthly audience. Like its "registered member" claim, LoopNet's inflated "unique visitors" claims are designed to create the false impression that LoopNet has a greater audience, and enjoys more widespread usage, than it actually does.

11

31.     Moreover, even an accurate count of "unique monthly visitors" presents a

misleading picture of LoopNet's true usage. It is my understanding, based on data provided to

CoStar by comScore, that only about a quarter of LoopNet's unique visitors actually log in or run

searches for real estate. The other traffic includes, for example, people who are put off by

having to create an account and input personal information on the website and decide not to run

any searches. It also includes others who may be interested in the company only as an

investment. Indeed, the one recent month of aberrantly high traffic on the LoopNet website –

January 2008, which saw over 1.1 million unique visitors to LoopNet.com as opposed to about

828,000 the month before and about 862,000 the month after – coincided with LoopNet being

named "Best Stock for 2008" by The Motley Fool website in an article dated December 31,

2007. (See Exs. 17 and 18).

## C.     LoopNet's Claims Regarding "Traffic From" Its Online Newspaper Partnerships Are False and Misleading

32.     LoopNet's new advertisements detailed above regarding supposed

*additional* "traffic from [its] exclusive network of newspaper web site partners," which LoopNet

claims "generates more than 18 million unique visitors each month," are also false and

misleading, in several respects.

33.     First, LoopNet's claim that its unique monthly visitor measure "doesn't

include" traffic from its online newspapers partnerships is false and deceptive because its

audience measures *do* include any such traffic. Based on the source relied upon by LoopNet,

LoopNet.com typically attracts fewer than 900,000 unique visitors to its website in a given

month. Those visitors are counted whether they arrived at LoopNet's site by manually entering

an internet address, using a search engine, or clicking on a link provided by one of LoopNet's

12

online marketing partners. Traffic to the LoopNet website that originates from these online newspapers will be counted like any other traffic within the unique visitor numbers.

34.    Second, it appears that the "18 million" figure to which LoopNet refers in its advertising represents *all* visitors to these newspaper websites – not to LoopNet.com. Yet LoopNet's ads say that it receives incremental "traffic from . . . newspaper website partners which generates ore than 18 million unique visitors each month." This is just false – "18 million" is the aggregate monthly traffic on these *newspaper* websites, not on LoopNet's.

35.    Third, only a tiny fraction of the "18 million" website visitors that LoopNet cites will ever view *any* ad for commercial real estate, let alone one sponsored by LoopNet. A person who accesses the New York Times website to check the latest headlines or sports scores is no more likely to read one of LoopNet's commercial real estate listings than anyone else who happens to be surfing the internet.

36.    In short, LoopNet's assertions concerning the additional "18 million unique visitors" supposedly generated by its newspaper partners are false and deceptive.

### D.    LoopNet's Claims Regarding The Relative Size Of Its Listings Database Are False and Misleading

37.    On its website, LoopNet addresses the question "What are the benefits of LoopNet membership?" with, among other things, the following claim: "LoopNet membership provides access to the largest database of commercial listings."

38.    This claim is false. It is my understanding that LoopNet currently has approximately 595,000 listings on its website. CoStar has over a million listings on its website. Accordingly, CoStar – not LoopNet – offers the largest database of commercial listings.

13

## Harm to CoStar and the Public

39.    CoStar Showcase may not get a second chance to succeed in the market after this case is finally resolved many months or years from now. Its success will be predicated very heavily on whether CoStar is able to create a critical mass for the CoStar Showcase product in the coming six months. Either the product will generate interest from buyers and sellers, such that Showcase will achieve critical momentum and become a widely used marketing platform, or it will fail to attract enough sustained interest, and have a short life.

40.    Cognizant of this short window of time, CoStar has made the launch of Showcase its most important business initiative for 2008. CoStar has spent several million dollars on the development and launch of the product, which includes marketing expenditures, the time and resources of CoStar's product development and IT department, and the investment in training CoStar's sales force to sell CoStar Showcase. It has also devoted extensive efforts to developing a product that has critical advantages over LoopNet's competing product. For example, customers using CoStar Showcase do not have to upload data about their property. CoStar can simply pull information about the property, such as photographs, geographic detail and maps, into the listing from CoStar's preexisting research databases. This is critical for brokerage houses that do not have the staff needed to collect detailed information about each property. CoStar also designed a clean, content-rich format for its listings that is unrivalled in the industry. And CoStar has carefully calibrated its pricing levels and incentives to be more attractive than those of LoopNet.

41.    But CoStar cannot compete effectively against LoopNet's campaign of misinformation, which is already taking a toll. Not only has CoStar been forced to devote substantial resources to responding to LoopNet's false messages, it has begun to see signs that LoopNet's false comparative claims are taking root. For example, we have heard from

14

customers who have expressed concern about the size of the CoStar Showcase online audience as compared to LoopNet's "2.75 million" strong "massive audience." In reality, I believe that the base of users actively running searches on CoStar is comparable to the audience running searches on LoopNet that return full property listings (i.e., those listings that include contact information); but LoopNet's false and misleading claims to the contrary are poisoning marketplace perceptions.

42.    If LoopNet succeeds in undoing CoStar's hard work through misinformation, the consequences will be irreparable. CoStar will not be able to wipe the slate clean and launch this product again. It is in the market now and will either achieve critical mass in terms of buyer and seller usage, or it will fail. If that happens, not only will CoStar lose its massive investment, it may be forced to layoff a number of skilled employees currently working at CoStar. Market perceptions regarding a newly launched product are very difficult to undo and the commercial consequences of LoopNet's unconstrained false messages will not be susceptible to later repair.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at White Marsh, Pennsylvania this 19th day of June, 2008.

Andrew C. Florance

15