Jacques Semmelman (JS 5020)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Tel: 212-696-6000
Fax: 212-697-1559
*Attorneys for Defendant and Counterclaim Plaintiff LoopNet, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
                                      :

COSTAR GROUP, INC.,

                    Plaintiff,        No. 08-CV-1156 (GBD) (GWG)
                                      :

        v.

                                        :

LOOPNET, INC.,

                    Defendant   :
                    and Counter-
                    Plaintiff.
---------------------------------------------------------------X
                                        :

LOOPNET, INC.,

                    Counterclaim
                    Plaintiff,
                                          :

        v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

                    Counterclaim   :
                    Defendants.
---------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>LOOPNET'S MOTION FOR A PRELIMINARY INJUNCTION</u>**

TABLE OF CONTENTS

Page

SUMMARY OF THE MOTION AND THE RELIEF SOUGHT ................................................ 1

STATEMENT OF FACTS ........................................................................................ 2

I.　LoopNet's Superior Reach And Exposure For Commercial Real
Estate Listings ........................................................................................ 2

II.　CoStar's Launch Of A Knock-Off Product And False Comparative
Advertising Campaign Directed Against LoopNet ................................. 3

　A.　CoStar's False Traffic Statistics About Showcase ................................... 5

　B.　CoStar's False Representations About Showcase's
Audience ................................................................................ 6

　C.　CoStar's False Statements About Showcase's Cost And
Entry Requirements ................................................................ 7

　D.　CoStar's False Comparisons To LoopNet's Service ................................. 7

　E.　CoStar's False Statements About Showcase's Attributes ....................... 10

　F.　CoStar's False Statements About Showcase's Success .......................... 11

III.　CoStar's False Advertising Irreparably Harms LoopNet And
Consumers ............................................................................................. 12

ARGUMENT ........................................................................................................ 13

THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AGAINST
COSTAR ............................................................................................................. 13

I.　LoopNet Is Likely To Succeed On The Merits ................................... 14

　A.　CoStar's False Traffic Statistics About Showcase ................................. 15

　B.　CoStar's False Representations About Showcase's
Promised Audience ................................................................ 17

　C.　CoStar's False Statements About Showcase's Cost And
Entry Requirements ................................................................ 18

　D.　CoStar's False Comparisons To LoopNet's Service ............................... 18

　E.　CoStar's False Statements About Showcase's Attributes ....................... 20

　F.　CoStar's False Statements About Showcase's Success .......................... 21

Page

II.   CoStar's False Statements Will Irreparably Harm LoopNet And
The Public ........................................................................................21

     A.   Irreparable Harm Is Presumed Because CoStar's
Advertising Campaign Is Directed Specifically At LoopNet .................22

     B.   LoopNet Can Also Establish A "Reasonable Basis" For
Concluding That CoStar's False Advertisements Will
Cause Irreparable Harm ........................................................................23

CONCLUSION ..............................................................................................................25

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Castrol, Inc. v. Quaker State Corp.*,
    977 F.2d 57 (2d Cir. 1992)................................................................................. 22

*Coca-Cola Co. v. Tropicana Prods., Inc.*,
    690 F.2d 312 (2d Cir. 1982)........................................................... 13, 15, 21, 23

*Hearst Bus. Pub., Inc. v. W.G. Nichols, Inc.*,
    76 F. Supp. 2d 459 (S.D.N.Y. 1999)................................................................. 24

*Johnson & Johnson v. Carter-Wallace, Inc.*,
    631 F.2d 186 (2d Cir. 1980).............................................................................. 23

*Johnson & Johnson v. GAC Int'l, Inc.*,
    862 F.2d 975 (2d Cir. 1988).............................................................................. 14

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision, Corp.*,
    348 F. Supp. 2d 165 (S.D.N.Y. 2004)............................................................... 14

*Johnson & Johnson\*Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d. Cir. 1992).............................................................................. 15

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
    848 F.2d 34 (2d Cir. 1988)................................................................................. 22

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002)............................................................................... 15

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*,
    32 F.3d 690 (2d Cir. 1994)................................................................................. 23

*Schering Corp. v. Pfizer Inc.*,
    189 F.3d 218 (2d Cir. 1999)............................................................................... 14

*Time Warner Cable, Inc. v. DirecTV, Inc.*,
    497 F. 3d 144 (2d Cir. 2007)......................................................................... passim

*Volunteer Firemen's Ins. Services, Inc. v. McNeil and Co., Inc.*,
    221 F.R.D. 388 (S.D.N.Y. 2004) ...................................................................... 14

## <u>SUMMARY OF THE MOTION AND THE RELIEF SOUGHT</u>

Counterclaim-Plaintiff LoopNet, Inc. ("LoopNet") respectfully submits this Memorandum of Law in support of its motion for a preliminary injunction against Counterclaim-Defendants CoStar Group, Inc. and CoStar Realty Information, Inc. (collectively "CoStar").

A preliminary injunction is needed to bring a halt to a recent barrage of false comparative advertising that CoStar has unleashed in conjunction with its mid-May 2008 launch of "CoStar Showcase," a knock-off product designed to compete unfairly with LoopNet's highly successful online market for commercial real estate listings. CoStar has made, and continues to make, numerous false claims about CoStar Showcase and its supposed comparative advantages over LoopNet's products, including:

- CoStar falsely claims CoStar Showcase reaches "over 400,000 prospects you won't find on LoopNet," allegedly each quarter.

- CoStar falsely claims 86% of CoStar Showcase users "are purchase decision makers and influencers for their firm."

- CoStar falsely claims it is "[t]he website brokers prefer 3 to 1" over LoopNet.

- CoStar falsely claims CoStar Showcase gives online listings "unmatched exposure" that provides "more prospects" and "more leads" than LoopNet.

- CoStar falsely claims Showcase is "free" and contains "over 900,000 property listings across the US," i.e., every single U.S. listing in CoStar's database.

CoStar's claims about Showcase and its supposed superiority over LoopNet are flat-out false. Indeed, *CoStar repeatedly concedes in fine print disclaimers that there is no assurance CoStar's claims are true.*

CoStar's efforts attempt to reshape public perception and to grab business from LoopNet with an advertising campaign featuring claims even CoStar admits have no basis in fact. This campaign of deception threatens irreparable injury to LoopNet and the public. A preliminary injunction should issue to bring a swift end to CoStar's outrageous false advertising campaign.

**STATEMENT OF FACTS**

**I.    LoopNet's Superior Reach And Exposure For Commercial Real Estate Listings**

      LoopNet and CoStar are the two leading companies providing commercial real estate information services on the internet. (*See* Ex. HH (CoStar 6/20/08 Mem. In Support of Plaintiff's Motion For A Preliminary Injunction, hereinafter "CoStar Mem.") at 19; Ex. II (Florance 6/19/08 Decl., hereinafter "Florance Decl.") at ¶ 19.)[1] Through their respective websites, both companies provide multiple-listing style services for commercial real estate listings. (*See* Florance Decl. ¶¶ 8–9.) LoopNet, however, is much more heavily trafficked than CoStar, and gives listings significantly greater reach and potential exposure. (*See* Exs. A–B.)

      For example, LoopNet's number of unique monthly visitors is typically 300% to 500% that of CoStar. (*See id.*) According to comScore, an independent source of website traffic data both parties use, LoopNet's unique visitor traffic in some months is over 800% that of CoStar's. (*See id.*) For January 2007 through May 2008, comScore's data shows LoopNet had an average of 915,230 monthly unique visitors, whereas CoStar had an average of only 201,021 monthly unique visitors—*22% of LoopNet's reported traffic.* (*Id.*) LoopNet's own traffic measurements using Google Analytics report even higher traffic patterns. In the latest quarter (Q1 2008), LoopNet recorded a *monthly* average of over 2,000,000 unique visitors, with the total unique visitors for the *quarter* exceeding 5,000,000. (Greenman Decl. ¶ 11 & Ex. F.) In contrast, CoStar's self-reported quarterly unique traffic for the same quarter was 1.3 million—*about one-quarter of LoopNet's.* (*See, e.g.*, Exs. H–L, V–W.) CoStar characterizes its own audience as "vast." (Exs. G, J at 1, L, V at 2.) LoopNet's audience is multiple times that purported vastness.

---

[1]    Citations in the form "Ex. __" are to the exhibits submitted in support of LoopNet's motion. Exhibits A through G are annexed to the June 30, 2008 Declaration of Jason Greenman, LoopNet's Senior Vice President, Corporate Development. Exhibits H through II are annexed to the June 30, 2008 Declaration of Raymond LaMagna, a LoopNet attorney.

## II.   CoStar's Launch Of A Knock-Off Product And False Comparative Advertising Campaign Directed Against LoopNet

Until last month, CoStar made listings available only to paid subscribers who logged onto CoStar.com.  (*See* CoStar Mem. 4; Ex. GG at 4.)  In contrast, listings from LoopNet's Premium Members are exposed to free searches on LoopNet's site, as well as exposed to free searches on major search engines such as Yahoo! and Google.  Through LoopNet's Showcase feature[2], listings are also exposed on over one hundred newspaper websites.  (*See* Greenman Decl. ¶ 3.)

On May 15, 2008, CoStar changed course with the launch of a new product called "CoStar Showcase," designed to mimic LoopNet's successful approach of giving broad exposure to online listings.[3]  In a dramatic departure from CoStar's prior approach of exposing listings only to subscribers to CoStar's expensive information products, CoStar Showcase exposes listings to free searching by anybody visiting CoStar.com—that is, if the broker representing a given listing pays CoStar an additional hefty fee.  (*See* CoStar Mem. 1; Florance Decl. ¶¶ 2, 8–9; Ex. GG at 3, 7, 15–16.)

CoStar's Showcase is a blatant attempt by CoStar to offer a product that imitates LoopNet's functionality and exposure profile.  CoStar's CEO Andrew Florance admits as much: "[t]he launch of CoStar Showcase opened up a new front of competition between CoStar and LoopNet," and by launching Showcase "CoStar has now moved into LoopNet's core business: the online marketing of commercial real estate listings."  (Florance Decl. ¶ 9.)

To compete with LoopNet's "core business," to extract fees for Showcase, and to lure customers away from LoopNet, CoStar had to promise to deliver exposure to a significant online audience.  (*See, e.g.*, Florance Decl. at ¶¶ 3, 9.)  But CoStar faced a significant hurdle, the

---

[2]   LoopNet has used the name "Showcase" for many years to denote a feature that boosts the exposure of listings.  (*See* Greenman Decl. ¶ 3.)

inconvenient truth that LoopNet's online audience is many times larger than CoStar's, making LoopNet the objectively superior platform for marketing commercial real estate listings online.

Indeed, CoStar concedes that "the size of the community using [a website] is of critical importance to customers" (*id.* at ¶ 9), and the undeniable truth is that the size of the community using LoopNet consistently dwarfs CoStar's (Exs. A–C). Plus, LoopNet can expose online listings to over one hundred newspaper websites with which LoopNet has exclusive relationships, reaching an extensive audience not available at CoStar. (*See* Greenman Decl. ¶ 3.)

In an attempt to unfairly erase the competitive disadvantage posed by the truth, CoStar has embarked upon a concerted unlawful effort to reshape the public's *correct* perception that LoopNet has a huge online audience that dwarfs CoStar's, and to deceive the public about CoStar Showcase's supposed qualities and comparative advantages. Beginning in mid-April, CoStar began privately marketing its forthcoming copycat product to existing CoStar subscribers. (CoStar Mem. 5; Florance Decl. ¶ 10; *see also* Ex. GG at 7.) CoStar made numerous false representations to induce its customers to sign pre-launch contracts for CoStar Showcase,[4] including promising that Showcase would expose listings to an audience of hundreds of thousands of prospects that could not be reached through LoopNet. (*See, e.g.*, Exs. G, M–O.)

In mid-May, CoStar publicly unleashed its false advertising campaign in conjunction with the public launch of CoStar Showcase on May 15, 2008. This advertising campaign falsely represented the audience and features of CoStar Showcase, making direct and indirect false comparisons to LoopNet's products. (*See* Parts II.A to F *infra*.) CoStar's false advertising campaign threatens irreparable harm to LoopNet and the public, and should be enjoined.

---

[3]    CoStar's parasitic use of "CoStar Showcase," which is confusingly similar to "LoopNet Showcase," is the subject of one of LoopNet's counterclaims.

A.    **CoStar's False Traffic Statistics About Showcase**

The cornerstone of CoStar's false advertising campaign is its false promise that its new product reaches "over 400,000 prospects you won't find on LoopNet." (*See* Ex. H.)[5] CoStar began making this promise before its product had even launched, thus without evidence it had attracted even a single "prospect." (*See, e.g.*, Exs. M–O.) In some advertising, CoStar attempted to lend credence to this false claim by attributing it to comScore. (*See, e.g.*, Ex. H.) But that claim is also false. comScore data is not the source of CoStar false claim. comScore did not collect data about sales "prospects" or issue a report about sales "prospects" with respect to either site. If anything, comScore's unique visitor data refutes CoStar's claim.[6] For example, in May 2008, the month CoStar Showcase launched, comScore reported that CoStar's *total* unique visitor traffic (i.e., visitors who came to CoStar.com for any reason, not just the smaller subset that searched Showcase listings) was *less than 157,000*—hardly 400,000 visitors, much less "400,000 prospects," much less "400,000 prospects you won't find on LoopNet." (*See* Ex. A.)

When CoStar launched Showcase on May 15, 2008, CoStar also began falsely promising that its service will reach "1.3 million unique visitors each quarter." (Exs. H–J, L, V, W.) As described above, independent companies measuring website traffic report *far* fewer visitor to CoStar.com for all of CoStar's services *combined*. In fact, CoStar's "1.3 million" claim *is more than double the number that CoStar had advertised just one week earlier as the "exact" number*. (*Compare* Exs. G at 2, M–O, *with* Ex. V at 1.) In a tact concession that comScore

_____

    [4]    CoStar's false promises were apparently not enough to entice customers. CoStar also had to give the product away—the initial Showcase contracts were secured by giving CoStar customers a multi-month free trial period with a no-penalty right to cancel. *See* Part II.F *infra*.

    [5]    Alternately, some of CoStar's advertising falsely claims "400,000+ potential prospects you won't find on LoopNet" (Ex. I) or "over 400,000 potential prospects you won't find on LoopNet" (Ex. L; *see also* Ex. J at 1).

    [6]    LoopNet is concurrently moving to obtain discovery on an expedited basis of CoStar's purported sources for it advertising claims.

does not support CoStar's claim, some of CoStar's recent advertisements no longer cite comScore as the source of CoStar traffic data, but instead cite "Omniture Q1 2008 CoStar.com Data." (*See, e.g.*, Exs. H–J, L.)  CoStar provides no explanation as to why it suddenly stopped using comScore (other than the obvious, to instantly double its numbers) or explanation why the new traffic number is not inaccurately high—approximately 100% too high in light of the comScore data CoStar touted as "exact" just days before.  (*Compare* Ex. G at 2, *with* Ex. V at 1.)

Whatever CoStar's justification for ditching comScore, CoStar's latest traffic claim falsely represents that its purported data for just one quarter—Q1 2008—is representative of "each quarter."  comScore's data refutes this assertion, demonstrating that CoStar's first quarter of 2008 featured its highest quarterly traffic over the past year.  (*See* Ex. C.)  CoStar thus cherry-picked its most heavily trafficked quarter, and quietly switched from comScore to a different source that artificially doubled CoStar's traffic count.  CoStar now falsely advertises that the resulting traffic count accurately represents CoStar's performance "each quarter."

### B.    CoStar's False Representations About Showcase's Audience

In addition to its falsehoods about the size and uniqueness of the audience it promises to deliver, CoStar falsely and prominently advertises that, of its purported 1.3 million unique visitors and over 400,000 "prospects you won't find on LoopNet," 86% "are purchase decision makers and influencers for their firm."  (*See* Exs. I, N.)  But CoStar purports to base this false claim on a survey that it purportedly took *a year before it launched Showcase*—that is, a survey that could not and did not test the usage of Showcase, which was not yet in existence at the time of the survey.  (*See id.*)  CoStar's claim falsely represents that Showcase's audience is identical in composition to the audience of professionals that subscribe to CoStar's other research services.  (*See id.*)  But CoStar's Showcase audience is not limited to real estate professionals

that subscribe to CoStar's other products, and who were allegedly surveyed last year—Showcase is designed to market to the general public as well. (*See* Ex. X.)

CoStar has also falsely characterized its Showcase audience as consisting of "qualified prospects who are likely very interested" in available real estate listings. (Ex. X at 1.)[7] Similarly, CoStar falsely promises that its Showcase audience "includes anyone with an interest in commercial real estate property listings across the U.S." (Ex. K at 2.) Yet CoStar has no basis to claim that its users are "prospects" who are financially "qualified" to complete real estate transactions, are "very interested" in doing so, or constitute "anyone" in the U.S. with such interests. (*Compare* Ex. X at 1, *with* Exs. AA, BB.) These incredibly broad claims are false.

**C.    CoStar's False Statements About Showcase's Cost And Entry Requirements**

CoStar blatantly and falsely advertises its Showcase product by saying, "It's free[.]" (*See* Ex. X ("It's free, it's easy, and it's available to help you present your listings to a vast new marketplace online.").) Similarly, CoStar falsely advertises that Showcase is a "truly open service" and "the First Truly OPEN Marketing Platform for Commercial Real Estate." (*See* Exs. V at 1, X at 1.) Both of these claims are false—CoStar charges its customers a significant amount to list on Showcase, and CoStar is not "Truly OPEN"—it requires a long-term contract before a customer's listings can be presented on Showcase. (*See* Ex. K at 3, GG at 3, 15–16.)

**D.    CoStar's False Comparisons To LoopNet's Service**

CoStar falsely states that it is "[t]he website brokers prefer 3 to 1." (*See* Ex. S) And in the same advertisements that compare CoStar Showcase traffic to LoopNet traffic, CoStar falsely claims that "75% of commercial real estate brokers prefer CoStar information products over other information sources," evidently referring to its principal competitor, LoopNet. (*See* Exs. I,

N). Yet, to support these false claims, CoStar cites a purported survey—evidently involving different CoStar subscription services—that predates the existence of CoStar Showcase by almost half a year. (*See id.*) The necessary implication of CoStar's advertisement is that commercial real estate brokers prefer CoStar's listing services—i.e., Showcase—to LoopNet's, although the 2007 survey supposedly supporting that claim could not possibly have determined that brokers prefer CoStar Showcase over LoopNet's competitive offering.

CoStar also falsely claims that Showcase "offers a number of advantages over other online marketing services" such as LoopNet's and that it "offers a true competitive advantage . . . by reaching more prospects and generating more leads online." (*See* Ex. V at 1–2)[8] CoStar further falsely states that Showcase is a "Better Way to Reach More Prospects and Generate More Leads." (*See* Ex. X at 1.) CoStar is in no position to claim "advantages" over LoopNet, that it is "better," or that it enables customers to reach more prospects and generate more leads than LoopNet. CoStar's claims are not only made without any evidence, they are demonstrably false considering LoopNet generates significantly more unique visitor traffic than all of CoStar's services combined. (*See* Exs. A–C (comScore data).) Plus, LoopNet offers access to over 100 newspaper websites that are not available through CoStar Showcase. (*See* Greenman Decl. ¶ 3.)

Even CoStar offers no purported support for these marketing fabrications. To the contrary, in fine print, CoStar admits, as it must, that "there can be no assurance that CoStar Showcase will enable commercial real estate professionals to reach more prospects and generate

---

[7]    Almost all of CoStar's false advertising characterizes CoStar Showcase's audience as being composed of "prospects," which has a defined meaning the real estate industry. (*Compare* Exs. G–O, T, V–X, *with* Ex. AA.)

[8]    In other variations, CoStar falsely claims that "[w]hen you advertise on Showcase, you'll reach more prospects and generate more leads" (*see* Ex. K at 2); that Showcase customers will "Reach More Prospects" and "Generate More Leads" (*see, e.g.*, Exs. H–O; *see also* Exs. T, W); and that "CoStar Showcase can present your commercial property listings to an even larger audience of online prospects" (*see* Ex. V at 2).

more leads from their online property listings." (*See* Ex. V at 2.) Similarly, CoStar concedes in more fine print that "there can be no assurance . . . that CoStar Showcase will be a true competitive advantage . . . [or] that commercial real estate professionals will gain additional valuable exposure for their available property listings." (*Id.*) CoStar's disclaimers constitute telling admissions that CoStar's advertising claims are bereft of support.

Even while CoStar acknowledges in fine print it has no evidence CoStar Showcase delivers competitive advantages over LoopNet, CoStar continues to promulgate false advertising to the contrary. Recently, CoStar goes so far as to claim that each of the more than 300 firms that signed contracts for Showcase "find" that Showcase "delivers on [its] promise to provide enhanced property exposure and more qualified lead generation." (*See* Ex. Y at 1.) There is no evidence that the 300-odd firms that have signed up for a free trial of Showcase have concluded that Showcase "delivered on its promises." CoStar cannot deduce this proposition from the mere fact that these firms have accepted a no-obligation free trial. Signing up for a free trial is not evidence of satisfaction, let alone the resounding endorsement trumpeted by CoStar.

Indeed, there is no way that firms using CoStar Showcase can evaluate whether their listings are seen by anybody at all—CoStar launched Showcase without tracking features that enable brokers to see how often listings are viewed—functionality that LoopNet provides. CoStar promises it will offer this functionality "soon." (Ex. K at 4.) But CoStar apparently made the strategic choice to keep customers in the dark about how CoStar performs during the free trial period. Absent this tracking information, customers have no way to know whether Showcase is delivering on its promises. CoStar even concedes in its fine print that "there can be no assurance . . . that CoStar Showcase offers a better solution; that the response to date indicates

the clients find CoStar Showcase to be a very compelling and effective solution for marketing their listings online[.]" (Ex. Y at 2.)  Translation: there is no assurance CoStar's claims are true.

**E.      CoStar's False Statements About Showcase's Attributes**

CoStar's now falsely claims that 900,000 listings can be viewed on Showcase. (*See* Exs. P–R.)[9]  But CoStar has only 900,000 U.S. listings *total* in its database. (Exs. T, GG at 5.) Showcase is an add-on service; only a subset of CoStar's customers have contracted to list on Showcase, and Showcase therefore contains only a fraction of CoStar's 900,000 listings. (*See, e.g.*. Exs. K at 3, Y.)  A person searching listings in Showcase who wishes to gain access to all 900,000 of CoStar's U.S listings is met with a sales pitch inviting him to become a "subscriber[] to CoStar's professional line of products." (*See* Ex. U at 2.)  Once again, CoStar resorts to its by now familiar gambit.  In fine print, CoStar concedes that "there can be no assurance . . . [that Showcase users] will be able to access thousands of available for sale and for lease listings." (Ex. Y at 2 (also conceding that Showcase may not "provide an enormously valuable resource").)

CoStar also falsely promises that the quality of Showcase listings will be exceedingly high by industry standards—CoStar claims that it "will make every effort to ensure the listing information is accurate, up-to-date and free from mislabeled, outdated or 'dead' listings that clutter other online property search services," evidently again in comparison to LoopNet, its principal competitor. (*See* Ex. V at 1.)  But again, CoStar itself has admitted in fine print that "there can be no assurance . . . that the listing information on CoStar Showcase is accurate, up-to-date and free from mislabeled, outdated or 'dead' listings." (*Id.* at 2–3.)

Likewise, CoStar falsely tells customers that its new product will "get the deal done faster" (*see* Ex. L; *see also* Ex. J at 1) and offer "more opportunity to lease or sell [their] property

---

[9]      Other advertising claims the equally infirm number as 890,000. (*See* Ex. S.)

more quickly than before" (*see* Ex. L). But CoStar cannot support these false claims; it has not even tried to. Similarly, CoStar falsely promises that customers will "gain unmatched exposure" (*see* Ex. L) and that Showcase offers "an unprecedented way" to market listings to commercial real estate professionals (*see* Ex. J at 1, L). Considering CoStar's Showcase is designed to mimic LoopNet's much more heavily trafficked service, these claims are false on their face. (*Compare* Exs. A–C, *with* Ex. CC.) LoopNet constitutes the precedent that easily surpasses Showcase's exposure. (*Compare* CoStar Mem. 1; Florance Decl. ¶ 2, *with* Exs. DD–FF.)

**F.    CoStar's False Statements About Showcase's Success**

In order to convince customers to sign potentially long-term, expensive contracts for its Showcase product, CoStar has falsely represented the success of its product launch and has falsely portrayed Showcase's related customer satisfaction. CoStar has falsely advertised that "the response to date clearly indicates these clients find CoStar Showcase to be a very compelling and effective solution for marketing their listings online." (*See* Exs. Y at 1, Z at 1.)[10] CoStar falsely assures customers, "Based on the enthusiastic response CoStar Showcase received . . . it's clear there is substantial demand among commercial property professionals for a more effective way to market their property listings online"—presumably again more effective than LoopNet. (*See* Ex. Y at 1.)

Yet CoStar's sole basis for these false claims appears *not* to be the "clear" statements or alleged "enthusiasm" of CoStar's customers but rather the mere fact that CoStar's free trial giveaway for Showcase drew numerous takers. That is, CoStar has falsely spun the success of a giveaway promotion into a customer referendum on the merits of its product. Once again, in fine print, CoStar admits, as it must, that "there can be no assurance . . . that the response to date

indicates [that] clients find CoStar Showcase to be a very compelling and effective solution for marketing their listings online." (Ex. Y at 2; *see also* Ex. Z at 2 (offering a similar disclaimer).) CoStar has also conceded in fine print that "there can be no assurance . . . that there is substantial demand among commercial property professionals for a more effective way to market their property listings online." (Ex. Y at 2.)

In sum, CoStar has a three-step marketing strategy: (1) Make outrageously false statements and disseminate them as widely as possible. (2) In fine print, admit there is no basis for the statements. (3) Hope the public doesn't catch on. CoStar's duplicity should be stopped— it runs afoul of the Lanham Act and New York State law, and should be preliminarily enjoined.

**III.    CoStar's False Advertising Irreparably Harms LoopNet And Consumers**

During CoStar's relentless false comparative advertising campaign, CoStar has tried to sign as many customers as it can to long-term contracts for its new Showcase product. (*See* Exs. V at 2, Y at 1, GG at 3, 7, 15.) Most, if not all, of these customers have a window during this fall when they can still cancel their contract—otherwise, the contracts become fixed long-term obligations. (*See* Ex. GG at 7, 19.) If CoStar's false advertising is not immediately brought to light and stopped, many of LoopNet's potential customers will be induced into and/or locked into these long-term contracts with CoStar for competitive services as a proximate result of CoStar's false advertising. As a result, both LoopNet and the public will be irreparably harmed.

Moreover, CoStar's false representations about the size, scope, and qualities of its service threaten irreparable harm to LoopNet's competitive reputation and market goodwill. CoStar's campaign features both direct and indirect comparative references targeting LoopNet. As CoStar's CEO admits, "[T]he perceived size of the online community of buyers and sellers who

---

[10]    In other advertising, CoStar represents that "[c]lients have responded enthusiastically to the new service, recognizing the numerous advantages it offers for marketing their listings

actively use their website platform is critical. . . . Sellers wish to expose their properties to the largest possible audience of buyers. Accordingly, customers are attracted to the platform that they consider to be the most widely used." (Florance Decl. ¶ 3.) CoStar's false advertising claims thus infect the most material elements of the competition between the parties.

LoopNet's goodwill and market reputation may be permanently damaged if the public is further exposed to CoStar's false claims that its copycat Showcase product generates superior traffic, reach, and leads to "prospects" that purportedly are almost all "decision makers" and are all financially "qualified" for and "very interested" in buying or leasing commercial real estate. LoopNet cannot compete fairly with a company that falsely represents that its product is "free" and "open," has more listings than it does, and ensures "unmatched exposure" that will "get the deal done faster" than LoopNet's competing service. This is unfair competition and false advertising under the Lanham Act and New York law. It should be stopped.

## ARGUMENT

### THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION AGAINST COSTAR

LoopNet is entitled to a preliminary injunction if it shows: "(1) either (a) a likelihood of success on the merits of its case or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor, *and* (2) a likelihood of irreparable harm if the request relief is denied." *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F. 3d 144, 152–53 (2d Cir. 2007) (citing *Coca-Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir. 1982)). CoStar's false advertisements directly target LoopNet, violate the Lanham Act and New York Law, and will likely irreparable harm LoopNet.

---

online." (Ex. V at 2.)

I.    **LoopNet Is Likely To Succeed On The Merits**

To state a claim of false advertising under the Lanham Act,[11] a plaintiff must allege that a

defendant:  (1) made false representations, (2) concerning plaintiff's or defendant's goods, (3) in

interstate commerce, (4) in commercial advertising or promotion, (5) about a material facet of

product, (6) that caused damage to the plaintiff.  *Volunteer Firemen's Ins. Servs., Inc. v. McNeil*

*& Co., Inc.*, 221 F.R.D. 388, 391 (S.D.N.Y. 2004).  Indisputably here, CoStar's various

actionable claims were made concerning its own products or LoopNet's.  These claims were

distributed in commercial advertising and promotion placed into interstate commerce via, *inter*

*alia*, the internet and U.S. mail.  And, as illustrated above, these claims target material facets of

the parties' respective products—namely, the scope and reach of their respective audiences, the

nature of that audience, the number of listings featured in the product, the quality of those

listings, the price of the product, and the market acceptance and effectiveness of the product.

Unlawful *false* statements fall into two different categories—those that are facially false

and those that are false by necessary implication.  *Time Warner*, 497 F.3d at 153, 158 (citing,

*inter alia*, *Johnson & Johnson v. GAC Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988)).[12]

A statement is facially false if its express meaning "conflicts with reality."  *Id.* at 153

(citing *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)).  Such claims are "best

supported by comparing the statement itself with the reality it purports to describe."  *Schering*

*Corp.*, 189 F.3d at 229.  A statement is false by necessary implication if "considered in context,

[it] necessarily impl[ies] a false message."  *Time Warner*, 497 F.3d at 158.  An advertisement is

deemed false if, "'considering the advertisement in its entirety, the audience would recognize the

---

[11]    The standard for false advertising under New York law is the same as under the
Lanham Act.  *Johnson & Johnson Vision Care, Inc. v. CIBA Vision, Corp.*, 348 F. Supp. 2d 165,
177 n.6 (S.D.N.Y. 2004).

claim as readily as if it had been explicitly stated.'" *Id.* (quoting *Novartis Consumer Health, Inc.*

*v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d 578, 586–87 (3d Cir. 2002)).

With facially false statements and statements false by necessary implication, "consumer

deception is presumed, and 'the court may grant relief without reference to the advertisement's

[actual] impact on the buying public.'" *Id.* (quoting *Coca-Cola*, 690 F.2d at 317) (alteration in

original).[13]  In this case, CoStar's statements are either facially false—that is, empirically in

conflict with reality—or false by necessary implication—that is, false when taken in context

and/or in necessary comparison to LoopNet.  The harm of consumer deception is thus presumed.

### A.    CoStar's False Traffic Statistics About Showcase

CoStar's claim that Showcase offers more than 400,000 "prospects you won't find on

LoopNet" is unsupported and false.  CoStar started making this claim before Showcase was in

existence (*see* Exs. M–N), when the empirical reality was that Showcase reached *zero prospects*.

CoStar's further claim that comScore is the source of this untruth is also false.  comScore

never issued any data or report remotely like CoStar's false advertising claim.  comScore is an

independent source of information about website traffic.  comScore's traffic estimates are made

by monitoring the activities of a group of panel members who agree to let comScore track their

internet usage.  (*See* Ex. E.)  comScore then extrapolates from the web activity of as few as

several dozen panel members to estimate unique website traffic or cross-visitation reports.  (*Id.*)

Contrary to CoStar's claim that comScore performed a survey of actual "prospects" who use

---

[12]   A commercial statement is also actionable if it is misleading; that is, if, while not
literally false, it is nevertheless likely to confuse consumers.  *Time Warner*, 497 F.3d at 154.

[13]   If a statement is misleading but not literally false, evidence must be presented that a
not insubstantial number of consumers received the misleading impression.  If, however, it is
demonstrated that the defendant "intentionally set out to deceive the public" in an "egregious"
manner, then a presumption of consumer deception arises.  *Johnson & Johnson*Merck
Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298–99 (2d. Cir. 1992).

Showcase but not LoopNet, comScore only estimates the number of visitors who visit one website but not another *during a specified time period.*  (*See, e.g.*, Ex. D.)

CoStar's claim that comScore collected data about Showcase in Q4'07 is false—CoStar Showcase did not launch until May 2008.  (*See, e.g.*, Ex. V.)  Thus, in Q4'07 CoStar Showcase drew *zero unique visitors*, and *zero prospects* were reached by Showcase listings.  Contrary to the necessary implication of CoStar's false advertisement, comScore did not survey over 400,000 actual people who visited CoStar, or ascertain they were "prospects."  (*See* Exs. H–J, L.)

CoStar's claim that comScore Q4'07 data is evidence Showcase has prospects "you won't find on LoopNet" is false for another reason.  Even assuming, for the sake of argument, there were prospects for commercial real estate who in Q4'07 did not use LoopNet, it would be false to assert, as CoStar does, that it necessarily follows that these are prospects you "won't find on LoopNet" in the future.  Whatever the data shows about the behavior of comScore's panel in Q4'07, CoStar with no basis to transform that data into a categorical prediction of future behavior or to claim that comScore's historical report was predictive of behavior for all time.

CoStar's false representation that Showcase offers "400,000 prospects you won't find on LoopNet" materially inflates the advantages of Showcase at the expense of LoopNet, giving the false impression that Showcase reaches a significantly larger unique audience than LoopNet.  According to comScore Q4'7 data, however, in that period *LoopNet received over 2.1 million unique visitors that did not visit CoStar*—data which is diametrically contrary to the impression CoStar seeks to convey with its false claim and false attribution to comScore.  (*See* Ex. D.)  Similarly, CoStar's promise to deliver "1.3 million unique visitors *each quarter*" to Showcase—based on supposed data *from only one quarter*—is equally false.  (*See* Exs. H–J, L, V, W.)  CoStar's own data refutes its claim—CoStar's report of unique traffic made on May 15, 2008, is

*over double the amount it reported just one week earlier*. (*See* Ex. G at 2, M–O.) Based on the overwhelming conflict between CoStar's statements and reality, LoopNet is likely to succeed in proving that these statements are literally false, making a preliminary injunction proper here.

**B.    CoStar's False Representations About Showcase's Promised Audience**

CoStar's claim that 86% of Showcase's audience "are purchase decision makers and influencers for their firm" is also literally false. (*See* Exs. I, N.) The purported survey CoStar relies on to support this claim was conducted *in the year before Showcase even came into existence*. (*See id.*)[14] By CoStar's own admission, CoStar's new Showcase product is designed to reach *a different audience* than its previous products. (*See, e.g.*, Ex. GG at 7; CoStar Mem. 1, 4.) And the comScore data CoStar relies on to support its related false claim to "over 400,000 prospects you won't find on LoopNet" is a survey of *general* internet users (*see, e.g.*, Exs. D–E), not CoStar's professional subscribers. Thus, there can be no truthful claim that these alleged "400,000 prospects" consist of 86% "decision makers." CoStar's representation is that the characteristics of the subscribers it surveyed with respect to CoStar's previous products apply equally to the audience for CoStar's new Showcase product. This is facially false.

Similarly, it is literally false that the "CoStar Showcase Audience" consists of all "qualified prospects who are likely very interested in learning" about commercial real estate availability (*see* Ex. X at 1.) along with "anyone with an interest in commercial real estate property listings across the U.S." (*see* Ex. K at 2). CoStar offers no support whatsoever for its false claim that its Showcase users are all "prospects" or "qualified" to buy or lease real estate or are "very interested" in doing so. And there is no basis to support CoStar's claim that its Showcase audience "includes anyone with an interest in commercial real estate." (*Cf. id.*) In

---

[14]    CoStar has never publicly revealed details of survey responses or its margin of error.

fact, comScore data reports that over 2,000,000 unique quarterly visitors typically use LoopNet.com but do not visit CoStar.com during the same quarter, thus refuting that Showcase's audience "includes" everyone "with an interest in commercial real estate listings across the U.S." (*Compare* Ex. D, *with* Ex. K at 2.) LoopNet will likely prevail in establishing that these claims are literally false, making a preliminary injunction appropriate.

**C.    CoStar's False Statements About Showcase's Cost And Entry Requirements**

CoStar touts that it has millions of dollars in subscription contracts for Showcase. (*E.g.*, Exs. Y, Z.) But in sharp contrast to this, CoStar continues to advertise Showcase by claiming "It's free" and a "truly open service." (Ex. X.) CoStar's advertising claims are literally false— its service is not free to subscribing listing brokers; it is not free to post listings; and, by requiring a long-term subscription contract, the service is not "the First Truly OPEN Marketing Platform for Commercial Real Estate." (*See id.*) LoopNet will likely prevail in establishing that these claims are literally false, supporting preliminary injunctive relief.

**D.    CoStar's False Comparisons To LoopNet's Service**

CoStar purportedly relies on a survey conducted with respect to its previous *information* service products to claim that its website and new Showcase *marketing* service are preferred "3 to 1" by brokers. (*See* Ex. S.) CoStar purportedly relies on this same survey to claim—*in the same advertising in which CoStar makes comparative references to LoopNet*—that "75% of commercial real estate brokers prefer CoStar information products over other information sources." (*See* Exs. I, N.) No doubt, customers understand that "other sources" means LoopNet, to which CoStar compares itself directly *in the same advertisement*. (*See id.*) But that alleged survey—taken in the year *before* Showcase was launched—had nothing to do with Showcase or CoStar's performance in *marketing* real estate listings. In fact, CoStar itself claims that it just

entered the arena of *marketing* listings *a few weeks ago*. (*See, e.g.*, Florance Decl. ¶ 2.) It is

likely that CoStar's purported survey did not even compare CoStar to LoopNet, contrary to what

the public would necessarily understand from CoStar's claim. LoopNet is not primarily an

information service company, but a marketing service company, placing it outside the parameters

of CoStar's purported survey. (*Compare* Ex. I, *with* CoStar Mem. 1; Greenman Decl. ¶¶ 2–3.)

      CoStar similarly levels a barrage of false comparisons to LoopNet, claiming its Showcase

"offers a number of advantages over other online marketing services" and "offers a true

competitive advantage . . . by reaching more prospects and generating more leads online[.]" (*See*

Ex. V at 1–2.) CoStar's false claim to "Reach More Prospects, and Generate More Leads" is

frequently and prominently made *in the same comparative advertising* where CoStar compares

the purported "Reach" of Showcase to LoopNet's traffic. (*See* Exs. H–J, L, M–O.) Customers

would necessarily understand these claims to be directly comparing Showcase and LoopNet.

      In reality, every reported metric of LoopNet's internet traffic dwarfs CoStar's (Exs. A–D,

F)—there can be no basis in fact to support CoStar's extreme claim to superior traffic "reach" or

lead generation. In fine print, CoStar even expressly disclaims the veracity of its own

advertising claims stating: "there can be no assurance that CoStar Showcase will enable

commercial real estate professionals to reach more prospects and generate more leads." (Ex. V

at 2; *see also* Exs. W (similar); V at 3 (conceding that "there can be no assurance . . . that CoStar

Showcase will be a true competitive advantage for commercial real estate professionals").)

      But CoStar's false advertising remains in place, publicly disseminated to mislead

consumers and harm LoopNet. Recently, CoStar has gone further, advertising that over 300

brokerage firms have *confirmed* that Showcase "delivers" on its "promise to provide enhanced

property exposure and more qualified lead-generation." (Ex. X at 1 (capitalization

standardized).)  This statement appears solely based on the fact that these brokers have accepted

a free trial.  That fact, however, offers no basis for CoStar's false statement.  It is likely that

LoopNet will establish that these claims are false, either facially or by necessary implication in

the context of CoStar's comparative advertising campaign.  A preliminary injunction is justified.

**E.      CoStar's False Statements About Showcase's Attributes**

CoStar's advertising falsely claims that Showcase features "900,000 listings" (*See*

Exs. P–T.)  This is false.  CoStar admits elsewhere that its *total* database of U.S. listings contains

900,000 listings.  (Ex. GG at 5.)  Only a fraction of those listings can be viewed on Showcase,

namely only those listings for which the broker has signed a Showcase contract with CoStar.

(*See, e.g.*, Ex. K at 3.)

CoStar also falsely claims that its Showcase listings will be "accurate, up-to-date and free

from mislabeled, outdated or 'dead' listings that clutter other online property search services"—

evidently another comparison to LoopNet.  (*See* Ex. V at 1.)  Yet, CoStar separately expressly

disclaims this promise, word-for-word.  (*See* Ex. V at 3.)  CoStar similarly falsely claims that

Showcase will "get the deal done faster" (Ex. L; *see also* Ex. J at 1), offers "more opportunity to

lease or sell . . . property more quickly" (*see* Ex. L), allows customers to "gain unmatched

exposure" (*see id.*), and offers "an unprecedented way" to market to real estate professionals (*see*

Ex. J at 1, L).  CoStar never offers support for these extreme claims.  But considering that

Showcase is designed to mimic LoopNet's established and significantly more heavily trafficked

service, such claims to an "unmatched" and "unprecedented" service are unsupportable.

LoopNet is the precedent that easily surpasses Showcase's exposure and speed in marketing.

(*Compare* Exs. A–C; CoStar Mem. 1, *with* Exs. DD–FF)  These claims about CoStar's Showcase

will likely be proved to be literally false, making a preliminary injunction proper.

- 20 -

F.    **CoStar's False Statements About Showcase's Success**

To boost customers' view of the popularity, success, and features of Showcase, CoStar

has falsely advertised that consumer response "clearly indicates these clients find CoStar

Showcase to be a very compelling and effective solution for marketing their listings online."

(*See* Exs. Y at 1, Z at 1)  CoStar advertises that customers' "enthusiastic response" demonstrates

"substantial demand among commercial property professionals for a more effective way to

market their property listings online"—another comparison to LoopNet.  (*See* Ex. Y at 1.)

CoStar appears to base its claims of market acceptance and success *solely* on the fact that

many of its customers have accepted a no-obligation, free trial for Showcase.  At the same time,

CoStar has separately and *expressly* disclaimed these false representations, conceding that "there

can be no assurance . . . clients find CoStar Showcase to be a very compelling and effective

solution" (*id.* at 2; *see also* Ex. Z at 2) or "that there is substantial demand among commercial

property professionals for a more effective way to market their property listings online" (*see*

Ex. Y at 2).  But CoStar continues to disseminate its false claims nonetheless.  That is, CoStar

continues to falsely claim that customers have *confirmed* that Showcase is more effective than

LoopNet and then, in fine print, *retracts* the exact same false statements word-for-word.  These

statements will likely be proven literally false, justifying a preliminary injunction.

II.    **CoStar's False Statements Will Irreparably Harm LoopNet And The Public**

LoopNet can show irreparable harm in two ways.  First, LoopNet is entitled to a

presumption of irreparable harm because CoStar's false advertisements target LoopNet directly.

Second, even if CoStar's advertisements are not comparative (and they are), LoopNet can still

establish a "reasonable basis" for concluding that those advertisements will cause further

irreparable harm.  *See Coca-Cola*, 690 F.2d at 316.

**A.** **Irreparable Harm Is Presumed Because CoStar's Advertising Campaign Is Directed Specifically At LoopNet**

Where a party engages in false comparative advertising, no proof of likely injury is necessary. *See McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988) (explaining that no proof is necessary because a false "comparison to a specific competing product *necessarily diminishes that product's value in the minds of the consumer*") (emphasis added); *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992). It is not necessary, however, for the false comparative advertisement to explicitly name the competitor. For example, in *Time Warner*, although "neither of the television commercials [at issue] identified [the plaintiff] by name," the court concluded that the advertisement was comparative because consumers "would undoubtedly understand [the] derogatory statement . . . as referring to [the plaintiff]." *Time Warner*, 497 F.3d at 162.

As in the *Time Warner* case, by CoStar's admission, "LoopNet and CoStar are the *only two entities* of any significant size competing in this market." (Florance Decl. ¶ 19 (emphasis added); *see also id.* ¶ 9 (explaining that CoStar has "moved into LoopNet's core business").) Thus, even when CoStar does not expressly identify LoopNet in certain of its false advertising, consumers would likely understand CoStar to be comparing itself to LoopNet. CoStar's false advertisements are part of its campaign that distorts consumers' perception of LoopNet. All of CoStar's advertisements either (*i*) include an express reference comparing CoStar's Showcase to LoopNet (*see* Exs. H–J, L–O), (*ii*) require necessary comparison by expressly referencing "other" online property services (*see* Exs. K, S, V, X), or (*iii*) require necessary comparison by making express claims that are relative to competitive options (*see* Exs. G, T, W–Z).

Therefore, consumers viewing CoStar's false advertisements will understand them to make both express and implicit comparison between CoStar and LoopNet. Because CoStar's false statements are comparative, LoopNet is entitled to a presumption of irreparable harm.

**B.  LoopNet Can Also Establish A "Reasonable Basis" For Concluding That CoStar's False Advertisements Will Cause Irreparable Harm**

Even if CoStar's advertisements and its coordinated false advertising campaign were not directed specifically at LoopNet—though they are (*see, e.g.*, Florance Decl. ¶¶ 9, 19)—LoopNet can still satisfy the irreparable harm requirement by establishing "a reasonable basis" for concluding that CoStar's advertising will harm LoopNet. *See Coca-Cola Co.*, 690 F.2d at 316; *see also Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190–91 (2d Cir. 1980). The reasonable basis test is "flexible" and only "require[s] a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products," which is not the case here. *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).

Based on CoStar's own admissions, LoopNet easily satisfies the "reasonable basis" standard. According to CoStar's CEO, CoStar has recently "moved into LoopNet's core business." (Florance Decl. ¶ 9.) Indeed, CoStar's CEO explained that "*only CoStar* is making a *new and aggressive push* into this area." (*Id.* at ¶ 19 (emphasis added).) According to CoStar's CEO, "LoopNet and CoStar are the *only two entities* of any significant size competing in this market." (*Id.* at ¶ 19 (emphasis added); *see also id.* at ¶ 40 (comparing CoStar's Showcase to "LoopNet's competing product").)

With LoopNet and CoStar being the only two entities competing head-to-head in the relevant market, it follows that any benefits to CoStar from its "new and aggressive push" (*id.* at ¶ 19) of false advertisements will come at LoopNet's expense. *See Time Warner*, 497 F.3d at 162 ("[T]he presumption [of irreparable injury] is properly limited to circumstances in which

injury would indeed likely flow from the defendant's objectionable statements, i.e., when . . . the plaintiff is an *obvious competitor* with respect to the misrepresented product.") (internal quote omitted); *Hearst Bus. Pub., Inc. v. W.G. Nichols, Inc.*, 76 F. Supp. 2d 459, 467 (S.D.N.Y. 1999) ("In a case where plaintiff's and defendant's products are in head-to-head competition in the relevant market, actual lost sales need not be proved[.]"). Thus, LoopNet has been and will continue to be irreparably harmed by CoStar's false and misleading advertisements.

CoStar itself states that Showcase "presents a serious commercial threat to LoopNet's business" (CoStar Mem. 1), which CoStar describes as "the most serious commercial threat that LoopNet currently faces" (*id.* at 5). CoStar characterizes itself as "LoopNet's main competitor in the online commercial real estate listing business" (*id.* at 19), yet CoStar has embarked on a relentless campaign of false comparative advertising that shamelessly misrepresents the nature of CoStar's own products and disparages LoopNet by comparison. CoStar's false comparative advertising campaign targets elements of LoopNet's products that CoStar's CEO describes as "critical" to attracting customers. (Florance Decl. ¶¶ 3, 9.)

LoopNet's goodwill and reputation could be permanently damaged if CoStar's false claims continue to be publicly disseminated. (Greenman Decl. ¶¶ 4–5.) As a result of its false comparative advertising campaign, CoStar has signed hundreds of customers into potentially long-term contracts purportedly worth millions of dollars. (*See, e.g.*, Exs. Y, GG at 7, 15.) CoStar concedes that most of these contracts have a cancellation window later this year, after which time they become fixed obligations. (*Id.*) Immediate injunctive relief will prevent CoStar from continuing to lie to customers to obtain new long-term contracts or to lock in customers who have already been victimized by the false advertising. Preliminary injunctive relief will

help restore fairness to the market that CoStar has upset with its false claims and unfair competition tactics. CoStar will have to begin to compete with truthful, honest advertising.

Without swift injunctive relief, however, CoStar will retain its unlawful advantage and be in a unique position to continue to lock LoopNet's potential customers into long-term commitments induced by false representations. Customers will pay more for less while LoopNet's hard-earned goodwill, market reputation, and market share will be irreparably impaired by CoStar's lies. LoopNet has established both a likelihood of success on the merits and that it will be irreparably harmed—a factor that is typically presumed in cases such as this. Preliminary injunctive relief should therefore be granted.

## CONCLUSION

For the foregoing reasons, this Court should grant LoopNet's motion for preliminary injunctive relief in its entirety.

Dated:   New York, New York
         June 30, 2008

                              CURTIS, MALLET-PREVOST,
                              COLT & MOSLE LLP


                              By: _____
                              Jacques Semmelman (JS 5020)
                              101 Park Avenue
                              New York, NY  10178-0061
                              Tel.: 212-696-6000
                              Fax: 212-697-1559
                              jsemmelman@curtis.com

                              *Attorneys for Defendant LoopNet, Inc.*

*Of Counsel:*

Elliot Brown (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276
Tel.:  (310) 277-1010
Fax:  (310) 203-7199
ebrown@irell.com

## TABLE OF EXHIBITS CONTAINING COSTAR'S FALSE STATEMENTS

**A.**    **CoStar's False Traffic Statistics About Showcase**

    (a)    CoStar Showcase either receives or its audience includes 400,000 or more prospects that cannot be found on LoopNet (whether stated quarterly, monthly, or otherwise);    Exs. H to J, L to O

    (b)    CoStar Showcase either receives or its audience includes 1.3 million unique CoStar.com visitors each or every quarter;    Exs. H to J, L, V, W

**B.**    **CoStar's False Representations About Showcase's Audience**

    (c)    86% of Costar Showcase's audience are purchase decision makers and influencers for their firm;    Exs. I, N

    (d)    The CoStar Showcase audience is composed of "prospects" for the purchase or lease commercial real estate;    Exs. G to O, T, V to X

    (e)    The CoStar Showcase audience is composed of "qualified" prospects, individuals or entities;    Ex. X

    (f)    The CoStar Showcase audience is composed of prospects, individuals or entities who are likely "very interested" in learning of commercial real estate that is available for lease or sale;    Ex. X

    (g)    The CoStar Showcase audience "includes anyone with an interest in commercial estate property listings across the U.S.";    Ex. K

**C.**    **CoStar's False Statements About Showcase's Cost and Entry Requirements**

    (h)    CoStar Showcase is a "free" service;    Ex. X

    (i)    CoStar Showcase is an "open" service or other statements that conflict with the fact that Showcase requires a long-term contract;    Exs. V, X

**D.**    **CoStar's False Comparisons to LoopNet's Service**

    (j)    CoStar Showcase is the website that brokers prefer 3 to 1 over other websites or over LoopNet;    Ex. S

    (k)    75% of commercial real estate brokers prefer CoStar Showcase over other services or over LoopNet;    Exs. I, N

    (l)    CoStar Showcase offers a true competitive advantage over other services or over LoopNet;    Ex. V

| | | |
|---|---|---|
| (m) | CoStar Showcase reaches more prospects than other services or than LoopNet; | Exs. G to O, T, V to X |
| (n) | CoStar Showcase generates more leads online than other services or than LoopNet; | Exs. G to O, T, V to X |
| (o) | More than 300 firms "find" or confirm that CoStar Showcase delivers on its promises related to online property exposure and lead-generation; | Ex. Y |

**E.    CoStar's False Statements About Showcase's Attributes**

| | | |
|---|---|---|
| (p) | CoStar Showcase features 890,000 or more listings, or allows that many listings to be searched or viewed by Showcase users; | Exs. P to T |
| (q) | CoStar Showcase is composed of accurate, up-to-date listings, and/or free from mislabeled, outdated, or "dead" listings; | Ex. V |
| (r) | CoStar Showcase will "get the deal done faster" or provide "more opportunity to lease or sell your property more quickly"; | Exs. J, L |
| (s) | CoStar Showcase provides "unmatched exposure" or its users "gain unmatched exposure"; | Ex. L |
| (t) | CoStar Showcase is "unprecedented" or offers an "unprecedented" way to market listings online; | Exs. J, L |

**F.    CoStar's False Statements About Showcase's Success**

| | | |
|---|---|---|
| (u) | The response for CoStar Showcase indicates that customers find CoStar Showcase to be a very compelling and effective solution for marketing listings online; | Exs. Y, Z |
| (v) | The response for CoStar Showcase makes clear that there is substantial demand for a more effective way to market commercial real estate listings online; and | Ex. Y |
| (w) | The response for CoStar Showcase indicates that customers recognize the purported advantages CoStar Showcase claims to offer. | Ex. V |