UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                      :

COSTAR GROUP, INC.,

                      Plaintiff,       No. 08-CV-1156 (GBD) (GWG)

                                        :

           v.

                                        :

LOOPNET, INC.,

                      Defendant    :
                      and Counter-
                      Plaintiff.
------------------------------------------------------------ X
                                        :

LOOPNET, INC.,

                      Counterclaim
                      Plaintiff,

                                        :

           v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

                      Counterclaim   :
                      Defendants.
------------------------------------------------------------ X

**DECLARATION OF RAYMOND A. LAMAGNA IN SUPPORT OF**
**LOOPNET'S MOTION FOR A PRELIMINARY INJUNCTION**

## DECLARATION OF RAYMOND A. LAMAGNA

I, Raymond A. LaMagna, declare as follows:

1.       I am an attorney with the law firm of Irell & Manella LLP, counsel for LoopNet, Inc. ("LoopNet") in the above-captioned action.  I am a member of good standing of the California Bar.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently to such facts under oath.

2.       Attached as Exhibit H is a true and correct copy of the CoStar Showcase information "Home" page from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/, on June 26, 2008, with select passages highlighted for emphasis.

3.       Attached as Exhibit I is a true and correct copy of the CoStar Showcase "Audience" page from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/Audience.html/, on June 26, 2008, with select passages highlighted for emphasis.

4.       Attached as Exhibit J is a true and correct copy of the CoStar Showcase "Visual Tour" pages from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/flash/Showcase-Visual-Tour.swf, on June 26, 2008, with select passages underlined in red for emphasis.

5.       Attached as Exhibit K is a true and correct copy of the CoStar Showcase "FAQs" page from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/ShowcaseFaqs.html, on June 26, 2008, with select passages highlighted for emphasis.

6.    Attached as Exhibit L is a true and correct copy of the CoStar Showcase "Marketing Flyer (pdf)" page from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/pdfs/Showcase_Flyer.pdf, on June 26, 2008, with select passages highlighted or underlined in red for emphasis.

7.    Attached as Exhibit M is a true and correct copy of the CoStar Showcase information "Home" page from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/, on May 7, 2008, with select passages highlighted for emphasis. Exhibit M is printed from the same webpage as Exhibit H, except that Exhibit M was printed at an earlier date. Exhibit M differs from Exhibit H in that, *inter alia*, Exhibit M recites "over 625,000 unique visitors each quarter" whereas Exhibit H recites "1.3 million unique visitors each quarter."

8.    Attached as Exhibit N is a true and correct copy of the CoStar Showcase "Audience" page from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/Audience.html/, on May 7, 2008, with select passages highlighted for emphasis. Exhibit N is printed from the same webpage as Exhibit I, except that Exhibit N was printed at an earlier date. Exhibit N differs from Exhibit I in that, *inter alia*, Exhibit N recites "625,000 unique CoStar.com visitors on average each quarter" whereas Exhibit I recites "1.3 million unique CoStar.com visitors each quarter."

9.    Attached as Exhibit O is a true and correct copy of the CoStar Showcase "Visual Tour" pages from CoStar's website as printed from that page, http://www.costar.com/ShowcaseInfo/flash/Showcase-Visual-Tour.swf, on May 7, 2008, with select passages underlined in red for emphasis. Exhibit O is printed from the same webpage as Exhibit J, except that Exhibit O was printed at an earlier date. Exhibit O differs from Exhibit J in

that, *inter alia*, pages 1 and 5 of Exhibit O recite "over 625,000 unique visitors each quarter" whereas pages 1 and 5 of Exhibit J recite "1.3 million unique visitors each quarter."

10.    Attached as Exhibit P is a true and correct copy of a printout of the result of an internet search conducted on the Yahoo! search engine on June 26, 2008, with select passages highlighted for emphasis. As Exhibit P indicates, the search terms used were "costar showcase" and search results included a sponsored link that stated "CoStar Showcase" "View 900,000 Property Listings."

11.    Attached as Exhibit Q is a true and correct copy of a printout of the result of an internet search conducted on the AltaVista search engine on June 26, 2008, with select passages highlighted for emphasis. As Exhibit Q indicates, the search terms used were "costar showcase" and search results included a sponsored link that stated "CoStar Showcase" "View 900,000 Property Listings."

12.    Attached as Exhibit R is a true and correct copy of a printout from the result of an internet search conducted on the Google search engine on June 27, 2008, with select passages highlighted for emphasis. As Exhibit R indicates, the search terms used were "costar showcase" and search results included a sponsored link that stated "CoStar Showcase" "900,000 Property Listings."

13.    Attached as Exhibit S is a true and correct copy of a printout of a CoStar Showcase website page as printed from that page, http://www.costar.com/showcaseinfo/gen-showcase-landing.html, on June 26, 2008, with select passages highlighted for emphasis.

14.    Attached as Exhibit T is a true and correct copy of a printout of a CoStar Showcase website page as printed from that page, http://showcase.costar.com/AppRoot.aspx, on June 26, 2008, with select passages highlighted for emphasis.

15.    Attached as Exhibit U is a true and correct copy of a printout of the results of a search conducted on CoStar Showcase on June 27, 2008, as printed on that day.  As Exhibit U indicates, the first portion of the search results (17 listings) could be viewed, but the majority of the search results are labeled "Subscriber access only."

16.    Attached as Exhibit V is a true and correct copy of a CoStar "Press Release" dated May 15, 2008, and titled "CoStar Showcase Launches With $1 Million in Presale Subscription Orders," as printed from the CoStar website at http://www.costar.com/Corporate/Press/Release.aspx?c=3267&ekmensel=8_submenu_76_link_ 2 on June 26, 2008, with select passages highlighted for emphasis.

17.    Attached as Exhibit W is a true and correct copy of a CoStar "Press Release" dated May 21, 2008, and titled "Reid Lambert Wins CoStar's Porsche Giveaway at ICSC Event in Las Vegas," as printed from the CoStar website at http://www.costar.com/Corporate/Press/Release.aspx?c=3273&ekmensel=8_submenu_76_link_ 2 on June 26, 2008, with select passages highlighted for emphasis.

18.    Attached as Exhibit X is a true and correct copy of a CoStar "News" item dated June 11, 2008, and titled "When It Comes To Presenting Your Listings Online, There's No Place Like Showcase!" as printed from the CoStar website at https://www.costar.com/News/Article.aspx?id=E8554F8D57FA4FFFECBBB4D9B130437F on June 19, 2008, with select passages highlighted for emphasis.

19.    Attached as Exhibit Y is a true and correct copy of a CoStar "Press Release" dated June 4, 2008, and titled "CoStar Showcase Receives Tremendous Market Reception at ICSC Event, Total Subscriptions Surpass $2 Million," as printed from the CoStar website at

http://www.costar.com/Corporate/Press/Release.aspx?c=3279&ekmensel=8_submenu_76_link_

2 on June 26, 2008, with select passages highlighted for emphasis.

20.     Attached as Exhibit Z is a true and correct copy of a CoStar "Press Release" dated

June 16, 2008, and titled "CoStar Group Promotes John Stanfill to Lead U.S. Sales

Organization," as printed from the CoStar website at

http://www.costar.com/Corporate/Press/Release.aspx?c=3283&ekmensel=8_submenu_76_link_

2 on June 26, 2008, with select passages highlighted for emphasis.

21.     Attached as Exhibit AA is a true and correct copy of excerpts from the

"Dictionary of Real Estate Terms" (5th ed., 2000) published by Barrons' Educational Series,

Inc., with select passages highlighted for emphasis. Namely, the term "PROSPECT" has been

highlighted, along with the portion of the definition that reads "a PERSON considered likely to

buy."

22.     Attached as Exhibit BB is a true and correct copy of excerpts from the "Illustrated

Encyclopedic Dictionary of Real Estate" (2nd ed., 1978) by Jerome S. Gross and published by

Prentice-Hall, Inc., with select passages highlighted for emphasis. Namely, the term

"QUALIFIED" has been highlighted, along with the definition that reads "Eligible; fit; entitled

to be chosen; meeting the requirements. Legally competent or capable."

23.     Attached as Exhibit CC is a true and correct copy of a printout of the Oxford

English Dictionary Online page defining the word "unmatched," as printed on June 26, 2008,

with select passages highlighted for emphasis. Namely, the first provided definition for

"unmatched" as been highlighted, which reads "Not matched or equaled; matchless; unrivaled."

24.     Attached as Exhibit DD is a true and correct copy of a printout of the Oxford

English Dictionary Online page defining the noun "precedent," as printed on June 27, 2008, with

select passages highlighted for emphasis. Namely, on page one of Exhibit DD, the first provided definition for "precedent" as been highlighted, which reads "A previous instance taken as an example or rule by which to be guided in similar cases or circumstances; an example by which a comparable subsequent act may be justified"; and on pages 5 to 6, the fifth provided definition has been highlighted, which reads "An event, person, or thing that goes before or in advance of another; a forerunner, a precursor, a predecessor; an antecedent."

25.    Attached as Exhibit EE is a true and correct copy of a printout of the Oxford English Dictionary Online page defining the adjective "precedent," as printed on June 27, 2008, with select passages highlighted for emphasis. Namely, on page one of Exhibit EE, the first provided definition for "precedent" as been highlighted, which reads "Earlier in time; existing or occurring beforehand; previous, former, antecedent"; and on page 2, the second provided definition has been highlighted, which reads "That comes before in order or arrangement; occupying a prior position; foregoing" and the third provided definition has been highlighted, which reads "Pre-eminent or higher in rank or estimation; having or taking precedence."

26.    Attached as Exhibit FF is a true and correct copy of a printout of the Oxford English Dictionary Online page defining the adjective "precedented," as printed on June 27, 2008, with select passages highlighted for emphasis. Namely, the provided definition for "precedented" as been highlighted, which reads "Provided with or having a precedent; in accordance with or warranted by precedent; paralleled or supported by a similar previous case," and the provided usage notation has been highlighted, which reads "Freq[uently used] in negative contexts."

27.    Attached as Exhibit GG is a true and correct copy of a transcript of the Q1 2008 CoStar Group Earnings Conference Call of April 24, 2008, as transcribed and reported by Thomson Financial, with select passages highlighted for emphasis.

28.    Attached as Exhibit HH is a true and correct copy of this case's Docket Entry number 19, which is CoStar Group, Inc.'s Memorandum Of Law In Support of Plaintiff's Motion For A Preliminary Injunction, as made available on this Court's PACER website.

29.    Attached as Exhibit II is a true and correct copy of this case's Docket Entry number 20, which is Andrew C. Florance's June 19, 2008 sworn declaration, as made available on this Court's PACER website.


Executed on June 30, 2008, at Los Angeles, California.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

_____
Raymond A. LaMagna

# EXHIBIT H

**With the Court's permission, this exhibit to be filed in hard copy
with the Clerk of the Court due to the ECF system's
size limitation on PDFs**

# EXHIBIT I

**With the Court's permission, this exhibit to be filed in hard copy
with the Clerk of the Court due to the ECF system's
size limitation on PDFs**

# EXHIBIT J





### Search Results:
### Lead-Focused, Deal-Driven

- List your for sale and for lease properties on CoStar Showcase for substantially more exposure than you get with your free CoStar listing.

- Your listings are presented in an attractive, quick-scan format for maximum impact and more prospect inquiries.

- Your phone number, brokerage affiliation and email contact is prominently featured.

- Simple tools for prospects to share your listing information with colleagues or clients.

- One click access to building and space-level data.

Next »

List     Reach     Connect     Get Started Now











# EXHIBIT K

**With the Court's permission, this exhibit to be filed in hard copy
with the Clerk of the Court due to the ECF system's
size limitation on PDFs**

# EXHIBIT L

Introducing

# CoStar Showcase™

## Reach More Prospects, Generate More Leads

### List...

your properties on CoStar Showcase and gain unmatched exposure.





### Reach...

over 400,000 potential prospects you won't find on LoopNet®.**



### Connect...

with prospects and get the deal done faster.



**CoStar Showcase** is an all-new online marketing service that offers you an unprecedented way to get your listings in front of a vast new audience of brokers, owners, investors, tenants and other commercial real estate prospects.

Properties marketed on CoStar Showcase benefit from tremendous exposure on CoStar.com, Google™, Yahoo!® and other major websites. The result? More reach, more leads, more opportunity to lease or sell your property more quickly than ever before.

- **Lead generation.** 1.3 million unique visitors each quarter have direct phone and email access to you.*
- **Unique audience.** Your listings can be seen by over 400,000 prospects that you won't find on LoopNet.**
- **Exposure.** One-click access to your property from CoStar.com, Google, Yahoo! and other major websites – no registration required!
- **Convenience.** Showcase your listings without re-entering data.
- **Professional.** Only commercial real estate professionals can list ... no competition or listing clutter from non-professionals.

**Start reaching more prospects and generating more leads today:**

 800.216.3270         www.CostarShowcase.com



* Omniture Q1 2008 costar.com unique visitor data    ** Q4'07 comScore Data, CoStar Custom Analysis

# EXHIBIT M

CoStar Showcase - Reach More Prospects, Generate More Leads

Page 1 of 1



# CoStar Showcase®

Reach More Prospects, Generate More Leads

| Home | Audience | Visual Tour | FAQs |

## Welcome to CoStar Showcase, the all-new commercial real estate marketing service that dramatically multiplies the reach of your CoStar listing.

**CoStar Showcase** offers commercial real estate professionals an exclusive opportunity to advertise their listings on one of the industry's most heavily trafficked websites, CoStar.com. When you advertise your property on CoStar Showcase, you get the following benefits:

- **Lead generation.** An average of over 625,000 unique visitors each quarter have direct email or direct phone access to you.*

- **Unique audience.** Reach over 400,000 potential prospects that you won't find on LoopNet®.**

- **Exposure.** One-click access to your property from CoStar.com, Google™, Yahoo!® and other major websites – no registration required!

- **Convenience.** Showcase your listings without re-entering data.

- **Professional.** Only commercial real estate professionals can list... no competition or listing clutter from non-professionals.



**Next Steps...**

**Learn More Now:**
☒ 800.216.3270
☒ Visual Tour
☒ Marketing Flyer (pdf)

\* Q4'06 - Q4'07 comScore Data, CoStar Custom Analysis

\*\* Q4'07 comScore Data, CoStar Custom Analysis

Copyright © 1997-2008 CoStar Realty Information, Inc. All rights reserved.

# EXHIBIT N

CoStar Showcase - Reach More Prospects, Generate More Leads



**GROUP**

## CoStar Showcase®
Reach More Prospects, Generate More Leads

| Home | Audience | Visual Tour | FAQs |
| --- | --- | --- | --- |

# CoStar Showcase Audience: Prospect Quantity and Quality

CoStar.com receives an average of over **625,000 unique visitors each quarter**[1], making it one of the commercial real estate industry's most heavily trafficked websites. When you advertise your properties on CoStar Showcase, you are opening up your listing to an active motivated marketplace:

**400,000 +** potential prospects you won't find on LoopNet®[2]

**625,000 +** unique CoStar.com visitors on average each quarter[1]

**2.4 million** total CoStar.com visits each quarter[3]

**86%** are purchase decision makers and influencers for their firm[3]

**75%** of commercial real estate brokers prefer CoStar information products over other information sources[4]

**Next Steps...**

**Learn More Now:**
☑ 800.216.3270
☑ Visual Tour
☑ Marketing Flyer (pdf)

1 Q406 - Q407 comScore Data, CoStar Custom Analysis
2 Q407 comScore Data, CoStar Custom Analysis
3 Based on online survey of randomly intercepted CoStar.com website visitors, May 2007
4 Based on a blind survey amongst top 500 U.S. brokerage firms conducted by CSRS in December 2007

Copyright © 1997-2008 CoStar Realty Information, Inc. All rights reserved.

# EXHIBIT O

**CoStar Showcase™** Visual Tour

| List | Reach | Connect | Get Started Now |
|------|-------|---------|-----------------|

## Reach More Prospects, Generate More Leads with
## CoStar Showcase™

CoStar Showcase is an online marketing service that offers you an unprecedented way to reach a **vast new audience** of brokers, owners, investors, tenants and other prospects.

### List...
On CoStar Showcase for maximum exposure and lead generation.

### Reach...
Over 400,000 potential prospects that you won't find on LoopNet®** and thousands more from **CoStar.com, Google™, Yahoo!®** and other major websites.

### Connect...
With an average of over 625,000 unique visitors each quarter that have direct access to you.*

Preview the benefits of CoStar Showcase now 

\* Q4'06 - Q4'07 comScore Data, CoStar Custom Analysis
\*\* Q4'07 comScore Data, CoStar Custom Analysis











Case 1:08-cv-01156-GBD-GWG    Document 31-4    Filed 06/30/2008    Page 8 of 8



**CoStar Showcase™** Visual Tour

| List | Reach | Connect | Get Started Now |
|------|-------|---------|-----------------|

 Previous

# Get Started Now!

Reach more prospects. Generate more leads.

Put the marketing advantages of **CoStar Showcase™** to work for you.

## 800.216.3270
sales@costar.com

# EXHIBIT P



costar showcase - Yahoo! Search Results - Microsoft Internet Explorer provided by Irell & Manella LLP

File   Edit   View   Favorites   Tools   Help

Address ...rch.yahoo.com/search?p=costar+showcase&fr=yfp-t-130&toggle=1&cop=mss&ei=UTF-8

Web   Images   Video   Local   Shopping   more ▾

costar showcase

**Search**

**Costar Showcase**
View 900,000 Property Listings Across Us. No Registration Required.
Showcase.CoStar.com

**CoStar Showcase** Launches With $1 Million in Presale Subscription Orders
**CoStar Showcase** will harness the substantial and previously untapped web traffic ... **CoStar Showcase** offers a true competitive advantage for commercial real estate ...
prnewswire.com/cgi-bin/stories pl?ACCT=109&STORY=/www/story/ &EDATE= / 3k - Cached

**CoStar** Group Press Releases
Latest press releases and announcements from **CoStar**, the most trusted name in commercial real estate. CoStar's suite of ... **CoStar Showcase** Receives ...
www.costar.com/CorporatePress/Default.aspx - 69k - Cached

When It Comes To Presenting Your Listings Online, There's No Place Like ...
... web site at <a href=&quot;http://www.**costar**.com&quot; target=&quot;_blank&quot ... >www.**CoStar**.com</a> We just added a ... on **CoStar Showcase** will be ...
www.costar.com/News/Article.aspx?id=E89544F8D57FA4FFFE0BB64D9B1904377 - 61k - Cached

http://rds.yahoo.com/_ylt=A0oGkmCsTWNISHcAIwRXNyoA;_ylu=X3oDMTEyb0O3cW0xBHNlYwNlzcgRwb3MDMDMQk\jb2x\vA3Nr\/v

# EXHIBIT Q



File  Edit  View  Favorites  Tools  Help

Back  ▾  Search  Favorites

Address  http://www.altavista.com/web/results?itag=ody&q=costar+showcase&kgs=1&kls=0  ▾  Go

Google G▾  Go  Bookmarks▾  0 blocked  ABC Check ▾  AutoLink ▾  AutoFill  ▾  Settings▾

altavista  **Web**  Images  MP3/Audio  Video  News

costar showcase

SEARCH IN:  ○ Worldwide  ● USA  RESULTS IN:  ● All languages  ○ English, Spanish

**FIND**

Advanced Search
Settings

Family Filter: off  Help

**Costar Showcase**
View 900,000 Property Listings Across Us. No Registration Required.

**CoStar Showcase** Launches With $1 Million in Presale Subscription Orders
**CoStar Showcase** will harness the substantial and previously untapped web traffic ... **CoStar Showcase**
offers a true competitive advantage for commercial real estate ...

More pages from prnewswire.com

**CoStar Group Press Releases**
Latest press releases and announcements from **CoStar**, the most trusted name in commercial real estate.
CoStar's suite of ... **CoStar Showcase** Receives ...

More pages from costar.com

When It Comes To Presenting Your Listings Online, There's No Place Like ...
...  web  site  at  <a  href=&quot;http://www.**costar**.com&quot;  target=&quot;_blank&quot
;>www.**CoStar**.com</a>  We just added a ... on **CoStar Showcase** will be ...

Internet

# EXHIBIT R

Sign in

Web   Images   Maps   News   Shopping   Gmail   more ▼

# Google

costar showcase

[ Search ]   Advanced Search
                Preferences

**Web**

Results **1 - 10** of about **59,500** for <u>costar showcase</u>. (**0.27** seconds)

Sponsored Link

**CoStar Showcase**
costar.com   900,000 Property Listings Across Us All Free. No Registration Required!

**CoStar Press Release  CoStar Showcase Launches With $1 Million in ...**
Latest press releases and announcements from **CoStar**, the most trusted name in
commercial real estate. **CoStar's** suite of commercial property databases and ...
www.costar.com/corporate/PressRelease.aspx?id=367 - 61k - Cached - Similar pages

**CoStar Showcase - Reach More Prospects, Generate More Leads**
**CoStar Showcase** is an all-new online marketing service that offers you an unprecedented
way to get your listings in front of a vast new audience of brokers, ...
www.costar.com/showcase/ - 10k - Cached - Similar pages

**CoStar Showcase** Launches With $1 Million in Presale Subscription ...
New Online Marketing Service and Free Property Search Enables Commercial Real Estate
Professionals To Reach More Prospects and Generate More Leads from ...
www.redorbit.com/.../costar_showcase_launches_with ... - 77k -
Cached - Similar pages

**CoStar Showcase** Receives Tremendous Market Reception at ICSC Event ...
**CoStar Showcase** Receives Tremendous Market Reception at ICSC Event, Total
Subscriptions Surpass $2 Million from PR Newswire in Business provided free by ...
findarticles.com/p/articles/mi_m4PRN/is_2008_June_4/ai_n25480475 - 43k -
Cached - Similar pages

**CoStar Showcase** Launches With $1 Million in Presale Subscription ...
**CoStar Showcase** Launches With $1 Million in Presale Subscription Orders from PR
Newswire in Business provided free by Find Articles.
findarticles.com/p/articles/mi_m4PRN/is_2008_May_15/ai_n25430104/pg_3 - 40k -
Cached - Similar pages
More results from findarticles.com »

**CoStar Showcase** Launches With $1 Million in Presale Subscription ...
**CoStar Showcase** Launches With $1 Million in Presale
Subscription Orders on Boston.com.
finance.boston.com/boston/?GUID=5479612&Page=MediaViewer&Ticker=CSGP -
Similar pages

Streetinsider.com - **CoStar Showcase** Receives Tremendous Market ...
Jun 4, 2008 ... "Based on the enthusiastic response **CoStar Showcase** received at ICSC,
and continued strong interest from our clients, it's clear there is ...
www.streetinsider.com/.../275115.html - 25k - Cached - Similar pages

Find Commercial Property for Sale and For Lease | CoStar Showcase

## CoStar GROUP

### Searching For Commercial Properties?
Use CoStar Showcase to find for-sale and to-lease properties across the U.S.

Home

# Find a Space for Lease or Properties for Sale on the Website Brokers Prefer 3 to 1*

**Getting started is easy...**

Free to search over 890,000 listings
No registration required
Direct access to listing brokers
Detailed property information

Start your **FREE** property search now



CoStar Group is the leading provider of information to the commercial real estate industry, with over 1 million listings and 2.8 million total properties. If you are a commercial real estate professional, click here to learn more about our Professional line of products.

* Data based on a recent blind survey by California Survey Research Services, Inc. conducted on Dec. 5-6. 2007.

Copyright 1997 - 2008 CoStar Realty Information, Inc. All rights reserved. By using this site, you agree to our Terms of Use.

http://www.costar.com/showcaseinfo/gen-showcase-landing.html

## Free Property Search

**Property Type:**
☐ Office          ☐ Multi-Family
☐ Industrial      ☐ Land
☐ Retail          ☐ Other

**Location:**
city, county, state, or zipcode

**Space Available (SF):**
[    ] to [    ]

**Rent - Square Feet Per Year ($):** ✕
[    ] to [    ] : [    ]

**Sale Price ($):**
[    ] to [    ]

**Building Size (SF):** price
[    ] to [    ]

**Search Now!**

**Want to Showcase Your Listings?**
You may already list for free in CoStar.
But, if you want even more exposure... click here

6/26/2008

# EXHIBIT S

Find Commercial Property for Sale and For Lease | CoStar Showcase

6/26/2008

CoStar GROUP

## Searching for Commercial Properties?
Use CoStar Showcase* to find for-sale and for-lease properties across the US

Home

# Find a Space for Lease or Properties for Sale on the Website Brokers Prefer 3 to 1*

### Getting started is easy...

Free to search over 890,000 listings
No registration required
Direct access to listing brokers
Detailed property information

Start your FREE property search now



## Free Property Search

Property Type:
☐ Office        ☐ Multi-Family
☐ Industrial    ☐ Land
☐ Retail        ☐ Other

Location:
[ city, county, state, or zipcode ]

Space Available (SF):
[ ] to [ ]

Rent - Square Feet Per Year ($) ⊠ :
[ ] to [ ] :

Sale Price ($):
[ ] to [ ]

Building Size (SF): price
[ ] to [ ]

[ Search Now! ]

**Want to Showcase Your Listings?**
You may already list for free in CoStar.
But, if you want even more exposure... click here

CoStar Group is the leading provider of information to the commercial real estate industry, with over 1 million listings and 2.8 million total properties. If you are a commercial real estate professional, click here to learn more about our Professional line of products.

* Data based on a recent blind survey by California Survey Research Services, Inc. conducted on Dec. 5-6, 2007.

Copyright 1997 - 2008 CoStar Realty Information, Inc. All rights reserved. By using this site, you agree to our Terms of Use.

http://www.costar.com/showcaseinfo/gen-showcase-landing.html

# EXHIBIT T

**With the Court's permission, this exhibit to be filed in hard copy
with the Clerk of the Court due to the ECF system's
size limitation on PDFs**

# EXHIBIT U





**124 W. Truslow Ave**
Orange County
Fullerton, CA 92832-2373
Multi-Family

4,300 SF Building
9 Units

For Sale
$999,999
$111,111.00/Unit
$250/SF

Lisa Weeber ... (714) 256-8668
Centure 21 Gierhann-Joseph
(562) 903-0086
More Information



**1994 Wallace Ave**
Orange County
Costa Mesa, CA 92626
Multi-Family

2,742 SF Building
Built in 1953
4 Units

For Sale
$1,195,000
$298,750/Unit
$515/SF

David T Sanford ... (949) 250-8647
Newport Apartment Group
(949) 258-1778
More Information



**328 S Philadelphia St**
Orange County
Anaheim, CA 92805
Multi-Family

4,743 SF Building
Built in 1989
5 Units

For Sale
$1,250,000
$250,000/Unit
$264/SF

Mike Lembeck ... (949) 282-0088
Keller Williams Realty
(949) 282-0088
More Information

**Subscribers to CoStar's professional line of products have complete access to the 86 listings below.**

| Address | Property Type | City, ST | Rent/SF/Yr | SF Avail | Sale Price | Building Size |
|---|---|---|---|---|---|---|
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $2,590,000 | 7,100 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $56,900,000 | 241,825 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $925,000 | 3,411 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $2,080,000 | 10,110 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $170,000,000 | 531,412 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $3,400,000 | 20,547 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $1,160,000 | 5,044 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $1,100,000 | 5,054 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $2,150,000 | 9,860 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $869,950 | 2,920 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $869,000 | 2,878 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $675,000 | 2,698 SF |
| Subscriber access only | Multi-Family | Anaheim, CA | Negotiable | | $2,150,000 | 10,680 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $799,900 | 2,437 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $799,950 | 2,424 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $7,700,000 | 35,606 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $6,550,000 | 29,475 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $6,650,000 | 35,688 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $3,720,000 | 13,892 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $835,000 | 2,598 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $17,300,000 | 80,960 SF |
| Subscriber access only | Multi-Family | Buena Park, CA | Negotiable | | $3,780,000 | 21,606 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | $3,200,000 | 10,111 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | $4,645,000 | 18,355 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | $1,500,000 | 6,704 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | | 9,340 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | $2,140,000 | 6,950 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | $1,295,000 | 4,612 SF |
| Subscriber access only | Multi-Family | Costa Mesa, CA | Negotiable | | $2,400,000 | 7,144 SF |
| Subscriber access only | Multi-Family | Fullerton, CA | Negotiable | | $15,400,000 | 58,748 SF |
| Subscriber access only | Multi-Family | Fullerton, CA | Negotiable | | $724,000 | 1,820 SF |
| Subscriber access only | Multi-Family | Fullerton, CA | Negotiable | | $829,000 | 1,260 SF |
| Subscriber access only | Multi-Family | Garden Grove, CA | Negotiable | | $1,518,000 | 7,040 SF |
| Subscriber access only | Multi-Family | Garden Grove, CA | Negotiable | | $70,060,000 | 142,918 SF |
| Subscriber access only | Multi-Family | Garden Grove, CA | Negotiable | | $2,300,000 | 4,509 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $1,799,000 | 6,933 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $949,950 | 8,692 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $949,950 | 3,343 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $1,298,000 | 4,069 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $1,298,000 | 4,069 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $950,000 | 4,090 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $1,479,000 | 3,886 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $4,140,000 | 9,996 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $1,269,000 | 12,104 SF |
| Subscriber access only | Multi-Family | Huntington Beach, CA | Negotiable | | $1,269,000 | 17,194 SF |
| Subscriber access only | Multi-Family | La Habra, CA | Negotiable | | $998,000 | 4,255 SF |
| Subscriber access only | Multi-Family | Laguna Beach, CA | Negotiable | | $3,125,000 | 26,450 SF |
| Subscriber access only | Multi-Family | Los Alamitos, CA | Negotiable | | $16,900,000 | 13,380 SF |
| Subscriber access only | Multi-Family | Los Alamitos, CA | Negotiable | | $2,700,000 | 15,132 SF |

# EXHIBIT V



CORPORATE INFORMATION                    **Press Release**

**May 15, 2008**

# CoStar Showcase Launches With $1 Million in Presale Subscription Orders

*New Online Marketing Service and Free Property Search Enables Commercial Real Estate Professionals To Reach More Prospects and Generate More Leads from Their Online Property Listings*

home page

news

corporate info

about costar

**press releases**

investors

costar research

testimonials

brochures

press kit

products

careers

support

contact us

add a listing

comps express

photo express

premier properties

power brokers

costar international

BETHESDA, MD – May 15, 2008 – CoStar Group, Inc. (Nasdaq: CSGP), the number one provider of commercial real estate information/marketing solutions, today announced the launch of CoStar Showcase™ (www.CoStar.com), an online property marketing service designed to provide commercial real estate professionals a dynamic new channel for maximizing the visibility of their available office, retail, warehouse/industrial, multifamily, land and other commercial properties before a large audience of online prospects.

CoStar Showcase will harness the substantial and previously untapped web traffic generated at CoStar.com, which includes more than 1.3 million unique visitors each quarter, and additional traffic generated on Google™, Yahoo!® and other leading search engines, to create an all-new, high-impact online marketing service that enables commercial real estate professionals with available space for lease and property for sale to reach more prospects and generate more leads.

This new online marketing service from CoStar offers a number of advantages over other online property marketing services:

- CoStar Showcase is the only major, online commercial property search tool that requires no search fees or registration. Visitors to www.CoStar.com can access this truly open service to search tens of thousands of for-lease and for-sale commercial property listings by location, available space, and rental rate or sale price range.

- Property listings marketed on CoStar Showcase will be exposed to an enormous online audience, including the 1.3 million unique visitors who go to www.CoStar.com each quarter, and thousands more expected through keyword linking strategies with Google, Yahoo, and other major search engines.

- Only property listings from commercial real estate professionals will be allowed on CoStar Showcase, in an effort to assure that all listings are active and available as advertised. Each listing is expected to include the listing broker's telephone number and email address.

- All listing information on CoStar Showcase is taken directly from CoStar's comprehensive commercial property database, updated by the industry's largest and most respected research service. CoStar will make every effort to ensure the listing information is accurate, up-to-date and free from mislabeled, outdated or "dead" listings that clutter other online property search services. It also makes posting listings a simple process, with no text to be keyed in, images uploaded or other time-consuming tasks.

"CoStar Showcase offers a true competitive advantage for commercial real estate professionals who want to gain additional valuable exposure for their available property listings by reaching more prospects and generating more leads online," said Andrew C. Florance, CoStar Group Founder and CEO. "After more than 20 years building our business by helping commercial real estate professionals use technology to market their listings more effectively, I believe CoStar is uniquely positioned to offer a better way to help our thousands of subscribers present their listings to a vast audience of highly qualified prospects."

Clients have responded enthusiastically to the new service, recognizing the numerous advantages it offers for marketing their listings online. As a result, CoStar has signed more than $1 million in presale subscriptions for CoStar Showcase, including subscriptions with more than 100 commercial brokerage firms across the country. These contracts include a trial period and an option to cancel, but based on the response received to date, CoStar believes CoStar Showcase to be a very compelling and effective solution for those interested in marketing their listings online.

CoStar will be officially presenting CoStar Showcase at next week's International Council of Shopping Center's (ICSC) global retail real estate convention in Las Vegas, NV. Please visit CoStar exhibit booth # S1014 in the Trade Exhibition (South Hall.) Additional information on CoStar Showcase is available at www.CoStar.com/showcaseinfo. To learn more about how CoStar Showcase can present your commercial property listings to an even larger audience of online prospects, please speak with a CoStar Showcase product specialist at 1-877-726-7827.

About CoStar Group, Inc.

CoStar Group, Inc. (Nasdaq: CSGP) is the number one provider of commercial real estate information/marketing solutions to commercial real estate professionals in the United States and United Kingdom. CoStar's suite of services offers customers access via the Internet to the most comprehensive database of commercial real estate information throughout the U.S. as well as in the United Kingdom and France. Headquartered in Bethesda, MD, the company has approximately 1,300 employees, including the largest professional research organization in the industry. For more information, visit www.costar.com.

---

This news release includes "forward-looking statements" including, without limitation, statements regarding CoStar's expectations, beliefs, intentions or strategies regarding the future. These statements are subject to many risks and uncertainties that could cause actual results to differ materially from these statements. More information about potential factors that could cause actual results to differ materially from those discussed in the forward-looking statements include, but are not limited to, those stated in CoStar's filings from time to time with the Securities and Exchange Commission, including CoStar's Form 10-K for the year ended December 31, 2007 and CoStar's Form 10-Q for the quarter ended March 31, 2008, under the heading "Risk Factors." In addition to these statements, there can be no assurance that CoStar Showcase will enable commercial real estate professionals to reach more prospects and generate more leads from their online property listings; that CoStar Showcase will maximize visibility of commercial real estate professionals available office, retail, warehouse/industrial, multifamily, building sites and other commercial properties before a large audience of online prospects; that CoStar Showcase will harness the substantial and previously untapped web traffic generated at CoStar.com and additional traffic generated on Google, Yahoo and other leading search engines to create an all-new, high-impact online marketing service that enables commercial real estate professionals with available space for lease and property for sale to reach more prospects and generate more leads; that CoStar Showcase will offer a number of advantages over other online property marketing services; property listings marketed on CoStar Showcase will be exposed to an enormous online audience; that thousands of web visitors will be generated through keyword linking strategies with Google, Yahoo and other major search engines; that all listings on CoStar Showcase will be from commercial real estate professionals; that all listings on CoStar Showcase are active and available as

advertised; that each listing will include the listing broker's telephone number and email address; that the listing information on CoStar Showcase is accurate, up-to-date and free from mislabeled, outdated or "dead" listings; that posting listings will be a simple process; that CoStar Showcase will be a true competitive advantage for commercial real estate professionals; that commercial real estate professionals will gain additional valuable exposure for their available property listings by reaching more prospects and generating more leads online; that CoStar is uniquely positioned to offer a better way to help our thousands of subscribers present their listings to a vast audience of highly qualified prospects; that the $1 million in presale subscriptions for CoStar Showcase will be maintained or that some or all of those subscriptions will not cancel that CoStar Showcase will be a very compelling and effective solution for those interested in marketing their listings online. All forward-looking statements are based on information available to CoStar on the date hereof, and CoStar assumes no obligation to update such statements.

Copyright © 1997-2008 CoStar Realty Information, Inc. All rights reserved.     Commercial Real Estate | Anti-Piracy | Webinars | RSS | Site Map
By using this site, you agree to our Terms of Use

# EXHIBIT W

CoStar Press Release: Reid Lambert Wins CoStar's Porsche Giveaway at ICSC Event in Las Vegas (5/2...



CoStar **Press Release**

GROUP

May 21, 2008

home page
news
corporate info
about costar
**press releases**
investors
costar research
testimonials
brochures
press kit
products
careers
support
contact us
add a listing
comps express
photo express
premier properties
power brokers
costar international

# Reid Lambert Wins CoStar's Porsche Giveaway at ICSC Event in Las Vegas

*Accounts Manager for Alpharetta, GA-based IEM Wins Porsche Cayman from CoStar Group in Drawing Held at ICSC RECon Event*

LAS VEGAS, NV – May 21, 2008 – Reid Lambert, a new accounts manager with Alpharetta, GA-based International Environmental Management (IEM) Inc., accepts the keys to a new 2008 Porsche Cayman sports car from Andrew C. Florance, founder and CEO of CoStar Group, Inc.  Lambert's business card was the one drawn from thousands entered in the annual drawing held at CoStar's booth during the International Council of Shopping Centers (ICSC) RECon global retail real estate convention in Las Vegas.

During the event, CoStar officially presented CoStar Showcase®, a new online property marketing service that harnesses the substantial web traffic generated at CoStar.com to provide commercial real estate professionals with a dynamic new channel for maximizing the visibility of their available office, retail, warehouse/industrial, multifamily, land and other commercial properties before a large audience of online prospects. By presenting listings of available commercial property through a free property search to the more than 1.3 million unique visitors at CoStar.com each quarter, and to thousands more expected through keyword linking strategies on Google™, Yahoo!® and other leading search engines, CoStar Showcase® enables commercial real estate professionals to reach more prospects and generate more leads for their available space for lease and property for sale.

View photo of winner

## About CoStar Group, Inc.

CoStar Group, Inc. (Nasdaq: CSGP) is the number one provider of information/marketing services to commercial real estate professionals in the United States as well as the United Kingdom.  CoStar's suite of services offers customers access via the Internet to the most comprehensive database of commercial real estate information throughout the U.S. as well as in the United Kingdom and France.  Headquartered in Bethesda, MD, the company has approximately 1,300 employees, including the largest professional research organization in the industry. For more information, visit http://www.costar.com.

---

This news release includes "forward-looking statements" including, without limitation, statements regarding CoStar's expectations, beliefs, intentions or strategies regarding the future. These statements are subject to many risks and uncertainties that could cause actual results to differ materially from these statements. More information about potential factors that could cause actual results to differ materially from those discussed in the forward-looking statements include, but are not limited to, those stated in CoStar's filings from time to time with the Securities and Exchange Commission, including CoStar's Form 10-K for the year ended December 31, 2007 and CoStar's Form 10-Q for the quarter ended March 31, 2008, under the heading "Risk Factors." In addition to these statements, there can be no assurance that CoStar Showcase will maximize the visibility of commercial real estate professionals' available commercial properties before a large audience of online prospects and that commercial real estate professionals will be able to reach more prospects and generate more leads for their available space for lease and property for sale by using CoStar Showcase®. All forward-looking statements are based on information available to CoStar on the date hereof, and CoStar assumes no obligation to update such statements.

Copyright © 1997-2008 CoStar Realty Information, Inc. All rights reserved. By using this site, you agree to our Terms of Use

Commercial Real Estate | Anti-Piracy | Webinars | RSS | Site Map

# EXHIBIT AA

# Dictionary of Real Estate Terms

## Fifth Edition

Jack P. Friedman, PhD, CPA, MAI, CRE
Jack Friedman & Associates
Dallas, Texas
Real Estate Consultant and Author

Jack C. Harris, PhD
Research Economist
Real Estate Research Center
Texas A&M University

J. Bruce Lindeman, PhD
Professor of Real Estate
University of Arkansas at Little Rock



This book is dedicated to the memory of my late aunt,
Miriam Friedman Drabkin.   –JPF

The book *Houses*, by Henry Harrison, was used as a source for some drawings used in
this book. Drawings of dormer, gable roof, gambrel roof, mansard roof, mobile home,
shed roof, termite, window, and hip roof, plus drawings and definitions of "A" frame,
American mansard, brownstone, bungalow, California bungalow, *California ranch*,
Cape Cod colonial, Dutch colonial, *Eastlake house*, Elizabethan Federal, French
provincial, *functional modern*, Georgian, high Victorian, international architecture,
Italian villa, log cabin, mission house, Monterey architecture, New England colonial,
New England farm house, prairie house, pueblo or adobe, Queen Anne house, *regency*,
saltbox colonial, southern colonial, *Spanish villa, stick style* or Swiss chalet, Tudor,
western row, and Williamsburg came from this source. © Copyright first edition
REALTORS NATIONAL MARKETING INSTITUTE® of the NATIONAL ASSOCI-
ATION OF REALTORS® 1976. Second edition copyright Residential Sales Council™
of the Realtors National Marketing Institute® 1992. All rights reserved. Reprinted from
*Houses* with permission.

© Copyright 2000 by Barron's Educational Series, Inc.
Prior editions © Copyright 1997, 1993, 1987, 1984
by Barron's Educational Series, Inc.

All rights reserved.
No part of this book may be reproduced in any form, by photostat,
microfilm, xerography, or any other means, or incorporated
into any information retrieval system, electronic or mechanical,
without the written permission of the copyright owner.

*All inquiries should be addressed to:*
Barron's Educational Series, Inc.
250 Wireless Boulevard
Hauppauge, NY 11788
**http://www.barronseduc.com**

*Library of Congress Catalog Card No. 00-031165*
International Standard Book No. 0-7641-1264-3

**Library of Congress Cataloging-in-Publication Data**
Friedman, Jack P.
    Dictionary of real estate terms / Jack P. Friedman, Jack C.
Harris, J. Bruce Lindeman. — 5th ed.
    p.   cm.
    ISBN 0-7641-1264-3
    1. Real estate business—Dictionaries. 2. Real property—
Dictionaries. I. Harris, Jack C., 1945–  . II. Lindeman,
J. Bruce (John Bruce). III. Title.
HD1365.F75   2000
333.33'03—dc21                                            00-031165

PRINTED IN THE UNITED STATES OF AMERICA
9 8 7 6 5 4 3 2

325    **PUBLIC HOUSING**

> **Example:** A owns 40%, B owns 30%, C owns 20%, and D owns 10%. A $100 *pro rata* distribution is paid to the owners: A received $40, B received $30, C received $20, D received $10.

**PRORATE**   to allocate between seller and buyer their proportionate share of an obligation paid or due; for example, to prorate real PROPERTY TAXES or insurance.
> **Example:** Property taxes were $730, assessed for the calendar year and paid by the seller on April 30. The property was sold on September 15 (Figure 154). It is necessary to *prorate* property taxes so that the buyer and seller each pay a proportionate share for his or her ownership period. There are 107 days from September 15 to December 31. Therefore the buyer must pay $214 at closing, based on a daily rate of $2.



FIG. 154. PRORATE

**PRORATION** *see* PRO RATA, PRORATE.

**PROSPECT**   a PERSON considered likely to buy. A prospective purchaser.
> **Example:** All of the persons who request further information about the advertised property are considered *prospects.*

**PROSPECTUS**   a printed descriptive statement about a business or investment that is for sale, to invite the interest of prospective investors.
> **Example:** A SYNDICATOR prepared a *prospectus* that disclosed all MATERIAL FACTS about the property being offered. Before it is approved by the SEC or state securities commissioner, it is called a RED HERRING. If it need not be approved, it is called a DESCRIPTIVE MEMORANDUM.

**PROXY**   a person who represents another, particularly in some meeting. Also, the document giving to another the authority to represent.
> **Example:** Abel could not be at the COOPERATIVE apartment association's annual meeting, so he cast his vote by *proxy.*

**PRP**   POTENTIALLY RESPONSIBLE PARTIES.

**PUBLIC HOUSING**   government-owned housing units made available to low-income individuals and families at no cost or for nominal rental rates. Contrast with LOW-INCOME HOUSING.
> **Example:** The Metropolitan Housing Authority operates several *public housing* projects for those who cannot afford decent housing on the rental market.

# EXHIBIT BB

# Illustrated Encyclopedic

# Dictionary of

# Real Estate

*SECOND EDITION*

Jerome S. Gross

PRENTICE-HALL, Inc. · ENGLEWOOD CLIFFS, N.J.

Prentice-Hall International, Inc., *London*
Prentice-Hall of Australia, Pty. Ltd., *Sydney*
Prentice-Hall of Canada, Ltd., *Toronto*
Prentice-Hall of India Private Ltd., *New Delhi*
Prentice-Hall of Japan, Inc., *Tokyo*
Prentice-Hall of Southeast Asia Pte. Ltd., *Singapore*
Whitehall Books, Ltd., *Wellington, New Zealand*

© 1978, 1969 *by*

Prentice-Hall, Inc.
Englewood Cliffs, N.J.

*All rights reserved. No part of this book
may be reproduced in any form or by
any means, without permission in writing
from the publisher.*

"This publication is designed to provide accurate and authoritative
information in regard to the subject matter covered. It is sold with the
understanding that the publisher is not engaged in rendering legal,
accounting, or other professional service. If legal advice or other
expert assistance is required, the services of a competent professional
person should be sought."

—From the Declaration of Principles jointly adopted
by a Committee of the American Bar Association and a
Committee of Publishers and Associations.

Library of Congress Cataloging in Publication Data

Gross, Jerome S.
   Illustrated encyclopedic dictionary of real
estate.

   First ed. published in 1969 under title:
Illustrated encyclopedic dictionary of real estate
terms.
   1.   Real estate business--Dictionaries.
I.   Title.
HD1365.G76   1978          333.3'3          77-25387
ISBN 0-13-450981-1

Printed in the United States of America

# Q

QUADRANGLE—A rectangular area bordered on all sides by buildings.

QUALIFIED—Eligib le fit; entitled to be chosen; meeting the requirements. Legally competent or capable.

QUALIFIED FEE—(See FEE DETERMINABLE.)

QUALITY OF ESTATE—The manner in which an estate is to be owned as to type of possession (sole, jointly, tenancy-in-common, etc.) and time (present or future). The term does not allude to value or physical characteristics of the estate.

QUANTITY SURVEY—1. In building, it is an estimate of all materials and labor that would be required to complete construction of a building or other project. Estimators take such a survey when arriving at the amount of the bid price. 2. In appraising, it is an estimate of the replacement cost of a building by figuring the amount of labor and materials that have gone into it and determining what it would currently cost to construct.

QUARRY—An open land area used for the excavation of granite, limestone, marble or other stones.

QUARTER SECTION—A quarter section of land; 160 acres; 2640 feet by 2640 feet.

**Quarter Section**



QUARTERLY—Four times a year as in quarterly payment, quarterly dividend, quarterly report, etc. Consisting of four parts.

# EXHIBIT CC

Oxford English Dictionary unmatched, ppl. a.                                   Page 1 of 1

## Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

# un'matched, *ppl. a.*                                   SECOND EDITION 1989

[UN-[1] 8.]

**1.** Not matched or equalled; matchless; unrivalled.

**1581** SIDNEY *Apol. Poetrie* (Arb.) 26 Though we get not so vnmatched a praise as the Etimologie of his names wil grant. **1621** G. SANDYS *Ovid's Met.* VI. (1626) 109 Antigone, who stroue For vnmatcht beautie with the wife of Ioue. **1637** J. RUTTER *1st Pt. Cid* V. iii. 27 It were better that his unmatch'd valour Should get him victory. **1678** DRYDEN *All for Love* IV. i, Your unmatch'd desert. **1780** BURKE *Sp. Bristol* Wks. 1792 II. 313 Refusing to commit this act of un~matched turpitude. **1812** COMBE *Syntax, Picturesque* XXIV. 89 Shakespeare, immortal Bard sublime! Unmatch'd within the realms of time! **a1845** HOOD *Lamia* i. 40 Let such an unmatched vision still shine on. **1878** SYMONDS *Sonn. M. Angelo* lix, Nay, nor the unmatched phœnix lives anew, Unless she burn.

*absol.* **1632** R. ALLEN in Lithgow *Trav.* B3b, This thy second Pilgrimage of Minde,..in Methode, Phrase, and Stile, May match the most vnmatched in this Ile.

**b.** Const. *by; at, for, in,* or *of.*

**1592** DANIEL *Compl. Rosamond* xxiv, Vnmatch'd by sword, [he] was vanquisht by a glaunce. **1602** WARNER *Alb. Eng.* XII. lxxiii. 304 Fertile grounds, vnmatch't for fruits. **1700** ROWE *Amb. Step-Moth.* II. ii, Long time unmatcht in War the Hero shone. **1789** BURNS *Whistle* iv, Unmatch'd at the bottle, unconquer'd in war. **1810** SCOTT *Lady of L.* I. vii, Two dogs..Unmatch'd for courage. **1868** MORRIS *Earthly Par.* I. II. 629 This is the man, unmatched of heart and limb.

**2.** Not provided with something equal or alike.

**1645** MILTON *Tetrach.* 19 When love findes it self utterly unmatcht, and justly vanishes. **1824** GALT *Rothelan* III. 132 A mean abode,..with old-fashioned unmatched chairs.

### Hence **un'matchedness**.

**c1611** CHAPMAN *Iliad* Pref. A3b, His cleare vnmatchednesse in all manner of learning.

---

# EXHIBIT DD

# Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

## precedent, *n.*

DRAFT REVISION Mar. 2008

*Brit.* /ˈprɛsɪd(ə)nt/, *U.S.* /ˈprɛsədnt/  Forms: α. lME **precedente**, lME **precydent**, lME-17 **precident**, lME- precedent, 15 **preceedent**.β. lME **preseident**, lME-15 **presydent**, lME-16 **presedent**, lME-16 **presidente**, lME-17 **president**, 15 **presdint**, 16 **presadent**, 16 **presydentts** (plural). [< PRECEDENT *adj.* Compare classical Latin *praecēdēns* (masculine) person who goes in front, person who ranks before, person who excels, (neuter) thing which precedes, prior event, preceding statement, in post-classical Latin also previous instance taken as an example or rule (c1523 in a British source), uses as noun of masculine and neuter respectively of *praecēdēns*, adjective; compare also Middle French *precedent* person who goes before or in front (1392; French *précédent* (legal) precedent (1824) is < English).]

   **1. a.** A previous instance taken as an example or rule by which to be guided in similar cases or circumstances; an example by which a comparable subsequent act may be justified. Freq. *to set a precedent*.

> α **1427** *Rolls of Parl.* IV. 326/2 Ye Lordes Spirituel and Temporel..serched precydentes of the governaill of ye land in tyme and cas semblable. **1597** R. HOOKER *Of Lawes Eccl. Politie* V. lxv. 168 That very precedent it selfe which they propose may be best followed. **1667** S. PEPYS *Diary* 9 Jan. (1974) VIII. 9 The Lords did argue that it was an ill precedent and that which will ever hereafter be used. **1742** E. YOUNG *Complaint* I. 392 Be wise to-day; 'tis madness to defer; Next day the fatal precedent will plead. **1787** T. JEFFERSON *Writings* (1859) II. 141 They consider the North American revolution a precedent for theirs. **1842** TENNYSON *You ask me Why* in *Poems* (1907) I. 382 A land..Where Freedom slowly broadens down From precedent to precedent. **1888** F. HUME *Madame Midas* I. i. 17 He promptly followed the precedent set by Oxford. **1923** E. WHARTON *Let.* 19 May (1988) 467 Thereafter..came urgent letters, saying that a 'Doctorat' had never before been conferred on a woman by any big University in America, that Yale had created a precedent for me. **1950** *Times* 10 Jan. 7/4 Their opera did not fit into any recognized category and could not be approached with any operatic precedent in mind. **1996** *Health Educ. Res.* **11** 260/1 Although market

segmentation techniques are frequently applied to the promotion of consumer products, there are precedents for their use in social marketing contexts.

β *a*1450-1500 (1436) *Libel Eng. Policy* 25 (*margin*) A story of destruccione of Denmarke for destruccione of here marchauntes, by a presidente of master Richard Barnett shewynge in a rolle. *a*1475 J. FORTESCUE *Governance of Eng.* (Laud) 134 Soche was þe sellynge off Chirke and Chirkes landes, weroff neuer manne see a president. 1537 T. CROMWELL in R. B. Merriman *Life & Lett. Cromwell* (1902) II. 102 The president were to yvel to be admytted. 1584 J. STOCKWOOD *Sermon of Necessitie* (*title*), A president for all incorporations, to direct them in the Christian choice of a godly Magistrate. 1628 O. FELLTHAM *Resolves: 2nd Cent.* xx. 67 Saint Paul is president for it... There is a way to be pleasingly-plaine. 1643 J. MILTON *Soveraigne Salve* 4 By such a provision a dangerous president is introduced. 1733 D. NEAL *Hist. Puritans* II. 445 His Majesty's not interposing..was afterwards made use of as a president.

‡**b.** *concr.* A document recording past proceedings, serving as a guide or rule for subsequent cases. *Obs.*

1450 *Rolls of Parl.* V. 191/1 Any Graunt made by us..of Viewe of Frauncplegge..which we graunted to hym opon certeyn precedentez allowed in Ayer to his Aunceterz. 1495 in J. Gairdner *Lett. Reigns of Rich. III & Hen. VII* (1863) II. 298 All my bokes, and that in especiall my precedentes. 1523 J. FITZHERBERT *Bk. Surueyeng* xi. f. 12, But yᵉ diuersytie of these tenures..can nat be knowen but by the lordes euydence, court rolles, rentayles, and suche other presydentes. 1543 (*title*) A boke of presidentes exactly written in maner of a register. 1631 B. JONSON *Staple of Newes* I. v. 16 in *Wks.* II, Newes, of all which seuerall, The Day-bookes, Characters, Precedents are kept. 1650 A. WELDON *Court & Char. King James* (1651) 11 He caused a whole cartload of Parliament Presidents (that spake the Subjects Liberty) to be burnt.

**c.** *Law.* A judicial decision which constitutes an authoritative example or rule for subsequent analogous cases; a form of a document which has been found valid or useful in the past and can be copied or adapted.

In English law the system of precedent is comparatively rigid; the general principle is that a court is bound by its own previous decisions and by those of a court above it in the hierarchy of courts. In other legal systems, the validity of a previous decision may be reconsidered by a court.

α 1600 SHAKESPEARE *Merchant of Venice* IV. i. 217 There is no power in

Venice can altar a decree established: twill be recorded for a precedent. **1689** *Tryal Bps.* 34 Things done in particular cases in favour are not Precedents. **1765** W. Blackstone *Comm. Laws Eng.* I. Introd. iii. 69 It is an established rule to abide by former precedents, when the same points come again in litigation. **1772** *Junius Lett.* Ded. Eng. Nat. 3 One precedent creates another.—They soon accumulate, and constitute law. **1847** *Times* 31 May 4/4 The practice of giving what the lawyers call extra-judicial opinions, which..are not deemed binding precedents. **1874** J. R. Green *Short Hist. Eng. People* viii. §5. 502 The legal research of Noy..found precedents among the records in the Tower. **1910** *Columbia Law Rev.* **10** 668 A decision is a binding precedent solely by virtue of its application of a rule of law to the facts of the case before it. **1992** D. Pannick *Advocates* v. 166 The future happiness of..people who may be affected by the precedent established by the judgment.

β **1523** J. Fitzherbert *Bk. Surueyeng* xi. f. 20, The lordes court rolles, the whiche is a regester to the lorde to knowe his presydentes, customes, & seruyces. **1642** Charles I *Answer to Printed Bk.* 25 Upon pretence of Authority of Book~cases, and Presidents. **1718** S. Sewall *Diary* 5 Feb., Look'd [out] the presidents which made it good.

   **d.** As a mass noun: precedents, *esp.* legal precedents, considered collectively; a system based on precedents. ***without precedent***: without supporting example or authority; unprecedented.

   **1593** T. Bilson *Perpetual Govt. Christes Church* xvi. 388 All this, your selues being priuate men, take vpon you to deuise and establish without precedent. **1612** S. Daniel *First Pt. Hist. Eng.* I. 3 The trayne of affaires carried by precedent. **1671** W. Salmon *Synopsis Medicinæ* Introd. 4 We will not much praise it,..for it was wrot without President. **1750** Johnson *Rambler* No. 28 ⁋7 Each comforts himself that his faults are not without precedent. **1769** *Junius Lett.* (1797) I. v. 44 Your conduct was not justified by precedent. **1858** J. A. Froude *Hist. Eng.* III. xvi. 362 The conservative English instinct, which..ever preferred the authority of precedent to any other guide. **1913** *Sat. Evening Post* 22 Feb. 5/3 The judge's proper rôle was to sit upon the bench, learnedly expounding text and precedent. **1913** *Sat. Evening Post* 22 Feb. 31/1 Gross receipts of the railroads were without precedent for dimensions, higher operating costs affecting the net unfavorably. **1985** R. C. A. White *Admin. of Justice* I. i. 7 A clear pecking order of courts exists which is of great importance in studying the doctrine of precedent, since decisions of courts higher in the hierarchy are generally binding on those lower in the hierarchy. **2001** *Hist. Scotl.* Winter 37/1 At the time the situation was without precedent

in Scotland, for until then historic shipwrecks had fallen outside the remit of its statutory agencies.

†**2. a.** In *pl.* The preceding or foregoing facts, notes, statements, etc. *Obs.*

> **1433** *Rolls of Parl.* IV. 425/1 My said Lord of Bedford..nought havyng his rewarde to ye said precedents, offerd and agreed hym to serve ye Kyng. **1460** *Paston Lett.* (1976) II. 204 These preseidentes consedred wolde discorage any man to a-bide but a litel amonges hem that so straunged hem self from me. **1516** R. FABYAN *New Chron. Eng.* (1811) VII. 397 Whan all these presedentes were sene by $y^e$ Scottes, a day was assygned of metynge at Norham. *a***1575** N. HARPSFIELD *Treat. Divorce Henry VIII* (1878) 237 A fourth impediment, and worse than the precedents. **1607** E. TOPSELL *Hist. Fovre-footed Beastes* 133, I should heere end the discourse of this beast, after the method already obserued in the precedents. **1684** T. FORRESTER *Rectius Instruendum* III. 89 Prelatists who are enemies to either long or short prayers..are much liker these precedents in the above mentioned characters.

**b. *the precedent*:** the aforementioned; that which has just been said or written. *Obs.*

> **1594** H. PLATT *Jewell-house* III. 63 This secrete with the preceedent I had of a Dutch mountbanke. **1597** J. GERARD *Herball* I. 8 The great Foxe-taile grasse hath..leaues or blades like Okes: is nothing rough in handling like the precedent. **1605** BACON *Of Aduancem. Learning* II. sig. Bb1$^v$, Another defect which I note, ascendeth a little higher than the precedent. **1699** tr. *H. de Blancourt's Art of Glass* 163 This Colour will be not only deeper, but also far fairer than the precedent. **1705** tr. W. Bosman *New Descr. Coast of Guinea* xv. 269 A Bird not above half so big as the precedent. **1738** E. ALBIN *Nat. Hist. Eng. Song-Birds* 61 This [bird]..is lesser than the precedent. **1856** A. O. EXQUEMELIN *Hist. Buccaneers Amer.* (new ed.) 30 The prickle palm, so called because it is infinitely full of prickles.., much more than the precedent.

†**3.** A sign, an indication of something; a token. *Obs.*

> **1518** W. NEVILL *Castell of Pleasure* (1930) 109 Which were playne precedentes the daye was clerely paste. **1581** B. RICH *Farewell Mil. Profession* (Shaks. Soc.) 183 He had given..to the Kyng himself, as a president of his good will, a riche jewell. **1593** SHAKESPEARE *Venus & Adonis* sig. B$^v$, With this she ceazeth on his sweating palme, The president of pith, and liuelyhood.

**†4. a.** An example to be followed or copied; a model, an exemplar. *Obs.*

> **1535** J. HUSEE *Let.* 21 July in *Lisle Papers* (P.R.O. SP 3/13) XIII. f. 94, If you miȝt haue suche a man of knowledge for the ordering and redresse of your household but one yeare it shoud be a presdint for ever. **1542** N. UDALL tr. Erasmus *Apophthegmes* f. 1ᵛ, We haue thought moste conuenient to set his saiynges first, as of yᵉ which the studious reader maye gather & take suche presidentes of holy and innocent liuyng. **1572** J. FIELD & T. WILCOX *Admon. to Parl.* sig. Bᵛ, The Queenes chappell, and these churches..are rather paternes and presidents to the people, of all superstitions. **1607** T. MIDDLETON *Revengers Trag.* I. sig. Cᵛ, *Piero.* That vertuous Lady? *Ant.* President for wiues. **1677** in *Englische Studien* (1930) **65** 366 His doctrine sound, his life a president. **1754** J. WOOLMAN *Considerations Keeping Negroes* in *Wks.* (1774) II. 254 Our blessed Saviour seems to give a check to this irregular fondness in nature, and, at the same time, a precedent for us: 'Who is my mother, and who are my brethren?'

**b.** An example, a specimen; an instance or illustration. *Obs.*

> **a1575** N. HARPSFIELD *Treat. Divorce Henry VIII* (1878) 217 But the most notable president of this kind of chastity is the virginity of our blessed lady..married to good Joseph. **1600** P. HOLLAND tr. Livy *Rom. Hist.* XXVIII. xliv. 704 Can there bee a president [L. *exemplum*] found more pregnant..to prove and enforce this point, than Anniball himselfe? **1631** R. NORWOOD *Trigonometrie* Ep. to Rdr., Some..who, when these tables were printing and almost finished, came to the printing house and not only tooke a sufficient view of them there, but carried away a president without the printer's leave. **1668** H. ROLLE *Abridgm.* I. 49, I will make thee an example and president for a perjured Rogue. **1695** J. WOODWARD *Ess. Nat. Hist. Earth* 103 There are so many Presidents on Record in Holy Writ of this way of proceeding, that no one can be well ignorant of them.

**c.** An original of which a copy is made. *Obs. rare.*

> **1597** SHAKESPEARE *Richard III* III. vi. 7 This is the indictment of the good Lord Hastings,..Eleuen houres I spent to wryte it ouer..The president was full as long a doyng. **a1616** SHAKESPEARE *King John* (1623) V. ii. 3 My Lord Melloone, let this be coppied out, And keepe it safe for our remembrance: Returne the president to these Lords againe.

**5.** An event, person, or thing that goes before or in advance of another; a

forerunner, a precursor, a predecessor; an antecedent.

**1599** J. RAINOLDS *Overthrow Stage-playes* sig. A2, These and such like warninges and examples going before should..haue bene a peasefull precedent to the succeeding age that came after. **1610** *Histrio-mastix* VI. 143 Ruine and Warre, the precedents of Wrath,..Have rid their circuit through this fertile soyle. *a***1613** G. OWEN *Descr. Penbrokshire* (1892) 274 Some gaine in running vpon his precedentes, some forced to come behinde those that were once foremost. **1691** T. BEVERLEY *Thousand Years' Kingdom* 10 The mention of the Three days, and a Half as the most Immediate Precedent of their Rising. **1788** T. TAYLOR tr. Proclus *Comm.* I. 67 Things subsequent are always annexed to their precedents. **1850** J. S. BLACKIE tr. Æschylus *Lyrical Dramas* I. 51 A host of jarring rumours..Each fresh recital with a murkier hue Than its precedent. **1917** F. W. HUARD *My Home in Field of Mercy* ix. 241 The second crash came! Closer and louder than its precedent. **1980** *Musical Q.* **66** 431 Each successive interval..is a minor second larger than its precedent. **1997** S. BARTSCH *Ideology in Cold Blood* i. 16 The by-products of the civil war that Lucan himself is documenting and not its precedent in the 80s B.C.

---

## COMPOUNDS

**C1.** Objective, as ***precedent-loving***, ***precedent-setting***, ***precedent-worshipping***, etc., adjs.

**1853** C. KINGSLEY *Lett.* (1878) I. 374 If we can prove this point, we prove everything with precedent-worshipping John Bull. **1883** *Harper's Mag.* July 296/1 We are a dull, blind, precedent-loving set of animals, we human beings. **1913** *Washington Post* 7 Mar. 1/8 Joseph P. Tumulty, President Wilson's secretary, started a small precedent-shattering campaign of his own yesterday. **1967** *Economist* 14 Oct. 160/3 In Boston an outspoken lawyer, in a precedent-setting challenge to the constitutionality of the Massachusetts laws against marijuana, is asking whether all the fuss over pot is really worth it. **2000** *Scotsman* (Nexis) 1 July 10 The erudite and precedent-loving procurator fiscal.

**C2. precedent book** *n.* a volume recording legal precedents.

**1591** T. NASHE in Sir P. Sidney *Astrophel & Stella* Introd., Although it be..the *president bookes of such as cannot see without another man's spectacles. **1715** R. GARDINER *Instructor Clericalis* (ed. 5) I. 201 In Townsend's Tables you will find References to good Precedents, and also

in other Precedent Books since published. **1842** *Times* 23 Dec. 5/1 A lawyer having copied into his precedent book a set of cropping clauses from a Norfolk lease. **1992** *Times Higher Educ. Suppl.* 27 Mar. 24/5 A more interesting area for text retrieval is secondary sources, text and precedent-books which lawyers use on a daily basis.

# EXHIBIT EE

Oxford English Dictionary precedent, adj.                                        Page 1 of 3

# Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

## precedent, *adj.*                                          DRAFT REVISION Mar. 2008

*Brit.* /prɪˈsiːd(ə)nt/, /ˈprɛsɪd(ə)nt/, *U.S.* /prɪˈsidnt/, /ˈprɛsəd(ə)nt/  Forms: α.
ME **precident**, ME **precydent**, ME- **precedent**, 16 **praecedent**; *Sc.* pre-
17 **precedant**, pre-17 **precedente**, pre-17 **preceidant**, pre-17 17-
**precident**.β. ME-15 **president**, 15 **president**, 16 **presedentt**, 16
**preseident**. [< Middle French *precedent* (French *précédent*) earlier in time
(13th cent. in Old French), that comes before in order (1400) and its etymon
classical Latin *praecēdent-*, *praecēdēns* earlier in time, foregoing, use as
adjective of present participle of *praecēdere* PRECEDE *v.*[2] Compare Old
Occitan *preceden* (*c*1350), Catalan *precedent* (14th cent.), Spanish
*precedente* (1358 as *precedent*), Italian *precedente* (1268).

  Now largely replaced by PRECEDING *adj.*

  *N.E.D.* (1907) indicates only stress on the second syllable. Similarly, S. Pegge *Anecd.
Eng. Lang.* (1803) 283 remarks on *precedent* having one sound when a noun, another
sound when an adjective.]

  **1.** Earlier in time; existing or occurring beforehand; previous, former,
antecedent. Cf. PRECEDING *adj.* 1.

  In early use freq. as postmodifier.

    *c*1400 (1391) CHAUCER *Treat. Astrolabe* (Brussels) II. §32 f. 93, Fro the
    mydday of the day precedent. **1472-3** *Rolls of Parl.* VI. 57/1 The same
    accompt for the first yere precedent. **1509** S. HAWES *Pastime of Pleasure*
    (1845) xxvii. 123 The desteny is a thyng accydent,..Tyll it be done it is ay
    precedent. **1598** R. BARCKLEY *Disc. Felicitie of Man* V. 458 There are two
    sorts of ends, some are precedent, some subsequent. **1616** SIR T. BUTTON
    in *Lismore Papers* (1887) 2nd Ser. II. 65, I shalbe glad..to be your
    tenant..and give as muche rentt..as the presedentt tenant did. *a*1674 LD.
    CLARENDON *Surv. Leviathan* (1676) 88 For there could be no Law
    precedent to that resignation of themselves. **1742** T. HUMPHREYS
    *Marriage Honourable Estate* 3 The dignity of the married state, hath, in
    this last century, more than in any precedent age, been depretiated. **1787**
    *Minor* 201 Mr. Plodder having been busied the precedent night. **1817** J.
    MILL *Hist. Brit. India* III. VI. i. 21 The operation of control is subsequent,
    not precedent. **1863** N. HAWTHORNE *Our Old Home* I. 228 The line of a
    railway..puts all precedent things at sixes-and-sevens. **1912** *Indianapolis*

*Star* 2 Jan. 10/3 The average import price per pound thus being but 92 cents in 1911, against $1.10 in the precedent year. **1968** *Amer. Econ. Rev.* **58** p. xxxii, In the respective no. 1 of every volume Public Finance/Finances Publiques publishes the papers and proceedings of the Congress of the International Institute of Public Finance held respectively the precedent year. **2000** *Nation* (Pakistan) (Nexis) 27 Dec., We have touched the level of 1993 after suffering a lot of decline in the garment exports during the precedent years, he added.

**2. a.** That comes before in order or arrangement; occupying a prior position; foregoing. Cf. PRECEDING *adj.* 2. Now *rare*.

**1418** in H. Nicolas *Proc. & Ordinances Privy Council* (1834) II. 354 Wheþer þe King may..werreie wiþ þe Douphin..is contened in þe next precedent two articles. **1483** CAXTON tr. *Caton* E iij b, To flee the false opynyons and errours of thauncient beforesayd in the iiii precedent commaundementes. **1561** J. HOLLYBUSH tr. H. Braunschweig *Homish Apothecarye* 15 b, As I have taught in the precedent chapter. **1604** T. WRIGHT *Passions of Minde* (new ed.) 255 Certaine Corollaries deducted out of the precedent Discourse of the Motives to Love. **1714** tr. I. Barrow *Euclide's Elements* (ed. 4) Pref., The six precedent and the two subsequent [books]. **1741** T. ROBINSON *Common Law of Kent* v. 77 The Generality of the Precedent Words. **1837** J. BADCOCK in N. Whittock et al. *Compl. Bk. Trades* 389 The discord of precedent, antecedent, and relative pronouns. **1936** *Times* 2 Apr. 2/6 Calculate the net products of each line, mentioned by the precedent chapter. **1995** A. V. GHEORGHE & M. NICOLET-MONNIER *Integrated Regional Risk Assessment* I. iii. 93 Examples of indirect processes are the wet and dry deposition already discussed in the precedent chapter.

**†b.** That has just been said or spoken of; aforementioned. Cf. PRECEDENT *n.* 2b. *Obs. rare.*

**1530** J. PALSGRAVE *Lesclarcissement* 987 The whiche may be turned lyke the verbe precedent.

**†3.** Pre-eminent or higher in rank or estimation; having or taking precedence. *Obs.*

**1598** J. FLORIO *Worlde of Wordes*, *Precedente*, precedent,..of better worth, overpassing, outpassing, surmounting. **1613** S. PURCHAS *Pilgrimage* 340 The one precedent in age and nobilitie, the other a Leader in Warre, and Lawgiuer in Peace. **1858** H. BUSHNELL *Nature &*

Oxford English Dictionary precedent, adj.                                          Page 3 of 3

> *Supernat.* (1864) x. 289 Laying his hand upon all the dearest and most intimate affections of life and demanding a precedent love.

# EXHIBIT FF

Entry printed from *Oxford English Dictionary Online*

Copyright © Oxford University Press 2008

---

# precedented, *adj.*

DRAFT REVISION June 2008

*Brit.* /ˈprɛsɪdɛntɪd/, *U.S.* /ˈprɛsədɛn(t)əd/ Forms: see PRECEDENT *n.* and -ED *suffix²*. [Partly < PRECEDENT *n.* + -ED *suffix²*, and partly < PRECEDENT *v.* + -ED *suffix¹*. Compare earlier UNPRECEDENTED *adj.*]

Provided with or having a precedent; in accordance with or warranted by precedent; paralleled or supported by a similar previous case. Freq. in negative contexts.

[**1659** J. RUSHWORTH *Hist. Coll.* 101 To forbid the Judges against their Oathes..is a thing unpresidented in this Kingdom.] **1701** R. COCKS *Diary* 15 Apr. in D. W. Hayton *Parl. Diary Sir R. Cocks* (1996) 94 Mr Boyle said that was not regular nor presidented. **1762** H. WALPOLE *Vertue's Anecd. Painting* I. Pref. p. v, When one offers to the public the labours of another person, it is allowable and precedented to expatiate in praise of the work. **1809** E. S. BARRETT *Setting Sun* II. 65 This prayer is, as we have shewn before, precedented and proper. **1880** F. G. LEE *Church under Q. Elizabeth* I. 275 Notwithstanding their extraordinary but precedented Oath of Homage. **1904** B. WENDELL *Temper of 17th Cent. in Eng. Lit.* i. 23 These noble words..are no more than another effort..to show the hardly precedented effects of which our new-found English was capable. **1975** W. SAFIRE *Before Fall* III. v. 169 Kissinger was not troubled with the morality of the taps, because..they were precedented (he thought). **1995** *Jrnl. Soc. Archit. Historians* **54** 418/1 Stacking on it, vertiginously, tier after tier with scarcely precedented engineering bravura.

---

# EXHIBIT GG

## Thomson StreetEvents™

### CSGP - Q1 2008 CoStar Group Earnings Conference Call

Event Date/Time: Apr. 24. 2008 / 11:00AM ET

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

## C O R P O R A T E   P A R T I C I P A N T S

**Mr. Trainer**
*CoStar Casting Group*

**Andrew Florance**
*CoStar Casting Group - CEO and President*

**Brian Radecki**
*CoStar Casting Group - CFO*

## C O N F E R E N C E   C A L L   P A R T I C I P A N T S

**John Maietta**
*Needham & Co. - Analyst*

**Jim Wilson**
*JMP Securities - Analyst*

**John Neff**
*William Blair & Company - Analyst*

**Vance Edelson**
*Morgan Stanley - Analyst*

**Brett Huff**
*Stephens Incorporated - Analyst*

## P R E S E N T A T I O N

**Operator**

Good morning. My name is Tiara, and I will be your conference operator today. At this time I would like to welcome everyone to the first quarter 2008 conference call. (OPERATOR INSTRUCTIONS) Thank you.

Mr. [Trainer], you may begin your conference.

---

**Mr. Trainer** - *CoStar Casting Group*

Thank you, Tiara.

Good morning, everyone, and welcome to CoStar Group's first quarter 2008 conference call.

Before I turn the call over to our CEO, Andrew Florance, let me state that certain portions of this discussion contain forward-looking statements which involve many risks and uncertainties that can cause actual results to differ materially from such statements. Important factors that can cause actual results to differ include but are not limited to those stated in CoStar's first quarter 2008 press release and CoStar's filings with the SEC, including CoStar's form 10-K for the period ended December 31, 2007, under the heading "Risk Factors."

All forward-looking statements are based on information available to CoStar on the date of this call, and CoStar assumes no obligation to update these statements. You can find a Webcast of this conference call at www.costar.com/corporate/investor.

Thank you for joining us. I will now turn the call over to Andy.

---

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Thank you, Tim.

I want to apologize for us getting going with a late start there on the phone call. We like to start more promptly than that. We had minor technical difficulty, but, again, I apologize, and welcome everyone, to the first quarter 2008 conference call.

I'm very pleased to report that CoStar Group continued the earnings momentum we began to generate last year, and we posted another strong performance in the first quarter, one in which we added a large number of new subscribers and achieved better-than-expected earnings growth. By executing our strategy of adding and retaining subscribers and managing our cost structure while taking advantage of the opportunities we created through our U.S. national expansion and our expanded U.K. operations, we generated solid earnings growth for the past three consecutive quarters, and we anticipate that we will continue to do so.

First quarter net income increased 178% over the same period one year ago to $5 million, or $0.26 per diluted shared, compared to $1.8 million, or $0.09 per diluted share, for the first quarter 2007.

EBITDA for the first quarter 2008 was $11.5 million, an increase of 128%, compared to EBITDA of $5 million in the first quarter of 2007.

Revenues for the first quarter 2008 were $52.3 million, a 16.6% increase over the first quarter 2007 revenues of $44.8 million and a 2.8% increase from fourth quarter 2007 revenues of $50.8 million.

As of March 31, 2008, we had $193.1 million in cash, cash equivalents, short-term and long-term investments. CoStar Group has no long-term debt.

Brian will address the first quarter results in more detail and provide some color on our outlook for the rest of the year and our decision to increase our guidance. Before he does, I'd like to talk about some of the trends and opportunities we see as a company, as well as some of the new services and initiatives we have planned and how we anticipate they will contribute to our earnings and revenue growth.

Demand for our information products remains strong. We continue to add a large number of new users, signed the largest number of new customer firms in a single quarter ever, and we enjoyed a high renewal rate, all of which contribute to our strong first quarter earnings growth.

Overall, subscriber growth in the first quarter was very strong. We added 2,071 net new-paying individual subscribers to bring our total subscriber count to 90,822. In total, we added 591 net new subscribing firms in the U.S., the most net new customers we've ever sold to in a single quarter. Five-hundred ninety-one new firms compares to 526 firms added in the fourth quarter 2007 and 535 firms added a year ago during the first quarter 2007.

Much of that subscriber growth can be attributed to our decision, which I discussed in last quarter's call, to concentrate the efforts of our sales team on a strategically important market segment for us, smaller-sized brokerage companies that have an inordinately high number of listings where those companies are not currently our customers. We target these specific small firms because, with an average of 32 listings each, they control a higher number of listings on average than does a typical small firm, which would be expected to have one or two commercial property listings.

Since these firms would normally only purchase one or two licenses, thereby representing lower average contract values, these firms would normally not be a high priority for our sales team. Despite the fact that the subscription revenue from these firms may not be the highest, they're valuable to have as clients because these small firms tend to give our researchers more detailed

| THOMSON | www.streetevents.com | Contact Us | |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

information on their listings and deals when they become clients. We would still collect their content if they were not clients, but it's easier to do so and results in higher quality if they are clients.

Many of these small prospects with high numbers of listings have recently experienced fee price increases from other vendors so we thought it was an opportune time to go after them. Our efforts in this area over the last two quarters have been a major success, and thousands of listings have been converted to client listings, giving us overall higher quality data and thereby increasing our value proposition to all of our clients and prospects.

Given our historical ability to renew and upsell firms once they become subscribers and benefit from the value of our higher quality research report information, we believe that expanding our customer base could be immediately beneficial from a sales perspective, and we expect it will also lead to long-term growth opportunities.

For these and other reasons, we believe there was value to targeting these previously untapped segments, and as I reported last quarter, we implemented a number of incentives for our sales teams and certain special pricing offers to focus our sales people on selling into these smaller accounts. As I indicated, this incentive program essentially covers the first half of the year, by which time I believe we will have largely accomplished our strategic objectives in this segment.

We are well aware that we made a decision that was a clear tradeoff between maximizing contract bookings during the quarter and gaining an intermediate term competitive advantage. While this incentive program has been very successful in signing a large number of contracts, the relatively small size of the firms result in contracts at a much smaller average price point, which also results in a lower average contract price for the quarter overall.

The average new contract value decreased 26% quarter over quarter from 9,277 in the fourth quarter 2007 to 6,864 in the first quarter 2008. Because of that, U.S. subscription contract bookings were also lower in the first quarter 2008, totaling 3.7 million, down from 5.8 million in the fourth quarter of 2007.

As we complete this initiative in the second quarter, we anticipate the average contract value will increase significantly back towards historical norms. Showcase will be a primary priority for the sales force for the rest of 2008, and with a current average contract value of $11,400 annually, it will put upward pressure on our average contract values and our quarterly bookings.

We believe the strategy of targeting these strategically important smaller-size firms will continue to generate a record number of new subscribing firms through the end of the second quarter.

Our customer renewal rate was slightly lower in the quarter but was still at 90%. The renewal rate is slightly lower due to January seasonality and customer anxiety given the negative media that's out there and an increase in bad debt. At 90%, the renewal rate remains the highest in our industry by a wide margin, which I believe affirms the youthfulness of our information and its central function as subscribers day to day missing critical business activity. In order to try to increase the renewal rate back to 92%-plus range, we are reemphasizing training customer attention focus within our sales force.

At the end of the first quarter, the company had 131 U.S. subscription sales reps, 9 U.S. advertising sales reps, 7 in-house sales reps, and 24 U.K. field sales reps, for a total of 171 quota-carrying sales representatives. This compares with 169 on staff at the end of the fourth quarter last year.

Commercial real estate market conditions are mixed right now. They are neither clearly negative nor are they universally positive. Many key industry indicators reflect unprecedented strengths right now. Rents are generally at multiyear highs. Property asset values are at multiyear highs. Cap rates remain low. Construction activity is robust. Vacancy rates are generally moderate and well within range considered healthy for a commercial real estate market. There are pockets of rising vacancy rates in a number of U.S. markets, but there is no clear dramatic national trend one way or another in the vacancy rates. Absorption, leasing activity, and sales volumes are trending down.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

Let me make it clear: commercial real estate is not experiencing the obvious negative market conditions that residential real estate is currently experiencing. In my mind, the proper commercial real estate downturn is characterized by consecutive quarters of clearly rising vacancy rates, falling rents and asset values, negative absorption and stalled construction activity. The plain reality here is that the expected downturn that many have been expecting has so far failed to clearly materialize.

Based on our analysis, the facts and statistics in this commercial real estate market do not support the conventional wisdom that the commercial real estate market is in a significant downturn. Our latest analysis based on performance of a core set of major U.S. markets (inaudible) researchers tracked since 2000 found that office, retail and industrial rental rates finished the quarter at multiyear highs while demand for commercial real estate did soften somewhat this past quarter.

Total office absorption remained positive at just 655,000 square feet this past quarter, compared to a much higher 14.6 million square feet of positive absorption one year ago. We expect this number will likely be revised upwards as more deals are captured.

Retail turned in the strongest first quarter performance of the three major property types with positive absorption of 10.3 million square feet, although still down from 26.8 million square feet of retail absorption one year ago. Again, this number will likely be revised upwards as more transactions for the quarter come in to our researchers.

The biggest change took place in the industrial property sector, which dipped into negative territory for the first time since 2002, posting 1.4 million square feet of negative absorption this quarter, compared to 40.9 million square feet of positive absorption one year ago.

Construction levels, which had been trending somewhat lower, essentially remained unchanged during the quarter. The total amount of office space under construction was 142 million square feet, compared to 134 million square feet last quarter, a 6% increase from last quarter and a 2% decrease from the first quarter 2007. These are not meaningful changes.

Industrial construction totaled 118 million square feet, compared to 126 million square feet last quarter. This represents a 7% drop over last quarter's level and a 27% drop from the previous year, a slightly more significant change.

A total of 104 million square feet of retail space was under construction at the end of the first quarter, just a 3% change from the 101 million square feet under construction last quarter but a 20% decrease over the same time last year.

Declining absorption levels combined with modest levels in continued new development has caused a national vacancy rate to go up just slightly in each of the property types. Office vacancy rates edged up just slightly from 11.2% at the end of last year to 11.5% in the first quarter, while the industrial rates went from 8.3% to 8.5%, and retail rates went from 6.4% to 6.6%.

We also see mixed results in the commercial real estate capital markets. The changes we've seen to date can just as easily be characterized as a return to mean rather than a dramatic drop off as sales activity came from super heated levels they reached over the past 24 months.

Office sales volume was down 36% from the same quarter last year from $20 billion to $18 billion but only down 5% from levels we saw two years ago. The average office sales price rose 19% over year-ago levels from $240 to $280 per square foot and is up 41% over the average sales price from two years ago. Average office cap rates are 14 basis points lower than the same quarter last year from 7.1% to 7.0% and 57 basis points lower than two years ago.

In the industrial property market, sales volume was down 11% from $7.3 billion in the fourth quarter 2006 to $6.5 billion in the fourth quarter 2007. Industrial sales volume is down 18% from two years ago. However, the average industrial sales prices are up 7% higher than last year at this time and also 9% higher than two years ago at $67.00 per square foot, and cap rates for industrial property sales are lower, averaging 7.2%, 45 basis points lower than one year ago and 78 basis points lower than two years ago.

 

| www.streetevents.com | Contact Us |
| --- | --- |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

Retail property sales volume is down 36% from the same quarter last year from $6.2 billion to $4 billion, down 44% from sales volume levels two years ago. The average sales price for retail property increased 21% over year-ago levels from $149 per square foot to $180 per square foot and 29% higher compared with average sales prices from two years ago.

All in all, we believe the first quarter market conditions remain fairly resilient. Obviously, the market could weaken further. We believe that any further softening would have a greater impact on revenue growth than on earnings growth. In last quarter's call, I addressed CoStar's proven ability to operate profitably through major real estate cycles. We have successfully managed our business through several real estate cycles over the years. As each cycle has come and gone, we have grown the total number of subscribers, increased revenues every quarter since our IPO more than a decade ago.

So far, this down cycle has failed to fully appear. Again, I want to reiterate that while residential real estate is in a clearly down market with almost all indicators in a significant decline, commercial real estate is not showing clear or consistent, across-the-board signs of being in a down cycle.

As I reported in our last call, we have taken appropriate steps to stabilize our cost structure after substantially completing the multimillion dollar investment required to complete our coverage of the U.S. and U.K. commercial real estate markets. Having completed the difficult and very expensive phase of adding the additional markets to our database, we believe the costs associated with maintaining the information our research teams evaluated in those markets have stabilized and may decline over time.

Of course, the job of updating, verifying, and enhancing information we provide our subscribers never ends. Based on current patterns of growth in our listing database, we project that our research team will add the one-millionth listing to CoStar's database sometime during the second quarter of this year. To the best of my knowledge, this represents an unprecedented and unmatched aggregation of commercial property information within a unified database.

We believe that to try and replicate the breadth and scale of the property information CoStar's researchers assembled would cost hundreds of millions of dollars. Our research team provides the core data that is the source of our value and identity as a company. The fact that they have done an outstanding job in researching these new markets and aggregating so many listings in such an efficient and timely manner in no way infers that our job is done, but the cost structure has been stabilized.

Total research and verified commercial real estate listings in CoStar's U.S. database grew 23% year over year from approximately 724,000 in the first quarter of 2007 to approximately 889,000 in the first quarter 2008.

In total between both the U.S. and U.K., the company had approximately 985,000 active listings in our database, and the total U.S. square footage of gross building area tracked and maintained by CoStar now exceeds 57 billion feet.

By the end of the quarter, our U.S. research team tracked detailed information on more than 2.15 million individual properties across all types and classes of commercial real estate. The total number of retail listings in our U.S. database at the end of the first quarter was 390,000 listings, and our database of for-sale listings continued to expand during the first quarter, adding 14,398 new properties listed for sale for a total of 340,000 with an aggregate value of $450 billion.

I am also pleased to report great progress towards our goal of becoming the preeminent source of commercial real estate information in the United Kingdom and eventually all of Europe by building as strong a U.K. product offering as we have currently in the United States. Last year we made a number of key executive appointments, opened a new Glasgow -based research center, and restructured our research operations. We introduced many of the same processes and systems we have in place in the U.S. in order to achieve the same degree of accuracy and comprehensive coverage that remains one of our key value propositions in the United States.

The U.K. research team is now in high gear and has added nearly 126 million square feet of available space in the first quarter alone, taking the U.K. database to 957 million square feet, a 15% increase from the fourth quarter 2007. The total number of

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

listings in the U.K. increased from 54,560 in March of 2007 to 840,000 in March of 2008. The U.K. database is now approaching the sort of levels we would expect to see relative to the U.S. on a G.D.P. basis.

This impressive growth has been accompanied by an increase in overall productivity and implementation of rigorous quality assurance processes similar to the ones used in our U.S. research operations, including a telephone recording and training system. This valuable coaching tool has enabled managers to impart best practices and effective strategies for making the most of client interactions. I believe that our Glasgow research center is now one of our best and most productive research centers globally.

Not surprisingly, our clients and prospective clients are taking note of our improved research quality. We believe the improved quality and comprehensiveness of our information will translate into increased sales over time as we work to become the clearinghouse for property listings in the United Kingdom.

Revenues attributable to our European operations increased year over year from $4.65 million in the first quarter 2007 to $5.86 million in the first quarter of 2008. We believe that the quality of our European management team now in place, our improved technology, and our experience in our European operations, and the demand we are seeing from our client base for a standardized research-verified information service will continue to give us the competitive advantage in that marketplace.

One sure sign that we are delivering our customer expectations is an increase in product usage we're seeing in both the U.S. and U.K. as clients continue to log into our system, run more queries, produce more reports, and set up more alerts. Usage of our U.K. products has doubled first quarter over first quarter and continues to grow. In fact, usage of our Focus product in the U.K. recorded its highest ever customer usage level earlier this month, reaching a level that was roughly 250% higher than the level we were seeing in the first quarter of 2007. In the U.S., total customer usage increased 15% in the first quarter over the fourth quarter 2007. We strongly believe that the higher overall usage levels bodes well for continued high customer renewal rates into the future.

Another area of our business where I was pleased to see substantial progress made in this past quarter was our ongoing efforts to protect legitimate subscribers from those who seek to fraudulently gain access to our information or who otherwise use our images or information illegally. Unfortunately, when you provide an extremely valuable service, some will attempt to use it without paying for it. Our clients expect us to take every reasonable measure to assure that they are the ones who benefit from the competitive advantage of CoStar's information services and that those who aren't paying for it and resort to theft aren't getting the benefit.

Fortunately, technology is available today that makes it very easy to detect theft and identify illegal password sharing. To help protect customers and combat data theft, we have established an internal antipiracy group that uses extensive fraud-detection technology to continually monitor CoStar's online information products and detect and prevent unauthorized access.

In the past year, CoStar obtained in excess of $1.7 million in court-awarded judgments and out-of-court settlements as a result of our antipiracy efforts. These judgments included $1 million against Centers & Malls, a company that stole and unlawfully resold CoStar's retail database, and a judgment of $100,000 against two other companies that shared a single passcode to gain access to CoStar's information service. CoStar has received additional significant out-of-court settlements with a number of companies engaged in passcode sharing, and we will continue to prosecute individuals and firms that engage in this unlawful activity.

Last (inaudible) a lawsuit involving CoStar and a competitor. In that case we challenged the competitor on the grounds it was wildly overstating its online audience of 2.5 million registered users, giving prospective property listers and misleading perception number of people who actually use their service. In a statement that appeared to validate CoStar's false-advertising lawsuit, the competitor's CEO admitted at an investor conference in February that it does not have 2.5 million active users.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
| --- |

The day after the first quarter ended on April 1, we expanded our user base in Atlanta, a key market for the Southwest U.S., by acquiring the online commercial real estate information assets of First CLS, an Atlanta-based provider of local commercial real estate information operating as The Dorey Companies and DoreyPRO. Under the agreement, former DoreyPRO customers will use CoStar's information service and will be served by the company's existing Atlanta research and sales team.

Essentially, we acquired this local competitor's nonduplicative client contracts at a cost of approximately three times EBITDA with a potential earn out that could bring the total cost up to five times EBITDA. The conversion process is proceeding very smoothly, and we are pleased to expand our client base in the strategically important market without incurring significant additional overhead. We basically believe that this revenue transfers over the operation without almost any increase in cost.

Given the current economic environment, we believe this is a good time to focus on similar, low-risk immediately creative acquisitions. This is not the time, in our opinion, to try to expand in new areas or invest in new software ventures with all the risk and additional support cost that would accompany such endeavors. Currently we are more interested in doing acquisitions like this Dorey acquisition, which are creative, and will be pursuing those as they present themselves.

Finally, I want to quickly provide an update on our new marketing service called CoStar Showcase that we plan to release in the next several weeks. We have downloaded this new service to a select group of our existing clients, and, quite frankly, the response has significantly exceeded our expectations. Prior to launch and with limited marketing, we have signed more than $250,000 in annual contract value, and this morning I was watching that number climb pretty significantly. These contracts do have a trial period, and they do have an option to cancel, so we wouldn't be booking the revenue for another quarter.

Based on the response we've received to date, we believe CoStar Showcase will be a very compelling and effective solution for those interested in marketing their listings online. Using the substantial Web traffic generated at costar.com and at leading search engines through the latest keyword linking strategies, we've created an all-new marketing service for displaying property listings to this online audience.

From both the user and advertiser's perspective, CoStar Showcase will provide a number of advantages over other online property marketing services. One, it will be a completely open system with no registration barriers. All the listings subscribers select to post will be available online to anyone who visits costar.com and will be readily accessible through very basic and straightforward search functionality.

Secondly, posting content will be a very simple process. Once you've become a subscriber, your listings will automatically appear on the external CoStar Showcase site with the appropriate listing content, including images, space available, and description, with no extra keying in text or uploading images.

Third, listings marketed on CoStar Showcase will benefit from one-click access from costar.com, Google, Yahoo, and other major Web sites and search engines. We believe the keyword linking strategy and the audience we expect CoStar Showcase to attract will prove effective at generating inquiries for those who list their properties online.

We believe those responsible for finding tenants or buyers for commercial properties will find that CoStar Showcase can provide a competitive advantage for marketing online listings by providing additional valuable exposure and generating qualified inquiries from a large audience of potential prospects.

We also believe CoStar Showcase has the potential to be a significant contributor to our revenue in the third and fourth quarters of this year. Our experience in marketing this service to date has been very positive. Compared with our core subscription-based information sales, which tend to have a sales cycle of a couple weeks or even months, the sales cycle for CoStar Showcase appears to be a matter of days, and, again, the average contract size of $11,400 is larger than our first quarter average contract value of $6,846.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

Before I turn the call over to Brian, I want to reiterate that the company is very focused on adding and retaining subscribers across the U.S. and U.K., controlling our costs, pursuing customer service excellence, enhancing the already high quality of research we conduct, expanding the type of services that we provide to our clients, and reaching out and finding thousands of prospects out there who will find real value in the array of marketing information and services we offer.

We have moved quickly to maximize the opportunity we created from our investments in the U.S. and U.K. to generate consistent earnings growth as we move through 2008 and into 2009. As you may have heard me state in previous calls, our first goal is long-term, intermediate-term, and short-term earnings growth. I believe this quarter's results have clearly delivered on that earnings goal, and our raising guidance today shows our confidence in our ability to continue to deliver on that goal throughout the rest of this year.

At this point, I will turn the call over to Brian.

---

**Brian Radecki** - *CoStar Casting Group - CFO*

Thank you, Andy.

As stated in the press release last night, net income accelerated in the first quarter of 2008, increasing 178% over the same period one year ago to $5 million, or $0.26 per diluted share, compared to $1.8 million, or $0.09 per diluted share, for the first quarter of 2007.

Now I am going to focus principally on the sequential results for the first quarter 2008 compared to the fourth quarter 2007 and our outlook for the second quarter and full-year 2008.

Total revenues grew sequentially by 2.8% from Q4 2007 to Q1 of 2008, increasing from $50.8 million to $52.3 million. Core U.S. subscription revenue increased by 3% from Q4 of 2007 to Q1 of 2008, consistent with last quarter, and our renewal rate remained solid at 90.3 for the quarter.

International operations contributed 11.2% of total revenues, and total subscription revenues for the company continued to account for 95% of revenues during Q1 of 2008. International revenues decreased slightly from $6.1 million in Q4 of 2007 to $5.9 million in Q1 of 2008, mainly due to lower foreign currency exchange rates and a slightly lower ad hoc revenue during the quarter. Quarterly international subscription revenue sequential growth remained relatively consistent with the business.

Again, let me remind everybody, the company has reported sequential revenue increases at every quarter since its IPO in 1998 and through several commercial real estate cycles since 1987, when Andy founded the business. We have and continue to expect that we will add and renew subscribers, increase usage, and grow our revenue each quarter through the current economic and real estate environment.

Gross margin increased by $1.7 million from $30.8 million in Q4 of 2007 to $32.5 million in Q1 of 2008 on a $1.4 million increase in revenues. Overall, gross margin percentage expanded to 62.3% in Q1 of 2008 from 60.6% in Q4 of 2007, as expected.

This increase in both gross margin dollars and percentage demonstrates the strength of our subscription-based business model. Now that we have completed the step-up and research costs, all of the revenue during the quarter dropped directly to the gross margin line.

Excluding the lease settlement gain in Q4 of 2007, overall operating expenses decreased approximately $800,000 from $26.1 million in Q4 of 2007 to $25.3 million in Q1 of 2008. This decrease was principally in selling the marketing due to the completion of multiple direct-mail campaigns in Q4 2007.

 | www.streetevents.com | Contact Us | 

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

Our revenue growth, coupled with our lower operating expenses in Q1, resulted in EBITDA for the first quarter of $11.5 million, an increase of $2.3 million, or 26%, compared to EBITDA of $9.2 million in the fourth quarter of 2007. Again, please note that I excluded the $7.6 million one-time gain of our London lease settlement for comparative purposes here.

Reconciliation of EBITDA and all non-GAAP financial measures discussed on this call to get basis results is shown in detail on our press release issued yesterday. The press release is available on our Web site at www.costar.com.

Capital expenditures for Q1 of 2008 were approximately $1.5 million, which is well within our expected range for the quarter. As Andy stated, we ended the first quarter with approximately $193.1 million in cash, cash equivalents, short-term and long-term investments, and, again, the company had no long-term debt.

Now I will discuss the outlook for the second quarter of 2008.

As indicated in our press release, we anticipate a sequential quarterly increase in revenue from the first quarter to the second quarter of 2008 of approximately 2% to 4% and fully diluted net income per share of approximately $0.24 to $0.26 in the second quarter, which includes the seasonally high selling and marketing expenses associated with the ICSC trade show and the pending release of CoStar Showcase.

In addition, during the second quarter the company expects a charge of approximately $300,000 resulting from the termination of a lease and write off of certain leasehold improvements that will save the company approximately $1.2 million over the remaining two-year term of the lease as we consolidate excess office space in Maryland. This savings is a direct result of management's focus on identifying operational efficiencies in the business that reduce both short-term and long-term costs.

As we have previously stated, we continue to expect to grow earnings from the U.S. operations through 2008 as a result of the consistent core revenue growth and our relatively fixed cost base. Based on the strong first quarter results and our confidence that we'll be able to execute our plan, we have raised the outlook for net income for the full year of 2008 to approximately $1.50 to $1.10 per diluted share. We also continue to anticipate for 2008 overall revenue growth in the range of 14% to 16% over 2007. Our full-year guidance also takes into account the effect of lower overall interest rates and our cash balances compared to last year.

We continue to believe there is upside sequential revenue growth potential in the back half of 2008. Revenue growth continues to be largely dependent on the successful growth and productivity of the sales force, particularly in the view of revenue opportunities, that we believe may result from momentum in the established markets, new markets, new products like CoStar Showcase, and international opportunities.

Gross margin percentage is expected to continue to improve from Q1 to Q2 as we leverage our stable U.S. cost structure. Also, operating expenses are expected to increase slightly, as I discussed, due to ICSC's trade show and the anticipated release of Showcase.

As we continue to incur losses internationally, the mechanics of our effective tax rate calculation continue to be affected by the amount of income or loss in the U.K., where we do not get an equivalent tax expense or benefit to offset the U.S. corporate tax. This results in an overall blended tax rate, which may increase or decrease over the current rate. We continue to anticipate our overall effective rate in the range of 43% to 45% for 2008.

In conclusion, we continue to expect earnings growth from our core U.S. business, and that will be the story for 2008. Our Q1 results demonstrate that we are delivering on these expectations. We also expect our international operations to continue to move towards breakeven by the end of 2008 while we develop the next generation of international software, which will position us for long-term growth opportunities in the U.K. and Europe later in 2009 and beyond.



© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

I can truly say the entire CoStar management team remains fully committed to achieving the 30% EBITDA margin in the U.S. and breakeven in our international operations by the end of 2008 as cost structures for the various investments previously made are expected to remain relatively stable as we grow our revenue and significantly leverage earnings.

We look forward to reporting our progress to you, and with that, I'll open up the call for questions.

Operator, are you with us?

## QUESTIONS AND ANSWERS

**Operator**

(OPERATOR INSTRUCTIONS)

Your first question comes from John Maietta with Needham & Co.

**John Maietta** - *Needham & Co. - Analyst*

Hey, thanks very much. Hi, Andy. Hi, Brian.

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Hi.

**John Maietta** - *Needham & Co. - Analyst*

The first question I had, Andy, I was wondering if you could talk qualitatively about any differences in behavior with regard to your larger customers today in this environment versus the smaller customers on purchase decisions?

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Yes. There's no question that the general anxiety in the economy is causing people to take a little bit longer in the sales cycle. So people are putting off some decisions here and there. I would have to say, though, that our middle to upper clients are very stable with us in this environment. These are situations where they absolutely need this information that we provide, and they're not going to try to save money by replicating our information processes in-house and our (inaudible) in-house. It is dramatically cheaper to outsource to us.

Where we see friction right now in the cycle is with the very small firms, so the one-, two-, three-, five-person, sort of marginal customers. Those are the folks who may have been new to the industry in the last several years and are losing confidence. So it's really strong in the middle-upper, a little weaker at the small client.

**John Maietta** - *Needham & Co. - Analyst*

Okay. And then could you talk about how you're actually going to rollout the Showcase product?

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
|---|

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Sure. We've been test marketing it over the last four weeks -- three to four weeks. We've met with -- we're first selling it really to our existing customers, and we've met with maybe 60 customer sites, and we've gotten a very positive response, signed a significant number of deals. And we will go live with the product in about two weeks, and we'll be pushing out to the entire sales force and going very aggressively on it. It will be a centerpiece of our ICSC presence -- International Council of Shopping Centers big spring convention. And we have a number of marketing campaigns around it, and it will be probably the primary priority in sales over the second, third and fourth quarters of this year.

---

**John Maietta** - *Needham & Co. - Analyst*

Okay. And then how are you actually pricing the products?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

We are pricing it with an algorithm that I couldn't begin to explain on this phone call. So what we are doing is we are looking at each client's inventory of listings -- both sale and lease. Roughly speaking, we're looking at the value of those listings, and then we're getting discounts for their bulk purchasing of these advertisements on our Web site.

So what we're trying to do there is incentivize our customers to buy ads for all their listings, not to cherry-pick some listings over others, and we're trying to make sure that we aren't charging more to advertise a little less than they're going to earn commissions, and so we're sort of setting the value relative to the value of the ads they are -- the properties they're trying to move.

And so far the response of this pricing model, which is fairly new and unique, has been very positive. So we've been out there, we've tried it on 60 customers, and they look at it, and they say overall they feel like it's right. And we haven't had a lot of push back on the price so it seems to be working pretty well.

---

**John Maietta** - *Needham & Co. - Analyst*

Okay. And then just last question, Brian, what was cash from operations in the quarter?

---

**Brian Radecki** - *CoStar Casting Group - CFO*

Cash from operations was -- I think it was around $6 million, something like that. EBITDA was $11.5 million.

---

**John Maietta** - *Needham & Co. - Analyst*

Got it. Okay. Thanks very much.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Thanks, John.

---

**Operator**

Your next question comes from Jim Wilson with JMP Securities.

---

| THOMSON | www.streetevents.com | Contact Us | |
|---|---|---|---|

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
|---|

**Jim Wilson** - *JMP Securities - Analyst*

Thanks. Good morning, guys.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Hi, Jim.

---

**Jim Wilson** - *JMP Securities - Analyst*

Let's see, I guess two things. I was wondering on the -- it's great color on the sales efforts this quarter and the size of firms. Anything you can give color on the geography of success of sales, or are those markets you have now fully completed with the most information, or have those been your target points, or have those been your most successful sales locations or anything else you can give that would color --

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

And you're referring to Showcase?

---

**Jim Wilson** - *JMP Securities - Analyst*

No, not to Showcase, but back to sales pace of new subscribers, the core products during the first quarter.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Okay. So one of the things we were doing in the first quarter was we were -- again, going back to this effort we made to put all of our sales group focusing on the smaller high listing count firms, they really probably concentrated in our weaker market areas. They would not be in Washington, D.C., New York City, or Los Angeles. They would be in newer territories. So a lot of the sales from the quarter came from weaker or midlevel market areas.

And you didn't really ask, but I'm going to tell you anyhow. On the Showcase side, one of the unusual aspects of the Showcase sales are some big sales are coming from some of our smallest markets. So we're seeing some unusually positive selling activity in markets like Omaha and that kind of market.

---

**Jim Wilson** - *JMP Securities - Analyst*

I guess maybe then another Showcase question. You gave us the average contract size so far and what you've worked on, but what about average number of listings? How big are these guys in terms of listings that you're signing up?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

We don't know. Initially what we're doing is we're focusing only on firms with 5 or more listings, so we're not even talking to firms that have less than 5 listings. So the number is -- I don't have precise numbers, but it appears to vary. It seems to vary from as little as -- I've seen some contracts come in at 10 listings, 15 listings, on up to a contract that probably came in for 1,000 listings. So it's a range.

---

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

**Jim Wilson** - *JMP Securities - Analyst*

Okay. And it's probably too early to have a terribly meaningful average anyway, I guess?

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Yes, and you tend to focus on the ones that come in at the bigger number.

**Jim Wilson** - *JMP Securities - Analyst*

Right. Sure. Okay. All right. Good. That's helpful. Thanks.

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Thank you, Jim.

**Operator**

Your next question comes from John Neff with William Blair.

**John Neff** - *William Blair & Company - Analyst*

Hi, guys. Congratulations on the quarter.

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Thank you very much.

**Brian Radecki** - *CoStar Casting Group - CFO*

Thanks, John.

**John Neff** - *William Blair & Company - Analyst*

A few questions for you. The 17% decline in selling and marketing -- my numbers it looks like sales head count was relatively flat year over year so why that sharp decline? Is there something negative about that? Is it an indictment of sales productivity or commission payouts? Are you cutting back somewhere we should be aware of?

**Brian Radecki** - *CoStar Casting Group - CFO*

Yes, I think I mentioned in my script that we had some year-end marketing campaigns that were going out, multiple direct-mail pieces that were going out all through the quarter before the end of the year. So those kind of dropped off from Q4 to Q1. And then again, we expect an increase there, not just from ICSC but also the release of Showcase in the second quarter. So there's just more -- it's more timing and when the marketing and direct-mail pieces went out. A lot went out in Q4, not as much went out in Q1, and we'll expect to see an increase in Q2.

| THOMSON | www.streetevents.com | Contact Us | |

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
| --- |

**John Neff** - *William Blair & Company - Analyst*

I meant more year over year so was there a similar -- were there proportionately more of those kinds of marketing --

**Brian Radecki** - *CoStar Casting Group - CFO*

Yes.

**John Neff** - *William Blair & Company - Analyst*

-- in the year-ago quarter first quarter?

**Andrew Florance** - *CoStar Casting Group - CEO and President*

You also had higher sales training and recruiting costs in the first quarter of '07.

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Correct, and higher sales training costs in the first quarter of '07 as we were ramping that up, and, again, we definitely had a difference in the marketing campaigns between the two years. Now I think as your seeing -- both on the research side and on the sales side, again, first quarter last year we were still full-on stepping up the cost structure. So now you're seeing a lot of efficiencies coming in, and we've talked about a relatively fixed cost structure, but obviously excluding the one-time gain, you actually saw costs come down quarter over quarter and, again, that's because you're not in hiring phase, those groups are maturing, so there's actually a lot less in training costs and those types of things.

**John Neff** - *William Blair & Company - Analyst*

Customer usage -- how do you measure that?

**Andrew Florance** - *CoStar Casting Group - CEO and President*

We're looking at how many searches people are doing, whether or not they log on consistently. We look for at least 100 page views before we call you active -- 100 requests from a logged-in state -- and we look for that in the course of a one-month time period, I believe, or else we don't call you active.

And we watch it pretty closely because it's one of the key metrics we use in compensating our sales people for growing the number of people using the product within their book of business, and we think it's an important predictor of renewal rates. So people that use our product heavily renew the service. Some people that don't use the product heavily renew the service too, but generally like them using the service. So it's a measure of number of searches, number of pages viewed, and right now the numbers look very good, which is counter to probably general sentiment of a down cycle.

**John Neff** - *William Blair & Company - Analyst*

And then could you describe -- you gave some numbers, if you could repeat what that total user count was at the end of the quarter, but also could you also describe from a standpoint of pricing scheme with contracts your revenue sensitivity to number

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

---

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

---

of users? In other words, if we were to see more widespread industry layoffs in commercial real estate, more brokers being let go, etc., what kind of an impact or sensitivity does that present to your contract value?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

So the total subscriber accounts, which the number we gave, is 90,822 currently. So that's up 2,071 over the preceding quarter. Now, so we're seeing very strong growth in the number of subscribers with authorized ID's.

As people -- if a 10-person shop cuts two brokers or three brokers or loses two or three brokers, it really has no impact on the contract value. It has no impact on the revenue side. Where it becomes more material is when somebody with five goes down to one. Those people are going to be looking for a discount. And that's what I sort of mentioned earlier in the call and as mentioned in previous calls is that's where you see a little bit more friction on the renewal rate are those folks getting much smaller. The folks who are mid-sized firms or big firms who are moving up and down slightly does not impact our -- generally it does not impact our revenue base.

But right now the usage numbers and the subscriber growth is what you would normally associate with a strong market, not a weak market.

---

**John Neff** - *William Blair & Company - Analyst*

That's helpful. And then I was just a little confused when you said the average contract size for Showcase was $11,400 --

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Annually.

---

**John Neff** - *William Blair & Company - Analyst*

Annually. Okay. So I'm just confused. My impression was that this was a per group of listing -- per X number of listings per month kind of an offering.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

What it is is we get --

---

**John Neff** - *William Blair & Company - Analyst*

Something more of a subscription kind of a thing.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

It's much more of a subscription service, and many people are looking at this as a multiyear subscription. So what we're doing is we're going to a brokerage firm, and we have good intelligence and information as to what their volume and content of listings typically looks like. We apparently have developed a formula that seems to resonate with them as a fair way to price marketing their entire basket of listings, and then we -- based upon their historical activity, we lock in a fixed rate, which will stay in place for the term of the contract regardless of whether or not their listing count goes up or down. So if their listing

---

 | www.streetevents.com | Contact Us | 

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

---

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
| --- |

count goes down, they're probably generating a lot of commissions, and if the listing count goes up, they're going to be generating commissions in the future, hopefully. But it's a fixed number based upon their historical activity.

And, again, we seem to have hit on something here because we have a short sale cycle on this product, it appears, and we have a high close rate so far.

---

**Brian Radecki** - *CoStar Casting Group - CFO*

John, it's much more similar to our subscription-based business in total. So it's very similar to kind of how we've been selling things in the past.

---

**John Neff** - *William Blair & Company - Analyst*

And if that --

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

We know you don't like the sort of annuity subscription revenue streams.

---

**John Neff** - *William Blair & Company - Analyst*

Yes. They're -- we hate that. But it's an interesting point because the -- I guess there was some concern previously to what extent -- how do you avoid cannibalization with other products? Is it even an issue if this is the average contract size?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

I think that was a concern that we had 12 months ago or 18 months ago as we first began looking at the product. And given the average contract size we're looking at right now, it becomes less of a concern because the contract values actually almost have a comparative relationship to the information contracts -- the marketing contracts are looking like the information contracts.

But also if you look in our Scottish property network company, they actually do something where they have a Showcase-like product and they have an information service, and I think something like 80% of their listing content is out for the public to see, yet they still have very strong subscriptions for information for the (inaudible) firms looking to get the extra 20% of the listings that aren't publicly disclosed. And when I look at the relative size of Glasgow and Edinburgh compared to the various U.S. markets and I look at the revenue stream we're deriving from that Scottish property network, it's actually favorable. So I think that's a little empirical experience that we can look at on the potential cannibalization, it doesn't look like a concern.

---

**John Neff** - *William Blair & Company - Analyst*

All right. I can get back in the queue. Thank you.

---

**Operator**

(OPERATOR INSTRUCTIONS)

The next question comes from Vance Edelson with Morgan Stanley.

---

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
| --- |

**Vance Edelson** - *Morgan Stanley - Analyst*

Hey, thanks for taking the questions.

You mentioned some of the smaller customers were undergoing a loss of confidence over the state of the industry, and if I heard you right, that may have contributed to the slight drop in the retention rate. Just wondering if you could elaborate a little on the increase in bad debt and the cause of that which might suggest more than just concern on the part of customers?

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Sure. So let's segment that appropriately.

I would say that -- you look at CB Richard Ellis's reported revenue growth and earnings growth (inaudible) sales reported revenue growth earnings growth, and there's no sign of any issues that I see as I look at that. And so if you have a delay in a buying cycle from our mid-size to larger firms, it is more related to them spending too much time reading the FT or The Wall Street Journal and the bad news, not the actual reality in their business.

When I talk about loss of confidence, that would not apply to the one-, two-, three-person brokerage firm in California, Phoenix, or Southern Florida. Some of them are in bad straits. It's actually real there. Leasing volume in some markets in California -- not San Francisco but, say, Orange County -- leasing volume is down sharply, and so some of the small firms are going bankrupt, which would be a loss of confidence. And so we're seeing bad debt in some of those guys. And that's what you're looking at in that cancellation rate being a little higher in this quarter.

And when you look at those guys anecdotally, what you see is some people who entered the marketplace -- generally I'm seeing people that entered the marketplace in the last one to three years, like, went out on their own from some bigger firm and now they're going back into a bigger firm or going into something different.

**Vance Edelson** - *Morgan Stanley - Analyst*

Okay. That's very helpful. And you would explain the slight international sequential drop in revenues, but the international EBITDA was down quite a bit more. Was that primarily due to the heavy investment upfront, or were there any other factors that work there?

**Andrew Florance** - *CoStar Casting Group - CEO and President*

We had a one-time transaction in the fourth quarter that probably should be written up in the real estate textbooks for the all-time most lucrative lease termination deal in the history of real estate globally. So we were paid $800 per square foot to terminate a 10,000 square foot lease in London early in the fourth quarter and took a large one-time gain, and so what you're seeing is just the elimination of that one-time gain. And the U.K. is probably six months behind the U.S. in sort of filling out the geographic coverage, and so they are a little bit behind the U.S. in the margin expansion phase of the business.

**Brian Radecki** - *CoStar Casting Group - CFO*

I think we discussed that international is running a few quarters behind, and that's why, obviously, we're targeting the 30% in the U.S. and then breakeven by the end of the year internationally.

THOMSON | www.streetevents.com | Contact Us

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
| --- |

**Vance Edelson** - *Morgan Stanley - Analyst*

All right. And then, lastly, could you provide some color on the legal expense related to the competitors, what effect that had on the quarterly numbers and then whether that should trend down significantly from here?

---

**Brian Radecki** - *CoStar Casting Group - CFO*

We haven't disclosed that amount. Obviously, if you take a look at the G&A line, it's not up significantly quarter over quarter. So I believe it was $9.743 in Q4 and $9.805 in Q1. So it's not a significant change. I don't think it's anything that we're going to discuss.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

And our legal and antipiracy team is actually having significant success with out-of-court settlements with smaller password stealers so that they're probably actually almost operating as a profit center, which is highly unusual in a general counsel's office.

---

**Vance Edelson** - *Morgan Stanley - Analyst*

Got it. Okay. Thanks a lot, guys.

---

**Brian Radecki** - *CoStar Casting Group - CFO*

Thank you.

---

**Operator**

Your next question comes from Christopher Mammone with Deutsche Bank.

---

**Unidentified Participant**

Sitting in for Chris. Just a housekeeping question.

For the $300,000 lease termination charge that you mentioned, is that included in the guidance for second quarter?

---

**Brian Radecki** - *CoStar Casting Group - CFO*

Yes, it is. It is included in the second quarter guidance.

---

**Unidentified Participant**

Okay. Thank you. And the other question, with respect to the strong subscriber group that you saw this quarter, would you characterize that as purely ramp up on the sales force activity, or do you think that you were seeing some early success in the new markets that you have in the U.S. now?

---

 | www.streetevents.com | Contact Us | 

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
| --- |

**Andrew Florance** - *CoStar Casting Group - CEO and President*

I'll sort of go between the two options, and I'll say that it's probably the maturation of the sales force. We had a lot of newer sales people now that have been with us for six months, nine months, and they're beginning to become productive. And this has probably been a somewhat challenging exercise for our sales force because their pursuing strategic initiatives, as opposed to the maximum revenue initiative so they're getting a lot of high subscriber growth that will pay off over the next several quarters to come. And I think it's a mix -- these subscribers are coming from both older and new markets, probably more the mid-aged markets is the biggest driver.

---

**Unidentified Participant**

Okay. And one last question. Did I hear you correct that you said you might be starting to see revenues from Showcase in the third quarter?

---

**Brian Radecki** - *CoStar Casting Group - CFO*

I would expect minor revenues from Showcase in the third quarter. I would believe that most of the revenues will show up in the fourth quarter. As Andy mentioned, there will be some free trial periods for a few months so we would expect to start to see Q4 seeing revenue come in from that, and we'll obviously discuss that more on calls to come.

---

**Unidentified Participant**

Okay, but is that included in your annual revenue growth guidance?

---

**Brian Radecki** - *CoStar Casting Group - CFO*

Yes, it is.

---

**Unidentified Participant**

Okay. Thank you.

---

**Brian Radecki** - *CoStar Casting Group - CFO*

Great. Thank you.

---

**Operator**

Your next question comes from Brett Huff with Stephens Incorporated.

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Hey, Brett.

---

 | www.streetevents.com | Contact Us | 

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

FINAL TRANSCRIPT

Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call

**Brett Huff** - *Stephens Incorporated - Analyst*

Good morning. How are you?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Doing fine and a couple of technical difficulties this morning.

---

**Brett Huff** - *Stephens Incorporated - Analyst*

I had two quick questions. Number one, I want to make sure I understood how the pricing on your product works generally. I know you described it a little bit, but I want to make sure that I understand it. Is it that, if a substantial decline in the number of people at a brokerage has to occur in order for repricing to occur, but isn't that also limited by the length of contract? Like that issue wouldn't even come up if it were an annual contract until renewal; is that right?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

You've got that correct.

---

**Brian Radecki** - *CoStar Casting Group - CFO*

That's correct, Brett.

---

**Brett Huff** - *Stephens Incorporated - Analyst*

Okay. So that's one thing. And then the second thing is can you talk just a little bit about the exposure of your business generally to weakness in sales versus weakness in leasing in the commercial market?

---

**Andrew Florance** - *CoStar Casting Group - CEO and President*

Sure. Our business -- our property professional business, which is the largest component of our business, is not very exposed to the sales marketplace. I mean, I think it's got very light exposure. Our commercial multiple listing service, which generates probably around $1 million a year, or half a percentage point of our revenue, would be exposed to a sales downturn. So if volumes came down, sales came down, our sales in that product -- which, again, is a half percentage point of our revenue -- would have a lot of exposure. And I see some softness in that product. So that product was growing steadily up until the fourth quarter, and then it began to level, and that's a low-end product that we set up to be more competitive with like LoopNet.

Our comps product is -- from the people that have worked with the product for 25 years is generally not very cyclical because, as volumes in the sales side go down or problems occur or bankruptcies occur, the banks themselves need the product more in order to try to understand their asset exposure and what's going on in their loan-to-asset ratios. So we don't -- the more cowboy brokers who are riding the upward trend are not the guys who are doing -- they're not the men and women who are doing a lot of careful analysis with our comps product. It's the appraisers and evaluation folks that do more work with our comps product, and they remain employed when things get dicey.

---

**Brett Huff** - *Stephens Incorporated - Analyst*

Okay. Those are the only two questions I had. Thanks for your time.

---


© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

| Apr. 24. 2008 / 11:00AM, CSGP - Q1 2008 CoStar Group Earnings Conference Call |
|---|

## Operator

At this time there are no further questions. Are there any closing remarks?

## Andrew Florance - *CoStar Casting Group - CEO and President*

So I'd like to thank everybody for joining us on the call. I think we had a great quarter, and I'm sorry that we had to make you wait ten minutes to hear about the good news. Thank you very much.

**DISCLAIMER**

Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2008, Thomson Financial. All Rights Reserved.

© 2008 Thomson Financial. Republished with permission. No part of this publication may be reproduced or transmitted in any form or by any means without the prior written consent of Thomson Financial.

# EXHIBIT HH

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| COSTAR GROUP, INC., | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 08- CV 1156 |
| v. | ) ) | |
| LOOPNET, INC., | ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A
PRELIMINARY INJUNCTION**

PATTERSON BELKNAP WEBB & TYLER LLP
Steven A. Zalesin (SZ 0901)
Karla G. Sanchez (KS 7247)
Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
Patrick J. Carome (admitted *pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiff CoStar Group, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... i

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 3

ARGUMENT ................................................................................................................. 10

I.    CoStar Is Likely To Succeed on the Merits.......................................................... 10

      A.    The "950,000 Unique Visitors Each Month" Claim Is Facially False .............. 12

      B.    The "2.75 Million Registered Members" Claim Is Facially False ................... 13

      C.    The "18 Million" Claims Are Facially False .................................................. 17

      D.    The "Largest Database of Commercial Listings" Claim Is Facially False ...... 18

II.   CoStar Will Suffer Irreparable Injury Absent Preliminary Relief........................ 19

      CONCLUSION ....................................................................................................... 22

## TABLE OF AUTHORITIES

### CASES

*American Home Prods. Corp. v. Johnson & Johnson,*
  654 F. Supp. 568 (S.D.N.Y. 1987) ..................................................21

*Avis Rent A Car System, Inc. v. Hertz Corp.,*
  782 F.2d 381 (2d Cir. 1986)..................................................16

*Castrol, Inc. v. Quaker State Corp.,*
  977 F.2d 57 (2d Cir. 1992)..................................................19

*Coca-Cola Co. v. Tropicana Prods.,*
  690 F.2d 312 (2d Cir. 1982) ..................................................11, 19

*Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,*
  No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982)..........................15

*Johnson & Johnson v. GAC Int'l, Inc.,*
  862 F.2d 975 (2d Cir. 1988) ..................................................11

*Johnson & Johnson*Merck Consumer Pharmaceuticals Co. v. Smithkline*
  *Beecham Corp.,*
  960 F.2d 294 (2d Cir. 1992)..................................................17

*Johnson & Johnson-Merck Consumer Pharms. Co. v. P&G,*
  285 F. Supp. 2d 389 (S.D.N.Y.), *aff'd* 90 F. App'x 8, 9 (2d Cir. 2003)....................21

*Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.,*
  348 F. Supp. 2d 165 (S.D.N.Y. 2004)..................................................11

*McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.,*
  755 F. Supp. 1206 (S.D.N.Y. 1990)..................................................11

*McNeilab, Inc. v. American Home Prods. Corp.,*
  501 F. Supp. 517 (S.D.N.Y. 1980) ..................................................12

*McNeilab, Inc. v. American Home Prods. Corp.,*
  848 F.2d 34 (2d Cir. 1988)..................................................19, 20

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.,*
  290 F.3d 578 (3d Cir. 2002)..................................................11

i

*Novo Nordisk A/S v. Becton Dickinson & Co.,*
    997 F. Supp. 470 (S.D.N.Y. 1998) ................................................................21

*Ortho Pharmaceutical Corp. v. Cosprophar, Inc.,*
    32 F.3d 690 (2d Cir. 1994)..........................................................................19

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,*
    926 F.2d 134 (2d Cir. 1991)........................................................................16

*Schering Corp. v. Pfizer Inc.,*
    189 F.3d 218 (2d Cir. 1999) ......................................................................11

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck*
    *Consumer Pharmaceuticals Co., Inc.,*
    906 F. Supp. 178 (S.D.N.Y. 1995) ............................................................14

*Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck*
    *Consumer Pharm. Co.,*
    No. 01 Civ. 2775-DAB, 2001 WL 588846 (S.D.N.Y. June 1, 2001) ..........................15

*Time Warner Cable, Inc. v. DIRECTV, Inc.,*
    497 F.3d 144 (2d Cir. 2007)..................................................................10, 11, 19

## STATUTES

Lanham Act, 15 U.S.C. § 1125(a) ...............................................................10

1775462v.1

Plaintiff CoStar Group, Inc. ("CoStar") respectfully submits this Memorandum of Law in support of its motion for a preliminary injunction to stop a new wave of false advertising by defendant LoopNet, Inc. ("LoopNet"). LoopNet's latest ads, aimed directly at CoStar, grossly exaggerate the size of LoopNet's online audience and make numerous false and misleading comparisons between LoopNet's products and those of CoStar. LoopNet's new advertising threatens to stop the multi-million dollar launch of CoStar Showcase® – a new product offering that competes directly in LoopNet's core market – dead in its tracks. CoStar seeks an immediate injunction to prevent the occurrence of such irreparable injury.

## PRELIMINARY STATEMENT

CoStar and LoopNet are major competitors in the online commercial real estate marketing business. Historically, LoopNet has served primarily as an advertising vehicle through which owners and brokers have promoted specific properties for sale or lease. Meanwhile, CoStar has focused its efforts on providing information services (*e.g.*, space available for lease, comparable sales information, tenant information, information about properties for sale, etc.) to commercial real estate professionals.

This marketplace alignment fundamentally changed on May 15, 2008, when CoStar launched CoStar Showcase®, an online commercial real estate marketing service that promotes individual listings. Showcase not only competes directly in the arena that LoopNet has long occupied, but offers distinct advantages – including ease of use (for both buyers and sellers) and a more favorable pricing system – in comparison to LoopNet. CoStar Showcase, which is backed by a multi-million dollar investment by CoStar, presents a serious commercial threat to LoopNet's business.

In the face of this new competition, and in an effort to prevent CoStar Showcase from gaining any traction in LoopNet's primary market, LoopNet recently unleashed a barrage of new advertisements that make false and misleading claims concerning the relative benefits of each party's products. The thrust of this new comparative ad campaign is that LoopNet has a vast online audience that dwarfs that of CoStar, such that customers should always choose to advertise on LoopNet instead of CoStar Showcase.

For example, one brochure that LoopNet is currently distributing poses the question "Does your online marketing compare?" and points to LoopNet's "2.75 million registered members" as supposed proof of LoopNet's expansive user base. But as LoopNet now has publicly admitted, it does not have an audience that large. The "registered member" figure that LoopNet cites merely represents the cumulative number of user accounts that have been created on the LoopNet website since its inception *in 1995* – more than a dozen ago. The actual number of individuals who actively search listings on LoopNet's site today is but a fraction of the "2.75 million registered members" LoopNet advertises. LoopNet has knowingly touted its bogus "registered members" statistic in order to exaggerate its online distribution for some time. But only in recent weeks has LoopNet turned this weapon directly against CoStar, and begun to make false *comparative* claims about CoStar Showcase.

LoopNet's new ad campaign goes well beyond this deceptive new use of its "registered members" metric. LoopNet has also begun to make false comparative claims about the actual number of visitors – or "traffic" – that each website attracts. For instance, LoopNet now advertises that, in comparison to the supposedly meager traffic enjoyed by CoStar, LoopNet receives a whopping "950,000 unique visitors each month." In the next breath, LoopNet claims that this figure is actually *understated* in that it "doesn't include the traffic from [LoopNet's]

2

exclusive network of newspaper web site partners[,] which generates more than 18 million unique visitors each month."

These claims are deceptive and untrue. In fact, according to the very data source that LoopNet cites, LoopNet typically attracts significantly *fewer than* the 950,000 unique monthly visitors claimed in its advertising. LoopNet falls short of this level of traffic even when those visitors who reach LoopNet's site through referrals from "partner" websites are counted. And LoopNet's online partnerships with various newspapers do not result in LoopNet's ads being viewed by anywhere near the "18 million unique visitors" that LoopNet claims.

LoopNet's false comparative claims are not limited to the relative size of its online audience. LoopNet has also begun to advertise that it offers "the largest database of commercial listings." In fact, LoopNet's listings database is less than 60% the size of CoStar's.

LoopNet's new ad campaign threatens to stamp out the competition posed by CoStar's Showcase product at its very inception. The launch of Showcase is crucial to CoStar's business, and the success of the product will largely turn on whether it can reach "critical mass" within the first few months of its debut. If permitted to continue, LoopNet's false and misleading advertising will cause CoStar to suffer an immediate loss of market penetration, goodwill and momentum that will not be compensable in money damages. To prevent such irreparable harm and to allow the parties' products to compete fairly in the marketplace, CoStar seeks preliminary injunctive relief to halt LoopNet's deceptive advertising.

## STATEMENT OF FACTS

The market for commercial real estate in the United States is in the process of being revolutionized by the availability of online research tools that provide fast, ready access to detailed information about properties and listings. Gone are the days in which listings were

3

1775462v.1

found only in local newspapers, and leads were passed primarily by word of mouth among brokers and others "in the know." *See, e.g.*, Vivian Marino, *Real Estate Investing, Made Easier Online*, N.Y. TIMES, Feb. 3, 2008, *available at* http://www.nytimes.com/2008/02/03/realestate /commercial/03sqft.html. Today, such information is available from a number of websites that supply critical facts about the marketplace and provide a searchable database of listings for individual properties.

***The Parties and Their Products***

   Two of the leading companies in this emerging industry are CoStar and LoopNet, the parties to this action. CoStar is the marketplace leader in the sale of information to commercial real estate professionals. *See* Declaration of Andrew C. Florance ("Florance Decl.") ¶ 7. LoopNet also provides market information but, unlike CoStar, its business model is based primarily upon the advertising and marketing of individual property listings. LoopNet functions essentially as a modern version of the newspaper classified pages, charging property owners or brokers a fee in exchange for distributing their listings to an audience of potential buyers or lessors. For several years, LoopNet has been the only large player in this particular market segment. *See id.* ¶ 2.

   In late 2007, CoStar announced a plan to expand its product line to compete directly in LoopNet's core business – online property marketing and lead generation. Since that time, CoStar has completed development and launched its competing product, called CoStar Showcase. *See id.* ¶¶ 8-10. Showcase offers several distinct advantages over LoopNet's products. For example, to advertise on CoStar Showcase, customers do not have to input or upload data about their property. CoStar's online tools pull the relevant information, such as photographs, maps and statistics, into the listing from CoStar's existing research databases. To entice users who are searching for available properties, CoStar designed a clean, content-rich

<div align="center">4</div>

format for Showcase that is unrivalled in the industry. And CoStar has carefully calibrated its pricing levels and incentives to be more attractive to commercial real estate professionals than those of LoopNet. *See id.* ¶ 40.

Co-Star began disseminating promotional literature about its Showcase product to commercial real estate professionals in early April 2008. *See id.* ¶ 10. On May 15, 2008, Showcase was officially launched. *See id.* ¶ 8. CoStar Showcase is the most serious commercial threat that LoopNet currently faces.

***LoopNet's False Claims About the Size of Its Online Audience***

In the battle for primacy in the developing market for internet-based commercial real estate advertising or lead generation, a critical element is the perceived size of the online community of buyers and sellers who actively use a website platform. Buyers want to be able to search the most comprehensive universe of listings. Sellers wish to expose their properties to the largest possible audience of buyers. Accordingly, customers are attracted to the platform that they believe to be most widely used. *See* Florance Decl. ¶ 3.

With full knowledge of this dynamic, LoopNet has undertaken a methodical – and successful – campaign to convince the relevant market that it has a vast, and constantly growing, audience. LoopNet's efforts in this regard have centered upon the claim that it has a staggering number of "registered members," which LoopNet intentionally equates with active users of its website. For example, LoopNet's website and essentially all of its advertising materials currently assert that LoopNet has "more than 2.75 million registered members."

The unmistakable impression created by LoopNet's ads is that millions of people actively view LoopNet listings. For example, on December 31, 2007, The Motley Fool, a widely followed source of online investment advice, recommended the purchase of LoopNet stock, emphasizing that LoopNet's "website [is] *frequented by* more than 2.5 million members." *See*

5

Ex. 2 to Florance Decl. at 2 (emphasis added). This is not surprising, since LoopNet itself often

proclaims that its ads are "seen by" and "viewable to" its entire roster of 2.75 million registered

members.

But as LoopNet has recently acknowledged, this claim is false. A "registered

member," in LoopNet's parlance, is merely a user account that was created at any time since the

inception of LoopNet's website roughly 13 years ago. Any time an account – which requires

only the submission of a working email address – is established, LoopNet adds another

"registered member" to its cumulative total. A substantial proportion of these accounts are

inactive, and have been for years. Nevertheless, LoopNet routinely promotes its historical total

of "registered members" as though each and every "member" were a current, active user of the

LoopNet website. *See* Florance Decl. ¶¶ 23-25.

***LoopNet's New Comparative Ad Campaign***

LoopNet has perpetrated its "registered members" fraud on the commercial real

estate and investment communities for some time. But it was not until the launch of CoStar

Showcase a few weeks ago that LoopNet aimed this misinformation campaign directly at CoStar.

In seeking to hold off the new threat from CoStar Showcase, LoopNet has launched a revamped

and expanded promotional campaign designed to convince prospective customers that there is no

reason even to consider listing their properties with CoStar.

Within days after the Showcase launch, LoopNet's CEO Richard Boyle falsely

and publicly dismissed CoStar's new product as having "no marketing audience." *See* Florance

Decl. ¶ 12 and Ex. 2 at 7. That essential message has since been repeated by LoopNet in a

variety of advertising and promotional materials that not only belittle the size of CoStar's

audience, but greatly exaggerate the scope of LoopNet's. In these current ads, which are

carefully designed to fend off the threat from CoStar Showcase, LoopNet has changed its

6

traditional messaging, in which it talked exclusively about its own audience, and adopted a

*comparative* advertising approach, in which it contrasts its purported distribution or "traffic"

with that of competitors including CoStar.  For instance, in a press release issued *within the past*

*24 hours*, LoopNet announced that it not only "operates the largest online commercial real estate

marketplace with more than 2.75 million members," but "has increased its leadership position as

the most heavily trafficked commercial real estate website."  *See* Press Release, ComScore

Report Shows that LoopNet Extends Its Commanding Lead Among Online Commercial Real

Estate Websites, *available at* http://www.sunherald.com/prnewswire/story/634605.html.

LoopNet's new comparative ads emphasize three purported measures of its audience size:

"registered members," "unique visitors" and "traffic from" its "exclusive network of newspaper

websites."

   For example, a new LoopNet marketing brochure, an excerpt from which appears

below, claims that LoopNet has:



*See* Ex. 3 to Florance Decl. at 1.  The same advertisement claims that a "Premium" listing

enables realtors to "Reach LoopNet's Entire Member Base," and that such listings are "viewable

to 2.75 million registered members."  *See* Ex. 3 to Florance Decl. at 2.

   This LoopNet flyer goes on to detail LoopNet's purported reach as compared to

its (unnamed) competitors.  Among other things, the ad claims that LoopNet attracts "950,000

unique visitors ***each month***" and that this figure "doesn't include traffic from our exclusive

network of newspaper web site partners[,] which generates more than 18 million unique visitors

each month." *See* Ex. 3 to Florance Decl. at 1 (emphasis added). The portion of the ad that

contains these claims appears below:



The dark blue bar on the above graph, immediately adjacent to the red LoopNet bar, is intended

to reflect the "web site traffic" generated by CoStar, and readers understand that LoopNet's

"More Members, More Traffic, More Partners" claim is directed at CoStar. Florance Decl. ¶ 15.

Another brochure currently being distributed by LoopNet not only repeats these

claims, but explicitly asks the reader to use them as a basis for comparison:



8

*See* Ex. 4 to Florance Decl. at 4.

Similar claims are repeated on LoopNet's website:

When you advertise on LoopNet, your property is seen by:

| | |
|---|---|
| **Registered Members:** | **2.75 million** |
| **Unique Visitors:** | **950,000 per month** |
| **Market Coverage:** | **All US & Canada** |
| **User Sessions:** | **14 million per month** |

*See* Ex. 5 to Florance Decl. at 1.

The LoopNet website also claims that LoopNet has "the largest database of commercial listings":

**Frequently Asked Question**

What are the benefits of LoopNet membership?

**Answer**

LoopNet membership provides access to the largest database of commercial listings.

*See* Ex. 6 to Florance Decl.

All of these claims of relative size, which form the heart of LoopNet's new marketing offensive in response to CoStar Showcase, are false and misleading. As stated above, LoopNet does not have a member base of 2.75 million people who actively use its website. LoopNet's site does not receive 950,000 unique visitors each month, as shown by the very data upon which LoopNet claims to rely. LoopNet's listings are not "seen by" or "viewable to" such inflated audiences – let alone by an additional "18 million" individuals who supposedly are directed to LoopNet's website each month by the websites of major newspapers. And it is CoStar, not LoopNet, that actually offers the largest database of commercial real estate listings.

1775462v.1

*Irreparable Harm to CoStar*

CoStar Showcase is in the midst of a critical launch period during which the product either will gain marketplace momentum and acceptance, or may fail within a period of months. *See* Florance Decl. ¶ 39. Advertisers will not pay to list their properties on Showcase if they believe its audience is dwarfed by LoopNet's, and potential customers for these properties will not continue to search CoStar's Showcase listings if they believe that the size of its database is insufficient. In other words, if allowed to continue, LoopNet's false and misleading comparative claims will permanently poison the waters against Showcase, potentially wiping out CoStar's investment and destroying an invaluable market opportunity.

## ARGUMENT

The standard for granting a preliminary injunction in this Circuit is well-established. The movant must show: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the party requesting the preliminary relief; and (2) a likelihood of irreparable harm if relief is denied. *See, e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). This standard is satisfied here.

## I.    CoStar Is Likely To Succeed on the Merits

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), establishes a federal cause of action for false advertising. The statute provides that:

> (1) Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

10

There are two theories of recovery available to a plaintiff under Section 43(a).[1]

*Time Warner Cable*, 497 F.3d at 153. First, a plaintiff can show that the advertisement in

question is literally false – *i.e.*, false on its face. *Id.* at 153 (citing *Johnson & Johnson v. GAC*

*Int'l, Inc.*, 862 F.2d 975, 977 (2d Cir. 1988)). An advertisement can be deemed literally or

facially false either if it makes an explicit statement or representation that "conflicts with

reality," *id.* (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999)), or if its

"words and images, considered in context, necessarily imply a false message." *Id.* at 158

(quoting *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Pharm. Co.*, 290 F.3d

578, 586-87 (3d Cir. 2002) ("A 'literally false' message may be either explicit or conveyed by

necessary implication when, considering the advertisement in its entirety, the audience would

recognize the claim as readily as if it had been explicitly stated") (internal citations and

quotations omitted)). Ads that are facially or unambiguously false may be enjoined without

extrinsic evidence of consumer perception – *i.e.*, without "reference to the advertisement's

[actual] impact on the buying public." *Id.* at 153-58 (quoting *Coca-Cola Co. v. Tropicana*

*Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

Alternatively, a plaintiff can show that the challenged advertisement, "while not

literally false, is nevertheless likely to mislead or confuse consumers." *Time Warner Cable*, 497

F.3d at 153. The extent to which consumers are deceived need not be established to obtain relief

against a misleading advertisement. *McNeil-P.P.C., Inc. v. Bristol-Myers Squibb Co.*, 755 F.

Supp. 1206, 1211 (S.D.N.Y. 1990), *aff'd*, 938 F.2d 1544 (2d Cir. 1991). "[A]ll that is required is

a 'qualitative showing [to] establish that a not insubstantial number of consumers received a false

---

[1] The standards for analysis of false advertising claims under New York law are the same as
under the Lanham Act. *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, 348 F.
Supp. 2d 165, 177 n.6 (S.D.N.Y. 2004).

11

or misleading impression from it.'" *Id.* (quoting *McNeilab, Inc. v. American Home Prods. Corp.*, 501 F. Supp. 517, 525 (S.D.N.Y. 1980)).

Here, LoopNet's claims all are facially false or, at a minimum, "likely to mislead or confuse" their intended audience. Accordingly, the ads violate the Lanham Act and should be enjoined.

### A.    The "950,000 Unique Visitors Each Month" Claim Is Facially False

LoopNet's claims regarding the monthly number of unique visitors to its website are false on their face. According to its ads, LoopNet's assertion that it receives "950,000 unique visitors each month" is based upon data from comScore, an Internet audience measurement service. In fact, the very data that LoopNet cites shows that actual visits to LoopNet.com fall far short of this claim.

In the 15 months from February 2007 to April 2008, the number of total unique monthly visitors to LoopNet.com exceeded 950,000 only three times (April 2007, July 2007, and January 2008). *See* Ex. 18 to Florance Decl. Each of these spikes was preceded, and followed, by a monthly traffic level below the 950,000 claimed by LoopNet. *Id.* Indeed, in eight of the remaining 12 months, LoopNet had fewer than 900,000 unique monthly visitors, including as recently as March 2008, when it had fewer than 850,000. *Id.* Thus, LoopNet's claim that its website receives "950,000 unique visitors *each* month" is literally false.[2]

Moreover, even an accurate count of "unique monthly visitors" presents a misleading picture of LoopNet's true usage. Based on data provided to CoStar by comScore, only about a quarter of LoopNet's unique visitors actually log in or run searches for real estate.

---

[2] It is similarly false to claim, as LoopNet does, that LoopNet premium listings are "[v]iewable to . . . 950,000 unique visitors per month," or that listings on LoopNet's website are "seen by" 950,000 unique visitors per month. As outlined above, LoopNet's website does not receive 950,000 unique visitors each month. Moreover, even in months in which LoopNet does receive 950,000 unique visitors, there is no guarantee that they will view or see any particular listing.

1775462v.1

The other traffic includes, for example, people who are put off by having to create an account and input personal information on the website and decide not to run any searches. It also includes others who may be interested in the company only as an investment. *See* Florance Decl. ¶ 31 and Exhs. 17-18.

**B.    The "2.75 Million Registered Members" Claim Is Facially False**

In its promotional materials and on its website, LoopNet claims to have "2.75 million registered members." When considered in context, the necessary implication of these claims is that each "registered member" is a unique individual who actually uses the LoopNet website. *See, e.g.*, Ex. 17 to Florance Decl. at 2 (emphasis added) (recommending LoopNet as an investment because its website is "*frequented by* more than 2.5 million members"). This is false. The "registered member" figure that LoopNet touts is merely a cumulative total – dating back to the company's inception in 1995 – of each and every instance in which an online user account has been set up on the LoopNet website. *See* Florance Decl. ¶¶ 23-25. An account that, for instance, was created in 1998, used to view the site's contents (for free) only once, and never accessed again is included in LoopNet's advertised total of 2.75 million "registered members." By definition, LoopNet's current online audience is only a fraction of its historical total of registered accounts.

Shortly after the commencement of this action, LoopNet acknowledged, for the first time, that not all of its "registered members" are active users of the LoopNet website. On February 27, 2008, LoopNet CEO Richard Boyle addressed the Jeffries Fourth Annual Internet Conference. Asked to explain LoopNet's claim (at that time) that it had 2.6 million "registered members," Mr. Boyle stated that "We don't break out the different segments of active users.

13

Basically the 2.6 million is total registered users over time." *See* Florance Decl. ¶ 25 & Ex. 11 at 8-9.

Despite this recent admission, LoopNet's advertisements continue to tout its "2.75 million registered members" as a measure of its user base and, in many instances, to claim that LoopNet ads are "seen by" or "viewable to" this entire audience. These "seen by" and "viewable to" claims are literally false because, as explained above, ads on LoopNet are neither "seen by" nor "viewable to" 2.75 million people. And even in those instances in which LoopNet does not use this specific language, its advertising necessarily implies that its "registered members" are actual individuals to whom LoopNet ads are exposed. Otherwise, why would the reader care how many "registered members" LoopNet has?

Courts in this District routinely enjoin ads that make use of impertinent or misleading statistics on the grounds that they necessarily imply a false message. For instance, in *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., Inc.*, 906 F. Supp. 178 (S.D.N.Y. 1995), SmithKline disseminated a print ad with a banner headline that read "Doctors Have Already Endorsed Tagamet In The Strongest Possible Way. With Their Prescription Pads." Beneath this headline was a bar chart that showed that physicians had written 237 million prescriptions for Tagamet compared to only 36 million for Pepcid – roughly a 7-fold advantage. That comparison was literally true, but there was a catch: Tagamet had gotten to market nearly a decade earlier, so had amassed prescriptions over a much longer period of time. The Court found "that the ad conveys clearly and unequivocally the false message that doctors prescribed Tagamet HB 200 million times more than they prescribed Pepcid over an equal period of time," and entered a preliminary injunction. 906 F. Supp. at 185-86.

14

Similarly, in *Smithkline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 2001 WL 588846 (S.D.N.Y. June 1, 2001), the advertiser – the maker of Tums antacid – aired a commercial claiming that Tums' competitor, Pepcid Complete, relieves "less than half of the heartburn episodes within 30 minutes. Less than half." What the ad did not mention was that Tums itself was significantly less effective at relieving heartburn within the same time frame. The Court determined that the "necessary implication" of the advertisement was the "unambiguous and concededly false claim that Tums provides for faster relief than Pepcid Complete," *id.* at *13, and enjoined the commercial on that basis. *See also, e.g., Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, No. 81 Civ. 731-CSH, 1982 WL 121559 (S.D.N.Y. June 9, 1982) (finding literally false a claim comparing the number of times professional chefs had chosen defendant's food processor over plaintiff's food processor where plaintiff did not market a professional model).

LoopNet's claim here is no different. LoopNet cites its "2.75 million registered members" in the context of an advertisement touting the popularity and reach of its website. In that context, those 2.75 million "members" would only be relevant if they were current, active users. LoopNet's "registered members" claim is therefore false by necessary implication.

LoopNet may argue that its "2.75 million registered members" claim does not convey a false impression because it appears alongside its "950,000 unique visitors each month" claim. While in some recent advertisements these two claims have appeared in close proximity to one another, LoopNet continues to use the "2.75 million registered members" claim on its own, most conspicuously in the prominent banner that greets every visitor to the LoopNet website:

### #1 in Commercial Real Estate Online

$500 billion of properties for sale • 4.3 billion sq. ft. of properties for lease • 2.75 million members

15

And even when the "2.75 million registered members" claim appears alongside the "950,000 unique visitors each month" claim, it remains facially false. As noted above, the overall context of LoopNet's advertising makes clear that it is talking about the size of LoopNet's *current* online audience – not some irrelevant count of the number of people who, historically, have signed up for user accounts. Thus, the only reasonable interpretation of LoopNet's ads is that it has 2.75 million *active* members, roughly 950,000 of which visit the LoopNet.com website in a given month. This unambiguous message concerning LoopNet's 2.75 million members is false, regardless of whether or not it is coupled to the (similarly false) claim that LoopNet receives 950,000 unique visitors each month. *See Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 381-82 and 85 (2d Cir. 1986) (holding that advertising claim that "Hertz has more new cars than Avis has cars," *in context*, "could only be understood as referring to companies' rental fleets" and noting that "[f]undamental to any task of interpretation is the principle that text must yield to context" and "there is no surer way to misread any document than to read it literally") (internal quotations and citations omitted).

Even if LoopNet's "registered members" claims were not facially false (and they are), they would nonetheless violate they Lanham Act because they are highly misleading – and intentionally so. In the Second Circuit, when a false advertising plaintiff demonstrates that the defendant has "intentionally set out to deceive the public" in an "egregious" manner, a presumption of consumer deception arises, and the plaintiff is relieved "of the burden of producing consumer survey evidence that supports its claim." *Johnson & Johnson*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 298-99 (2d Cir. 1992) (citing *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*, 926

F.2d 134, 140 (2d Cir. 1991) ("Once it is shown that a defendant deliberately engaged in a

deceptive commercial practice, we agree that a powerful inference may be drawn that the

defendant has succeeded in confusing the public. Therefore, upon a proper showing of such

deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer

confusion.")).

        Such a presumption is warranted here. Indeed, LoopNet not only *intends* that its

ads convey the false message that it has an actual audience of 2.75 million people, it *says so*

explicitly in numerous advertisements. That LoopNet occasionally omits the words "seen by" or

"viewable to" does not change the fact that LoopNet uses the words "registered members"

interchangeably to describe "active users." Moreover, LoopNet is undoubtedly aware that the

relevant public have been taken in by its claims and reported that LoopNet has an online

audience equal to its number of "registered members." As detailed in the Florance Declaration,

numerous commercial real estate and investment analysts have publicly construed LoopNet's

"registered members" claims to equate to "active users." *See* Florance Decl. ¶ 26 (collecting

examples). Especially given the fact that LoopNet has never taken any affirmative action to

dispel the widespread confusion it has created, it is evident that LoopNet intended the confusion

all along.

### C.    The "18 Million" Claims Are Facially False

        LoopNet has also undertaken to advertise that its audience is even larger than its

"2.75 million registered members," or its purported 950,000 unique monthly users. According to

LoopNet's most recent ads, these figures are actually understated because they do not include

traffic from LoopNet's "exclusive network of newspaper web site partners[,] which generates

more than 18 million unique visitors each month." *See* Florance Decl. ¶ 15 & Ex. 3. This claim

is literally false. The Internet audience measurement service that LoopNet cites for its "950,000 unique visitors each month" claim measures traffic on LoopNet's website *regardless of how it gets there*. A visitor who arrives at the LoopNet site by clicking on a link found on a newspaper website is counted the same as one who reaches LoopNet's site by typing in the URL, or using a search engine such as Google. *See id.* ¶ 33. LoopNet's claim that its traffic as reported by comScore "doesn't include the traffic from our . . . newspaper web site partners" is therefore contrary to the facts. For the same reason, the claim that this nonexistent incremental traffic adds another "18 million unique visitors each month" to LoopNet's monthly total is facially false.

Moreover, even if the reader were to understand that the "18 million" figure refers to the aggregate number of monthly visitors to the *newspaper* websites (though that is contrary to what the ads literally say), the claim would still have a false implication. There is no basis to think that more than a tiny fraction of these "18 million" online newspapers readers, who typically are searching for updated news reports, sports scores or weather forecasts, is even exposed to the commercial real estate classified ads that LoopNet places. It is therefore grossly misleading for LoopNet to suggest that its partnerships with online newspapers result in its ads being seen by another "18 million" people every month. *See* Florance Decl. ¶¶ 32-36.

**D.    The "Largest Database of Commercial Listings" Claim Is Facially False**

Finally, LoopNet's claim that it offers the "largest database of commercial listings" is literally false. *See* Ex. 6 to Florance Decl. LoopNet currently has approximately 595,000 listings on its website, whereas CoStar has over a million. *See id.* ¶ 38. Accordingly, CoStar – not LoopNet – offers the largest database of commercial listings. Indeed, LoopNet's database is less than 60% the size of CoStar's.

18

II.    **CoStar Will Suffer Irreparable Injury Absent Preliminary Relief**

Because "[i]t is virtually impossible to prove that so much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a competitor's advertisement," the Second Circuit has held that a plaintiff seeking a preliminary injunction need only demonstrate "a reasonable basis" for the belief that false and misleading advertisements of a competitor will cause it irreparable harm. *Coca-Cola Co.*, 690 F.2d at 316.[3] When the challenged ads are directly comparative and the plaintiff has demonstrated a likelihood of success on the merits, irreparable harm is presumed. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992); *McNeilab, Inc. v. American Home Products Corp.*, 848 F.2d 34, 38 (2d Cir. 1988); *see also Time Warner Cable, Inc.*, 497 F.3d at 162-63 (affirming District Court's decision to presume irreparable harm even though the challenged ads did not mention plaintiff by name when plaintiff was defendant's main competitor in the relevant marketplace).

Here, the evidence both supports a presumption and supplies a "reasonable basis" for a factual finding of irreparable harm. With respect to the presumption, LoopNet's new ads are comparative in nature and are targeted directly against CoStar, which is now LoopNet's main competitor in the online commercial real estate listing business. *See Florance Decl.* ¶¶ 9-19. As the Second Circuit recently held in *Time Warner Cable*, a false comparative ad need not mention the competitor by name to support a presumption of irreparable injury. All that is required is a showing that the audience will understand that the claims in the advertisement are directed at the plaintiff. *See Time Warner Cable*, 497 F.3d at 162 (upholding application of presumption of irreparable harm where "consumers in the markets covered by the preliminary injunction would

---

[3] This "flexible approach" requires "a more substantial showing where the plaintiff's products are not obviously in competition with defendant's products, or the defendant's advertisements do not draw direct comparisons between the two." *Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).

undoubtedly understand [the ad's] derogatory statement . . . as referring to [plaintiff]" or where

"it would be obvious to consumers that [defendant's] claims of superiority are aimed at

diminishing the value of [plaintiff's product]").   As detailed in the Florance Declaration, the

commercial real estate marketplace well understands that LoopNet's current spate of

comparative claims are directed at CoStar and its new Showcase product.  Florance Decl. ¶ 19;

*see McNeilab, Inc.*, 848 F.2d at 38 (a false "comparison to a specific competing product

necessarily diminishes that product's value in the minds of the consumer" and establishes

irreparable harm).

        But the availability of the presumption is academic here, because CoStar can

readily demonstrate a "reasonable basis" for a finding that it will be injured absent a preliminary

injunction.  CoStar is in the midst of a critical new product launch whose ultimate fate is closely

tied to its success in the market over the next few months.  If LoopNet is permitted to continue to

make false and disparaging claims about CoStar Showcase until this case is finally resolved,

CoStar will have serious difficulty in attempting to quantify or recoup the loss of its current

opportunity:  to expand its business to compete head-to-head, and on even par, with LoopNet in

the marketing of individual commercial real estate listings.  As explained by CoStar's CEO Mr.

Florance, "CoStar Showcase may not get a second chance to succeed in the market" if its initial

launch fails.  Florance Decl. ¶ 39.  Only by gaining enough sales and momentum to reach

"critical mass" can CoStar realize the full value of its investment and establish CoStar Showcase

as a viable alternative to LoopNet.

        Courts in this District have previously recognized that the risk of immediate and

irreparable injury from a false advertising campaign is especially high when a new product is

being introduced to the market.  *See, e.g., Johnson & Johnson-Merck Consumer Pharms. Co. v.*

1775462v.1

*P&G*, 285 F. Supp. 2d 389, 394 (S.D.N.Y.), *aff'd* 90 F. App'x 8, 9 (2d Cir. 2003) ("[I]t is very

clear to the Court that there is irreparable injury in this case stemming from the very nature of the

advertising campaign involved. P&G's false advertising is occurring at the inception of a new

product launch, a time when the buying public is particularly attentive and educable. Correcting

the false impressions made on consumers will therefore be difficult."); *Novo Nordisk A/S v.*

*Becton Dickinson & Co.*, 997 F. Supp. 470, 473 (S.D.N.Y. 1998) (noting that "because Becton's

claims relate to the Ultra-Fine II, which is a relatively new entrant in the needle market, Becton

would have a particularly difficult time proving money damages if it were to succeed ultimately

in its claims"). Indeed, CoStar has already begun to feel the bite of LoopNet's deceptive

advertising, as some customers have expressed concern about CoStar's ability to compete with

the LoopNet's purportedly massive audience. Unless an injunction is issued, such

misconceptions – and resulting defections from CoStar Showcase – will proliferate, causing

irreparable injury to CoStar's business. *See* Florance Decl. ¶¶ 39-42.

   Not only will CoStar be severely injured if preliminary relief is denied; so too will

the public at large. Courts in this District have long recognized that there is a strong public

interest in the prevention of false or misleading advertising. *See, e.g, American Home Prods.*

*Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987). That interest is especially

acute here because CoStar is attempting to establish Showcase – a superior product with lower

pricing – as a viable competitor to LoopNet, the dominant player in the market. If LoopNet's

false advertising campaign is allowed to continue, CoStar's bid to establish itself in LoopNet's

market may fail, and the marketplace will be denied the benefits of fair and robust competition

between the parties.

1775462v.1

## CONCLUSION

In the end, LoopNet's claims about its "registered members" are no different than a traditional newspaper that knowingly inflates its circulation figures in order to drive up advertising sales and revenue. LoopNet is deliberately communicating to the marketplace false information about the size of its online audience. Such claims violate the Lanham Act and should be enjoined. CoStar's motion for a preliminary injunction should be granted.

Dated: June 20, 2008

<div align="center">

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By:    */s Steven A. Zalesin*     
     Steven A. Zalesin (SZ 0901)
     Karla G. Sanchez (KS 7247)
     Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone: (212) 336-2000
Facsimile: (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
     Patrick J. Carome (admitted *pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 663-6000
Facsimile: (202) 663-6363

*Attorneys for Plaintiff CoStar Group, Inc.*

</div>

Of counsel:

     Christopher Winters, Esq.
     CoStar Group, Inc.

1775462v.1

# EXHIBIT II

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| COSTAR GROUP, INC., | ) | |
| Plaintiff, | ) ) ) | Civil Action No. 08-CV 1156 |
| v. | ) ) | **DECLARATION OF ANDREW C.** |
| LOOPNET, INC., | ) ) | **FLORANCE** |
| Defendant. | ) ) ) | |

**ANDREW C. FLORANCE,** under penalty of perjury, declares as follows:

1.    I am President and CEO of CoStar Group, Inc. ("CoStar"). I have held this position since I founded CoStar in 1987. I submit this declaration in support of CoStar's motion for a preliminary injunction to prevent LoopNet, Inc. ("LoopNet") from disseminating false advertising that threatens irreparable harm to CoStar's business.

2.    CoStar and LoopNet are both in the online commercial real estate business. Throughout most of its history, CoStar has focused on the provision of information *about* the commercial real estate market to industry professionals. Within the past few weeks, however, CoStar launched a new product called CoStar Showcase®, which focuses on Internet lead generation for commercial real estate professionals. The launch of Showcase put CoStar into direct competition with LoopNet, whose online marketing product, LoopNet.com, has always been focused on Internet lead generation.

3.    For all industry competitors, the perceived size of the online community of buyers and sellers who actively use their website platform is critical. Buyers want to be able to

search the most comprehensive universe of listings. Sellers wish to expose their properties to the largest possible audience of buyers. Accordingly, customers are attracted to the platform that they consider to be the most widely used.

      4.    With full knowledge of this dynamic, LoopNet has undertaken a methodical – and successful – campaign to convince the market that it has a vast, and constantly growing, number of users. LoopNet's efforts in this regard have centered upon the claim that it has a staggering number of "registered members" that actively use and view content on LoopNet's website. For example, LoopNet's site currently asserts that ads on LoopNet are "seen by" 2.75 million "registered members." LoopNet is also propagating claims about the number of users who visit its website on a monthly basis, the traffic to its website from its network of partnerships with online newspapers, and the size of its database of listings.

      5.    All of these claims are false. LoopNet's "registered member" count is not only false (it has admitted that its count is based on the cumulative total of accounts that have been established over more than a decade, not on the current number of active "members"), but misleading in that the "registered member" number has no connection with usage of its website. Further, LoopNet's unique monthly visitors claims are contradicted by the very data LoopNet cites. Its presentation of claimed traffic is false and misleading. And its comparative claims regarding numbers of commercial listings are factually incorrect.

      6.    LoopNet's new ad campaign is intended to stifle the competition posed by CoStar's Showcase service at its very inception. Unless enjoined, LoopNet's false and misleading claims will cause CoStar to suffer an immediate loss of market penetration, goodwill and momentum that will be difficult to quantify or recoup. Indeed, LoopNet's efforts, if successful, will substantially impede CoStar's ability to enter the Internet lead generation market

<div align="center">2</div>

in which LoopNet is already entrenched. Accordingly, CoStar seeks preliminary injunctive relief to halt LoopNet's deceptive advertising so that CoStar's new Showcase product can compete fairly in the market with LoopNet.

## CoStar's Evolution and the Launch of Showcase

7.    CoStar is headquartered in Bethesda, Maryland and has approximately 1,300 employees, including the largest professional research organization in the commercial real estate industry. Twenty years ago CoStar revolutionized the commercial real estate industry with a simple yet powerful idea: create the most thoroughly researched, unbiased source of commercial property information anywhere. Today CoStar is the number one provider of information services to commercial real estate professionals in the United States. CoStar offers customers access via the Internet to a proprietary database covering more than 2.8 million U.S. and U.K. properties and almost 60 billion square feet of inventory in all commercial property types and classes, including retail. CoStar has several competitors in this information provision arena, including LoopNet.

8.    On May 15, 2008 CoStar expanded from the provision of information services into the business of Internet lead generation through the introduction of CoStar Showcase. CoStar Showcase is a listing service that is designed to provide commercial real estate professionals with an online platform for marketing their properties before a large audience of online prospects.

9.    The launch of CoStar Showcase opened up a new front of competition between CoStar and LoopNet. Indeed, CoStar has now moved into LoopNet's core business: the online marketing of commercial real estate listings. In this business, as noted above, the size of the community using the platform is of critical importance to customers.

3

**<u>LoopNet's New Advertising Campaign Directed At CoStar Showcase</u>**

10.    CoStar's plan to launch CoStar Showcase has been known and publicly discussed within the commercial real estate industry for some time. For example, the planned launch of Showcase was the subject of considerable discussion during CoStar's October 25, 2007 Q3 2007 earnings conference call. (*See* <u>Ex. 1</u> at 6, 17-18). CoStar began sending promotional literature for Showcase to prospective customers, in connection with pre-launch sales efforts, in early April 2008. LoopNet, therefore, was well aware that the competitive landscape was about to change. In fact, during the Seventh Annual JMP Securities Research Conference in May 2008, Richard Boyle, LoopNet's CEO, acknowledged that LoopNet had heard about the introduction of CoStar Showcase six or seven months earlier. (*See* <u>Ex. 2</u> at 7).

11.    In anticipation of this new threat, LoopNet apparently decided to launch a preemptive strike so as to prevent CoStar from gaining any traction in LoopNet's primary market. In recent weeks, LoopNet has inaugurated a new advertising and promotional campaign designed to spread false information about the size of LoopNet's user community in comparison to CoStar's. Some of the claims that LoopNet makes as part of this new campaign build upon its prior false marketing tactics, while others are entirely new.

12.    Just days after the launch of CoStar Showcase, during the JMP Securities Conference mentioned above, LoopNet falsely dismissed CoStar's Showcase product as having "no marketing audience." (*See* <u>Ex. 2</u> at 7). By comparison, LoopNet claims to have a vast and unparalleled audience. In recent ads, LoopNet has focused on three purported metrics of its size: (a) "registered members," (b) "unique visitors" and (c) "traffic from" its "exclusive network of newspaper websites."

13.    For example, a new LoopNet marketing brochure, an excerpt from which appears below, proclaims that LoopNet has "More Members" and "More Traffic" than

4

competing commercial real estate websites, then goes on to state – falsely -- that LoopNet's

online community numbers in the millions (Ex. 3 at 1):

# More Members. More Traffic. More Partners.

- Over 2.75 million registered members
- 950,000 unique visitors each month*
- Exclusive distribution network of 125+ newspaper web sites
- Trusted by the nation's leading brokerage firms

       14.    The same advertisement falsely claims that a "Premium" listing enables

realtors to "Reach LoopNet's Entire Member Base," and that such listings are "viewable to 2.75

million registered members." (Ex. 3 at 2)

       15.    This LoopNet flyer goes on to detail LoopNet's purported website

"traffic" as compared to its competitors.  Among other things, the ad falsely claims that LoopNet

attracts "950,000 unique visitors *each month*" and that this figure "doesn't include traffic from

our exclusive network of newspaper web site partners which generates more than 18 million

unique visitors each month."  The portion of the ad that contains these claims appears below (Ex.

3 at 1):

## #1 in Exposure

With 950,000 unique visitors each month, LoopNet.com is the most heavily trafficked commercial real estate site on the Internet. LoopNet's user base represents the largest online community of commercial real estate professionals. In fact, LoopNet.com generates 4 times more traffic than any other commercial real estate web site... and that doesn't include the traffic from our exclusive network of newspaper web site partners which generates more than 18 million unique visitors each month.



5

Based on my knowledge of the market, the second bar from the left in the above graph, immediately adjacent to the LoopNet bar, is intended to reflect the "web site traffic" generated by CoStar.

16.     Other LoopNet ads that appear to be part of the same comparative marketing initiative make similar claims. For example, another brochure currently being distributed by LoopNet not only repeats these claims, but explicitly asks the reader to use them as a basis for comparison (Ex. 4 at 4):

## Does your online marketing compare?

STRENGTH IN NUMBERS

- **2.75 million** registered members

- **950,000** unique visitors per month*

- **125+** national and local newspaper web site partners

- Powering listings to **1000+** commercial real estate web sites



\* 4x more traffic than any other commercial real estate web site. comScore 2008.

17.     LoopNet's claims are also repeated on its website, as depicted below:

When you advertise on LoopNet, your property is seen by:

| | |
|---|---|
| Registered Members: | 2.75 million |
| Unique Visitors: | 950,000 per month |
| Market Coverage: | All US & Canada |
| User Sessions: | 14 million per month |

6

This information appears on LoopNet's website at

http://www.loopnet.com/xNet/Mainsite/Marketing/Advertising/PropertyAdvertising.aspx?linkco
de=19280. (Ex. 5).

18.    The LoopNet website also claims that LoopNet has "the largest database
of commercial listings." This claim appears on a section of LoopNet's website detailing the
purported benefits of membership as part of the "Comprehensive Help Center" accessible
through http://www.loopnet.com/xNet/MainSite/Marketing/About/Faq.aspx?LinkCode=1230 .
(Ex. 6).

19.    LoopNet's new comparative ads are squarely directed at CoStar
Showcase, and readers will understand them as such. LoopNet and CoStar are the only two
entities of any significant size competing in this market. And only CoStar is making a new and
aggressive push into this area such as would explain LoopNet's new ad campaign. Indeed, at a
recent trade show around the time of the Showcase launch, LoopNet set up a booth just a few
feet away from CoStar's booth – in a massive arena – with huge banners touting LoopNet's
"More Members, More Traffic, More Partners" message. (See Ex. 7) (photo taken at the
International Council of Shopping Centers (ICSC) RECon event – The Global Retail Real Estate
Convention, May 18-21, 2008 in Las Vegas, NV). There was no doubt as to whom LoopNet was
addressing.

20.    As detailed below, all of these claims of relative size, which form the heart
of LoopNet's new marketing offensive to combat CoStar Showcase, are false and misleading.

A.    **LoopNet's Claims Regarding "Registered Members"
Are False And Misleading**

7

21.    LoopNet's claims regarding its 2.75 million "registered members" depend

for their impact on a reader believing that "members" are unique individuals and active users of

the website. LoopNet actively creates and fosters this impression. For example, as discussed

above, its website claims that ads on LoopNet are "seen by" all 2.75 million registered members,

and its brochures state that listings are "viewable to" the same population.

22.    This builds upon a carefully laid foundation of market deception.

LoopNet has for some time deliberately seeded the market with misinformation that conflates

"registered members" with active users of the LoopNet website. To provide just a few examples:

- In 2006, when LoopNet claimed 1.2 million registered members, LoopNet sponsored a prominent advertisement in an issue of the RCA Report, a commercial real estate journal published by the National Association of Realtors. In that ad, LoopNet claimed that it had "*over 1.2 million members viewing* 100 million property listings each month." (Emphasis added here and throughout).  (*See* Ex. 8 at 3).

- On November 9, 2006, LoopNet CEO Richard Boyle was interviewed by John Duncan, Pacific Growth Equities' Internet Infrastructure & Services Analyst. Mr. Boyle repeatedly referred to LoopNet's registered members as "users" of its service and "transaction participants" on the LoopNet marketplace. He stated that the first of "three key metrics that we look at in terms of measuring against our primary goal of bringing the marketplace online . . . is *registered users*," which Mr. Boyle defined as "*how many people are the registered users who have come on and become transaction participants on the LoopNet marketplace*, as I said, ending Q3 just under *1.6 million*." One of LoopNet's "[p]rimary areas of investment," according to Mr. Boyle, was "to drive further growth in the registered *user* base, so bringing more participants online . . . ." (*See* Ex. 9).

- In a brochure entitled "LoopNet Product Summary," LoopNet described its membership as "the largest *audience of 2.2 million active commercial real estate professionals*." That brochure also stated that "Premium Membership for Professionals enables you to market listings to LoopNet's 2.2 million members." (*See* Ex. 10 at 1).

- In a subsequent brochure called "Premium Membership for Professionals," LoopNet sought to attract customers to pay for listings on LoopNet by promising them that paid listings are "*immediately expos[ed] to more than 2.4 million LoopNet members*." (*See* Ex. 11 at 1).

23.    In reality, LoopNet's count of "registered members" provides no

indication of how many unique persons are using its website. It represents nothing more than the

8

total number of user accounts that have been created – free of charge – at the LoopNet.com website at any time since the site was launched in 1995.  An account that, for instance, was set up in 1998, used to view the site's contents only once, and never accessed again is included in LoopNet's advertised total of "2.75 million registered members."  In the same way, a second account set up by a "member" because they received a new e-mail address, or wanted access from home, would be counted as a separate "member" even though only one person is responsible for both accounts.

24.     In fact, LoopNet's current online audience is only a fraction of its historical total of registered accounts.  It's claimed 2.75 million "members" include accounts created by:

- people who signed up for LoopNet (at any time from 1995 to the present) but did not view a single property at the time;
- people who clicked on a link to LoopNet from another site (at any time from 1995 to the present), created a user name and password out of curiosity, but decided after a single visit that the LoopNet site was of no interest to them;
- potential LoopNet investors or business analysts who simply wanted to learn about LoopNet's products, and had no interest in buying, selling, leasing, or marketing commercial real estate properties;
- people who registered under invented names, since LoopNet has no way of knowing whether the "names" submitted by basic members are real;
- "bots" or other nonhuman "visitors";
- people with duplicative "memberships," e.g., for a single individual using different email addresses (such as janedoe12345@yahoo.com, janedoenyc@hotmail.com, janewdoe@aol.com, janedoerealestate@gmail.com, and jane.doe@company.com); and
- people who once signed up for LoopNet but are now retired, are no longer in the commercial real estate business, have long since sold the only property they hoped to market, or are deceased.

25.     LoopNet has recently conceded that "registered members" are in fact different from active users.  On February 27, 2008, LoopNet CEO Richard Boyle addressed the

9

Jeffries Fourth Annual Internet Conference and was specifically asked about LoopNet's claim (at

that time) that it had 2.6 million "registered members" and how this figure compared with

"active users." Mr. Boyle stated that "We don't break out the different segments of active users.

Basically the 2.6 million is total registered users over time." (*See* Ex. 12 at 8-9).

       26.    Despite this, LoopNet has forged ahead with its false advertising and has

successfully established a marketplace perception among industry professionals, securities

analysts and market journalists that its "registered members" are indeed active users of its

website. For example:

- One target of LoopNet's promotional claims, a regional real estate alliance, repeated LoopNet's statement (at a time when LoopNet claimed 1.5 million members) that paid listings are *"immediately expos[ed] to more than 1.5 million LoopNet members."* (*See* Ex. 13 at 2).

- The real estate website RetailTraffic stated in an October 1, 2007, report that "LoopNet reports having *more than 2.2 million registered users*." (*See* Ex. 14 at 2).

- SunTrust securities analysts Robinson Humphrey analysts Andrew W. Jeffrey and Jack D. Ancich wrote in a June 2007 report that: *"[W]e encourage investors to note that LoopNet currently has two million registered members.* Of these, all but 84,500 are currently non-paying members. The company estimates that roughly 40% of its non-paying members are agents. *By this measure, the company already has relationships with about 768,000 agents.* This exceeds our estimate of the entire commercial real estate agent market! From this, we infer that LoopNet's appeal extends beyond traditionally defined commercial real estate agents." (*See* Ex. 15 at 3).

- Jake Fuller and Timothy Forrester, two securities analysts at Thomas Weisel Partners, commenting on LoopNet's November 28, 2007 press release, understood LoopNet's claim about "2.5 million members" to mean that LoopNet has 2.5 million "users": "LOOP also announced today (November 28) that it hit *2.5 [million] registered users* (includes free *users* and paid subs)." (*See* Ex. 16 at 1).

- The influential online investing site, The Motley Fool, has been repeatedly misled by LoopNet's false claims. On December 31, 2007, for example, The Motley Fool, in an article written by Katrina Chan, stated (in recommending LoopNet as an investment) that a crucial feature of LoopNet is that it has **"a website *frequented by* more than 2.5 million members."** (*See* Ex. 17 at 2)

<div align="center">10</div>

27.     In short, the cornerstone of LoopNet's comparative advertising campaign against CoStar Showcase – its claim to have millions of "registered members" – is a gross exaggeration of LoopNet's true user base. LoopNet's real audience is nowhere near as large as the inflated number its advertising broadly touts.

## B.     LoopNet's Claims Regarding "Unique Visitors" Are False and Misleading

28.     LoopNet's claims regarding the number of unique visitors to its website each month are similarly false. According to its ads, LoopNet's claim that it has "950,000 unique visitors *each* month" purportedly is based upon data from comScore, an Internet traffic monitoring service. In fact, the very data that LoopNet cites shows that actual visits to LoopNet.com fall short of this claim.

29.     In the 15 months from February 2007 to April 2008, the number of total unique monthly visitors to LoopNet.com exceeded 950,000 only three times (April 2007, July 2007, and January 2008), i.e., only one out of every five months. Each of these spikes was preceded, and followed, by a monthly traffic level well below the 950,000 claimed by LoopNet. Indeed, in eight of the remaining 12 months, LoopNet had fewer than 900,000 unique monthly visitors, including as recently as March 2008, when it had fewer than 850,000. A chart summarizing the comScore data is attached as Ex. 18.

30.     Rather than present the true facts, LoopNet appears to be cherry picking specific months of elevated usage and presenting this data as though it represents LoopNet's standard monthly audience. Like its "registered member" claim, LoopNet's inflated "unique visitors" claims are designed to create the false impression that LoopNet has a greater audience, and enjoys more widespread usage, than it actually does.

11

31.     Moreover, even an accurate count of "unique monthly visitors" presents a misleading picture of LoopNet's true usage. It is my understanding, based on data provided to CoStar by comScore, that only about a quarter of LoopNet's unique visitors actually log in or run searches for real estate. The other traffic includes, for example, people who are put off by having to create an account and input personal information on the website and decide not to run any searches. It also includes others who may be interested in the company only as an investment. Indeed, the one recent month of aberrantly high traffic on the LoopNet website – January 2008, which saw over 1.1 million unique visitors to LoopNet.com as opposed to about 828,000 the month before and about 862,000 the month after – coincided with LoopNet being named "Best Stock for 2008" by The Motley Fool website in an article dated December 31, 2007. (See Exs. 17 and 18).

### C.    LoopNet's Claims Regarding "Traffic From" Its Online Newspaper Partnerships Are False and Misleading

32.     LoopNet's new advertisements detailed above regarding supposed *additional* "traffic from [its] exclusive network of newspaper web site partners," which LoopNet claims "generates more than 18 million unique visitors each month," are also false and misleading, in several respects.

33.     First, LoopNet's claim that its unique monthly visitor measure "doesn't include" traffic from its online newspapers partnerships is false and deceptive because its audience measures *do* include any such traffic. Based on the source relied upon by LoopNet, LoopNet.com typically attracts fewer than 900,000 unique visitors to its website in a given month. Those visitors are counted whether they arrived at LoopNet's site by manually entering an internet address, using a search engine, or clicking on a link provided by one of LoopNet's

12

online marketing partners. Traffic to the LoopNet website that originates from these online newspapers will be counted like any other traffic within the unique visitor numbers.

34.    Second, it appears that the "18 million" figure to which LoopNet refers in its advertising represents *all* visitors to these newspaper websites – not to LoopNet.com. Yet LoopNet's ads say that it receives incremental "traffic from . . . newspaper website partners which generates ore than 18 million unique visitors each month." This is just false – "18 million" is the aggregate monthly traffic on these *newspaper* websites, not on LoopNet's.

35.    Third, only a tiny fraction of the "18 million" website visitors that LoopNet cites will ever view *any* ad for commercial real estate, let alone one sponsored by LoopNet. A person who accesses the New York Times website to check the latest headlines or sports scores is no more likely to read one of LoopNet's commercial real estate listings than anyone else who happens to be surfing the internet.

36.    In short, LoopNet's assertions concerning the additional "18 million unique visitors" supposedly generated by its newspaper partners are false and deceptive.

### D.    LoopNet's Claims Regarding The Relative Size Of Its Listings Database Are False and Misleading

37.    On its website, LoopNet addresses the question "What are the benefits of LoopNet membership?" with, among other things, the following claim: "LoopNet membership provides access to the largest database of commercial listings."

38.    This claim is false. It is my understanding that LoopNet currently has approximately 595,000 listings on its website. CoStar has over a million listings on its website. Accordingly, CoStar – not LoopNet – offers the largest database of commercial listings.

13

## Harm to CoStar and the Public

39.    CoStar Showcase may not get a second chance to succeed in the market after this case is finally resolved many months or years from now. Its success will be predicated very heavily on whether CoStar is able to create a critical mass for the CoStar Showcase product in the coming six months. Either the product will generate interest from buyers and sellers, such that Showcase will achieve critical momentum and become a widely used marketing platform, or it will fail to attract enough sustained interest, and have a short life.

40.    Cognizant of this short window of time, CoStar has made the launch of Showcase its most important business initiative for 2008. CoStar has spent several million dollars on the development and launch of the product, which includes marketing expenditures, the time and resources of CoStar's product development and IT department, and the investment in training CoStar's sales force to sell CoStar Showcase. It has also devoted extensive efforts to developing a product that has critical advantages over LoopNet's competing product. For example, customers using CoStar Showcase do not have to upload data about their property. CoStar can simply pull information about the property, such as photographs, geographic detail and maps, into the listing from CoStar's preexisting research databases. This is critical for brokerage houses that do not have the staff needed to collect detailed information about each property. CoStar also designed a clean, content-rich format for its listings that is unrivalled in the industry. And CoStar has carefully calibrated its pricing levels and incentives to be more attractive than those of LoopNet.

41.    But CoStar cannot compete effectively against LoopNet's campaign of misinformation, which is already taking a toll. Not only has CoStar been forced to devote substantial resources to responding to LoopNet's false messages, it has begun to see signs that LoopNet's false comparative claims are taking root. For example, we have heard from

14

1775436v.1

customers who have expressed concern about the size of the CoStar Showcase online audience as compared to LoopNet's "2.75 million" strong "massive audience." In reality, I believe that the base of users actively running searches on CoStar is comparable to the audience running searches on LoopNet that return full property listings (i.e., those listings that include contact information); but LoopNet's false and misleading claims to the contrary are poisoning marketplace perceptions.

42.    If LoopNet succeeds in undoing CoStar's hard work through misinformation, the consequences will be irreparable. CoStar will not be able to wipe the slate clean and launch this product again. It is in the market now and will either achieve critical mass in terms of buyer and seller usage, or it will fail. If that happens, not only will CoStar lose its massive investment, it may be forced to layoff a number of skilled employees currently working at CoStar. Market perceptions regarding a newly launched product are very difficult to undo and the commercial consequences of LoopNet's unconstrained false messages will not be susceptible to later repair.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed at White Marsh, Pennsylvania this 19th day of June, 2008.

Andrew C. Florance

15