Steven A. Zalesin
Karla G. Sanchez
Adeel A. Mangi
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000
Facsimile 212-336-2222

Patrick J. Carome (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

*Attorneys for CoStar Group, Inc. and CoStar Realty Information, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| COSTAR GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 08-CV 1156 |
| | ) | |
| v. | ) | |
| | ) | **COSTAR'S MEMORANDUM OF** |
| LOOPNET, INC., | ) | **LAW IN OPPOSITION TO** |
| | ) | **LOOPNET'S MOTION FOR A** |
| Defendant. | ) | **PRELIMINARY INJUNCTION** |
| | ) | |

| | |
|---|---|
| LOOPNET, INC., | ) |
| | ) |
| | ) |
| Counterclaim | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| COSTAR GROUP, INC., and COSTAR | ) |
| REALTY INFORMATION, INC., | ) |
| | ) |
| Counterclaim | ) |
| Defendant. | ) |

**Table of Contents**

Page

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF BACKGROUND FACTS ..............................................................2

A.    Audience Size Can Be Estimated Using A Panel Or Literally Counted
       Using Website Software ........................................................................................3

B.    Showcase Is A Tool On The CoStar Website, Not A Separate Website ...........4

ARGUMENT ................................................................................................................5

I.    LoopNet Will Not Succeed On the Merits.............................................................5

       A.    "Over 400,000 Prospects You Won't Find On LoopNet" .......................5

       B.    "1.3 Million Unique Visitors Each Quarter" ..........................................8

       C.    "86% Are Purchase Decision Makers and Influencers for Their Firm" ...............11

       D.    "The Website Brokers Prefer 3 to 1" .....................................................11

       E.    "View 900,000 Property Listings Across the US"..................................12

       F.    Showcase Is "Free" and "Truly Open" ..................................................13

       G.    "Reach More Prospects" and "Generate More Leads" ..........................14

       H.    Descriptions of Showcase .......................................................................14

II.   CoStar's Safe Harbor Disclaimers Do Not Constitute Admissions That Its
       Advertising Claims Are False ..............................................................................16

III.  The Parties Agree as to The Law on Irreparable Harm .....................................18

CONCLUSION.............................................................................................................19

## Table of Authorities

**Page(s)**

**Cases**

Asher v. Baxter Intern. Inc.,
377 F.3d 727 (7th Cir. 2004) ......................................................17

Avis Rent-A-Car System, Inc. v. Hertz Corp,
782 F.2d 381 (2d Cir. 1986).........................................................10

Bologna v. Allstate Ins. Co.,
138 F.Supp.2d 310 (E.D.N.Y. 2001) ...........................................16

Bose Corp. v. Linear Design Labs, Inc.,
467 F.2d 304 (2d Cir. 1972).........................................................16

In Re Century 21-RE/MAX Real Estate Adv. Claims,
882 F.Supp. 915 (C.D. Cal. 1994) ...............................................15

Cytyc Corp. v. Neuromedical Systems, Inc.,
12 F.Supp.2d 296 (S.D.N.Y. 1998) .............................................15

In re EVCI Colleges Holding Corp. Securities Litigation,
469 F.Supp.2d 88 (S.D.N.Y. 2006) .............................................17

Lipton v. Nature Co.,
71 F.3d 464 (2d Cir.1995)............................................................15

McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,
938 F.2d 1544 (2d Cir. 1991).....................................................9, 12

Nikkal Industries, Ltd. v. Salton, Inc.,
735 F.Supp. 1227 (S.D.N.Y. 1990) .............................................15

In re Nortel Networks Corp. Sec. Litigation,
238 F.Supp.2d 613 (S.D.N.Y. 2003)............................................17

Oestreicher v. Alienware Corp.,
544 F.Supp.2d 964 (N.D. Cal. 2008) ...........................................16

Procter & Gamble Co. v. Chesebrough-Pond's Inc.,
747 F.2d 114 (2d Cir. 1984)........................................................9, 12

Time Warner Cable, Inc. v. DIRECTV, Inc.,
497 F.3d 144 (2d Cir. 2007)........................................................5, 15

1880557v.1

## Table of Authorities

**Page(s)**

**STATUTES**

15 U.S.C. §§ 77z-2(c)(1)..............................................................................17

15 U.S.C. §§ 77z-s(i)(1)..............................................................................17

PSLRA Pub.L. 104-67, 109 Stat. 737 (1995) .................................................16

Securities Litigation Reform, H.R. Rep. No. 104 -369, 104th Cong., 1st Sess., at
   42-43 (Nov. 28, 1995)............................................................................16

Law of Corp. Offs. & Dirs.: Rts., Duties & Liabs. § 12:8 (2007) .....................17

iii

Counterclaim Defendants CoStar Group, Inc. ("CoStar Group") and CoStar Realty Information, Inc. (collectively, "CoStar") hereby submit this brief in opposition to the motion seeking a preliminary injunction filed by LoopNet, Inc. ("LoopNet").

## PRELIMINARY STATEMENT

LoopNet's reactive motion betrays a simple litigation strategy: deploy enough chaff to try and divert the Court's focus away from LoopNet's own false advertising.

Faced with CoStar's motion for a preliminary injunction, LoopNet parsed every word of every advertisement, press release and web page from CoStar looking for material to challenge in return. It then filed a scattershot brief attacking literally dozens of words and phrases in CoStar advertisements. The result is a motion seeking 23 injunctions and a brief replete with empty disparagement of CoStar Showcase ("Showcase") as a "knock-off" with "hefty" fees and an audience "dwarf[ed]" by LoopNet's.

Where LoopNet does make specific arguments, they are based primarily on commonplace securities law disclaimers that appear in CoStar's press releases. LoopNet seeks to convert these forward-looking disclaimers, which merely state the obvious – that things can change in the future – into admissions that "there is no assurance CoStar's claims are true." (LoopNet Br. at 1). This approach speaks eloquently to the strength of LoopNet's arguments.

In reality, CoStar's advertising claims are sound and fully supported by research and analysis. For example:

- CoStar's claim that its website reaches "over 400,000 prospects you won't find on LoopNet" is supported both by a custom study it purchased from comScore and the off-the-shelf comScore study that LoopNet attaches to its motion papers.

- CoStar's claim that 86% of its website visitors are "purchase decision makers and influencers for their firm" is supported by an online survey of its website visitors.

- CoStar's claim that it is "the Website brokers prefer 3 to 1" is supported by a survey of the largest brokerage houses in the United States conducted by an outside research firm.

- CoStar's claims that Showcase has a "free property search tool" and provides access to "over 900,000 listings" are true.

Showcase is a product with unique attributes that is seeking to challenge a competitor with a long head-start. It must be allowed to compete on a level playing field, uncluttered by LoopNet's false advertising.[1]

## STATEMENT OF BACKGROUND FACTS

The essential facts concerning the nature of the online commercial real estate industry and CoStar's launch of its Showcase product were described in detail in CoStar's Memorandum of Law in support of its preliminary injunction motion, and in the Declaration of CoStar President Andrew C. Florance attached thereto. CoStar will not burden the Court with repetition, save to reiterate that the launch of Showcase heralded direct competition with LoopNet, and that in this industry the perceived size of the audience using a particular website is critical. Because LoopNet's motion is premised in large part on assumptions as to how that audience is measured and defined, these two issues merit explanation before turning to the substance of LoopNet's claims regarding CoStar advertising.

---

[1] LoopNet suggests in footnotes 2 and 3 of its brief that CoStar "parasitical[ly]" appropriated the name "Showcase" from LoopNet. This claim is baseless. To CoStar's knowledge, prior to CoStar publicizing its planned launch of a product using that name, LoopNet used the term "showcase" solely in a generic sense as a verb. Such usage is common in the real estate industry. Indeed, in allowing CoStar's application for trademark protection for the term "CoStar Showcase," the U.S. Patent and Trademark Office specifically ruled that the term "showcase," standing alone, is generic and not susceptible to trademark protection. *See* Declaration of Daniel Kimball ("Kimball Decl.") ¶ 38.

2

**A.    Audience Size Can Be Estimated Using A Panel Or Literally Counted Using Website Software**

LoopNet's memorandum refers extensively to traffic estimates from a vendor called comScore, which sells data to companies about traffic to their website as well as competitors' websites.  To derive these numbers, comScore employs a "panel-based" methodology.  That means it monitors the internet activities of a volunteer pool of Internet users and uses the results to extrapolate broad conclusions about monthly traffic to websites.  (Kimball Decl. ¶ 6).

This methodology tends to understate traffic for a website such as CoStar's.  This is because comScore's panel skews towards home computer users – due in part to the particular types of incentives offered by comScore for participation – whereas CoStar's user base tends to be professional.  The comScore methodology can also result in apparent variations that are not reflective of the market.  This occurs because even small shifts in panel habits – even a few individuals visiting one website rather than another in a given period – can result in large apparent shifts when the trend is extrapolated outwards.  This can be misleading because it does not always reflect any real changes in the market.  Nonetheless, comScore data is a useful measure, not least because comScore data is also available about competitors' websites.  (*Id.*)

There are, however, alternative ways to measure website traffic.  One option is to actually count "hits" on websites.  One vendor with a product that can do just that is Omniture.  In simple terms, the Omniture product is software that "lives" on a website and literally counts visitors.  Omniture also tracks so-called "unique visitors," which is a measure intended to approximate the number of actual individuals who visit the website (as opposed to all hits, which would include multiple visits by the same individual).  Omniture does this using "cookies," which are electronic markers that websites deposit on visitors' computers.  Omniture uses

3

cookies to ascertain which visitors have been to the website before in the relevant period. Omniture's methodology is not perfect – it can double count a "unique" visitor if he uses two computers or if he manually cleans out the "cookies" on his computer – but it is a standard methodology used in the industry and is the best available tool for actually counting visitors to a website.  (*Id.* ¶¶ 7-8).

In sum, both comScore and Omniture are valid measures of website traffic.  But they utilize very different methodologies and this can lead to very different results.  Critically, however, comScore is a panel-based extrapolation whereas Omniture aims to be an actual count. CoStar has used both measures in its advertising in the past with citations to the sources it has relied upon.  More recently, it has increasingly relied upon Omniture data because it considers Omniture to be a more precise measure of its traffic.  (*Id.* ¶ 9).

**B.    Showcase Is A Tool On The CoStar Website, Not A Separate Website**

Many of LoopNet's arguments assume that Showcase is a website distinct from www.costar.com.  Indeed, LoopNet criticizes CoStar for making claims that it contends are applicable only to the audience for www.costar.com and not the audience for Showcase.  In reality, however, it is the same audience.

Showcase is not a website separate and apart from www.costar.com.  Rather, Showcase is a marketing product that appears on www.costar.com.  It allows real estate brokers to have their listings appear when visitors search the website for commercial real estate properties.  Showcase is an important new product with unique features, such as enabling users to view Showcase listings for commercial real estate without charge.  But it is just one of a number of different tools or products available on the CoStar website.  This is apparent from a review of the website homepage.  *See* Kimball Decl. Ex. 1.  Showcase is the tool that appears on the far right of the page under "Free Property Search" and is used to run searches for listings on

4

the CoStar website. That same page has a login link at the top of the page. Users logging into the password protected sections of the website will also see various other CoStar tools to which they subscribe, such as CoStar Property Professional (a subscription listings product) and CoStar Comps (a subscription-based source of verified sales comparables). (*Id.* ¶ 10).

As such, the audience for the CoStar website is the same audience viewing the Showcase tool. And the inverse is equally true. It is one audience using one website. CoStar studies that audience using a variety of different analyses and surveys. Some of these are carried out in-house by marketing staff and others are purchased from outside vendors. All of CoStar's claims regarding its audience are accurate and supported by such studies.

**ARGUMENT**

The parties agree on the standards for a preliminary injunction. LoopNet is entitled to such relief only if it can show: (1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor; and (2) a likelihood of irreparable harm if relief is denied. *See, e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-53 (2d Cir. 2007). LoopNet contends it is likely to succeed on the merits because CoStar's claims are either facially false or false by necessary implication. *See* LoopNet Br. at 15. They are not.

**I.    LOOPNET WILL NOT SUCCEED ON THE MERITS**

LoopNet's brief makes a multitude of allegations. For relative ease of analysis, the challenged CoStar claims can be grouped into eight categories.

**A.    "Over 400,000 Prospects You Won't Find On LoopNet"**

CoStar advertising materials include the following claim: "Unique audience. Your listings can be seen by over 400,000 prospects that you won't find on LoopNet®." The early versions of this claim that LoopNet also complains about used the term "potential

5

prospects" rather than "prospects."  (CoStar later dropped the word "potential" as redundant.)  (Kimball Decl. ¶ 11).  *See also* Exhibits H, I, J and L in Support of LoopNet's Motion for a Preliminary Injunction ("LoopNet Ex.").  LoopNet describes this claim as "the cornerstone" of the CoStar advertising it challenges.  *See* LoopNet Br. at 5.

These CoStar advertisements cite as their source a quarterly study that CoStar commissioned from comScore, which is referenced in the ads as "Q4 07 comScore Data, CoStar Custom Analysis."  That Custom Analysis measured total traffic to CoStar in the fourth quarter of 2007 as consisting of 659,921 unique visitors.  It also found that only 34% of those unique visitors also visited www.loopnet.com, i.e., 66% of the CoStar visitors were not also on LoopNet.  Applying that percentage to the total number of unique visitors to the CoStar website yields a figure of 435,548.  In other words, there are more than 400,000 individuals on CoStar that "you won't find on LoopNet."[2]  (Kimball Decl. ¶ 12).

This claim is, if anything, highly conservative.  As discussed above, comScore data understates the number of visitors to the CoStar website.  CoStar is in possession of more accurate data from Omniture.  In Q4 2007, the same period analyzed by comScore, the Omniture data showed 1,039,290 unique visitors to the CoStar website.  Applying the percentage from the Custom Analysis to the more accurate total unique visitor numbers from Omniture would have yielded a total of 685,931 prospects "you won't find on LoopNet."  But CoStar took a conservative approach and applied that percentage only to comScore's less inclusive count.  (*Id.* ¶ 13).

CoStar's claim is also supported by another comScore study, an off-the-shelf "cross visitation analysis" that LoopNet itself attaches to its papers.  *See* LoopNet Ex. D.  That

---

[2] CoStar is not attaching this study or other non-public documents hereto because a protective order has not yet been entered in this case.  CoStar anticipates that it will submit copies of these supporting documents at or prior to the preliminary injunction hearing.

study shows that in the Quarter ending December 2007 the number of visitors to CoStar's website that did not also visit LoopNet's website totaled 432,039.  In other words, the very data on which LoopNet relies demonstrate that more than 400,000 unique individuals visited the CoStar website in this period but did not also visit LoopNet's website – precisely what is claimed in CoStar's ads.  (Kimball Decl. ¶ 14).

       LoopNet next complains that the Custom Analysis was created before the launch of Showcase.  This is irrelevant.  As described above, there is only one CoStar website, which includes Showcase.  CoStar's ads do not suggest that there are over 400,000 prospects visiting Showcase – as opposed to www.costar.com – that do not use LoopNet.  Rather, CoStar's ads state clearly that "your listings can be seen by" the 400,000 prospects who visit CoStar's website, which is where Showcase is housed.  For example, LoopNet Ex. H, one of the challenged ads containing this claim, clearly establishes that traffic to the CoStar.com *website* is the context before setting forth the "400,000 prospects" claim:  "CoStar Showcase offers commercial real estate professionals an exclusive opportunity to advertise their listings on one of the industry's most heavily trafficked websites, CoStar.com."  (*See* LoopNet Ex. H).  Moreover, the number of visitors to CoStar that did not visit LoopNet only grew as the Showcase launch came closer.  Indeed, even the data presented by LoopNet shows that in the first quarter of 2008, the number of visitors who went to CoStar.com but not Loopnet.com *exceeded 600,000*, meaning that CoStar's claims *understated* the size of CoStar.com's unique traffic by 50%.  (Kimball Decl. ¶ 15; LoopNet Ex. D).

       LoopNet also takes issue with CoStar's use of the words "potential prospect" or "prospect" in these ads.  "Prospect" is defined in the Merriam-Webster dictionary as "a *potential* buyer or customer."  *See* Kimball Decl. Exhibit 2 (emphasis added).  That definition accurately

describes the audience on CoStar's website – an audience focused on the commercial real estate market – from the perspective of professionals looking to sell or lease commercial properties. (Kimball Decl. ¶ 16). LoopNet's complaints about these terms are therefore without merit.

LoopNet makes two final arguments in regard to this claim that can be readily dismissed. First, it notes that there are other unique visitors to LoopNet who do not also visit CoStar. This is true but irrelevant. LoopNet is free to use that fact in its advertisements if it chooses to do so; CoStar is neither required to draft nor is it in the business of drafting LoopNet's marketing copy. Second, it complains that "[w]hatever the data shows about the behavior of comScore's panel in Q4'07, CoStar with no basis [sic] to transform that data into a categorical prediction of future behavior or to claim that comScore's historical report was predictive of behavior for all time." (LoopNet Br. at 16). This is a curious argument. CoStar's ads make no claims about the distant future, and do not represent that current traffic is "predictive of behavior for all time." CoStar is simply running advertisements now based on recent data that reflect the composition of its audience. Those ads are truthful and accurate.

### B.    "1.3 Million Unique Visitors Each Quarter"

This statement appears in a variety of CoStar materials. *See* LoopNet Exs. H-J, L, V, W. LoopNet contends that the claim is inaccurate because it is not supported by comScore data. As discussed above, however, comScore is not the only or the most appropriate measure of traffic. This claim is based on the more precise Omniture data from Q1 2008. The prior CoStar ad to which LoopNet points as supposed proof of falsity (*see* LoopNet Ex. G) was based on comScore data, and therefore quoted a less comprehensive figure. The different sources on which the two ads are based are accurately identified in each instance. (Kimball Decl. ¶ 17).

LoopNet also complains about CoStar's use of the term "each quarter," which it contends is misleading because the cited quarter was CoStar's highest. But the statement was

8

true at the time it was made, and CoStar fully expects the overall trend for 2008 to be upward.

Indeed, CoStar is heavily increasing spending on the pay-per-click advertising that drives traffic,

and expects the introduction of Showcase to drive even more traffic to the CoStar website.

(Kimball Decl. ¶ 18).  LoopNet has no proof, as the Lanham Act requires, that the challenged

claim is false.  *See Procter & Gamble Co. v. Chesebrough-Pond's Inc.,* 747 F.2d 114, 119 (2d

Cir. 1984) ("each plaintiff bears the burden of showing that the challenged advertisement is false

and misleading, not merely that it is unsubstantiated by acceptable tests or other proof") (internal

citations omitted); *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,* 938 F.2d 1544, 1549 (2d

Cir. 1991) (same).

      LoopNet next complains about some of the descriptive terms CoStar has used

when talking about this audience.  For example, LoopNet takes issue with the term "qualified

prospects" as used in a CoStar press release.  (*See* LoopNet Ex. X).  That press release states as

follows (emphases added):

> #1 Make Your Listings Available To a Vast New Audience
>
> CoStar Showcase exposes your property listings to the **1.3 million** unique visitors that come to www.CoStar.com, a new marketplace that extends far [sic] the subscribers to CoStar's "professional-grade" subscription-based information products. Better yet, there are **qualified prospects** who are likely very interested in learning of availabilities.

      Again, this is entirely accurate.  The CoStar audience comes from four primary

sources:  pay-per-click advertisements that are carefully calibrated to bring in an audience

focused on commercial real estate; people who directly enter the website address; CoStar's

widely circulated commercial real estate email newsletter CoStar Advisor; and CoStar

Commercial Real Estate News distribution.  This audience is a pool well suited for the goals of

brokers and listers, i.e., "there are qualified prospects" in that audience. (Kimball Decl. ¶¶ 19-20).

LoopNet also complains about another statement about CoStar's audience, which appears on CoStar's Frequently Asked Questions Webpage (LoopNet Ex. K):

> Q. Tell me more about the CoStar Showcase audience. Who will see my listings if I sign up for CoStar Showcase?
>
> A. The CoStar Showcase audience includes anyone with an interest in commercial real estate property listings across the U.S. It includes: brokers, owners, investors, tenants, and principals, among others.

LoopNet contends the word "anyone" here is false because there are people interested in commercial real estate who do not use CoStar's website. (*See* LoopNet Br. at 18). This argument turns on the assumption that the term "anyone" literally means every single person with an interest in commercial real estate property listings. The FAQ statement says no such thing. It simply gives a general description of the types of people who make up the CoStar audience – *i.e.,* "anyone with an interest in commercial real estate property listings" – and then provides specific examples ("brokers, owners, investors, tenants" etc.). (Kimball Decl. ¶¶ 21-22).

LoopNet's contention that the challenged statement is "literally false" ignores the core principle that, in deciding what claims are present in an advertisement, "text must yield to context." *Avis Rent-A-Car System, Inc. v. Hertz Corp*, 782 F.2d 381, 385 (2d Cir. 1986). In *Avis*, for instance, the Second Circuit reversed the district court's finding that the advertising claim that "Hertz has more new cars than Avis has cars" was false even though, in the most literal sense, the statement was untrue: Avis *owned* more total cars than Hertz owned new ones. But in the context of cars available *for rent* – the issue to which the ad was clearly addressed –

the statement was true.  The Court of Appeals ruled that the latter reading was the only one that

mattered, and upheld the claim in the ad.  *Id.*

These principles apply with equal force here.  Only a cynic would read the

statement describing CoStar's audience as "anyone with an interest in commercial real estate

property listings" to include every such person on the planet – effectively changing the word

"anyone" to "everyone."  LoopNet's attack on this claim should be rejected out of hand.

### C.    "86% Are Purchase Decision Makers and Influencers for Their Firm"

LoopNet contends that ads stating the above in relation to visitors to CoStar's

website are false.  (*See* LoopNet Exs. I, N).  They are not.  This claim is based upon a survey that

CoStar conducted of visitors to its website using an online tool called "Zoomerang."

Participation was voluntary and visitors were asked about their role in decision-making for their

firm.  The results were aggregated and summarized, leading to the claim in these ads.  (Kimball

Decl. ¶ 23).

LoopNet also complains that the survey was taken before the Showcase launch.

That is true but irrelevant.  As stated above, the audience at issue is visitors to the CoStar

website.  There is no separate Showcase website.  The cited survey accurately profiles visitors to

that website.  Indeed, as mentioned above, the preamble to the specific figures discussed in these

ads, including the 86% statistic, refers expressly to traffic to "CoStar.com."  (*See* id.)  (Kimball

Decl. ¶ 24).

### D.    "The Website Brokers Prefer 3 to 1"

LoopNet blindly charges that this claim, which appears in a number of CoStar

advertisements (*see* LoopNet Exs. S, I, N), is false.  In fact, the claim is substantiated by a survey

conducted for CoStar by an outside firm called California Survey Research Services (CSRS).

CSRS sampled the 500 largest brokerages in the United States and asked "When searching for

11

commercial real estate on the Internet/Online, which of the following resources do you consider to be the number one resource?"  CoStar, LoopNet, and a number of other minor competitors – all of which have websites that can used to "search[] for commercial real estate" – were among the choices offered to respondents.  Just under 75% of the responders picked CoStar over the competing websites.  (Kimball Decl. ¶ 25).

LoopNet also complains that this survey was conducted prior to the launch of Showcase.  That is true but, again, irrelevant.  There is only one CoStar "website," and brokers prefer it by a large margin over LoopNet.  (Kimball Decl. ¶ 26).  The ad does not say that brokers prefer the Showcase marketing product, as opposed to the CoStar website as a whole.  And even if it did, LoopNet lacks the requisite proof that such a claim would be false.  *See Chesebrough Ponds*, 747 F.2d 114, 118; *McNeil-PPC*, 938 F.2d 1544, 1549.

E.    **"View 900,000 Property Listings Across the US"**

LoopNet complains that the above phrase, which appears in CoStar pay-per-click ads in internet search engines, is false.  (*See* LoopNet Exs. P, Q, R).  It is not.

A buyer running a search in Showcase will get results for properties whose seller or broker had paid an added fee, as well as for properties that have not been "upgraded" to Showcase because the seller or broker chose not to pay the additional fee.  The Showcase listings are fully detailed.  The non-Showcase listings are less detailed, though they still contain key information about lease rates and so on, and an interested purchaser needs to then purchase access to gain additional details.  But regardless of the level of detail, both items are listings.  Indeed, the CoStar website expressly calls them all "listings."  *See* LoopNet Ex. U (screen shot showing results of Showcase free search).  The Showcase listings are those at the top of the page with details, color pictures and links to more information.  The other listings that come from the same search appear below that on the same web page.  (Kimball Decl. ¶¶ 27-28).

LoopNet does the same thing.  www.loopnet.com advertises "Over 595,000 commercial properties For Sale and For Lease," but provides users with *full* listings only for those properties for which sellers paid for greater exposure.  Properties that are not the subject of a premium listing appear in less detail.  *See* Kimball Decl. ¶ 29, Ex. 3 (screen shot from the LoopNet website showing search results).

**F.    Showcase Is "Free" and "Truly Open"**

LoopNet next complains that CoStar is falsely claiming that Showcase is "free" and "truly open" because sellers need to pay a fee before their listings are featured in Showcase.

These claims appear in a CoStar press release (s*ee* LoopNet Ex. X), and their meaning is obvious when the statements are read in context.  The release states that "we have just added a free property search service called CoStar Showcase" and refers to CoStar's "free property search tool."  There is nothing inaccurate about these statements.  Showcase is free to search.[3]  (Kimball Decl. ¶ 31).  No one exposed to the claims in context would think it is free *to advertise* on Showcase, which is the basis of LoopNet's ill-conceived attack.

The same is true of the phrase "truly open," which appears in the following section of the same press release:

> #2 Take Advantage of the First Truly OPEN Marketing Platform for Commercial Real Estate
> Ever notice how other listing websites put up roadblocks before visitors can view your listings? Things like annoying pop-ups requiring registration and ads pushing other products detract from the user's experience. On Showcase, nothing comes between your listing and those using the free property search tool.  No pop-ups, no registration, no sales pitches. Just 'one-click access' to listings that meet their search criteria. And listing broker contact information is readily available on each listing.

---

[3] This is what makes CoStar Showcase different from CoStar's prior listings search service, CoStar Property Professional, which was accessible only to paid subscribers.  A free search on CoStar Showcase pulls up detailed listings of "Showcase" properties as well as less detailed listings for properties not featured on Showcase.  (Kimball Decl. ¶ 31).

13

Again, this is entirely true.  Showcase has no pop-up ads and does not require registration to run searches, which renders it "truly open."  (Kimball Decl. ¶ 32).

G.      "Reach More Prospects" and "Generate More Leads"

LoopNet argues that CoStar's claims that its Showcase product can help property owners reach more prospects and generate more leads are false, in that LoopNet enjoys greater website traffic than CoStar.  (LoopNet Br. at 8).  This argument is based on a misreading of CoStar's ads, which are not comparative in nature and in reality have nothing to do with LoopNet.  The ads simply point out the unassailable truth that sellers can enhance their marketing and access an additional audience for their properties by using Showcase.  Put differently, by expanding their marketing efforts to include Showcase, sellers and brokers can "reach more prospects" and "generate more leads" than if they did not use Showcase.  (Kimball Decl. ¶¶ 33-34).

For example, one of the ads that LoopNet challenges (LoopNet Ex. X) states as follows:

> Simply put, CoStar Showcase enables real estate professionals with available space for lease and property for sale to reach more prospects and generate more leads online, providing additional exposure to the large "general audience" that visits http://www.costar.com/.

There is nothing remotely "false" about this truism, and LoopNet's challenge to this claim is devoid of merit.  (Kimball Decl. ¶ 35).

H.      Descriptions of Showcase

LoopNet's remaining arguments consist of assertions that a variety of other phrases used in CoStar ads to describe Showcase are false.  These include CoStar's claims that Showcase "delivers on [its] promises to provide enhanced property exposure and more qualified lead generation"; that customers find it to be a "compelling and effective solution"; that it has

14

met with an "enthusiastic response"; gives online listings "unmatched exposure"; "offers a number of advantages over other online marketing services"; will "get the deal done faster"; is an "unprecedented way" to market; and that CoStar will "make every effort to ensure the listing information is accurate, up to date and free from mislabeled, outdated or 'dead' listings that clutter other online property search services." LoopNet asserts that none of these claims can possibly be true because its website receives more unique visitors per month than does CoStar's.

        LoopNet's position is once again without merit, as all of CoStar's claims for its Showcase product are accurate and substantiated. Showcase is an important new tool and CoStar has worked hard to create a platform with attributes that are superior to others available in the market. The market response has been very positive and CoStar hears from satisfied customers on a regular basis. CoStar also works hard and devotes substantial resources to ensuring its databases are up to date and accurate. The fact that LoopNet has more unique visitors per month at present has no bearing on the claims made in these ads, which focus on the attributes of the platforms and quality of the audience. (Kimball Decl. ¶¶ 36-37).

        In any event, these claims are non-actionable under the Lanham Act as mere "puffery." *See Time Warner*, 497 F.3d at 159 (non-actionable puffery includes "a general claim of superiority over comparable products that is so vague that it can be understood as nothing more than a mere expression of opinion") *citing Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995). Indeed, numerous courts have found that the same or analogous words and phrases constitute non-actionable puffery. *See, e.g., Cytyc Corp. v. Neuromedical Systems, Inc.,* 12 F.Supp.2d 296, 300 (S.D.N.Y. 1998) (claim of a system that detects cervical cancer and presents cells with "unprecedented clarity" held to be puffery); *In Re Century 21-RE/MAX Real Estate Adv. Claims*, 882 F.Supp. 915, 923 (C.D. Cal. 1994) (claims that broker has "Highest Level of

Customer Satisfaction" held to be puffery because of the many potential meanings of the statements); *Lipton*, 71 F.3d at 474 (2d Cir. 1995) (pledge to provide "thorough" research held to be puffery); *Nikkal Industries, Ltd. v. Salton, Inc.,* 735 F.Supp. 1227, 1234 n.3 (S.D.N.Y. 1990) (citing *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 310-11 (2d Cir. 1972) (claim to be "better than its competitors" "constitute[s] mere 'puffing' and [is] not actionable as false advertising")); *Bologna v. Allstate Ins. Co.,* 138 F.Supp.2d 310, 323 (E.D.N.Y. 2001) (holding that Allstate's claim of "Good Hands" constitutes a "general, subjective [claim] and cannot be proven true or false"); *Oestreicher v. Alienware Corp.*, 544 F.Supp.2d 964, 973 (N.D. Cal. 2008) (applying California False Advertising Law to hold that promising "faster" access to data is "non-actionable puffery").

## II.  COSTAR'S SAFE HARBOR DISCLAIMERS DO NOT CONSTITUTE ADMISSIONS THAT ITS ADVERTISING CLAIMS ARE FALSE

Perhaps because it lacks affirmative proof that any of CoStar's ads are false, LoopNet tries to bootstrap a finding of falsity by arguing that CoStar has conceded as much. Pointing to fine print statements built into CoStar's press releases, LoopNet argues that "CoStar's disclaimers constitute telling admissions that CoStar's advertising claims are bereft of support." (LoopNet Br. at 9).

This argument is a non-starter. The detailed disclaimers in CoStar's press releases are industry standard, and exist solely to invoke the protections of the Private Securities Litigation Reform Act of 1995 ("PSLRA").[4] That statute created a safe harbor for predictions about future performance, which are referred to in securities parlance as "forward-looking statements." The goal of this legislation was to encourage public companies to disclose forward-looking information by protecting them from securities lawsuits if that information did not come

---

[4] *See* PSLRA Pub.L. 104-67, 109 Stat. 737 (1995), codified as amending the Securities Exchange Act of 1934 as 15 U.S.C. §§ 77a-78lll.

to pass. *See* Securities Litigation Reform, H.R. Rep. No. 104 -369, 104th Cong., 1st Sess., at 42-

43 (Nov. 28, 1995) (Joint Explanatory Statement of the Committee of Conference) ("Fear that

inaccurate projections will trigger the filing of securities class action lawsuit[s] has muzzled

corporate management . . . . The Conference Committee has adopted a statutory "safe harbor" to

enhance market efficiency by encouraging companies to disclose forward-looking information").

       The safe harbor defines "forward-looking statement" broadly, including

projections of future financial results, statements of plans and objectives for future operations,

and statements of future economic performance. *See* 15 U.S.C. §§ 77z-s(i)(1). The heart of the

safe harbor is 15 U.S.C. §§ 77z-2(c)(1), which provides in relevant part that a company:

> shall not be liable with respect to any forward-looking statement,
> whether written or oral, if and to the extent that
>
> – (A) the forward-looking statement is
>
> (i) identified as a forward-looking statement, and is accompanied
> by meaningful cautionary statements identifying important factors
> that could cause actual results to differ materially from those in the
> forward-looking statement . . . .

       The requirement of "meaningful cautionary statements" means that "boilerplate

warnings will not suffice." Rather, "[t]he cautionary statements must convey substantive

information about factors that realistically could cause results to differ materially from those

projected in the forward-looking statement, such as, for example, information about the issuer's

business." *See* Joint Explanatory Statement of the Committee of Conference at 43. *See also*

Law of Corp. Offs. & Dirs.: Rts., Duties & Liabs. § 12:8 (2007) (same). Courts have issued

similar warnings about the need for specificity. *See e.g.*, *Asher v. Baxter Intern. Inc.,* 377 F.3d

727, 733-734 (7th Cir. 2004) (reversing dismissal because the cautionary language at issue, while

not boilerplate, was not on its face sufficiently specific); *In re EVCI Colleges Holding Corp.*

*Securities Litigation*, 469 F.Supp.2d 88, 102 (S.D.N.Y. 2006) ("To be meaningful, cautionary

17

language 'must precisely address the substance of the specific statement or omission that is challenged'"); *In re Nortel Networks Corp. Sec. Litigation*, 238 F.Supp.2d 613, 628 (S.D.N.Y. 2003) (same).

Here, CoStar did precisely what the drafters of the PSLRA had in mind. It added specific and detailed cautionary language to forward-looking assessments in press releases. Indeed, CoStar identified every phrase and claim in every press releases that was "forward-looking" and identified how things could change in the future. This is sound practice and certainly provides no foundation for alleging that CoStar is conceding its advertisements are false. CoStar's forward-looking press releases merely state what is obvious – that no one can predict the future with certainty – in specific language designed to invoke the PSLRA's protections against frivolous lawsuits. These securities-law disclaimers in no way detract from the truth of CoStar's advertising claims, which are accurate and fully substantiated.

## III.    THE PARTIES AGREE AS TO THE LAW ON IRREPARABLE HARM

LoopNet cannot establish irreparable harm from false advertising because CoStar has not engaged in any false advertising. It is noteworthy, however, that LoopNet agrees with CoStar that, as between these two parties, irreparable harm from comparative ads – even ads that do not expressly name the other party – can be presumed because "LoopNet and CoStar are the only two entities of any significant size competing in this market." (LoopNet Br. at 22, quoting Florance Decl.). Indeed, according to LoopNet even false *non-comparative* ads will cause the other party irreparable harm in that "LoopNet and CoStar [are] the only two entities competing head-to-head in the relevant market," such that any benefit to one from its advertisements will come at the expense of the other. (LoopNet Br. at 22). Accordingly, the Court can presume irreparable harm on either side if it finds that either party's ads are false or misleading.

18

## CONCLUSION

For the forgoing reasons, the Court should deny LoopNet's motion for a preliminary injunction.

Dated:  July 21, 2008

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: */s/  Steven A. Zalesin*

Steven A. Zalesin (SZ 0901)
Karla G. Sanchez (KS 7247)
Adeel A. Mangi (AM 5322)
1133 Avenue of the Americas
New York, New York 10036
Telephone:  (212) 336-2000
Facsimile:  (212) 336-2222

WILMER CUTLER PICKERING HALE AND DORR LLP
Patrick J. Carome (admitted *pro hac vice*)
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone:  (202) 663-6000
Facsimile:  (202) 663-6363

*Attorneys for Plaintiff CoStar Group, Inc. and*
*CoStar Realty Information, Inc.*

Of counsel:

Christopher Winters, Esq.
CoStar Group, Inc.