Jacques Semmelman (JS 5020)
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178-0061
Tel: 212-696-6000
Fax: 212-697-1559
*Attorneys for Defendant and Counterclaim Plaintiff LoopNet, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

COSTAR GROUP, INC.,
         Plaintiff,

      v.

LOOPNET, INC.,

         Defendant and
         Counter-Plaintiff

:   No. 08-CV-1156 (GBD) (GWG)

-------------------------------------------------------------------- X

LOOPNET, INC.,
         Counterclaim
         Plaintiff,

      v.

COSTAR GROUP, INC., and COSTAR
REALTY INFORMATION, INC.,

         Counterclaim
         Defendants.

-------------------------------------------------------------------- X

## LOOPNET'S MEMORANDUM OF LAW IN OPPOSITION TO COSTAR'S MOTION FOR A PRELIMINARY INJUNCTION

# Table of Contents

Page #

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND TO THIS MOTION ................................................................. 1

ARGUMENT ................................................................................................................................ 5

I.    CoStar Has Not Met The Standard For Issuance Of A Preliminary Injunction ................ 5

    A.    CoStar Is Not Likely To Succeed On The Merits Of Its Claim .................................... 5

        1.    LoopNet's Advertising is Truthful ................................................................. 6

            (a)    LoopNet's Statements About Its Registered Members Are True ......................... 6

            (b)    LoopNet's Statements About Its Monthly Unique Visitors Are True ................ 9

            (c)    LoopNet's Statements About Traffic On Its Partner Websites Is True ............. 10

            (d)    LoopNet's Statement About Having The Largest Database Was True
                  When Made, And It Is Still True With Respect to Showcase ............................ 12

        2.    CoStar's Claim That LoopNet's Advertising Is Misleading Is Defective As
            A Matter of Law ........................................................................................... 13

        3.    CoStar Is Not Likely To Prevail With Respect To Statements That Are Not
            Part Of LoopNet's Advertising ...................................................................... 16

            (a)    CoStar Is Not Likely To Prevail With Respect To A Single Statement Of
                  Opinion That Is Not Part Of Any Advertisement ........................................... 16

            (b)    CoStar Is Not Likely To Prevail With Respect To Statements That Have
                  Been Superseded, Mooting Any Claimed Need For Preliminary Relief .......... 16

    B.    CoStar Has Not Met Its Burden of Showing That It Will Suffer Irreparable
        Harm If Its Motion For A Preliminary Injunction Is Denied ................................ 17

        1.    CoStar's Delay In Moving For A Preliminary Injunction Warrants A Finding
            That It Will Not Suffer Irreparable Harm If The Motion Is Denied ..................... 17

        2.    CoStar's Recent Launch Of Its Showcase Product Does Not Excuse Its
            Delay In Seeking A Preliminary Injunction ...................................................... 18

        3.    Many Of The Challenged Claims Have Been Made By LoopNet For Several
            Years ............................................................................................................ 21

            (a)    Database Size Claim Is Not New ................................................................. 21

            (b)    Registered Member Claims Are Not New ..................................................... 21

            (c)    Unique Visitor Counts Are Not New ............................................................ 22

        4.    There Is No "Changed Marketplace" To Justify The Revival Of Costar's
            Claims ......................................................................................................... 23

CONCLUSION ......................................................................................................................... 24

## Table of Authorities

**Page #**

**Cases**

*Avis Rent A Car System, Inc. v. Hertz Corp.*,
    782 F.2d 381 (2d Cir. 1986)............................................................................ 6

*Bourne Co. v. Tower Records, Inc.*,
    976 F.2d 99 (2d Cir. 1992)................................................................ 19, 20, 23

*Citibank, N.A. v. Citytrust*,
    756 F.2d 273 (2d Cir. 1985)............................................................... 17, 18, 19

*Doninger v. Niehoff*,
    527 F.3d 41 (2d Cir. 2008)............................................................................ 5

*Gear, Inc. v. L.A. Gear Cal., Inc.*,
    637 F. Supp. 1323 (S.D.N.Y. 1986)............................................................ 19, 20

*Johnson & Johnson Merck Consumer Pharm. Co. v. SmithKline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992)......................................................................... 13

*Le Sportsac, Inc. v. Dockside Research, Inc.*,
    478 F. Supp. 602 (S.D.N.Y. 1979) ................................................................ 18

*Majorica, S.A. v. R.H. Macy & Co., Inc.*,
    762 F.2d 7 (2d Cir. 1985)............................................................................ 17

*Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*,
    960 F.2d 294 (2d Cir. 1992)......................................................................... 13

*National Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997)......................................................................... 10

*Procter & Gamble Co. v. Chesebrough-Pond's Inc.*,
    747 F.2d 114 (2d Cir. 1984)......................................................................... 13

*Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.*,
    926 F.2d 134 (2d Cir. 1991)......................................................................... 15

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
    Consumer Pharm. Co.*,
    906 F. Supp. 178 (S.D.N.Y. 1995) ........................................................... 13, 15

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck
    Consumer Pharm. Co.*,
    No. 01 Civ. 2775 (DAB), 2001 WL 588846 (S.D.N.Y. June 1, 2001)........................... 14

*Time Warner Cable , Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007)........................................................................ 7, 8

*Tough Traveler, Ltd. v. Outbound Prods.*,
    60 F.3d 964 (2d Cir. 1995)....................................................................... 17, 18

## PRELIMINARY STATEMENT

Defendant and Counterclaim-Plaintiff LoopNet, Inc. ("LoopNet") respectfully submits this Memorandum of Law in opposition to CoStar Group, Inc.'s ("CoStar") Motion for a Preliminary Injunction. CoStar's motion should be denied because it can establish neither likelihood of success on the merits nor irreparable harm.

CoStar claims that certain statements in LoopNet's advertisements and on LoopNet.com are literally false. They are not. Whether read in isolation or in context (as the Second Circuit mandates they must be), the statements are true. CoStar, moreover, presents not a shred of competent evidence that the statements are misleading to consumers. Despite the fact that the allegedly false statements have been on LoopNet's website *for years* in identical or substantially similar form, there is no evidence of any actual consumer confusion, and CoStar has failed to submit a consumer survey. For these reasons and others, CoStar is not likely to prevail on the merits, and its motion should be denied.

CoStar also cannot prove irreparable harm. To the contrary, the evidence shows that CoStar has not been irreparably harmed. CoStar sat idly for years in the face of identical or similar statements, until this past February, when it filed a Complaint based on many of the statements that it now claims warrant preliminary relief, but in which CoStar did not even recite a boilerplate request for a preliminary injunction, let alone move for one. Whether CoStar's delay is measured over the course of the years it took no action, or merely the many months it pursued this suit without seeking a preliminary injunction, CoStar's delay rebuts any suggestion that CoStar is suffering irreparable harm. For that further reason, CoStar's motion should be denied.

## FACTUAL BACKGROUND TO THIS MOTION

LoopNet and CoStar are two leading providers of on-line commercial real estate information services. (CoStar's 6/20/08 Mem. In Support of Plaintiff's Motion For A

Preliminary Injunction (hereinafter "CoStar Mem.") 19; Florance Decl. ¶ 19).)[1]  Through their

respective websites, both companies provide multiple-listing style services for commercial real

estate listings; LoopNet and CoStar have been in direct competition for years.[2]  (Florance Decl.

¶¶ 8–9.)  LoopNet's listings, however, are exposed to a much larger audience than CoStar's.

LoopNet's website, for example, is much more heavily trafficked than CoStar's.  Using the

recognized measure of their respective unique monthly visitors as determined by comScore (an

independent service both parties use) LoopNet typically enjoys at least 300% to 500% the

monthly traffic of CoStar—and in some months as much as 800%.  (Greenman Decl. ¶¶ 4-7;

Exs. A-D.)  LoopNet Premium listings have the further advantage of being searchable via major

search engines, such as Google and Yahoo!, whereas CoStar listings historically could only be

searched by CoStar's paid subscribers.  Through a feature called "Showcase,"[3] LoopNet,

moreover, exposes LoopNet Premium listings on over one hundred newspaper websites

(including that of the New York Times) with which it has exclusive relationships.  (Greenman

Decl. ¶ 3.)  According to comScore, these newspaper websites expose LoopNet listings to a

monthly aggregate of 18 million additional unique visitors.  (Greenman Decl. ¶ 33.)

　　　　Beginning at least 18 months ago, in an evident attempt to imitate more closely

LoopNet's successful listing product, CoStar undertook a significant product redesign it would

ultimately launch under the name "CoStar Showcase." (Ex. L; Florance Decl. ¶ 10.)  The public

---

[1] Citations in the form "Ex. __" are to the exhibits submitted in support of LoopNet's motion.  Exhibits A through K are annexed to the July 21, 2008 Declaration of Jason Greenman, LoopNet's Senior Vice President, Corporate Development.  Exhibits L through GG are annexed to the July 21, 2008 Declaration of Raymond LaMagna, a LoopNet attorney.  Citations to the "Florance Decl." are to the June 19, 2008 Declaration of Andrew C. Florance, CoStar's CEO, submitted in support of CoStar's motion.

[2] To build up its directly competitive listings service, scores of CoStar employees set up LoopNet accounts so that they could log onto LoopNet's password protected areas where they would copy LoopNet listings en masse. LoopNet sued CoStar to halt this copying.  That suit resulted in a settlement in which CoStar undertook to cease its unlawful copying.  However, last year, LoopNet discovered that CoStar employees were copying LoopNet listings, now from the non-password protected areas of LoopNet.com.  LoopNet initiated suit in the California Superior Court to stop CoStar's unlawful copying.  *LoopNet, Inc. v. CoStar, Inc.,* Cal. Sup. Ct., Case No. BC 380863.  The instant suit, a tactical second front, was initiated by CoStar two-and-a-half months later, in a forum in which neither party is headquartered and the relevant events did not transpire.

[3] Not to be confused with the later-in-time CoStar "Showcase" product featured so prominently in CoStar's motion papers.  CoStar's parasitic and confusing use of "Showcase" to describe similar services is the subject of one

record reveals that the planning for CoStar Showcase was already underway no later than

*January 2007*, when CoStar filed an "intent to use" application for "CoStar Showcase" with the

U.S. Trademark Office. (Ex. L.) And by October 2007, CoStar Showcase was sufficiently well

along the road to its release that CoStar publicly announced that it planned to launch the product

some time in the first half of 2008. (Florance Decl. Ex. 1 at 6, 17-18.)

In early 2008, in anticipation of the May launch of Showcase, CoStar undertook a two-

pronged strategy designed to undermine LoopNet's competitive advantage due to its vastly larger

online audience. CoStar began to disseminate false and misleading advertising designed to

deceive consumers about the size and quality of CoStar's online audience, touting supposed (but

non-existent) comparative advantages over LoopNet, and seeking to smear LoopNet by falsely

suggesting that LoopNet's vastly larger online audience was somehow in reality smaller than

CoStar's.[4]

The second prong of CoStar's strategy was bringing this suit to provide it with a platform

for publicly disseminating misinformation about LoopNet's audience size. On February 5, 2008,

CoStar filed this action based on LoopNet's supposed violations of the Lanham Act in

connection with LoopNet's statements over the last several years regarding LoopNet's numbers

of registered members. CoStar immediately began to use the pendency of the suit as occasion to

issue press releases, "news" items, and statements to the public in which CoStar denounced

LoopNet for allegedly overstating its online audience size, the same core issue as to which

CoStar now demands preliminary relief in the instant motion. (Exs. M-O, Q at 5.) On February

21, 2008, speaking about this lawsuit, CoStar's CEO emphasized the direct connection between

this lawsuit and the impending launch of Showcase, set for several months later:

---

of LoopNet's counterclaims. (*See* D.I. 23 at ¶¶ 11-14.)
    [4]CoStar's false advertising campaign is detailed in LoopNet's Amended Counterclaims and LoopNet's co-
pending motion for a preliminary injunction. (*See* D.I. 23.)

> Fundamentally this issue is about whether a direct competitor has made false and misleading claims about the size and character of its service . . . . The market's perception of the relative value of the audience that uses CoStar's information services is critically important to CoStar's ability to generate revenue growth. *This will become even more important as we release our Showcase product*. . . . When people are selecting which web service or product they're going to purchase, they understandably place great weight on which product or service has been most successful in attracting the largest user base for critical mass. . . .

(Ex. Q at 5-6.) (emphasis added).

Significantly, although the original Complaint and the instant motion are premised on the same general theory (that LoopNet overstates its online audience), rely on many of the same statements concerning LoopNet's total number of registered members, and were both supposedly brought to protect CoStar's interests in its competing position in the marketplace (including the imminent Showcase launch), CoStar did not move for a preliminary injunction when it brought suit over five months ago. Indeed, the original Complaint did not contain even a boilerplate request for preliminary relief. CoStar instead proceeded with litigation in the ordinary course.

On May 29, 2008, CoStar brought in a new legal team to take over the role of lead counsel. (D.I. 16.) Apparently dissatisfied with the progress of the suit relative to its Showcase marketing goals, CoStar and its new lawyers adopted the new tack of claiming that a preliminary injunction had suddenly become imperative. On June 20, 2008, CoStar filed the instant motion, followed shortly thereafter with a motion demanding expedited discovery on many of the same issues it had been pursuing for months by the ordinary procedures.

CoStar recognized the obvious problem—that it had to explain away its failure to seek a preliminary injunction in 2007, when it was planning its release of Showcase against a backdrop of years of supposed false advertising by LoopNet about its online audience size, and CoStar's failure to seek a preliminary injunction in this suit during the preceding four-and-a-half months. In an effort to create the appearance that something new had happened, CoStar's new attorneys filed an Amended Complaint and took the position that the May 2008 launch of CoStar

-4-

Showcase and two recent ads by LoopNet somehow changed everything, and that a preliminary injunction had suddenly become legally justified. (CoStar Mem. 1.) However, as detailed below (Section I.B), CoStar's sudden claimed need for preliminary relief based on recent advertisements is a pretext that fails to overcome CoStar's unexcused delay in seeking preliminary injunctive relief last year, or at the very latest when it commenced this suit. Most of the statements at issue on this motion have been on LoopNet's website for years, using identical or substantially similar wording, and indeed, CoStar's February 5, 2008 Complaint quoted many of the statements that are now the target of CoStar's belated motion.

## **ARGUMENT**

## I.     **CoStar Has Not Met The Standard For Issuance Of A Preliminary Injunction**

"A party seeking a preliminary injunction ordinarily must show: (1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008) (citation omitted). CoStar has failed to meet its burden under the first standard, as CoStar is not likely to prevail on the merits, and there is no showing of irreparable harm. CoStar does not even attempt to satisfy the alternative standard.

### A.     CoStar Is Not Likely To Succeed On The Merits Of Its Claim

CoStar's motion is based principally on the erroneous claim that four statements made by LoopNet in advertisements and/or on its website are literally or "facially" false. Alternatively, CoStar argues that LoopNet's statements, while literally true, are nonetheless misleading, an allegation CoStar makes without any extrinsic evidence (such as a survey) showing that any consumer has ever been misled, or is likely to be misled. CoStar is not likely to succeed on either of these claims, as LoopNet's statements are literally true and not misleading.

1.    LoopNet's Advertising is Truthful

In interpreting allegedly false advertising, "fundamental to any task of interpretation is the principle that text must yield to context." *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 386 (2d Cir. 1986). In *Avis*, the Second Circuit emphasized that a court must "consider the advertisement in its entirety and not . . . engage in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." *Id.* LoopNet's statements are true when read in isolation, and true when read in context (as they must be).

(a)    LoopNet's Statements About Its Registered Members Are True

LoopNet periodically updates its website with statistics about its total aggregate number of registered users and its website traffic as measured by the metric of monthly unique visitors to LoopNet.com during a specified recent period. In the statements that are the subject of CoStar's motion, LoopNet stated that in the relevant time frame, it had over 2.75 million "registered members," and that it had 950,000 monthly unique visitors. Both of these statements are truthful. (Greenman Decl. ¶¶ 4-13.)

From the outset of this suit in February, CoStar has pursued an erroneous theory based on the speculation that LoopNet's registered member figure is "merely a cumulative total—dating back to the company's inception in 1995—of each and every instance in which an online user account has been set up on the LoopNet website." (CoStar Mem. 13) This assertion is false. LoopNet's list of registered members is not merely a cumulative total of signups over 13 years, and LoopNet membership requires more than "the submission of a working email address," as CoStar claims. (*Compare* CoStar Mem. 6, *with* Greenman Decl. ¶¶ 19-21.) Contrary to CoStar's unsupported speculation, LoopNet has periodically deleted registered members from its lists based on various factors, and it makes efforts to remove non-human or fictitious accounts. (Greenman Decl. ¶¶ 20-21.)

LoopNet's advertisements present statistics about LoopNet's total number of registered members in a way that is consistent with the plain, common sense meaning of the words "registered members." CoStar's assertion that LoopNet uses "registered member" as an interchangeable synonym for "active user," is baseless.[5] LoopNet's statements are true even when read in isolation.

CoStar also argues that LoopNet's claims are "false by necessary implication." (CoStar Mem. 15.) An advertisement is considered literally false if its "words and images, considered in context, necessarily imply a false message[.]" *Time Warner Cable , Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007). Under this doctrine, only an "unambiguous" message can be literally false. *Id.* Thus, "if the language or graphic" of the advertisement "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Id.* Here, the context in which LoopNet's statements appear eliminates any possibility of false implication.

CoStar takes the position that the statement in LoopNet's advertising that it has "2.75 million registered members" conveys the "necessary implication" that all 2.75 million members are "current, active users" and that each of the 2.75 million members "is a unique individual who actually uses the LoopNet website." (CoStar Mem. 13, 15). That is, CoStar contends that this is the necessary implication of these statements, and that no other interpretation is reasonably possible.

CoStar's claim fails for three reasons. First, as a matter of ordinary usage, the phrase "registered member" is simply not synonymous with "current, active user." An individual can be a "registered member" of something (for example, a political party, a religious organization, a state bar, a gym, or an online merchant) but not a current, active user or participant. Thus, it

---

[5] CoStar's armchair etymological claim that "registered members" necessarily implies "active use" is furthermore refuted by usage conventions on the Internet, where one readily finds examples of other leading websites that similarly report on cumulative membership or visitors distinct from active users. (LaMagna Decl. ¶¶ 16-23 & Exs. Z-GG (collecting examples).)

is not likely, and certainly not "necessary," that consumers would confuse the phrase "registered members" with "current, active users." (Greenman Decl. ¶¶ 22-25.)

Second, under the false-by-implication doctrine, the Court must evaluate the challenged advertisement "in full context," and "must consider the advertisement in its entirety[.]" *Time Warner*, 497 F.3d at 158. It has been LoopNet's longstanding practice to present information regarding its total number of registered members together with other pertinent information, and in particular, to report LoopNet's unique monthly visitors during a specified recent time period. (Greenman Decl. ¶¶ 11-17.) LoopNet typically reports on its total number of registered members in the *same* advertisements or on the *same* webpage in which it reports the number of unique visitors who use LoopNet's site each month, frequently *in the same or consecutive sentences*. (*See, e.g.*, Exs. E-H.) In fact, every advertisement cited in CoStar's motion papers contains LoopNet's registered member total *reported in tandem with, and as distinct from, LoopNet's number of unique monthly visitors*. (CoStar Mem. 7–9; Florance Decl. ¶¶ 13, 16–17 & Ex. 3 at p. 1; Ex. 4 at p. 2; Ex. 5 at pp. 1, 2; Ex. 10 at pp. 1, 11.) Using LoopNet's recent advertising as an illustration, that advertising provides readers with (at least) two statistics: (1) the number of registered members (most recently, 2.75 million), and (2) the number of unique, monthly users (in Q1 2008, 950,000). (Exs. E, F.) Read in its entirety and in full context, LoopNet's advertising does not imply that the 2.75 million registered members are all current, active users.

Finally, at the very worst, CoStar might contend that there is ambiguity in the advertisements. But under the false-by-implication doctrine, an ambiguous advertisement cannot be literally false. *Time Warner*, 497 F.3d at 158. CoStar's argument fails on this ground as well.[6]

---

[6] In the three cases relied on by CoStar (CoStar Mem. 14-15), the courts issued preliminary injunctions where the challenged statements were unambiguous and could *only* be understood one way. *See SmithKline*

(b)    LoopNet's Statements About
Its Monthly Unique Visitors Are True

The number of "unique visitors" is a commonly used measure of website traffic.

LoopNet obtains information about its unique visitors from various sources, including comScore

and Google Analytics, two widely-used traffic monitoring services

CoStar does not challenge the truth of the primary messages about LoopNet's traffic in

the statements CoStar takes to task—namely that "LoopNet is the most heavily trafficked

commercial real estate website on the Internet," that LoopNet has four times the traffic of any

other listing service, and that LoopNet.com gets more traffic than CoStar.com. (Florance Decl.

¶¶ 13, 15, 16 & Exs. 3, 4 (examples of LoopNet's advertisements referencing traffic).) The fact

is that LoopNet, by all objective measures, has significantly more website traffic than does

CoStar, and CoStar is therefore left to nitpick LoopNet's specific numbers. CoStar's claim of

literal falsity fails, however, for the simple reason that with respect to Q1 2008, LoopNet could

truthfully represent that it had 950,000 unique monthly visitors. Indeed, 950,000 was a

conservative number for that time period, at the low end of the spectrum of what LoopNet could

accurately report. (Greenman Decl. ¶¶ 4-10.)

CoStar's challenge to LoopNet's statements is based on the selective, incomplete

presentation of data from comScore. CoStar fails to provide the Court with whatever comScore

report(s) it has. Instead, it has created a table using incomplete comScore data. (*Compare* Exs.

A-D, *with* Florance Decl. Ex. 18.) Putting aside the evidentiary problems attendant to this

approach, CoStar's claim that comScore data does not support LoopNet's number is simply

untrue. CoStar fails to mention, much less submit, comScore's "Quarterly Site Traffic Report,"

---

*Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.,* 906 F. Supp. 178, 186
(S.D.N.Y. 1995) (comparison of numbers of prescriptions issued could only reasonably be read to imply
prescriptions issued over the same time period); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson &
Johnson-Merck Consumer Pharm. Co.,* 2001 WL 588846, at *13 (S.D.N.Y. June 1, 2001) (advertisement that
disparaged effectiveness of competitor's product necessarily conveyed the false message that advertiser's product's
performance was superior); *Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.,* No. 81 Civ. 731-CSH, 1982 WL 121559, at

for Q1 2008, which reports that during that quarter, LoopNet received 2,877,845 total unique

visitors, or, on average, at least *959,281 unique visitors per month in Q1 2008*.  (Ex. C.)

According to Google Analytics (another source of CoStar traffic data) during Q1 2008, LoopNet

had an average of *over 2 million unique monthly visitors*—more than twice the conservative

estimate LoopNet reported publicly.  (Greenman Decl. ¶¶ 9-10 & Ex. E.)

   Once again, CoStar has failed to take into account the entire mosaic of facts, and it has

seized on just the comScore monthly unique visitor numbers compiled in an exhibit to Mr.

Florance's declaration.  (Florance Decl. Ex. 18.)[7]  But even if one were to use just the numbers

selectively cited by CoStar, in Q1 2008 CoStar received an average of 948,616 monthly unique

visitors, which is 99.854% of the 950,000 stated by LoopNet.  (*Compare* Exs. A, B, *with*

Florance Decl. Ex. 18.)  CoStar's claim of "literal falsity" and "irreparable harm" appears to be

based on this minuscule difference.  But in order to be actionable, a misstatement must be

"material" to a consumer's purchasing decision.  *See National Basketball Ass'n v. Motorola,

Inc.,* 105 F.3d 841, 855 (2d Cir. 1997) (citing cases).  The difference between 948,616 and

950,000 unique monthly visitors is immaterial to a consumer's purchasing decision, and is

therefore not actionable as a matter of law.  More importantly, based upon all of comScore's

reports and the other evidence, the 950,000 figure is not only true but conservative.

<div align="center">

(c)    LoopNet's Statements About
<u>Traffic On Its Partner Websites Is True</u>

</div>

   CoStar claims that LoopNet engages in false and misleading advertising with respect to

its network of partner websites.  (CoStar Mem. 18.)  Again, CoStar is wrong.  LoopNet's

advertising is truthful.

---

*1-2 (S.D.N.Y. June 9, 1982) (comparison of number of professionals who used advertiser's and competitor's product necessarily conveyed the false impression that competitor manufactured that type of product).

[7]  As detailed in LoopNet's co-pending motion to preliminarily enjoin CoStar's false advertising, CoStar's own advertisements cite data from comScore Quarterly Reports and from Omniture, a service similar to Google Analytics.  CoStar's implicit suggestion that it is illegitimate for LoopNet to use anything other than comScore monthly unique data is undercut by CoStar's own conduct.

LoopNet's Showcase (which predates by years CoStar's product with a confusingly similar name) enables a LoopNet Premium Member's listings to be displayed not only at LoopNet.com, but also on LoopNet's extensive and exclusive network of over 100 partner websites. (Greenman Decl. ¶ 3.) Listings are *simultaneously* viewable on LoopNet's website and *also* on LoopNet's partner websites, a subset of which have reported traffic of over 18 million total unique visitors per month. (*Id.* at ¶¶ 28-33 & Exs. J, K.) Visitors to the partner sites need not visit LoopNet.com to view a listing—*the listings are available directly at the partner site.*[8] (*Id.*)

LoopNet advertises that its customers' listings can be exposed on LoopNet's own site, which "doesn't include the traffic from our exclusive network of newspaper web site partners which generates more than 18 million unique visitors each month." (CoStar Mem. 8; Florance Decl. Ex. 3.) This statement is true. Indeed, it is a conservative statement that is based on the additional traffic to just four of the over one hundred LoopNet partner sites. (Greenman Decl. ¶ 33.)

CoStar's motion papers reflect, at the very least, a failure by CoStar to investigate how LoopNet's partner listings work. CoStar incorrectly describes these listings as "referrals" to LoopNet's website. (CoStar Mem. 3, 9, 18; Florance Decl. ¶ 33.) They are not referrals. Visitors to partner websites are able to view LoopNet listings directly on those sites, without ever coming to, or being directed to, LoopNet.com. (Greenman Decl. ¶¶ 28-32 & Exs. J, K.)

CoStar distorts the words used by LoopNet, claiming that LoopNet advertises that traffic from these partner sites "receives" or "adds another" 18 million visitors to LoopNet's monthly traffic. (CoStar Mem. 18; Florance Decl. ¶ 34.) *LoopNet never makes any such statement.* (Florance Decl. Ex. 3; Greenman Decl. ¶¶ 34-35.) LoopNet's advertising does not include the

---

[8] There are two exceptions to this arrangement, LoopNet's partnership with the Wall Street Journal's online Real Estate Journal, and LoopNet's partnership with Bizspace.com. (Greenman Decl. ¶ 29.)

words "receives" or "adds" in relation to the 18 million number. CoStar's improper attempt to embellish its baseless claim by attributing to LoopNet words that LoopNet does not use should be rejected.

<div style="margin-left: 2em;">

(d)    LoopNet's Statement About Having The Largest Database Was True When Made, And It Is Still True With Respect to Showcase

</div>

CoStar also seeks a preliminary injunction with respect to a statement that LoopNet first made in 2002 and no longer makes. (*Compare* CoStar Mem. 18, *with* Greenman Decl. ¶¶ 36-37.) The statement is that LoopNet offers the "largest database of commercial listings." This claim fails for several reasons. First, this statement does not come from a recent comparative advertisement concerning Showcase. CoStar asserts that "LoopNet has also *begun* to advertise that it offers 'the largest database of commercial listings.'" (CoStar Mem. 3) (emphasis added). But this characterization is misleading. LoopNet has not just "begun" to make that statement; LoopNet posted that statement to its website's FAQ page in 2002. (Greenman Decl. ¶.)

At the time the statement was posted in 2002, it was true. Assuming, arguendo, that CoStar were correct that LoopNet's claim to have the "largest database of listings" is part of comparative advertising with respect to Showcase (CoStar Mem. 10), CoStar has not shown it to be false. CoStar claims that its subscription-based, for-pay listings database is now larger than LoopNet's. (CoStar Mem. 18) But CoStar has offered no evidence that CoStar's Showcase, which contains only a *fraction* of CoStar's overall listings database, is larger than LoopNet's. If this is comparative advertising, it is literally true. (Greenman Dec. ¶ 38.)

<p style="text-align: center;">*    *    *</p>

In sum, LoopNet's statements about its registered members, unique monthly visitors, and partner websites and database size relative to Showcase are true. CoStar has not met its burden of showing a likelihood of success on the merits.

<p style="text-align: center;">-12-</p>

2.    CoStar's Claim That LoopNet's Advertising
Is Misleading Is Defective As A Matter of Law

CoStar has not shown that LoopNet's statements are facially false.  The statements in question are true or, at a minimum, susceptible to multiple meanings.  CoStar accordingly argues alternatively that LoopNet's statements are misleading.  But CoStar cannot establish that LoopNet's statements are misleading absent a showing that there is actual consumer confusion. *See, e.g.*, *Procter & Gamble Co. v. Chesebrough-Pond's Inc.*, 747 F.2d 114, 118, 119 (2d Cir. 1984).  CoStar makes no such showing.  Its claims that LoopNet's statements are misleading therefore fail as a matter of law.

Determining whether a truthful advertisement is misleading is a question that depends on the meaning attributed to the advertisement by the person to whom it is addressed.  *See Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992).  Typically, a plaintiff seeking to demonstrate the existence of actual confusion does so by means of a consumer survey.  *See Johnson & Johnson Merck Consumer Pharm. Co. v. SmithKline Beecham Corp.*, 960 F.2d 294, 297-98 (2d Cir. 1992) (absent literal falsity, plaintiff "*must* demonstrate, by *extrinsic evidence*, that the challenged commercials tend to mislead or confuse customers . . . the success of a plaintiff's implied falsity claim usually turns on the persuasiveness of a consumer survey.")  (emphasis added).  Notably, in the authorities cited by CoStar (CoStar Mem. 14-15), the adjudication of whether an advertisement was misleading turned on the presence of a reliable consumer survey, or plaintiff's failure to provide one.  *See SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 906 F. Supp. 178, 185 (S.D.N.Y. 1995) (plaintiff "provided three consumer surveys to this Court to substantiate their allegations."); *SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, No. 01 Civ. 2775 (DAB), 2001 WL 588846 at *12

(S.D.N.Y. June 1, 2001) ("Without a persuasive consumer survey, J & J Merck's claim as to any implied falsity necessarily fails.").

CoStar has failed to adduce any evidence of actual consumer confusion. Notwithstanding the fact many of the statements at issue have been on LoopNet.com for *years*, CoStar has not submitted a survey to establish that any of LoopNet's statements misled consumers. Indeed, CoStar has not submitted a scrap of competent evidence of *consumer* confusion.[9]

CoStar's claim that it is misleading for LoopNet to report on unique visitors, as not every visitor comes to LoopNet.com to search for property listings, is belied by CoStar's own advertising for Showcase. Not every unique visitor to CoStar.com searches property listings, yet CoStar's advertisements for Showcase all use unique visitor numbers as relevant information about the audience for CoStar Showcase listings. (D.I. 31 at Exs. H-J, L-O.) It is disingenuous for CoStar to suggest that when CoStar uses monthly unique visitors the public understands that not all visitors search property listings, but that the public does not apply the same understanding to LoopNet's monthly visitor numbers, and rather becomes confused.

CoStar's claim that LoopNet's statement about traffic on LoopNet.com and traffic on partners' websites is misleading is similarly unmoored from any connection with facts about what LoopNet actually says, and any evidence of how LoopNet's words are actually understood. CoStar simply asserts that LoopNet "suggest[s] that its partnerships with online newspapers result in its ads being seen by another '18 million' people every month." (CoStar Mem. 18.) CoStar's argument fails for the simple reason that LoopNet never implies that *all* 18 million visitors to partner sites are somehow directed to LoopNet's site. Indeed, considering that LoopNet's advertising reports having 2.75 million registered members and (in Q1 2008) 950,000

---

[9] CoStar's evidence of the purported confusion between "registered members" and "active users" consists of the incompetent opinion testimony of CoStar's CEO regarding the supposed confusion he detects in a single comment made by one stock analyst. (CoStar Mem. 5.) Putting aside the multiple evidentiary infirmities arising from CoStar's attempt to prove the confusion of a stock analyst through the interpretation of his comments by the testimony of CoStar's CEO, a stock analyst is *not a consumer*. The confusion of a stock analyst (assuming such

-14-

unique monthly visitors (Florance Decl. Ex. 3), there is no likelihood that a consumer will somehow believe that LoopNet actually receives *18 million* visitors.  Not surprisingly, CoStar offers no evidence of such confusion.

Finally, LoopNet offers its customers tracking reports on the number of visitors who actually view their listings.  LoopNet's registered members who list with LoopNet therefore have access to detailed information about not just the audience to which their listings are exposed, but how many times their listing(s) come up in search results and are viewed.  This element of LoopNet's service further eliminates any likelihood of confusion.  (Greenman Decl. ¶ 27 & Ex. I.)

In one final attempt to evade its burden of proving consumer confusion to establish that the statements at issue are misleading, CoStar argues that "'where a plaintiff adequately demonstrates that a defendant has intentionally set out to deceive the public,' and the defendant's 'deliberate conduct' in this regard is of an 'egregious nature,' a presumption arises 'that consumers are, in fact, being deceived.'" *Johnson & Johnson*, 960 F.2d at 298 (quoting *Resource Developers, Inc. v. Statue of Liberty-Ellis Island Foundation, Inc.,* 926 F.2d 134, 140, 17 (2d Cir. 1991)).  However, CoStar has not offered a shred of evidence that would establish that LoopNet "intentionally set out to deceive the public," much less that LoopNet's "deliberate conduct" is of an "egregious nature."

In sum, Given CoStar's failure to adduce survey or other extrinsic evidence that LoopNet's statements are misleading, and the complete absence of any evidence that LoopNet acted with an "egregious" and "deliberate" intent to deceive, CoStar's claim that LoopNet's advertisements are actionably misleading fails as a matter of law

---

confusion occurred) is not a substitute for the necessary showing of *consumer* confusion.

3.    CoStar Is Not Likely To Prevail With Respect To
      Statements That Are Not Part Of LoopNet's Advertising

   (a)    CoStar Is Not Likely To Prevail With Respect To A Single
          Statement Of Opinion That Is Not Part Of Any Advertisement

CoStar alleges that part and parcel of LoopNet's advertising is the claim that CoStar has "no marketing audience," which supposedly has "been repeated by LoopNet in a variety of advertising and promotional materials." (CoStar Mem. 6.)  This is a fabrication.  Not a single piece of LoopNet's advertising states that CoStar has "no marketing audience."  This statement is not on LoopNet's website, nor is it in LoopNet's print ads.  (Greenman Decl. ¶ 39.)  The citation provided by CoStar points to a statement of opinion by LoopNet's CEO at a private investors' conference.  This is not an advertisement, and CoStar presents no authority that this single statement of opinion in a non-public forum is even theoretically actionable under the Lanham Act.

In any event, CoStar adduces no evidence that this statement of non-actionable opinion was not true when it was made.  CoStar's CEO admits that CoStar only entered the market for "online marketing of commercial real estate listings" on May 15, with the launch of Showcase.  (Florance Decl. ¶ 9.)  It should hardly come as a surprise that prior to that, CoStar did not have a marketing audience.  In sum, the isolated statement by LoopNet's CEO to private investors was true when made, is not actionable, and certainly provides no basis for a preliminary injunction.

   (b)    CoStar Is Not Likely To Prevail With
          Respect To Statements That Have Been Superseded,
          Mooting Any Claimed Need For Preliminary Relief

The outdated FAQ page containing the 2002 statement about LoopNet having the largest database was a vestigial page superseded by another FAQ page that did not contain that statement.  The vestigial older version of the page, which was no longer linked to LoopNet's home page, was removed before CoStar even filed its Amended Complaint.  (Greenman Decl. ¶ 36.)

-16-

CoStar asserts that this "largest database" statement can be found on a webpage that is "accessible through" a LoopNet address. (Florance Decl. ¶ 18.) But the webpage to which CoStar refers is from a non-party source, http://server.iad.liveperson.net. Once LoopNet became aware of the non-party source of this statement, LoopNet contacted that party and arranged for the sentence in question to be removed. (Greenman Decl. ¶ 37.)

As a result, CoStar's claim about this statement is moot.

With regard to LoopNet's Q1 2008 reporting of 950,000 monthly unique visitors, while that number was true at the time (*see* Section I.A.1.b), it has been superseded by more recent numbers and LoopNet therefore no longer references the 950,000 number in any of its advertising. (Greenman Decl. ¶ 40.) LoopNet's current website and advertising report that, in 2008, LoopNet had "920,000 average monthly unique visitors." (*See, e.g.*, Ex. E.) This correctly sets forth the conservative numbers in comScore's reports. (Ex. B (reporting 921,486 average monthly visitors from January to May 2008).)

> B.    CoStar Has Not Met Its Burden of Showing That It Will Suffer
>        Irreparable Harm If Its Motion For A Preliminary Injunction Is Denied

>        1.    CoStar's Delay In Moving For A Preliminary Injunction Warrants A
>               Finding That It Will Not Suffer Irreparable Harm If The Motion Is Denied

A preliminary injunction may be granted where "there is an *urgent need for speedy action* to protect the plaintiffs' rights." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985) (emphasis added). Thus, "[s]ignificant delay in applying for injunctive relief . . . tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction." *Id.* "Lack of diligence, standing alone, may . . . preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm[.]" *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7 (2d Cir. 1985); *see also Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995) ("[A]ny such presumption of irreparable harm is inoperative if the plaintiff has delayed

either in bringing suit or in moving for preliminary injunctive relief.") (cites omitted). A delay of weeks—let alone months or, as here, *years*—is a sufficient basis for refusing to grant a preliminary injunction. *See, e.g.*, *Citibank*, 756 F.2d at 276 (delay of more than 10 weeks justifies denial). "[F]ailure to act sooner 'undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Id.* at 277 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y. 1979)); *see also Tough Traveler*, 60 F.3d at 968 (reversing preliminary injunction where plaintiff initiated suit more than nine months after learning of the alleged improper conduct and then waited four more months before moving for a preliminary injunction).

CoStar filed its Complaint on February 5, 2008. The Complaint *itself* references almost all of the statements—and almost all of the categories of statements—that CoStar now seeks to enjoin. CoStar waited years from the time the supposedly offending conduct began, and four-and-a-half months from the inception of this lawsuit before moving for a preliminary injunction. Its delay is fatal to its claim of irreparable harm. CoStar cannot at this late hour demand a preliminary injunction.

<div align="center">2.      CoStar's Recent Launch Of Its Showcase Product Does<br>Not Excuse Its Delay In Seeking A Preliminary Injunction</div>

Despite the fact that LoopNet has been making many of the challenged statements for years, CoStar argues that its recent launch of "CoStar Showcase" entitles it to a preliminary injunction. (CoStar Mem. 2.) CoStar's theory, apparently, is that LoopNet's longstanding practice of advertising information about LoopNet's registered members and unique monthly visitors is now being put to a *new use*—purportedly maligning CoStar Showcase.

To the extent CoStar pretends the LoopNet statements targeted by this motion are new, the evidence shows otherwise; in all but one instance the statements in question have been made for years in the same or similar form. (Greenman Decl. ¶¶ 16-18, 41-43.) Furthermore, CoStar

cannot claim it only recently became aware that LoopNet's statements could affect its launch of CoStar Showcase. As noted, in February, CoStar already was publicly connecting the dots between Showcase and the LoopNet statements. (Exs. M-O, Q.) To evade the consequences of its delay—a finding of no irreparable harm—CoStar is thus forced to the novel proposition that its unilateral product launch transformed LoopNet's existing statements into a new use, resetting the clock for measuring CoStar's delay.

As an initial matter, CoStar cites no authority applying the "new use" doctrine to false advertising claims. The Second Circuit's jurisprudence on the "new use" doctrine in copyright and trademark actions in any event precludes its application in this case. In *Bourne Co. v. Tower Records, Inc.*, 976 F.2d 99 (2d Cir. 1992), the Second Circuit rejected a claim that a purportedly "new" infringing use of a copyrighted work justified issuance of a preliminary injunction. After noting that "even a ten-week delay from discovery of the claimed infringement to commencement of the lawsuit" was alone sufficient to rebut a presumption of irreparable harm and defeat a motion for a preliminary injunction (*id.* at 101 (citing *Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir. 1985)), the court stated that although a "new use" could theoretically provide a basis for a preliminary injunction, "the perceived harm from the new use must be so *qualitatively different* from the harm flowing from the prior uncontested use that the injured party could not *reasonably foresee* the new harm." *Id.* at 102 (adopting the holding of *Gear, Inc. v. L.A. Gear Cal., Inc.*, 637 F. Supp. 1323, 1332–33 (S.D.N.Y. 1986)) (emphasis added).

In *Gear,* the defendant had used the infringing trademark for some time, and its use had been the subject of contentious correspondence between the parties. However, the plaintiff did not file suit until roughly one year after it first learned of the defendant's use of the mark. Only when the defendant then launched a new product line using the same mark did plaintiff file suit. An additional year after filing suit, the plaintiff moved for a preliminary injunction, arguing that the defendant was now engaging in a new use. The court denied the motion, holding that

-19-

> Plaintiff was on notice a year before it filed suit and more than a year before seeking preliminary relief that defendants intended to continue to use [the mark] on various product lines, including one directly competitive with [one of the plaintiff's] line[s]. . . . It is too late in the day for plaintiff now to claim irreparable injury.

637 F. Supp. at 1333.

Even assuming arguendo that a "new use" could (in theory) be established by unilateral action of the plaintiff, and even assuming arguendo that the "new use" doctrine applies in false advertising cases, CoStar still cannot meet the exacting standard set forth in *Bourne*. LoopNet's advertising has not changed in any material way in many months. (*Compare* Florance Decl. Ex. 3 *with* Ex. F.) The alleged harm from the "new use" is not "qualitatively different" from the alleged harm from the longstanding prior use. *Bourne*, 976 F.2d at 102.

Moreover, even if CoStar could somehow resurrect its untimely claim by virtue of its unilateral introduction of its Showcase product, any alleged harm to the Showcase product has been foreseeable for many months. CoStar was already planning its Showcase product launch in January 2007, it announced the project to the public in October 2007, and it began marketing the product in April 2008. (Florance Decl. ¶10.) Throughout the process of planning, announcing, and launching its Showcase product, CoStar knew the relevant facts about LoopNet's advertising statements, and could reasonably anticipate their impact on Showcase. Indeed, CoStar's CEO admitted *on February 21, 2008*, while discussing the recently-filed lawsuit against LoopNet, that LoopNet's registered member total (now a primary subject of CoStar's motion) would "become even more important as we release our Showcase product." (*See* Ex. Q at 6.) Any harm to CoStar Showcase caused by LoopNet's advertising, therefore, was not only "reasonably foresee[able]" but was *actually foreseen* by CoStar months ago. *Bourne*, 976 F.2d at 102.

CoStar's release of its Showcase product cannot be deemed a new use giving CoStar a justification for delaying in seeking preliminary injunctive relief. CoStar's delay vitiates its claim of irreparable harm. CoStar's motion should be denied on that further basis.

3.      Many Of The Challenged Claims Have
        Been Made By LoopNet For Several Years

Recognizing the enormous hurdle it has created for itself through its own lack of

diligence, CoStar mischaracterizes LoopNet's advertising as "new." (CoStar Mem. 1–2.)

CoStar's logic is that, if LoopNet's advertising is "new," CoStar cannot be faulted for not having

acted before. But LoopNet's advertising is not "new." While some specific details (such as the

numbers reported by comScore) will vary, most of the themes and statements that appear in

LoopNet's advertisements today have appeared, in closely similar form, for many months and

even years.

For example, CoStar's papers complain about LoopNet's advertisement that reads, "More

Members. More Traffic. More Partners." (CoStar Mem. 7; Florance Decl. ¶ 19.) While the

specific words have not always been identical, LoopNet has made advertising claims similar to

this for at least the past five years. (Greenman Decl. ¶¶ 17-18 ; Ex. H [1/23/03 LoopNet Press

Release] ("more registered members, more unique visitors to its web site").) CoStar cannot

overcome its failure to act by mischaracterizing as "new" something which is months and even

years old. CoStar had the facts necessary to bring this motion when it filed suit in February.

Indeed, it could have acted last year when it was preparing the launch of CoStar Showcase.

(a)      Database Size Claim Is Not New

CoStar complains about LoopNet's statement that it has the "largest database." As

discussed above, that statement was posted to LoopNet's website years ago.

(b)      Registered Member Claims Are Not New

There is similarly nothing new about LoopNet's statements about its total number of

registered members.

In CoStar's initial Complaint, as well as in press releases and other statements made by

CoStar beginning in February 2008, CoStar stated that the "heart" of LoopNet's "misleading

campaign" was the alleged misuse by LoopNet of its "registered member" total.  (D.I. 1 [CoStar

Complaint] at ¶ 4.)  For example, CoStar has stated that:

- "LoopNet has used [its 'registered member'] statistic in ways that imply that 2.5 million people use LoopNet . . . the actual number of people who use LoopNet is much lower." (Ex. M [2/5/08 CoStar Press Release], *see also* Ex. N [2/13/08 CoStar "News"].)

- CoStar's lawsuit is "about" whether LoopNet's statements about its registered members constituted "false and misleading claims about the size and character of its service." (Ex. Q [2/21/08 Earnings Call Tr.] at 5-6.)

- LoopNet's reporting on its registered member numbers "will become even more important as we [CoStar] release our Showcase product."  (*Id.* at 6.)

- "The heart of the case is this: LoopNet says that it has about 2.6 million 'registered members,' but this number does *not* reflect unique, current users."  (D.I. 13) at 2.)

- "This is a straightforward false advertising case under the Lanham Act," based on LoopNet's "repeated[] . . . false statements about how many people use its site."  (Ex. X [5/9/08 CoStar Letter to Judge Daniels] at 2.)

Yet, it was not until June 20, 2008 that CoStar filed its motion for a preliminary

injunction based upon the *very same* statements that formed the basis of CoStar's original

Complaint.  In support of its motion, CoStar has filed a declaration from its CEO who concedes

that "LoopNet has *for some time*" used its member total in ways CoStar deemed false.  (Florance

Decl. ¶ 22 (emphasis added).)  CoStar's CEO has even cited purported examples *from 2006*.

(*Id.*)  This is not surprising.  *LoopNet has consistently reported its registered member total the

same way for years*.  (Greenman Decl. ¶¶ 11-17, 41-42; Exs. F, H.)

(c)    <u>Unique Visitor Counts Are Not New</u>

In a similar vein, once again trying to overcome the hurdle it has created for itself

through its inactivity, CoStar contends that LoopNet's claim of "950,000" unique monthly

visitors is a focus of LoopNet's purportedly "new comparative ad campaign."  (CoStar Mem.

12.)  But LoopNet has made materially similar statements regarding its unique monthly visitor

traffic for years.  Of course, the numbers change from time to time as the independent data

provider comScore reports new data. (Greenman Decl. ¶¶ 9, 16-17; & Exs. F, H.) CoStar cannot

claim that LoopNet's reference to its monthly unique visitor total is in any sense "new," or, for

that matter "qualitatively different," from reports made repeatedly over the past several *years*.

*Bourne*, 976 F.2d at 102. And LoopNet's ongoing reporting on its unique visitor count was

"reasonably foresee[able]" to Costar. *See id*. Again, there is no reason that CoStar could not

have brought these claims years ago, last year when CoStar was planning Showcase, or at the

very least this past February when CoStar filed its Complaint.

> ### 4.    There Is No "Changed Marketplace"
> ### To Justify The Revival Of Costar's Claims

In a final attempt to inject urgency into CoStar's stale claims, CoStar argues that the

"marketplace alignment fundamentally changed on May 15, 2008, when CoStar launched CoStar

Showcase." (CoStar Mem. 1.)    CoStar's assertion that its product redesign "fundamentally"

altered the marketplace is both untrue and irrelevant. (LaMagna Decl. ¶¶ 8-13; Exs. R-W.) If

(as CoStar claims) LoopNet's statements are false and/or misleading now, they have been false

and/or misleading for a very long time. Because CoStar chose not to take action based on those

statements during all this time, any alleged alteration in the "marketplace alignment" cannot

overcome or excuse CoStar's lack of diligence.

But there has been no alteration in the "marketplace alignment." LoopNet and CoStar

have been fierce competitors for years. In 2005, when CoStar launched an earlier commercial

listing product, "CoStar Commercial MLS," CoStar made a point of announcing to the public

how that product was designed to compete directly with LoopNet. A CoStar press release issued

November 28, 2005, quoted CoStar's CEO Mr. Florance as stating, "We heard what was being

offered by Internet bulletin boards like LoopNet that don't have large, proven research teams like

ours focusing on information quality, and we thought the market deserved a better for-sale listing

product at a better price." (Ex. T at p. 1.) Even before that, in a brief dated October 15, 2003,

CoStar told the U.S. Court of Appeals for the Fourth Circuit that LoopNet "provides commercial real estate information, in direct competition with CoStar." (Ex. Y at p. 2.)  And CoStar's February 5, 2008 Complaint, which pre-dated by three months the official launch of CoStar's "Showcase" product, concedes that "LoopNet competes with CoStar in offering information and marketing services relating to commercial real estate." (D.I. 1 at ¶ 46.)

In sum, nothing changed in May 2008 that provides CoStar any justification for its failure to act with diligence for so many months and years.

<div align="center">**CONCLUSION**</div>

CoStar has failed to meet its burden.  CoStar cannot establish likelihood of success on the merits, as LoopNet's statements are true and not misleading.  CoStar's delay for years before seeking a preliminary injunction (at the very least its months of delay since initiating this suit), rebuts any claim CoStar is suffering irreparable harm.  CoStar's motion should be denied.


Dated:   New York, New York
         July 21, 2008

                                  CURTIS, MALLET-PREVOST,
                                  COLT & MOSLE LLP


                                  By: _____
                                      Jacques Semmelman (JS 5020)
                                      Joshua Brook (JB 4555)
                                      101 Park Avenue
                                      New York, NY  10178-0061
                                      Tel.:  212-696-6000
                                      Fax:  212-697-1559
                                      jsemmelman@curtis.com

                                      *Attorneys for Defendant LoopNet, Inc.*

*Of Counsel:*

Elliot Brown (admitted *pro hac vice*)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067-4276
Tel.:  (310) 277-1010
Fax:  (310) 203-7199
ebrown@irell.com