Steven A. Zalesin
Karla G. Sanchez
Adeel A. Mangi
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Telephone 212-336-2000
Facsimile 212-336-2222

Patrick J. Carome (admitted *pro hac vice*)
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000

*Attorneys for CoStar Group, Inc. and CoStar Realty Information, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| COSTAR GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> LOOPNET, INC., <br><br> Defendant. | Civil Action No. 08-CV 1156 <br><br> **COSTAR'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION** |
| LOOPNET, INC., <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> COSTAR GROUP, INC., and COSTAR REALTY INFORMATION, INC., <br><br> Counterclaim Defendants. | |

**Table of Contents**

**Page**

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT .........................................................................................................................2

I. LOOPNET'S CLAIMS ARE FALSE AND MISLEADING............................................2

    A. LoopNet's Challenged Claims Are False ..............................................................2

        1. "2.75 Million Members"..............................................................................2

        2. "950,000 Unique Visitors Each Month".....................................................4

        3. LoopNet Claims Regarding Website Partnerships......................................5

        4. LoopNet Has Withdrawn its Largest Database Claims ..............................6

    B. LoopNet Has Acted Egregiously ............................................................................6

II. COSTAR WILL BE IRREPARABLY HARMED BY LOOPNET'S
    FALSE ADVERTISING ................................................................................................7

CONCLUSION.....................................................................................................................10

**Table of Authorities**

**Page(s)**

Bourne Co. v. Tower Records, Inc.,
 976 F.2d 99 (2d Cir. 1992)...................................................................................................8n

Citibank, N.A. v. Citytrust,
 756 F.2d 273 (2d Cir. 1985)..............................................................................................8, 9

Gear, Inc. v. L.A. Gear Cal., Inc.,
 637 F. Supp. 1323 (S.D.N.Y. 1986)..................................................................................8n

Majorica, S.A. v. R.H. Macy & Co., Inc.,
 762 F.2d 7 (2d Cir. 1985)..................................................................................................8n

PDK Labs, Inc. v. Friedlander,
 103 F.3d 1105 (2d Cir. 1997).............................................................................................8

Time Warner Cable, Inc. v. DirecTV, Inc.,
 497 F.3d 144 (2d Cir. 2007).............................................................................................7n

Tough Traveler, Ltd. v. Outbound Prods.,
 60 F.3d 964 (2d Cir. 1995)...............................................................................................8n

**PRELIMINARY STATEMENT**

LoopNet carefully ignores what it cannot answer. Nowhere in its 136-page opposition does LoopNet defend its advertising claims that listings on LoopNet are "seen by" or "viewable to" 2.75 million "members." Nor does LoopNet discuss its seeding of the market with deliberate conflation of "registered members" and actual users. Moreover, despite a brief that is ostensibly dedicated to defending its use of the "registered members" metric, LoopNet never explain how it calculates or updates that tally. This deliberate silence is telling.

LoopNet instead takes a different tack. It argues that the challenged claims have been in use for years and therefore cannot support an injunction now. But the irreparable harm threatened here is to CoStar Showcase ("Showcase"), a product that was first launched on May 15, 2008. The fact that LoopNet's new Showcase-directed comparative advertising campaign builds upon a historic foundation of falsity is a reason to grant CoStar's motion, not to deny it.

LoopNet fares no better with its other defenses. It admits that its claim to 950,000 unique visitors "each month" is false because the cited data does not support it. And LoopNet's Senior Vice President admits in his supporting declaration that LoopNet's "partnerships" with online newspaper websites generate no incremental traffic to its own website, which renders its claims regarding "traffic from" those partnerships equally false. Finally, LoopNet sacrifices much ink to defend its claim to "the largest database of commercial listings" without mentioning that it has already agreed to withdraw this claim in response to CoStar's motion.

This nimble gamesmanship has gone on for long enough. LoopNet's false advertising should be enjoined.

## ARGUMENT

CoStar's motion focused on four categories of LoopNet claims: (1) those regarding its 2.75 million "members"; (2) its "950,000 unique visitors each month"; (3) traffic from its partner newspaper websites; and (4) its claimed "largest database of commercial listings." LoopNet's opposition confirms the falsity of the first three claims, and LoopNet has already withdrawn the fourth.

## I.   LOOPNET'S CLAIMS ARE FALSE AND MISLEADING

### A.   LoopNet's Challenged Claims Are False

#### 1.   "2.75 Million Members"

LoopNet makes three arguments in defense of its "registered members" claims: that LoopNet's ads present its membership count alongside other statistics that render its meaning clear; that LoopNet has "periodically deleted registered members from its lists based on various factors"; and that LoopNet's ads are at worst ambiguous and therefore cannot be false under the Lanham Act.[1]  These arguments are all unavailing.

LoopNet first argues that "every advertisement cited in CoStar's motion papers contains LoopNet's registered member total reported in tandem with, and as distinct from, LoopNet's number of unique monthly visitors." (LoopNet Opp'n Br. at 8).  In other words, according to LoopNet, "registered members" cannot be synonymous with active users because LoopNet uses a different shorthand – "monthly visitors" – for this purpose, and because the two terms always appear together.  This logic is untenable.  When the two statistics do appear together, they impart the false belief that LoopNet has 2.75 million active users, 950,000 of whom visit the website in any given month.  Moreover, the claim that these statistics are always

---

[1] *See* LoopNet's Memorandum of Law in Opposition to CoStar's Motion for a Preliminary Injunction ("LoopNet Opp'n Br.") at 6-8.

2

1899977v.4

reported "in tandem" is inaccurate. The most obvious example is the banner at the top of LoopNet's home page (emphasis added):



That banner says nothing about monthly visitors. Instead, that information is buried in tiny font at the very bottom of the webpage.[2] And, as LoopNet admits, the "registered member" metric also appears in isolation each time a user logs into the website. (Greenman Decl. ¶ 15).

LoopNet's next argument – that it has "periodically" deleted some members based on "various factors" – is important because it shows that even LoopNet acknowledges that keeping non-active users on the list is inappropriate. But what is notably absent from LoopNet's argument is a factual assertion – based on evidence clearly within its possession – that 2.75 million persons are actual members. LoopNet's failure to make a full and detailed accounting of its methodology for calculating and updating "registered members" is telling.

As a final bid to avoid an injunction, LoopNet argues that its ads are "ambiguous" and therefore cannot be "false" as a matter of law. This doesn't help LoopNet. There is no ambiguity about LoopNet's claims that listings on its website are "seen by" or "viewable to" 2.75 million "members." These claims are simply false. Moreover, as detailed in CoStar's Amended Complaint and moving papers, LoopNet has purposefully led the market to believe that these registered members are active users of its website. The market has accepted this,

---

[2] See Declaration of Jason Greenman in Opposition to CoStar's Motion for a Preliminary Injunction ("Greenman Decl.") Ex. G.

3

1899977v.4

which is reflected by a multitude of news and analyst reports.[3] In this context, LoopNet's carefully constructed deceptions leave no room for a defense of ambiguity.[4]

### 2. "950,000 Unique Visitors Each Month"

LoopNet's ads claim 950,000 unique visitors "per month" or "each month" by reference to comScore data. CoStar's moving papers exposed the truth: that LoopNet's website only surpassed 950,000 unique visitors in one out of every five months between February 2007 and April 2008 and that each such spike was followed by traffic well below that mark. LoopNet's opposition papers show that trend continued in May 2008 when LoopNet had only 858,040 visitors, which is a level nearly 100,000 visitors below the traffic it claims "each month." (Florance Decl. ¶ 29, Exs. 3-5; Greenman Decl. ¶ 5, Ex. A).

LoopNet responds that various averages it has calculated – all of which depend upon the January 2008 traffic spike after LoopNet was declared "Best Stock for 2008" on a popular investing website (Florance Decl. ¶ 31) – put the number of monthly visitors over or just below 950,000. For example, LoopNet argues that averaging data for the first quarter of 2008 gives a number just over 950,000 per month. But LoopNet is not claiming any sort of

---

[3] *See* Declaration of Andrew C. Florance dated June 19, 2008 ("Florance Decl.") ¶ 26, Exs. 13-17; Amended Complaint at ¶¶ 5, 17-28, 37-46.

[4] LoopNet also notes that other websites report active users separately from other metrics comparable to membership. *See* LoopNet Opp'n Br. at footnote 5. This underscores why LoopNet's ads are false. Unlike those other companies that report total accounts and then explain how many are active, *see e.g.*, LaMagna Decl, ¶ 21, LoopNet loudly advertises its registered members count and conflates it with active users. The other examples LoopNet cites as companies advertising only membership (like LoopNet) are inapposite. Gold's Gym, for example can fairly advertise total members since they are by definition active in that they pay for membership. (*Contra* LaMagna Decl. ¶ 16). Notably, unlike LoopNet, most real estate websites advertise their actual user base and not some amorphous concept of total membership. For example, Xceligent.com advertises "millions of page views each month"; ForSaleByOwner.com tells its visitors "Advertise your home to nearly 2 million monthly visitors"; Realtor.com purports to attract "more than 6.3 million monthly unique users"; and Remax.com and ColdwellBanker.com advertise the number of properties they list, not the internet traffic they attract. *See* http://xceligent.com/About_Ads.aspx; http://www.forsalebyowner.com/; http://www.move.com/company/corporateinfo.aspx; http://www.remax.com/; http://coldwellbanker.com/home/about/president.jsp.

4

"average" in the challenged ads. It is claiming to have 950,000 unique visitors "per month" or "each month." The comScore monthly data prove that is false. LoopNet's only other defense – that it has alternative data from an unexplained "Google Analytics" source – changes nothing. That is not the source cited in these ads and LoopNet has chosen not to rely on that data in its advertisements.

Notably, LoopNet appears to have quietly accepted that the challenged claims are false. As detailed in its opposition papers, its website – as distinct from the print ads at issue here – now claims only "920,000 average monthly unique visitors" and describes the period being averaged. *See* Greeman Decl. ¶ 40, Ex. E.

### 3. LoopNet Claims Regarding Website Partnerships

CoStar's motion challenged LoopNet ads stating that its 950,000 monthly visitor total "doesn't include the traffic from our exclusive network of newspaper web site partners which generates more than 18 million unique visitors each month." (*See* Florance Decl. Ex. 3).

LoopNet now denies that it is claiming that any additional traffic comes via these newspaper partnerships. But that is exactly what the LoopNet ad quoted above says. Moreover, even if LoopNet intends only to point out how many people read newspapers online, that is still deceptive as few of those readers review commercial listings.

LoopNet also states that its "doesn't include traffic from" claim is true because newspaper readers who view LoopNet listings do so on the website of LoopNet's sister company CityFeet via the newspaper websites without being redirected to LoopNet's website. Indeed, it says that "[a] visitor would only come to the LoopNet.com site if, after viewing this listing on this [cityfeet.com] webpage, the visitor decided to examine the comparable listing on LoopNet's website." *See* Greenman Decl. ¶ 29-31. This concession further establishes the falsity of LoopNet's claim because it shows that *there is no traffic* from newspaper websites to LoopNet.

5

If LoopNet wishes to state that individual listings are duplicated on a sister website that online newspaper readers can search, it should do so – but claiming that there is a vast amount of "traffic from" those websites to www.loopnet.com is false.

LoopNet's claims are also false in another respect. Per its declarant Mr. Greenman, there are a few exceptional newspaper websites from which traffic *is* directed to LoopNet's website. One example is the Wall Street Journal's online Real Estate Journal, the logo for which LoopNet displays prominently in ads that make the "doesn't include traffic from" claim. (*See e.g.*, Florance Decl. Ex. 4). In such instances, however, this traffic is counted in comScore's traffic reports, which again renders LoopNet's claims false.

### 4. LoopNet Has Withdrawn its Largest Database Claims

LoopNet claims that its "largest database of commercial listings" claim is a "vestige" "from a non-party source." (*See* Greenman Decl. ¶ 37). In fact, this claim appeared in a "pop up" on the LoopNet website's "Help" section. That pop-up indicated the webpage had been updated as recently as April 30, 2008. Regardless, LoopNet dropped the claim earlier this month in response to LoopNet's motion, which renders this issue moot. (*See* Sanchez Decl. ¶¶ 2-5).

### B. LoopNet Has Acted Egregiously

For the reasons stated above, LoopNet's ads are false and not merely misleading. If the Court finds the ads are merely misleading, however, it can enjoin LoopNet's advertising without regard to a consumer survey because LoopNet has acted egregiously. *See* CoStar Br. at 16-17.

LoopNet counters that "CoStar has not offered a shred of evidence" establishing such egregiousness. (LoopNet Br. at 15). This is a curious claim given that discovery has not yet taken place. But even the public record establishes LoopNet's deceptive intent. This is not,

6

as LoopNet claims, "supposed confusion [detected] in a single comment made by one stock analyst." (LoopNet Br. at 14). Rather it is a pattern of pronouncements by LoopNet executives (using "user" and "member" interchangeable) and carefully phrased advertisements designed to propagate obvious falsehoods (listings are "seen by" or "viewable to" all 2.75 registered members; 950,000 visitors "each month"), the impact of which is reflected in the market. *See e.g.*, Amended Complaint at ¶¶ 5, 17-28, 37-46.[5]

## II.  COSTAR WILL BE IRREPARABLY HARMED BY LOOPNET'S FALSE ADVERTISING

LoopNet argues that a preliminary injunction cannot issue because it has been running similar ads for years and that, at a minimum, CoStar should have taken action when its plans for Showcase first started to coalesce. (LoopNet Opp'n Br. at 17-24).

LoopNet contradicts itself. In its own motion seeking a preliminary injunction against CoStar, LoopNet argues that irreparable harm must be presumed here because readers understand each party's comparative ads to refer to the other party, even where the ads contain no such explicit reference, because CoStar and LoopNet are "the only two entities of any significant size competing in this market." Indeed, LoopNet argues that harm must be presumed even from the parties' non-comparative ads because benefit to one party will necessarily come at the expense of the other.[6]

---

[5] LoopNet claims that a statement by LoopNet's CEO to an investor's conference that CoStar has "no marketing audience" is not advertising. (LoopNet Br. at 16). That is a red herring. This statement is simply one part of LoopNet's conduct, which must be assessed in totality as a measure of egregiousness.

[6] *See* Memorandum of Law In Support of LoopNet's Motion for a Preliminary Injunction at 22-25 citing *Time Warner Cable, Inc. v. DirecTV, Inc.*, 497 F.3d 144 (2d Cir. 2007).

7

LoopNet nonetheless argues for a different result here based upon precedents dealing with trademarks and copyrights.[7] Those cases, however, stand only for the proposition that the owner of an existing property interest in a trademark or copyright must act promptly to protect it when it is first infringed, or risk undermining any later claim that infringement necessitates injunctive relief. These precedents do not bar claims for false advertising simply because thematically similar false advertising occurred before the product threatened with irreparable harm was launched, and before the comparative advertising at issue even occurred. Adopting LoopNet's argument would lead to the absurd result that every company has a duty to act to prevent false advertising in markets it might enter in the future.

In fact, the law is just the opposite. An injunction against false advertising can only be obtained once the party seeking the injunction has a "reasonable interest to be protected" and a "reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising." *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1111 (2d Cir. 1997) (affirming judgment against plaintiff who brought suit before his product had been fully developed and brought to market). *See also Ortho Pharmaceutical Corp., v. Cosprophar,* Inc., 32. F.3d 690, 692 (2d Cir. 1994) (affirming denial of injunction where plaintiff's product had not yet obtained regulatory approval for the indication at issue and was "not obviously in competition" with defendant's product).

The cases cited by LoopNet are not to the contrary. Only one such case even included a Lanham Act false advertising claim, and that was a "kitchen sink" additional claim that was not the focus of the decision. *See Citibank, N.A. v. Citytrust*, 756 F.2d 273 (2d Cir.

---

[7] *See* Loop Opp'n Br. at 17 citing *Majorica, S.A. v. R.H. Macy & Co., Inc.*, 762 F.2d 7 (2d Cir. 1985), *Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995), *Bourne Co. v. Tower Records, Inc.* 976 F.2d 99 (2d Cir. 1992), *Gear, Inc. v. L.A. Gear Cal., Inc.*, 637 F. Supp. 1323 (S.D.N.Y. 1986).

1985). Indeed, in attempting to rely on *Citibank*, LoopNet engaged in disingenuous quote cropping. The following complete quotation emphasizes the language LoopNet omits from its quote (in the first instance using ellipses and in the second without even indicating the omission):

> Significant delay in applying for injunctive relief **in a trademark case** tends to neutralize any presumption that infringement alone will cause irreparable harm pending trial, and such delay alone may justify denial of a preliminary injunction **for trademark infringement**.

*Compare Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 and LoopNet Opp'n Br. at 17.

Of course, undue delay can undermine even a false advertising preliminary injunction motion. But that did not occur here. The "irreparable harm" of which CoStar is complaining is to its Showcase product, which is its most important business initiative for 2008. It is now at a critical juncture where it will either garner marketplace momentum and succeed or it will fail. This market penetration is being impacted by LoopNet's false advertising. (Florance Decl. ¶¶ 39-42). That threat of harm did not exist before LoopNet launched a new comparative advertising campaign targeted at Showcase in connection with the Showcase launch in May 2008. Indeed, LoopNet does not deny that it is running such new ads.[8] CoStar filed this motion promptly upon learning of those ads.

---

[8] *See* Greenman Decl. ¶ 41 ("Exhibits 4 and 5 to Mr. Florance's declaration appear to represent newer advertising formats for LoopNet."). LoopNet also does not dispute that its newspaper partnership based comparative claims are new. LoopNet does point to a single press release from 2003 claiming "more registered members, more unique visitors to its website." (*See* Greenman Decl. Ex. H). But that one stray comparative reference in a different context changes nothing. Showcase did not exist in 2003.

9

## CONCLUSION

For the forgoing reasons, the Court should grant CoStar's motion for a preliminary injunction.

Dated: July 31, 2008

                                      Respectfully submitted,

                                      PATTERSON BELKNAP WEBB & TYLER LLP

                                      By: */s/ Steven A. Zalesin*

                                          Steven A. Zalesin (SZ 0901)
                                          Karla G. Sanchez (KS 7247)
                                          Adeel A. Mangi (AM 5322)
                                      1133 Avenue of the Americas
                                      New York, New York 10036
                                      Telephone:  (212) 336-2000
                                      Facsimile:  (212) 336-2222

                                      WILMER CUTLER PICKERING HALE AND DORR LLP
                                          Patrick J. Carome (admitted *pro hac vice*)
                                      1875 Pennsylvania Avenue, N.W.
                                      Washington, D.C. 20006
                                      Telephone:  (202) 663-6000
                                      Facsimile:  (202) 663-6363

                                      *Attorneys for Plaintiff CoStar Group, Inc.*

Of counsel:

    Christopher Winters, Esq.
    CoStar Group, Inc.